DAVID R. ZARO (BAR NO. 124334)
JOSHUA A. DEL CASTILLO (BAR NO. 239015)
MATTHEW D. PHAM (BAR NO. 287704)
ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone:  (213) 622-5555
Fax:  (213) 620-8816
E-Mail:  dzaro@allenmatkins.com
          jdelcastillo@allenmatkins.com
          mpham@allenmatkins.com

Attorneys for Court-Appointed Receiver
GEOFF WINKLER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>MATTHEW WADE BEASLEY; BEASLEY LAW GROUP PC; JEFFREY J. JUDD; CHRISTOPHER R. HUMPHRIES; J & J CONSULTING SERVICES, INC., an Alaska corporation; J & J CONSULTING SERVICES, INC., a Nevada corporation; J AND J PURCHASING, LLC; SHANE M. JAGER; JASON M. JONGEWARD; DENNY SEYBERT; and ROLAND TANNER,<br><br>　　　　　Defendants. | Case No.  2:22-mc-00123<br><br>**NOTICE OF APPOINTMENT OF RECEIVER (28 U.S.C. § 754)** |

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

4886-5731-3061.1

NOTICE OF APPOINTMENT
OF RECEIVER

1     Pursuant to 28 U.S.C. section 754, receiver Geoff Winkler, appointed by the

2 United States District Court for the District of Nevada in the case entitled *SEC v.*

3 *Matthew Wade Beasley, et al.*, Case No. 2:22-cv-00612-JCM-EJY, hereby files true

4 and correct copies of the following in this district:

5          Exhibit 1.    Complaint; and

6          Exhibit 2.    Order Appointing Receiver.

7

8 Dated:  June 21, 2022                    ALLEN MATKINS LECK GAMBLE
                                          MALLORY & NATSIS LLP
9
                                  By:      */s/Joshua A. Del Castillo*
10                                         _____
                                          JOSHUA A. DEL CASTILLO
11                                        Attorneys for Court-Appointed
                                          Receiver GEOFF WINKLER
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

TRACY S. COMBS (California Bar No. 298664)
Email: combst@sec.gov
CASEY R. FRONK (Illinois Bar No. 6296535)
FronkC@sec.gov
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, UT 84101-1950
Tel.: (801) 524-5796
Fax: (801) 524-3558

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No.: |
| v. | |
| MATTHEW WADE BEASLEY; BEASLEY LAW GROUP PC; JEFFREY J. JUDD; CHRISTOPHER R. HUMPHRIES; J&J CONSULTING SERVICES, INC., an Alaska Corporation; J&J CONSULTING SERVICES, INC., a Nevada Corporation; J AND J PURCHASING LLC; SHANE M. JAGER; JASON M. JONGEWARD; DENNY SEYBERT; and ROLAND TANNER; | **COMPLAINT** |
| Defendants, | |
| THE JUDD IRREVOCABLE TRUST; PAJ CONSULTING INC; BJ HOLDINGS LLC; STIRLING CONSULTING, L.L.C.; CJ INVESTMENTS, LLC; JL2 INVESTMENTS, LLC; ROCKING HORSE PROPERTIES, LLC; TRIPLE THREAT BASKETBALL, LLC; ACAC LLC; ANTHONY MICHAEL ALBERTO, JR.; and MONTY CREW LLC; | |
| Relief Defendants. | |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

## SUMMARY

1.     This case concerns a long-running fraudulent offering of securities perpetrated by Defendants Matthew Wade Beasley, Esq., his law firm Beasley Law Group PC ("Beasley Law Group"), Jeffrey Judd, Christopher Humphries, and three entities that Judd controlled: J&J Consulting Services, Inc. (a Nevada corporation), J&J Consulting Services, Inc. (an Alaska corporation), and J and J Purchasing LLC (unless otherwise noted, collectively, the "J&J Entities"), a scheme for which Judd, Humphries, and Defendants Shane M. Jager, Jason M. Jongeward, Denny Seybert, Roland Tanner, and others acted as promoters.

2.     The scheme worked as follows: from at least 2017 and continuing through March 2022, the J&J Entities offered investments in purported settlement contracts with tort plaintiffs called "purchase agreements." These investments in the so-called "purchase agreements" constituted securities under federal law. Judd, Humphries, and others told investors:

   a.   that they could purchase interests in insurance tort settlements, and that the invested money was used to make advance payments to tort plaintiffs who had reached settlements with insurance companies for tort claims and who were willing to pay a premium to receive a portion of their settlement in advance rather than wait for payment from the insurance companies;

   b.   that investors would receive returns on their investments of at least 12.5% every 90 days, for an annualized return of 50%, sometimes more, and that the investment had almost zero risk; and

   c.   that Beasley and Beasley Law Group managed relationships with numerous personal injury attorneys around the country to maintain a supply of purchase agreements to the J&J Entities and their investors.

3.     From at least 2017 to March 2022, over 600 investors invested in the scheme, and it appears that at least $449 million in investor funds flowed into the scheme through Beasley Law Group's attorney trust ("IOLTA") account at Wells Fargo, N.A. The amount that investors

1

may have been paid in Ponzi payments is as yet unknown. During that time, Beasley and Judd acted as business partners in the J&J Entities and Beasley purported to act as an attorney for the J&J Entities.

4.       In fact, the purchase agreements were fictitious, a fact which Beasley, Judd, and Humphries knew or were reckless in not knowing. Beasley, Beasley Law Group PC, Judd, and the J&J Entities did not use investor money to purchase interests in personal injury settlements, as Judd, Humphries, Jager, Jongeward, Seybert, and Tanner represented to actual and prospective investors.

5.       Beasley, Judd, and others used a portion of investors' money to make periodic payments of fictitious "returns" on the purchase agreements to investors in a Ponzi-like fashion, but used the bulk of investor money to fund lavish lifestyles, including purchasing luxury homes and properties, a private jet, ATVs, boats, and numerous luxury cars for themselves and their relatives. Each of Judd, Humphries, Jager, Jongeward, Seybert, and Tanner recruited dozens, if not hundreds, of investors into the scheme and received transaction-based compensation for bringing in additional investors and more money from existing investors, even though none of them was a registered broker or dealer, nor associated with a broker or dealer, registered with the Commission.

6.       On March 3, 2022, agents from the Federal Bureau of Investigation ("FBI") executed search warrants at the homes of Judd, Humphries, and Beasley. When agents arrived at Beasley's home, Beasley brandished a pistol and the agents shot him twice. Beasley then locked himself inside his home for nearly four hours. During that standoff, Beasley repeatedly confessed to an FBI negotiator that the J&J Entities' investment scheme was actually a Ponzi scheme that started in 2016 or 2017.

7.       The Commission brings this action to halt Defendants' violations of the federal securities laws, prevent further harm to investors, and to seek disgorgement and civil penalties stemming from Defendants' wrongdoing, among other remedies.

Exhibit 1, Page 6

## JURISDICTION AND VENUE

8.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and (g)] and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and (e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as this Court may deem just and appropriate.

9.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendants and Relief Defendants are found, inhabit, and/or transacted business in the District of Nevada and because one or more acts or transactions constituting the violations alleged herein occurred in the District of Nevada.

11.     Defendants were, individually and collectively, involved in the offer and sale of the securities, as that term is defined under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], issued by Defendants J&J Consulting Services, Inc., a Nevada corporation, J&J Consulting Services, Inc., an Alaska corporation, and J and J Purchasing LLC.

12.     Defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged in this Complaint.

## DEFENDANTS

13.     **Matthew Wade Beasley** ("Beasley"), age 49, is a resident of Las Vegas, Nevada. Beasley is President, Secretary, Treasurer, and Director of Beasley Law Group PC. Beasley has been licensed to practice law in Nevada since May 2006.

14.     **Jeffrey Jason Judd** ("Judd"), age 50, is a resident of Henderson, Nevada. Judd is director, president, and treasurer of J & J Consulting Services, Inc. (Nevada) and director,

3

president, shareholder, and treasurer of J & J Consulting Services, Inc. (Alaska). Judd is a manager of J & J Purchasing, LLC. Judd personally promoted the "purchase agreement" investment scheme to multiple investors with false and misleading statements and omissions, and he compensated promoters who in turn found additional investors. On information and belief, Judd is a trustee of The Judd Irrevocable Trust.

15. **Christopher Ronn Humphries** ("Humphries"), age 48, is a resident of Henderson, Nevada. He personally promoted the "purchase agreement" investment scheme to multiple investors. He is a managing member of CJ Investments LLC.

16. **Beasley Law Group PC** ("Beasley Law Group") is a professional corporation organized in Nevada in 2011 with its principal place of business in Nevada. Beasley controls this entity.

17. **J&J Consulting Services, Inc.** is a Nevada corporation formed in 2005 with its principal place of business in Nevada ("J&J Nevada"). Judd controls this entity.

18. **J&J Consulting Services, Inc.** is also the name of an Alaska corporation, incorporated in 2019, with its principal place of business in Nevada ("J&J Alaska"). Judd controls this entity.

19. **J and J Purchasing LLC** ("J and J Purchasing") is a Florida limited liability company formed in October 2021 with its principal place of business in Nevada. Judd controls this entity.

20. **Shane Michael Jager** ("Jager"), age 47, is a resident of Henderson, Nevada. He personally promoted the Ponzi scheme to multiple investors and also recruited several additional promoters who worked under his supervision. He received compensation for the investments he procured. Jager is the managing member and owner of Stirling Consulting, L.L.C.

21. **Jason Myers Jongeward** ("Jongeward"), age 50, is a resident of Washington, Utah. Jongeward promoted the "purchase agreement" investment scheme to multiple investors and received compensation for the investments he procured. Jongeward is the governor of JL2 Investments LLC.

4

22. **Roland Tanner** ("Tanner"), age 65, is a resident of Henderson, Nevada. He promoted the "purchase agreement" investment scheme to multiple investors and received compensation for the investments he procured.

23. **Denny Seybert** ("Seybert"), age 44, is a resident of Henderson, Nevada. He promoted the "purchase agreement" investment scheme to multiple investors and received compensation for the investments he procured. He is the manager of Rocking Horse Properties, LLC.

## **RELIEF DEFENDANTS**

24. **The Judd Irrevocable Trust** is a trust of unknown date and domicile, believed to be under the control of Matthew Beasley, Jeffrey Judd, and/or Jennifer Judd. On information and belief, Matthew Beasley is a trustee. The Judd Irrevocable Trust received at least $1.4 million in transfers from the Beasley Law Group IOLTA account at Wells Fargo, N.A. ("Beasley Law Group IOLTA"), which were proceeds from the fraud to which it has no legitimate claim.

25. **PAJ Consulting Inc ("PAJ")** is a Nevada corporation formed in October 2019. Preston Judd, Jeffrey Judd's 22-year-old son, is the president, secretary, and treasurer. PAJ received over $990,000 from J&J Consulting Services, Inc. between June 2020 and February 2022, which were proceeds of the fraud to which PAJ has no legitimate claim. PAJ also received at least $824,500 from the Beasley Law Group PC IOLTA, which were proceeds from the fraud to which PAJ has no legitimate claim. PAJ's bank records suggest it has no legitimate business operations. It received large distributions of cash from J&J Consulting Services, Inc. and Beasley Law Group PC followed by lavish spending on, *e.g.*, travel, gambling, cryptocurrencies, shopping, and restaurants.

26. **BJ Holdings LLC** is a Nevada limited liability company formed in March 2021. Its managing members are J&J Consulting Services, Inc. and Beasley Law Group, PC. On information and belief, BJ Holdings LLC holds assets that were purchased using investor funds, including a 2008 Hawker Beechcraft 900XP private jet. It received at least $500,000 in transfers

5

from the Beasley Law Group IOLTA, which are proceeds from the fraud to which it has no legitimate claim.

27.    **Stirling Consulting, L.L.C.** is a Nevada limited liability company formed in April 2018. Its principal place of business is Las Vegas, Nevada. Jager controls this entity. Stirling Consulting, L.L.C. received at least $30 million from the Beasley Law Group IOLTA account. On information and belief, these were proceeds from the fraud to which it has no legitimate claim.

28.    **CJ Investments LLC** is a Nevada limited liability company formed in November 2019. Its principal place of business is in Henderson, Nevada. Humphries and Jessica Humphries are both managing members of CJ Investments LLC. It received at least $25 million from the Beasley Law Group IOLTA account. On information and belief, these were proceeds from the fraud to which it has no legitimate claim.

29.    **JL2 Investments, LLC** is a Washington limited liability company formed in November 2019. Its principal place of business was initially Cheney, Washington. Upon information and belief, its principal place of business moved to Washington, Utah in 2021. Jongeward controls this entity. On information and belief, JL2 Investments received proceeds from the fraud to which it has no legitimate claim.

30.    **Rocking Horse Properties LLC** is a Nevada limited liability company formed in January 1997. Its principal place of business is in Nevada. Seybert controls this entity. It received over $690,000 from the Beasley Law Group IOLTA account. On information and belief, these were proceeds from the fraud to which it has no legitimate claim.

31.    **Triple Threat Basketball, LLC** is a Nevada limited liability company formed in April 2009. Its managers are Warren Rosegreen and Priscilla Rosegreen. It received transfers of over $9 million from the Beasley Law Group IOLTA account. On information and belief, these were proceeds from the fraud to which Triple Threat Basketball, LLC has no legitimate claim.

32.    **ACAC LLC** is a limited liability company of unknown domicile. A bank account in the name of ACAC LLC received at least $6.5 million from the Beasley Law Group IOLTA

6

account. On information and belief, these were proceeds from the fraud to which it has no legitimate claim.

33. **Anthony Michael Alberto, Jr.** ("Alberto"), age 34, is believed to be a resident of Nevada or Pennsylvania. He received nearly $4 million in transfers from the Beasley Law Group IOLTA account. Beasley confessed to an FBI negotiator that Alberto was his bookie and he used investor money to pay gambling debts he owed to Alberto. Alberto has received proceeds from the fraud to which he has no legitimate claim.

34. **Monty Crew LLC** was a Nevada limited liability company formed in January 2019. Its principal place of business was in Nevada. It became inactive in September 2021 and was revoked in February 2022. Its manager was Alberto. It received nearly $3 million in transfers from the Beasley Law Group IOLTA account. As stated in paragraph 33 above, Beasley confessed that the money paid to Alberto was proceeds from the fraud used to pay gambling debts. Money Crew LLC received investor money to which it has no legitimate claim.

## FACTS

## I. Judd, Humphries, and the J&J Entities Raised Money from Investors with False Representations of an Investment in Personal Injury Settlements.

35. Beginning at least as of January 1, 2017 and continuing until March 2022, the J&J Entities, directly and through Judd, Humphries, Jager, Jongeward, Seybert, and Tanner, offered investments in purported personal injury settlement contracts. Judd told investors that he had a litigation financing business with his attorney, Matthew Beasley, whereby Judd invested money in contracts with personal injury plaintiffs while Beasley procured those contracts through his contacts with other attorneys around the country. Judd told investors that Beasley and his law firm Beasley Law Group had relationships with personal injury attorneys whose clients had settlements with insurance companies, and who were willing to pay a premium to receive a portion of their settlement in advance rather than wait for payment from the insurance companies. Judd told investors that the J&J Entities entered into "purchase agreements" with the personal injury plaintiffs whereby the J&J Entities advanced to the personal injury plaintiffs a

7

portion of their expected insurance settlement payout, and the plaintiffs repaid the J&J Entities plus interest and fees when their insurance payout arrived.

36.     Judd told investors that the purchase agreements came in amounts of $80,000 or $100,000, with a term of 90 days, although he also said he allowed investors to split contracts with him or other investors if they wanted to invest less than $80,000. Judd told different investors that they would receive different returns. Judd told some investors that they would make up to $22,000 within 90 days on an investment of $100,000. Judd told other investors they would receive 12.5% on their investments (50% on an annual basis), for a return of $12,500 within 90 days on an investment of $100,000 or $10,000 within 90 days on an investment of $80,000.

37.     Judd told investors that at the end of the 90-day period, the J&J Entities would reinvest the principal in a new purchase agreement with a new tort plaintiff, and the investor could continue to receive his or her promised returns every 90 days. Judd told investors that they could get their principal back rather than reinvesting it at the end of the contract term if they chose.

38.     Judd told investors that the tort plaintiffs who entered the purchase agreements paid an administrative fee of $5,000, half of which went to Beasley and Beasley Law Group, and the other half of which went to the tort plaintiff's attorney. Judd also told investors that Beasley and Beasley Law Group managed the relationships with the various personal injury attorneys and wrote the agreements with the personal injury plaintiffs, while Judd managed the investment side of the business with assistance from his son Parker Judd. On information and belief, Judd highlighted the fact that attorney Beasley was involved and that investor funds flowed through Beasley Law Group's IOLTA account.

39.     Judd told investors that the risk from investing in the purchase agreements was almost zero. Judd also told some investors that he would make good any investor loss, saying that he and Beasley had a separate fund to make investors whole if a personal injury plaintiff

failed to pay on a contract. He claimed he had "never had to use" this fund, because "we've never had one go bad."

40.     Humphries, like Judd, promoted the J&J Entities investment scheme to numerous investors. Like Judd, Humphries told investors that the investment involved funding purchase agreements with personal injury plaintiffs who had settlements with insurance companies but wanted to obtain a portion of their money in advance. Humphries told investors that Matthew Beasley and his law firm Beasley Law Group managed the relationships with various attorneys to supply the purchase agreements to Judd and the J&J Entities. Humphries told investors that the purchase agreements were in amounts of $80,000 or $100,000 and paid returns of 13% every 90 days. Humphries told investors that their capital would be reinvested in a new purchase agreement at the expiration of each prior purchase agreement. Humphries told investors that there was little to no risk on the investment.

41.     Humphries received compensation for bringing new investors into the scheme and for raising additional money from existing investors. He told one investor that he received 5% of the investor funds he raised and that he made around $250,000 every three months.

42.     Judd and Humphries typically instructed investors to wire their investment money to Beasley Law Group's IOLTA account at Wells Fargo Bank N.A., but sometimes instructed investors to wire their investment money to other accounts as well, including an account in the name of J&J Consulting Services, Inc. at U.S. Bank, and an account in the name of Humphries' entity CJ Investments LLC.

**II.     Defendants' Representations Were Materially False and Misleading**

43.     The foregoing representations made to investors by Judd, the J&J Entities, and Humphries were materially false and misleading. Judd and the J&J Entities did not invest the investors' funds in contracts with personal injury plaintiffs. Beasley and Beasley Law Group did not actually procure contracts with personal injury plaintiffs and their attorneys.

44.     Beasley confessed on March 3, 2022 to an FBI negotiator that the business was a Ponzi scheme. Beasley and Judd returned a small portion of the invested money to investors in

Exhibit 1, Page 13

Ponzi-type payments to meet investors' expectations of the promised percentages of returns every 90 days. These payments promoted investor confidence in the scheme, encouraged current investors to invest more money, and allowed Beasley, Judd, and Humphries to continue to find new victims. In reality, Beasley, Judd, and Humphries used the majority of investor money for lavish personal expenses and to pay others to promote the scheme.

45. To lend credibility to the scheme, Beasley created fake "purchase agreements" between J&J Consulting or J and J Purchasing and various purported injured tort plaintiffs and their attorneys, which were then shared with investors by Judd, Humphries and other promoters. Beasley often used the names of real attorneys from around the country (and sometimes even used the names of real personal injury tort plaintiffs) on the fake purchase agreements, but there were no actual underlying tort settlements and the attorneys whose names appeared on the fake purchase agreements had no actual connection to Beasley. An example of one of these "purchase agreements" is attached as **Exhibit A**.

46. Until approximately December 2020, Judd provided investors "Investment Agreements" or "Buyer Agreements" purporting to memorialize the investor's investment in a tort plaintiff's purchase agreement. The agreements were between the investor, and Judd and J&J Consulting Services, Inc. An example of one of the "Investment Agreements" is attached as **Exhibit B**. An example of one titled a "Buyer Agreement" is attached as **Exhibit C.** These agreements were signed by Judd.

47. In approximately October 2021, Judd began telling investors that he was making modifications to the business at the suggestion an attorney who conducted a review of the business. As part of these purported business modifications, Judd formed J and J Purchasing LLC in October 2021 and started operating the investment business through J and J Purchasing. In approximately December 2021, as part of the business modifications, Judd started requiring investors to sign new documentation with J and J Purchasing: a Confidential Private Placement Memorandum ("PPM"); a Non-Compete, Non-Disclosure and Non-Solicitation Agreement; a Mutual Confidentiality and Non-Disclosure Agreement, and a Confidential Subscription

Agreement. Judd personally distributed these documents to some investors, and the Promoter Defendants and other promoters distributed copies to their investors. A copy of the PPM is attached as **Exhibit D.**

48.     Judd and Humphries told investors that Beasley managed the relationship with the personal injury attorneys and, on information and belief, told investors that they were not allowed to contact the attorneys or plaintiffs whose names appeared on the purchase agreements. This kept investors from learning that the attorneys and plaintiffs on the purchase agreements were not actually parties to the purchase agreements, and that the purchase agreements were fake.

49.     Despite this admonition from Judd and Humphries, some investors contacted the attorneys named in the purchase agreements to inquire whether the purchase agreements were real, only to discover that the attorneys had no such personal injury clients and no relationship with Matthew Beasley or Beasley Law Group.

**III.     Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries Acted With Scienter**

50.     Defendants Beasley, Beasley Law Group, Judd, the Judd Entities, and Humphries knowingly or recklessly engaged in the fraudulent scheme detailed in the paragraphs above.

51.     On March 3, 2022, when the FBI attempted to serve a search warrant at his home, Beasley engaged in a standoff for approximately four hours with FBI agents, during which Beasley spoke by telephone with an FBI negotiator. In the recorded calls with the FBI negotiator, Beasley repeatedly confessed that the J&J investment was a Ponzi scheme that he started in 2016 or 2017. He confessed that the purchase agreements were fake and he used the names of attorneys he did not know on the purchase agreements.

52.     Beasley confessed that investors were promised that their investment money would be given to someone who had settled a personal injury case but had not received their settlement money yet. He confessed that he "got names of attorneys" for the scheme but "I never actually talked to them." He confessed that as Jeffrey Judd found more investors, "I made up

more attorney's deals and just kept growing it." Beasley confessed that investors "would give their money to me, and I would supposedly send it to a bunch of attorneys" but actually "I kept it and used it to pay, basically pay them back to pay off gambling debts."

53. Judd knew or was reckless in not knowing that the purchase agreements were fake and that the investment scheme was a fraud. Judd, as Beasley's business partner in the scheme for over seven years, either knew that the business was a fraud, or was reckless in not knowing. Judd worked intimately with Beasley throughout the entire scheme. Judd told investors that he and Beasley operated the business together and that Beasley was his attorney. Judd told at least one investor that he saw bank statements and other documentation from Beasley. Had Judd reviewed the bank statements of the Beasley IOLTA account—where, on information and belief, he knew investor funds were aggregated—he would have readily seen that the investment scheme was not a legitimate business and that there were very few, if any, proceeds of personal injury tort settlements pursuant to the purchase agreements flowing into the account.

54. Further, the J&J Entities, which Judd controlled, were the counterparties on all the purported purchase agreements and Judd supposedly signed them on behalf of his entities. As of February 24, 2022, Judd boasted that he had $475 million "under management," was doing 450 contracts per week, and had done over 16,000 contracts to date. Judd either knew or was reckless in not knowing that the purported counterparties on those 16,000 contracts did not actually enter the agreements. Judd knew the purchase agreements were never signed by the purported counterparties, or he recklessly disregarded that fact. Had Judd conducted the most basic of due diligence on the fake purchase agreements and the flow of funds to and from Beasley Law Group, it would have revealed the scheme.

55. Upon information and belief, Humphries also knew or was reckless in not knowing that the purchase agreement investment scheme was a fraud. Upon information and belief, Humphries was at least aware of indicia that the tort settlements at issue in the investment were fictitious and acted to hide that fact from investors.

12

56.     Judd and Humphries acted to hide the fraud from investors by telling them that they were prohibited from contacting the parties to the purchase agreements.  Over the years, despite being told not to do so, several investors contacted the attorneys listed on the purchase agreements and the attorneys denied having such clients or entering the purchase agreements. On information and belief, this information made its way back to the promoters, including Humphries, and ultimately to Judd himself. Various investors pushed their promoters, Judd, and the J&J Entities to answer questions about the inability to verify that the purchase agreements were real, or asked to see documentation such as bank statements showing actual money flows to the purported counterparties on the purchase agreements. When promoters confronted Judd and the J&J Entities about the fact that attorneys on the purchase agreements denied that the purchase agreements were legitimate, Judd hid the fraud by stating to investors that the law firms were probably denying the existence of the contracts simply due to client confidentiality concerns.

57.     At least as early as 2019, Judd started requiring investors to enter non-disclosure agreements as a condition of investing. Judd and his promoters also often required investors to sign a document saying that they were prohibited from contacting any parties related to the personal injury settlement or purchase agreement without the written consent of Jeffrey Judd. Also, the "Investor Agreement" and "Buyer Agreement" documents (Exs. B and C hereto) expressly prohibited investors from contacting the parties on the purchase agreements without Judd's consent.

58.     Ultimately, on or around January 2022, Judd and certain of his promoters decided to stop sending the fake purchase agreements to investors altogether. Judd gave investors the excuse that his "attorneys" had advised him to stop sending the purchase agreements to them.

59.     On information and belief, Judd required investors to sign the document prohibiting them from contacting the parties related to the personal injury settlement or purchase agreement, and ultimately stopped disseminating the fake purchase agreements, because he was attempting to hide their fictitious nature from investors.

13

60. Despite that they knew or were reckless in not knowing that the Purchase Agreements were fake, Humphries and Judd nonetheless continued to solicit new investors and additional investments from existing investors.

**IV. Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner Violated the Federal Securities Laws by Acting as Unregistered Brokers.**

61. In addition to Humphries, Judd had several other promoters working underneath him to locate new investors and funnel investment money into the J&J Entities scheme. Defendants Jager, Jongeward, Seybert, and Tanner were among these promoters.

62. Jager, Jongeward, Seybert, and Tanner, like Judd and Humphries, each solicited dozens of investors to invest in the purchase agreements and received transaction-based compensation in return. The investors' interests in the purchase agreements issued by the J&J Entities—which Judd, Jager, Jongeward, Seybert, and Tanner solicited investors to buy—constituted securities as that term is defined under the federal securities laws.

63. In 2020, Humphries stated to at least one investor that he personally made $250,000 every three months from his investor solicitations and received a 5% commission on investments he solicited.

64. Jongeward also made a percentage on each investment he obtained on behalf of the J&J Entities. In early 2022, Jongeward stated to at least one prospective investor that he personally "managed" over 150 investors and about $52 million in investment funds, that this was his "full-time job," and that he had been doing it for two years.

65. In early 2022, Jager stated to at least one prospective investor that he had been soliciting investors for the J&J Entities investment for five years, had solicited 250 investors, and that he and Jongeward together had raised over $200 million from investors for the J&J Entities. Jager also stated to at least one prospective investor that Judd had negotiated a rate of payment to Jager and Jongeward on the investments they raised, and that Tanner worked "under Jager" soliciting investments in the purchase agreements. Judd, Jager, Jongeward, Seybert, and Tanner each used means or instrumentalities of interstate commerce to solicit and sell securities as part

of their regular business. Judd, Jager, Jongeward, Seybert, and Tanner each used the internet to solicit investors, transferred cash through wire transfers, and used email and telephone to negotiate and effect sales transactions.

66. Humphries, Jager, Jongeward, and Seybert also handled investor funds. While investor funds typically (but not always) flowed into Beasley Law Group's IOLTA account, the payments of purported "returns" to investors whom Humphries, Jager, Jongeward, and Seybert recruited would flow from accounts held by Beasley Law Group or the J&J Entities into bank accounts for entities controlled by Humphries, Jager, Jongeward, and Seybert. From there, Humphries, Jager, Jongeward, and Seybert would distribute purported "returns" to investors they had solicited. Sometimes Humphries, Jongeward, and Seybert also instructed investors to wire their investment money directly to the accounts in the names of the entities they controlled rather than to Beasley Law Group's account.

67. Jager used an account in the name of his entity Stirling Consulting, L.L.C., and possibly others, to receive investor funds and also to distribute purported "returns" to investors. Humphries used an account in the name of CJ Investments LLC and JCH Consulting, L.L.C., among others, to receive investor funds and also distribute Ponzi payments to his investors. Jongeward used an account in the name of his entity JL2 Investments LLC, and possibly others, to receive investor funds and to distribute Ponzi payments to his investors. Seybert used an account in the name of his entity Rocking Horse Properties, LLC, and possibly others, to receive investor funds and distribute purported returns to his investors. Tanner used an account in the name of Anthem Assets, LLC, and possibly others, to receive investor funds and distribute purported returns to his investors. On information and belief, Jager, Humphries, Jongeward, Seybert, and Tanner also received commission payments for their investor solicitations in the accounts of those entities that they controlled.

68. Tanner solicited numerous investors for the J&J Entities scheme over a period of many months or years. In early 2022, Jager represented to prospective investors that Tanner worked under his supervision to solicit additional investors for the J&J Entities investment and

that Tanner had raised over $50 million for the J&J Entities. On information and belief, Tanner

and received transaction-based compensation for the investors and investments he solicited.

69.     At all relevant times while Judd, Jager, Jongeward, Seybert, and Tanner engaged

in soliciting investors to buy interests in the purchase agreements in exchange for transaction-

based compensation, none of them were registered with the Commission as a broker or dealer,

nor were they associated with a broker or dealer registered with the Commission.

## V.     The Securities Offered and Sold Were Not Registered

70.     The securities offered and sold by Judd, Humphries, Jager, Jongeward, Seybert,

and Tanner were not registered with the Commission.

71.     J and J Purchasing LLC filed a Form D on December 13, 2021, purporting to give

notice of an exempt offering under Rule 506(b), but the J&J Entities' offers and sales of

securities were not exempt under Rule 506(b) because, among other things, investors were never

provided with the required disclosures of information under Rule 502(b) [17 CFR § 230.502].  In

addition, the Form D was itself false and misleading in its description of, *inter alia*, the

investment and the use of investor funds.

### **FIRST CLAIM FOR RELIEF**

### **Violations of Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]**

### *(Against All Defendants)*

72.     The Commission re-alleges and incorporates by reference each and every

allegation in paragraphs 1–71, inclusive, as if they were fully set forth herein.

73.     Defendants Beasley, Beasley Law Group, Judd, the J&J Entities, Humphries,

Jager, Jongeward, Seybert, and Tanner, by engaging in the conduct described above, directly or

indirectly,

      a.     made use of means or instruments of transportation or communication in

              interstate commerce or of the mails to sell securities, as to which no

              registration statement was in effect, through the use or medium of any

              prospectus or otherwise;

16

b.  carried or caused to be carried through the mails or in interstate commerce, by
any means or instrument of transportation, securities as to which no
registration statement was in effect, for the purpose of sale or for delivery
after sale; and

c.  made use of any means or instruments of transportation or communications in
interstate commerce or of the mails to offer to sell or offer to buy through the
use or medium of any prospectus or otherwise securities as to which no
registration statement had been filed.

74.     In regard to the sale of securities described herein, no exemption validly applied
to the registration requirements described above.

75.     By reason of the foregoing, Defendants Beasley, Beasley Law Group, Judd, the
J&J Entities, Jager, Jongeward, Humphries, Seybert, and Tanner violated, and unless enjoined,
will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77 e(a) and (c)].

## SECOND CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(1)]**

***(Against Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries)***

76.     The Commission re-alleges and incorporates by reference each and every
allegation in paragraphs 1–75, inclusive, as if they were fully set forth herein.

77.     By engaging in the conduct described above, Beasley, Beasley Law Group, Judd,
the J&J Entities, and Humphries, and each of them, directly or indirectly, individually or in
concert with others, in the offer and sale of securities, by use of the means and instruments of
transportation and communication in interstate commerce or by use of the mails,

a.  employed devices, schemes, or artifices to defraud;

b.  obtained money or property by means of untrue statements of material fact or
omissions to state material facts necessary in order to make the statements
made, in light of the circumstances under which they were made, not
misleading; and

17

c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

78. With respect to violations of Section 17(a)(1) of the Securities Act, each of Defendants Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries engaged in the above-referenced conduct knowingly or with severe recklessness.

79. With respect to violations of Sections 17(a)(2) and (a)(3) of the Securities Act, each of Defendants Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries engaged in the above-referenced conduct was at least negligent in its/his conduct and in making the untrue and misleading statements alleged herein.

80. By reason of the foregoing, Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]**

*(Against Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries)*

81. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–80, inclusive, as if they were fully set forth herein.

82. By engaging in the conduct described above, Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails,

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, and course of business which operated as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

83. Each of Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries engaged in the above-referenced conduct and made the above-referenced untrue and misleading statements knowingly or with severe recklessness.

84. By reason of the foregoing, each of Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries have violated and, unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## **FOURTH CLAIM FOR RELIEF**

### **Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]**

### *(Against Judd, Humphries, Jager, Jongeward, Seybert, and Tanner)*

85. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–84, inclusive, as if they were fully set forth herein.

86. By engaging in the conduct described above, Judd, Humphries, Jager, Jongeward, Seybert, and Tanner, and each of them:

a. engaged in the business of effecting transactions in securities for the account of others; and

b. directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker or dealer registered with the Commission.

87. By reason of the foregoing, Judd, Humphries, Jager, Jongeward, Seybert, and Tanner each violated, and unless enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

19

Exhibit 1, Page 23

## FIFTH CLAIM FOR RELIEF

### Equitable Disgorgement

### *(Against All Relief Defendants)*

88.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–87, inclusive, as if they were fully set forth herein.

89.     Each of the Relief Defendants named in paragraphs 24-34 above obtained money, property, and assets as a result of the violations of the securities laws by Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries, to which they have no legitimate claim.

90.     Each of the Relief Defendants should be required to disgorge all ill-gotten gains which inured to their benefit under the equitable doctrines of disgorgement, unjust enrichment and constructive trust.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining all Defendants from, directly or indirectly, engaging in conduct in violation of Section 5 of the Securities Act [15 U.S.C. § 77e(a)(1)];

### II.

Permanently restraining and enjoining Defendants Beasley, the Beasley Law Group, Judd, the J&J Entities, and Humphries from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b–5 thereunder [17 C.F.R. § 240.10b–5];

### III.

Permanently restraining and enjoining Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner from, directly or indirectly, engaging in conduct in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)];

**IV.**

Permanently restraining and enjoining each of Defendants Beasley, Beasley Law Group, Judd, and the J&J Entities from, directly or indirectly, including, but not limited to, through any entity owned or controlled by each, the issuance, purchase, or sale of any security related to settled litigation claims, except for the purchase or sale of securities listed on a national securities exchange by these Defendants for their own personal accounts;

**V.**

Permanently restraining and enjoining each of Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner from, directly or indirectly, including, but not limited to, through any entity owned or controlled by each, soliciting any person or entity to purchase or sell any security;

**VI.**

Ordering Defendants and Relief Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**VII.**

Ordering all Defendants to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VIII.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and,

**IV.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

21

Dated: April 12, 2022.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**


_/s/ Tracy S. Combs_
Tracy S. Combs
Casey R. Fronk
Attorneys for Plaintiff
Securities and Exchange Commission

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Securities and Exchange Commission

**DEFENDANTS**

Matthew Wade Beasley, et al. (See Attachment)

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Clark County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Tracy S. Combs and Casey R. Fronk, Securities and
Exchange Commission, 351 S. West Temple, Ste. 6.100,
Salt Lake City, UT 84101; (801) 524-5796

Attorneys *(If Known)*

See Attachment

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1   U.S. Government Plaintiff | ☐ 3   Federal Question *(U.S. Government Not a Party)* |
| ☐ 2   U.S. Government Defendant | ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)* |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                                     Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 77e(a) and (c); 77q(a)(1); 77q(a)(2) and (3); 78j(b); § 78j(b); 78o(a)(1); 78t(a); 17 C.F.R. § 240.10b-5(a) and (c); § 240.10b-5(b)

Brief description of cause:
Offering fraud

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions):*     JUDGE _____     DOCKET NUMBER _____

DATE
Apr 12, 2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Tracy S. Combs

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## ATTACHMENT TO CIVIL COVER SHEET
## SEC V. MATTHEW WADE BEASLEY, ET AL.


### ATTORNEYS FOR DEFENDANTS AND RELIEF DEFENDANTS:

Garrett Ogata, Esq.
Law Offices of Garrett T. Ogata
2880 W. Sahara Avenue
Las Vegas NV 89102
(702) 366-0891
*Counsel for Defendant Matthew Wade Beasley*

Kamille Dean, Esq.
Law Office of Kamille Dean P.L.C
4545 N. 36th St. Ste 202
Phoenix, AZ 85018
(602) 252-5601
*Counsel for Defendant Jeffrey J. Judd and Relief Defendant The Judd Irrevocable Trust*

Peter S. Christiansen, Esq.
Christiansen Trial Lawyers
710 S 7th Street
Las Vegas, NV 89101
702-357-9977
*Counsel for Defendant Christopher R. Humphries*

Kevin Anderson, Esq.
Fabian Van Cott
215 South State Street Suite 1200
Salt Lake City, Utah 84111
702.333.8861
801.323.2225
*Counsel for Defendants J&J Consulting Services, Inc. (Alaska), J&J Consulting Services, Inc. (Nevada), and J and J Purchasing LLC*

T. Louis Palazzo, Esq.
Palazzo Law Firm
520 S 4th St
Las Vegas, NV 89101
(702) 385-3850
*Counsel for Defendant Shane M. Jager*

Thomas Ericsson, Esq.
Oronez & Ericsson LLC
1050 Indigo Dr, #120
Las Vegas, NV 89145

1

702-766-9432
*Counsel for Defendant Jason M. Jongeward*

Lance A. Maningo, Esq.
Maningo Law
400 S 4th St, Ste 650
Las Vegas, NV 89101
(702) 626-4646
*Counsel for Defendant Denny Seybert*

Dyke Huish, Esq.
Huish Law Firm
26161 Marguerite Pkwy, Ste B
Mission Viejo, CA 92692
949-837-8600
*Counsel for Defendant Roland Tanner*

**DEFENDANTS:**

Matthew Wade Beasley;

Beasley Law Group PC;

Jeffrey J. Judd;

Christopher R. Humphries;

J&J Consulting Services, Inc., an Alaska corporation;

J&J Consulting Services, Inc., a Nevada Corporation;

J and J Purchasing LLC;

Shane M. Jager;

Jason M. Jongeward;

Denny Seybert;

Roland Tanner

**RELIEF DEFENDANTS:**

The Judd Irrevocable Trust;

PAJ Consulting Inc;

BJ Holdings LLC;

Stirling Consulting, L.L.C.;

CJ Investments, LLC;

JL2 Investments, LLC;

Rocking Horse Properties, LLC;

Triple Threat Basketball, LLC;

ACAC LLC;

Anthony Michael Alberto, Jr.;

Monty Crew LLC

**Securities and Exchange Commission v. Beasley, et al.**

Case No. _____

**Complaint**

**Index of Exhibits**

| Exh. No. | Description | Date |
|----------|-------------|------|
| A | Example of Fake Purchase Agreement | 12.18.2020 |
| B | Example of Investor Agreement | 12.29.2020 |
| C | Example of Buyer Agreement | 10.19.2021 |
| D | Confidential Private Placement Memorandum ("PPM") | 12.02.2021 |

# Exhibit A

## Example of Fake Purchase Agreement

# PURCHASE AGREEMENT

This is a Purchase Agreement ("Agreement") dated the 18th day of December, 2020. This Agreement is by and between Sheri Burg ("Seller") who is represented by Howard Ankin, Esq. of Ankin Law Office, LLC whose address is 10 North Dearborn, Suite 500, Chicago, Illinois 60602 ("Attorney") and J & J Consulting Services, Inc., an Alaska corporation ("Buyer") who is represented by Matthew Beasley, Esq. of the Beasley Law Group, PC ("Buyer's Attorney") whose address is 737 North Main Street, Las Vegas, Nevada 89101.

A.      Seller has a claim arising from a slip and fall incident which occurred on February 18, 2019 ("Claim") at Element - Moline which is owned by Moline Promenade Investors, LLC and operated by C-Two Hotel Group. Seller has hired Attorney to represent Seller in this Claim. Seller has settled the Claim. The entire amount of the settlement is $285,250.00 ("Settlement Amount"), less legal fees, superior medical liens existing on the date of this Agreement, costs and disbursements payable to Attorney under the existing fee agreement between Seller and Attorney ("Proceeds").

B.      Seller desires to sell and assign to Buyer an interest in the Proceeds. Buyer desires to purchase the interest in the Proceeds, on the terms and under the conditions set forth in this Agreement.

BUYER AND SELLER AGREE AS FOLLOWS:

1.      PURCHASE OF INTEREST

a.      Seller hereby sells, transfers, conveys and assigns to Buyer a $112,500.00 interest ("Interest") in the Proceeds for a purchase price of $100,000.00 ("Purchase Price"). Seller acknowledges receipt of the Purchase Price. Seller understands that the amount of Buyer's Interest, or, in other words, the amount to be paid to Buyer, will increase to reflect the date the Buyer is paid its Interest in the Proceeds as set forth in the following Disclosure Table ("Disclosure Table"):

[Intentionally Left Blank]

## DISCLOSURE TABLE

Purchase Price:              $100,000.00

**Date of Payment to Buyer**

                                                        **Amount due to Buyer**

On or before March 20, 2021                          $112,500.00
After March 20, 2021 but on or before April 19, 2021   $119,000.00

*Should Seller not pay Buyer from the Proceeds by April 17, 2021 the Buyer's Interest will increase by **$6,500.00 every thirty (30) days thereafter.**

b.      Buyer's Interest will be paid by Attorney out of the Proceeds of the Claim and will be deducted directly from the Proceeds of the Claim and will be paid to Buyer prior to any payment to Seller with respect to the Claim.  If the Proceeds of the Claim Amount are not enough to pay the full amount due to Buyer, then Buyer shall be entitled to receive 100% of the Proceeds of the Claim.  Seller has directed Attorney to, among other things,(i) place an assignment, consensual lien and security interest in favor of Buyer against any and all Proceeds due Seller from the Claim (after payment of any and all legal fees and reimbursable costs) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of Buyer's Interest, (ii) notify Buyer of receipt of Settlement Amount, (iii) pay Buyer from the Proceeds the proper amount due to Seller representing Seller's Interest  in the Proceeds at the time of distribution of the Proceeds prior to any payment to Seller with respect to the Claim, (iv) respond to requests for information from Buyer and (v) notify Buyer prior to any disbursements of funds to verify the amount due Buyer.  Seller has provided Buyer with an executed Authorization for Attorney to Pay Buyer from Proceeds of Claim/Acknowledgement of Authorization by Seller and Attorney in the form attached as Exhibit "A" ("Authorization and Acknowledgement ").

c.      The amount Buyer is entitled to may be more than is listed in the Disclosure Table above if Seller does not honor the obligations in this Agreement.  Seller will also be liable to pay Buyer's Interest, even if there are no Proceeds, if Seller has mislead Buyer or Attorney concerning Seller's Claim and will also be liable for Buyer's attorney's fees or collection costs, as permitted by law.

d.      If Seller wants to sell an additional Interest, and if Buyer agrees to purchase an additional Interest, Buyer and Seller will sign an amended Disclosure Table. Seller understands that Buyer is not required to purchase any additional Interest.

e.      In the event that the Claim is the subject of more than one lawsuit, claim or cause arising out of more than one incident/accident/transaction, or against one or more defendants, then the amount due Buyer pursuant to this Agreement shall be paid from the Proceeds of the first lawsuit, claim and/or case against any of the defendants, including insurance companies and malpractice claims arising out of the Claim, which results in a monetary recovery.  If insufficient funds are available from the first lawsuit, claim and/or case resulting in a monetary recovery to pay the full amount due Buyer pursuant to this Agreement, then the balance due Buyer shall be paid from the Proceeds of the next lawsuit, claim and/or cause, if any.

f.      The amount due Buyer shall be withheld from any money collected as a result of the Claim and shall immediately be paid to Buyer (after first deducting Attorney's fees and costs, and any prior liens which exist on the date of this Agreement).  Seller agrees and hereby directs that all Proceeds received in connection with the Claim, are held in Trust for Buyer until Buyer has been fully paid its Interest.  Seller understands that Seller will not receive any money or payment from the Proceeds of Seller's Claim until Buyer has been paid Buyer's Interest in full. This shall also apply to any structured settlements.  If Seller receives payments from several sources, Seller will pay Buyer all monies received from each source until Buyer is paid in full its Interest in the Proceeds of the Claim.  Seller acknowledge that receipt or use of any Proceeds of the Claim prior to the full payment to Buyer of Buyer's Interest in the Proceeds of the Claim may constitute an illegal conversion and may be a crime.

2.      GRANT OF SECURITY INTEREST

By signing this Agreement, Seller grants to Buyer a security interest and a lien in the Settlement Amount and all Proceeds of the Claim ("Collateral").  Buyer shall have all rights and remedies of a secured party under the Nevada Uniform Commercial Code. Seller authorizes Buyer to file one or more UCC financing statements regarding Buyer's security interest and lien in the Collateral and Seller agrees to take all other steps reasonably required by Buyer to perfect and maintain the perfection of Buyer's security interest.

3.      NO TRANSFER OF CLAIM

Seller is not assigning any portion of the Claim to Buyer, and Buyer is not buying any portion of the Claim under this Agreement.  Buyer has no right or obligation to take any legal action for Seller in connection with the Claim. Buyer has no right or obligation to advise, direct or instruct Seller or Attorney in how to go forward with Seller's Claim. Buyer will not be involved in the negotiation of any settlement of Seller's Claim.  Buyer has no obligations or duties concerning the Claim, or the collection of any settlement, award or verdict from the Claim.

4.    SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that:

a.    Seller is using the funds received from the Purchase Price for Seller's immediate economic necessities.  Seller has been advised that Seller should not sell any portion of the Proceeds of the Claim if Seller has any other alternative to meet my immediate economic necessities.  Seller understands that due to the various factors involved that Buyer may make a large profit.

b.    Seller acknowledges that Seller has been advised to seek the services of legal, tax, accounting and/or financial advisors in the negotiation and signing of this Agreement.  Seller has either received such counsel prior to signing this Agreement or expressly waived such counsel.  Seller understands from speaking to Attorney and/or other advisors that the amount of Buyer's Interest as set forth in the Disclosure Table is greater than the Purchase Price Seller is receiving, and that there is a cost to Seller selling Buyer the Interest.  Seller understands that Buyer is relying upon Seller's representations in deciding to purchase this Interest and Seller represents and warrants that all statements made by Seller are true and correct as of the date hereof.  Seller understands that if any information provided by Seller changes that Seller has an obligation to immediately notify Buyer.

c.    Seller is not currently in bankruptcy, there are no pending tax claims or criminal allegations against Seller, and Seller has complied with all laws in connection with the Claim.  Seller further represent that Seller is not in violation of any obligations concerning childcare, alimony or support, and Seller has not been convicted of a felony or other crime involving dishonesty.  Other than the Claim itself, there is no claim, legal action, lien or any proceeding or order pending or in effect or threatened, against Seller, or which would in any manner affect or impair Buyer's Interest or Buyer's rights under this Agreement.  Seller has been truthful in all aspects of the Claim and has provided all information to Attorney in a complete and honest fashion. Seller also confirms that all documents submitted in connection with the investigation and Buyer's evaluation of the Claim are true, whether submitted by Attorney or Seller.  Seller understands that Buyer is relying upon these statements in determining whether to enter into this Agreement.

d.    Seller agrees to not change the fee agreement between Seller and Attorney in any way that would reduce the amount of Buyer's Interest in the Proceeds of the Claim.  Seller further promises to notify Buyer in writing within 72 hours if Seller terminates the services of Attorney, or if Attorney determines not to proceed with the Claim.  If new attorneys are retained to represent Seller in the Claim, Seller will notify Buyer within 72 hours of the new attorneys being retained, and will direct the new attorneys to comply with the terms of this Agreement by Seller and the new attorney executing a

new Authorization and Acknowledgement within 14 days after accepting Seller's representation . Seller will also notify Buyer in writing within 72 hours if Seller moves from the address listed above.

e.     Seller will not knowingly create or permit any additional liens, charges, security interests, encumbrances, agreements of any kind or other rights of third parties against the Proceeds of the Claim without the prior written consent of Buyer. Seller specifically promises not to sell any additional portion of the Proceeds of the Claim after the date of this Agreement, unless Buyer has given prior written permission. Seller also confirms that neither the Claim nor the Proceeds are subject to any liens, charges, security interests, encumbrances, agreements of any kind or nature (other than this Agreement) or other rights of third parties except for liens previously provided to Seller's medical providers. Seller understands that if these statements are not true, it may be considered as a fraud, as Buyer is relying upon these statements in going forward with this Agreement.

5.     EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall be an event of default by Seller under this Agreement (each, an "Event of Default"):

a.     The failure by Seller or Attorney to pay Buyer's Interest in the Proceeds within thirty (30) days after the Settlement Amount is received by Seller or Attorney; or

b.     Seller's failure to perform or comply with any of the agreements, conditions, provisions or promises contained in this Agreement, including but not limited to if Buyer does not receive a timely response to a request for information from Seller or Attorney or if Buyer does not receive a new Authorization and Acknowledgement by Seller and new attorney within fourteen (14) days after accepting representation, and such failure to perform or comply continues unremedied for a period of ten (10) days after written notice from Buyer to Seller, unless such default, in Buyer's reasonable discretion, is not curable, in which event there shall be no grace period; or

c.     If Buyer discovers any material misrepresentation or inaccuracy in any representation or warranty made by Seller to Buyer in this Agreement.

Upon an Event of Default by Seller under this Agreement, Seller agrees that Buyer may contact any insurance company, claims adjuster or attorney then handling the Claim on behalf of any responsible party and advise such insurance company, claims adjuster or attorney about Buyer's Interest in Seller's Claim and to direct that Buyer be included as a payee on settlement checks provided further that nothing herein shall prevent Buyer from exercising any other right or remedy provided under law or equity. If Buyer does

anything stated in this paragraph, Buyer shall not be liable to Seller for any damages which Seller may suffer resulting from Buyer's actions described above.

6.    APPLICABLE LAW

This Agreement shall be governed, construed and enforced in accordance with, and all disputes arising out of or in connection with this Agreement shall be governed by, the internal laws of the State of Nevada, without regard to the conflict of law rules of Nevada or any other jurisdiction.

7.    ARBITRATION

BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT ALL DISPUTES, CLAIMS, DEFENSES OR CONTROVERSIES (WHETHER IN LAW OR IN EQUITY) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIPS THAT RESULT FROM THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY DISPUTES, CLAIMS OR  CONTROVERSIES  INVOLVING FEDERAL OR STATE STATUTORY CAUSES OF ACTION  OR INJUNCTIVE RELIEF, ANY INVOLVING FEDERAL OR STATE ADMINISTRATIVE  REMEDIES, ANY INVOLVING CONSUMER FRAUD AND ANY INVOLVING A CHALLENGE TO THE LEGALITY OF ANY PART OR ALL OF TH IS AGREEMENT ("DISPUTES") SHALL BE RESOLVED THROUGH FINAL AND BINDING ARBITRATION UNDER THE COMMERCIAL ARBITRATION RULES  ("RULES") OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA").  THE ARBITRATION SHALL TAKE PLACE BEFORE A SINGLE ARBITRATOR TO BE CHOSEN BY AGREEMENT OF THE PARTIES, OR FAILING SUCH, IN ACCORDANCE WITH AAA RULES.  THE ARBITRATION SHALL TAKE PLACE IN THE STATE OF NEVADA, COUNTY OF CLARK UNLESS THE PARTIES AGREE TO A DIFFERENT LOCATION.  THE PARTIES AGREE THAT THIS ARBITRATION AGREEMENT IS MADE PURSUANT TO A TRANSACTION IN INTERSTATE COMMERCE AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SHALL BE GOVERN ED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. §1 AND THE SUBSTANTIVE LAWS OF THE STATE OF NEVADA SHALL BE APPLIED IN ALL EVENTS.  JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.  THE PARTIES ALSO AGREE THAT THE AAA OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION SHALL APPLY TO THE PROCEEDINGS.

8.    WAIVER OF JURY TRIAL

BUYER AND SELLER, AFTER CONSULTATION WITH THEIR RESPECTIVE ATTORNEYS, EACH HEREBY WAIVE ANY RIGHT WHICH THEY MAY HAVE TO A JURY TRIAL, INCLUDING ANY RIGHT VESTED BY FEDERAL, STATE OR LOCAL STATUTE, IN CONNECTION WITH ANY DISPUTES OR LEGAL PROCEEDING

INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER COMMENCED BY OR AGAINST EITHER PARTY IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR WITH ANY DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT.

9.  WAIVER OF CLASS ACTION CLAIMS

SELLER HEREBY AGREES TO WAIVE ANY AND ALL RIGHTS TO (i) ANY DISPUTE WITH BUYER BEING HANDLED AS A CLASS ACTION AND (ii) JOINING AS A PLAINTIFF, CLAIMANT, MEMBER OR PARTICIPANT IN ANY CLASS ACTION AGAINST BUYER. IT IS AGREED THAT ANY ARBITRATION WILL BE LIMITED TO THE DISPUTE BETWEEN BUYER AND SELLER, AND BUYER AND SELLER WAIVE ANY RIGHT TO CONSOLIDATE OR TO HAVE HANDLED AS A CLASS ACTION ANY PROCEEDING ON ANY DISPUTES WITH ANY PROCEEDING ON DISPUTES, CLAIMS, OR CONTROVERSIES INVOLVING ANY PERSON OR ENTITY NOT A PARTY TO THIS AGREEMENT.

10.  RECLASSIFICATION OF TRANSACTION

This Agreement represents an investment by Buyer, and not a loan to Seller. However, should a court of law determine that the transaction set out in this Agreement is a loan of money, Seller agrees that interest shall accrue at the maxim um rate permitted by law. Seller agrees that any fees or expenses paid by Buyer in connection with the Claim will not be included as interest. This includes any attorney's fees and costs Buyer has expended to enforce its rights under this Agreement. Seller agrees that these will be considered as a reimbursement to Buyer, rather than as interest.

11.  MISCELLANEOUS

a.  If any part of this Agreement is deemed invalid or unenforceable, it shall not affect the validity or enforceability of (i) any other part of this Agreement, and the Agreement shall be modified to the extent legally possible to legally carry out the intent of this Agreement and (ii) any agreement between Buyer and any other party. This Agreement and its exhibit make up the entire and only agreement or understanding between Buyer and Seller. It may not be changed unless signed in writing by Buyer and Seller. This Agreement takes precedence over all prior agreements, brochures, negotiations, commitments and representations, whether oral or written, about Seller's Claim and Buyer's purchase of its Interest.

b.      Should Buyer retain the services of an attorney to enforce the terms of this Agreement, Seller will be responsible for any costs or expenses (including reasonable legal fees and expenses) in enforcing Buyer's rights under this Agreement and the amount of Buyer's Interest shall be increased in an amount equal to Buyer's costs and expenses.

c.      This Agreement will be binding upon Buyer and Seller, and each of their heirs, executors, administrators, successors and assigns. Seller understands and agrees that Seller has no right to assign Seller's rights and obligations under this Agreement.  Seller further understands and agrees that Buyer may assign its rights and obligations under this Agreement (and Buyer's Interest) to any party without Seller's prior approval, provided that any such party agrees to be bound by the terms and conditions of this Agreement.  It is agreed that if Buyer assigns this Agreement as provided in the prior sentence, Buyer shall have no further obligations under this Agreement and Seller must look solely to the party Buyer assigned the Agreement to for performance under this Agreement.  When requested by Buyer or any assignee, Seller will sign and deliver any and all reasonably requested documents as Buyer or such assignee may require to confirm the various rights and obligations of the parties under this Agreement.  This Agreement may be signed in separate counterparts.  A facsimile signature shall be deemed to be an original signature.

12.     RIGHT TO CANCEL

SELLER HAS THE RIGHT TO CANCEL THIS AGREEMENT WITHOUT PENALTY OR FURTHER OBLIGATION AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH (5TH) BUSINESS DAY FROM THE DATE SELLER RECEIVES FUNDING HEREUNDER FROM BUYER.

In order for the cancellation to be effective, Seller must return the full amount of disbursed funds to Attorney within five (5) business day of the disbursement of funds who will then return the amount to Buyer's Attorney upon the clearance of the funds in Attorney's Trust Account.

DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT COMPLETELY OR IF IT CONTAINS ANY BLANK SPACE. BEFORE YOU SIGN THIS AGREEMENT YOU SHOULD OBTAIN THE ADVICE OF YOUR ATTORNEY.  YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS AGREEMENT.

SELLER:                                              BUYER:


_____                  _____

SHERI BURG                                       LV Capital LLC & J & J CONSULTING
                                                         SERVICES, INC.

## EXHIBIT A

AUTHORIZATION FOR ATTORNEY TO PAY J & J CONSULTING SERVICES, INC. FROM PROCEEDS OF CLAIM/ACKNOWLEDGEMENT OF AUTHORIZATION

Pursuant to that certain Purchase Agreement dated December 18, 2020 between Sheri Burg ("Seller") and J & J Consulting Services, Inc. ("Buyer") (the "Agreement"), I, Sheri Berg hereby irrevocably authorize and direct my attorney, Howard Ankin, Esq. ("Attorney"), (and any future Attorney representing me in connection with my Claim to, among other things, (i) place an assignment, consensual lien and security interest in favor of Buyer against any and all of the Proceeds due Seller from the Claim (after payment of any and all legal fees, reimbursable costs, statutory liens and liens) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of Buyer's Interest, (ii) pay Buyer's Attorney from the Proceeds the amount due to Buyer representing Buyer's Interest in the Proceeds of the Claim at the time of distribution of the Proceeds prior to any payment to Seller with respect to the Claim, (iii) in the event that the Claim is the subject of more than one lawsuit, claim or cause of action arising out of more than one incident/accident/transaction, or against one or more defendants, pay Buyer's Interest from the Proceeds of the first lawsuit, claim and/or case against any of the defendants, (iv) notify Buyer's Attorney of discontinuance or ending with respect to Attorney's representation, (v) respond to requests for information from Buyer's Attorney and (vi) call Buyer's Attorney prior to any disbursements of funds to verify the amount of Buyer's Interest. Such amounts shall be paid directly to Buyer's Attorney to satisfy Seller's obligations to Buyer under the Purchase Agreement prior to any distribution of Proceeds to Seller. The amount of Buyer's Interest will increase to reflect the date Buyer is paid its Interest in the Proceeds as set forth in the Disclosure Table to the Agreement, as such may be amended from time to time. This Authorization is irrevocable and binding and may only be amended by the mutual written agreement of Seller and Buyer.

Dated this 18th day of December, 2020.


_____

SHERI BURG, Seller

## ACKNOWLEDGEMENT OF AUTHORIZATION

I, Howard Ankin, Esq. hereby acknowledge that Ankin Law Office, LLC represents Sheri Burg, as her attorney, in connection with the Claim described in the Agreement. I acknowledge that Sheri Burg has irrevocably instructed me to comply with the Agreement's terms pursuant to the Authorization set forth above (the "Authorization"). I will honor Sheri Burg's Authorization. I agree to pay Buyer's Attorney Buyer's Interest from Sheri Burg's Proceeds of the Claim in accordance with the Disclosure Table set forth in the Agreement, as such may be amended from time to time. I agree not to distribute any Proceeds of the Claim to Sheri Burg until Buyer's Interest has been paid in full. In the event of a dispute, I agree that only disbursements for attorney's fees, reimbursable costs, statutory liens and medical liens that are in existence prior to the date of the Agreement will be made. All other funds due Sheri Burg shall be held in my Trust Account until such dispute is resolved. In the event that I am terminated as Sheri Burg's attorney with respect to the Claim, I shall give Buyer's Attorney immediate written notice thereof by certified mail, and state the name, address and telephone number of Sheri Burg's new attorney.

All disbursements of funds, including Sheri Burg's share of the Proceeds, will be through my Trust Account, and Sheri Burg will not receive a settlement check directly from any defendant or insurance company. I agree to verify the amount of Buyer's Interest prior to any disbursement of funds. I have no knowledge of Sheri Burg having previously sold, transferred or assigned any interest in the Claim or in the Proceeds of the Claim, and understand that Sheri Burg may not further sell, transfer or assign any additional Interest to any party other than Buyer without Buyer's written permission. I warrant and covenant that I am authorized to execute this document on behalf of Ankin Law Office, LLC.

DATED this 18th day of December, 2020.

ANKIN LAW OFFICE, LLC


_____

By: HOWARD ANKIN, ESQ.

# Exhibit B

## Example of Investor Agreement

December 29, 2020

Attn: Crestview Capital

Re: Sanford Investment Agreement between J&J Consulting/Jeffrey Judd and Crestview Capital

J&J Consulting/Jeffrey Judd has a business where he purchases contracts (Purchase Agreements) for attorney's clients once a settlement has been reached and an award has been granted. Jeffrey Judd uses his own money and money from friends and family to purchase these contracts. Jeffrey Judd uses the services of Matthew Beasley Esq. to assist him in finding these agreements and also to write the contracts. The Purchase Agreement act as a lien on the client's settlement.

Crestview Capital (Entity) and TJI LLC will be purchasing part of the Sanford Purchase Agreement. This will be a split Purchase Agreement (See Attachment) for $80,000 and the term of the contract will be for 90 days. Crestview Capital will be investing $70,000 and TJI LLC will be investing $10,000 to equal the said amount. If the agreement closes within 90 days, the Entity will receive a return of $8,750. If this agreement extends over 90 days, the Entity will receive $3,250 for each additional month the contract goes over the 90 days.

Marshall Gibbs will represent the Entity and be instructed by Shane Jager, representing J&J Consulting, as to where to wire the funds and other matters.

The Entity and their members are prohibited from contacting any parties related to the injury settlement or Purchase Agreement, without the written consent of Jeffrey Judd.

Force Majeure. No Party shall be deemed in default of any Purchase Agreement or, unless otherwise expressly provided therein, any Ancillary Agreement for any delay or failure to fulfill any obligation hereunder or thereunder so long as and to the extent to which any delay or failure in the fulfillment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of Force Majeure. In the event of any such excused delay, the time for performance of such obligations shall be extended for a period equal to the time lost by reason of the delay. A Party claiming the benefit of this provision shall, as soon as reasonably practicable after the occurrence of any such event, (a) provide written notice to the other Party of the nature and extent of any such Force Majeure condition; and (b) use commercially reasonable efforts to remove any such causes and resume performance under this Agreement and the Ancillary Agreements, as applicable, as soon as reasonably practicable.

Shane Jager, acting through Stirling consulting LLC, will represent the Entity (instructed by Shane Jager, representing J&J Consulting) limited to such matters as to where to wire incoming

funds, issuing ACH returns and the return of principal (upon the Entity exit) to the Entity as provided by J&J Consulting per this Investment Agreement. Shane Jager and Stirling consulting LLC are hereby indemnified and held harmless in all other matters pertaining to the Purchase Agreement's and the Investor Agreement's now and in future agreements.

_____                    **12/29/2020**
Jeffrey Judd                                        Date


_____
Marshall Gibbs                                      Date

Attachment A
Purchase Agreement

# Exhibit C

## Example of Buyer Agreement

October 19, 2021

Attn: Todd Sansom

Re: Creger Buyer Agreement between J&J Consulting Services, Inc./Jeffrey Judd and MTWE Investments LLC.

J&J Consulting Services, Inc./Jeffrey Judd has a business where he purchases contracts (Purchase Agreements) for attorney's clients once a settlement has been reached and an award has been granted. Jeffrey Judd uses his own money and money from friends and family to purchase these contracts. Jeffrey Judd uses the services of Matthew Beasley Esq. to assist him in finding these agreements and also to write the contracts. The Purchase Agreement act as a lien on the client's settlement.

MTWE Investments LLC (Entity) will be purchasing part of the "Creger" Purchase Agreement. This Purchase Agreement (See Attachment) will be for $80,000 and the term of the contract will be for 90 days. If the agreement closes within 90 days the Entity will receive a return of $10,000 and the principle will be rolled over into another Purchase Agreement until such time that the Entity desires to receive the principal back. If the Purchase Agreement extends over 90 days the Entity will receive $5,000 for each additional month the contract goes over the initial 90 days.

Force Majeure. No Party shall be deemed in default of any Purchase Agreement or, unless otherwise expressly provided therein, any Ancillary Agreement for any delay or failure to fulfill any obligation hereunder or thereunder so long as and to the extent to which any delay or failure in the fulfillment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of Force Majeure. In the event of any such excused delay, the time for performance of such obligations shall be extended for a period equal to the time lost by reason of the delay. A Party claiming the benefit of this provision shall, as soon as reasonably practicable after the occurrence of any such event, (a) provide written notice to the other Party of the nature and extent of any such Force Majeure condition; and (b) use commercially reasonable efforts to remove any such causes and resume performance under this Agreement and the Ancillary Agreements, as applicable, as soon as reasonably practicable.

Roland Tanner, acting through Anthem Assets LLC, will represent the Entity (instructed by Shane Jager, representing J&J Consulting Services, Inc.) limited to such matters as to where to wire incoming funds, issuing ACH returns and the return of principal (upon the Entity exit) to the Entity as provided by J&J Consulting Services, Inc. per this Buyer Agreement. Roland Tanner and Anthem Assets LLC in addition to Shane Jager are hereby indemnified and held harmless in all other matters pertaining to this Purchase Agreement and Buyer Agreement.

The Entity and their members are prohibited from contacting any parties related to the injury settlement or Purchase Agreement, without the written consent of Jeffrey Judd.

*Jeffrey Judd*
_____          10/19/2021
Jeffrey Judd                                        date

*Todd Sansom*
_____          10/20/2021
Todd Sansom                                       date

Attachment A
Purchase Agreement

# Exhibit D

## Confidential Private Placement Memorandum

## ("PPM")

**Name of Prospective Investor:** _____

# J & J PURCHASING, LLC

### ("THE COMPANY")

### A LIMITED LIABILITY COMPANY FORMED UNDER THE LAWS OF FLORIDA
### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
### AGGREGATE OFFERING AMOUNT: UNLIMITED

### JANUARY 1, 2022

### ("EFFECTIVE DATE")

THE COMPANY OFFERS TO PROSPECTIVE INVESTORS ("**INVESTORS**") PURSUANT TO THIS PRIVATE PLACEMENT MEMORANDUM ("**MEMORANDUM**") AN OPPORTUNITY TO INVEST IN A **PARTIAL BENEFICIAL INTEREST** OF A "**PURCHASE CONTRACT**." PURCHASE CONTRACTS ARE NEGOTIATED BY COMPANY AND ENTERED INTO WITH "**THIRD-PARTY BENEFICIARIES**" OF CERTAIN "**INSURANCE SETTLEMENT AGREEMENTS**." THE CONSIDERATION FOR A COMPANY NEGOTIATED AND SECURED PURCHASE CONTRACT IS FUNDED BY THE INVESTOR'S $80,000.00 OR $100,000.00 "**INVESTMENT PRINCIPAL**." THIS OFFERING IS ONLY OPEN TO "**ACCREDITED INVESTORS**" AND SUBJECT TO ALL COMPANY SUBSCRIPTION DUE DILIGENCE STANDARDS.

A PURCHASE CONTRACT TIED TO AN INSURANCE SETTLEMENT AGREEMENT IS NEGOTIATED AND SECURED BY COMPANY IN $80,000.00 OR $100,000 VALUES. ACCORDINGLY, THE MINIMUM SUBSCRIPTION INVESTMENT UNDER THIS OFFERING IS EIGHTY THOUSAND DOLLARS ($80,000.00) (THE "**MINIMUM OFFERING AMOUNT**") AND UP TO THE MAXIMUM SUBSCRIPTION INVESTMENT OF FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) (THE "**MAXIMUM OFFERING AMOUNT**") (COLLECTIVELY, THE "**OFFERING**"). THE COMPANY'S MANAGING MEMBER/PRESIDENT HAS THE SOLE DISCRETION TO ACCEPT INVESTMENTS UNDER THIS OFFERING IN ANY PARTICULAR AMOUNT OR REQUIRE A HIGHER AMOUNT ALL OF WHICH MATTERS ARE SUBJECT TO COMPANY'S DUE DILIGENCE UNDER ITS COMPLIANCE PROGRAM.

AN INVESTOR UNDER THIS OFFERING, AND AS RELEVANT TO A PURCHASE CONTRACT, INVESTS IN A "**PARTIAL BENEFICIAL INTEREST**." SPECIFICALLY, A PARTIAL BENEFICIAL INTEREST IN THE REVENUE SECURED UNDER THE TERMS OF THE PURCHASE CONTRACT. THE INVESTOR'S PARTIAL BENEFICIAL INTEREST IS EQUAL TO THE "**INVESTMENT RETURN**" WHICH, AFTER THE EXPIRATION OF THE "**PLACEMENT PERIOD**," THE INVESTOR WILL RECEIVE IN A LUMP SUM. AT THAT TIME, THE INVESTOR MAY CHOOSE TO EXERCISE THE "**RIGHT OF REDEMPTION**" FOR THE REFUND OF THEIR INVESTMENT PRINCIPAL. IF SO EXERCISED, THE INVESTOR WILL CEASE TO BE AN INVESTOR. AT SUCH TIME, THE INVESTOR MAY, IN COMPANY'S DISCRETION, AND AS FURTHER DESCRIBED IN THE MEMORANDUM, HAVE THE BENEFIT OF THE "**OPTION TO REINVEST**" THE INVESTMENT PRINCIPAL. THE OPTION TO REINVEST IS NOT AUTOMATIC AND IS SUBJECT TO COMPANY APPROVAL. ALL PROFITS OR REVENUES CAPTURED OR OTHERWISE SECURED UNDER THE TERMS OF ANY PURCHASE CONTRACT, **OTHER THAN THE INVESTMENT PRINCIPAL AND INVESTMENT RETURN**, WILL BELONG SOLELY TO THE COMPANY.

## INVESTOR NOTICES AND DISCLOSURES

THIS **PRIVATE PLACEMENT MEMORANDUM** CONTAINS CONFIDENTIAL INFORMATION. BY ACCEPTING DELIVERY OF THE MEMORANDUM, AS CONSISTENT WITH YOUR PRIOR EXECUTED NON-DISCLOSURE AGREEMENT(S), YOU AGREE NOT TO COPY, DISTRIBUTE, OR DISCLOSE ITS CONTENTS TO UNAUTHORIZED PERSONS OR ENTITIES. SPECIFICALLY, YOU AGREE THAT ANY REPRODUCTION OR DISCLOSURE FOR ANY PURPOSE OTHER THAN FOR THE NAMED PROSPECTIVE INVESTOR'S CONSIDERATION OF AN INVESTMENT UNDER THE OFFERING DESCRIBED HEREIN IS STRICTLY PROHIBITED. IF THE NAMED PROSPECTIVE INVESTOR DECIDES NOT TO PARTICIPATE IN THIS OFFERING, OR IF COMPANY TERMINATES THIS OFFERING, YOU MUST PROMPTLY RETURN THIS MEMORANDUM AND ANY OTHER MATERIAL THE COMPANY MAY SUBSEQUENTLY OR CONCOMITANTLY PROVIDE TO YOU AND TO THE ADDRESS NOTED HEREIN.

THE INVESTMENT DESCRIBED IN THIS CONFIDENTIAL **MEMORANDUM** PURSUANT TO THIS OFFERING IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. THIS MEMORANDUM SETS OUT THE MATERIAL RISKS IN CONNECTION WITH AN INVESTOR'S INVESTMENT UNDER THIS OFFERING FOR THE **PARTIAL BENEFICIAL INTEREST** IN COMPANY NEGOTIATED AND SECURED PURCHASE CONTRACTS TIED TO THIRD-PARTY BENEFICIARY INSURANCE SETTLEMENT AGREEMENTS. THE INVESTOR'S INVESTMENT (THE "**INVESTMENT PRINCIPAL**") WILL BE USED AS CONSIDERATION FOR A "PURCHASE CONTRACT" (SEE GENERALLY, EXHIBIT C) AND, UNDER ITS TERMS AND THOSE OF THIS OFFERING, A PARTIAL BENEFICIAL INTEREST RELEVANT TO SUCH THIRD-PARTY INSURANCE PAID CLAIMS UNDER SUCH THIRD PARTIES' INSURANCE SETTLEMENT AGREEMENT. NO SUCH THIRD-PARTY CLAIMS UNDER ANY INSURANCE SETTLEMENT AGREEMENTS STEM FROM CURRENT COURT LITIGATION, BUT RATHER FROM SETTLEMENT OF SUCH CLAIMS BEFORE ANY RELEVANT LAWSUIT IS FILED BY SUCH THIRD PARTIES. FROM THE PROFITS AND REVENUES SECURED UNDER THE TERMS OF A PURCHASE CONTRACT FUNDED BY THE INVESTOR'S INVESTMENT PRINCIPAL, THE INVESTOR MAY EXPECT TO RECEIVE BACK **ONLY** THEIR "**INVESTMENT PRINCIPAL**" AND THE "**INVESTMENT RETURN**." SPECIFICALLY, UNDER THIS OFFERING, THE INVESTOR MAY **ONLY EXPECT TO RECEIVE THE INVESTMENT PRINCIPAL AND INVESTMENT RETURN** WITH THE COMPANY RETAINING **ALL OTHER PROFIT OR OTHER AMOUNTS REALIZED BY COMPANY OR OTHERWISE SECURED UNDER THE TERMS OF ANY PURCHASE CONTRACT** OR GERMANE TO THE CLAIMS SETTLED IN THE RELEVANT INSURANCE SETTLEMENT AGREEMENT (SEE "**RISK FACTORS AND OTHER DISCLOSURES**").

THE INVESTMENT, UPON EXECUTION AND ACCEPTANCE OF THE ENCLOSED SUBSCRIPTION DOCUMENTS, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), THE LAWS OF THE STATE OF FLORIDA OR THE SECURITIES LAWS OF ANY OTHER STATE AND IS BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH JURISDICTIONS AND LAWS. MOREOVER, THE INVESTMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, THE FLORIDA DIVISION OF SECURITIES, THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, OR ANY OTHER STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION BY ANYONE TO THE CONTRARY IS UNAUTHORIZED AND UNLAWFUL. THE OFFERING DESCRIBED HEREIN IS BEING MADE **ONLY** TO **ACCREDITED INVESTORS** AS DEFINED IN RULE 501 OF REGULATION D OF THE SECURITIES ACT OF 1933, AS AMENDED AND SUBJECT TO COMPANY'S COMPLIANCE PROGRAM DUE DILIGENCE.

SUBJECT TO THE **INVESTOR QUALIFICATION REQUIREMENTS AND VARIOUS OTHER DUE DILIGENCE CONDITIONS** DESCRIBED HEREIN, THIS MEMORANDUM CONSTITUTES AN OFFER **ONLY TO THE PERSON TO WHOM THE MEMORANDUM IS PURPOSEFULLY DISTRIBUTED BY THE COMPANY**. THE COMPANY DOES NOT, UNDER ANY CIRCUMSTANCES, INTEND THIS MEMORANDUM TO CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, TO ANYONE IN ANY STATE IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION. **THE COMPANY RESERVES THE RIGHT, IN ITS SOLE DISCRETION,** TO: (A) MODIFY, AMEND, OR WITHDRAW ANY PORTION OF THE OFFERING, OR (B) TO ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE INVESTMENT UNDER THIS OFFERING, OR (C) TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AMOUNT OF INVESTMENT SUCH PROSPECTIVE INVESTOR DESIRES TO INVEST. IN CASE ANY OF THE FOREGOING OCCURS, THE COMPANY SHALL HAVE NO LIABILITY WHATSOEVER TO ANY PROSPECTIVE INVESTOR/SUBSCRIBER.

THE INVESTMENT FOR PARTIAL BENEFICIAL INTERESTS DESCRIBED IN THIS MEMORANDUM IS SUBJECT TO **ABSOLUTE RESTRICTIONS ON TRANSFERABILITY OR RESALE OR REFUND** AND MAY NOT BE TRANSFERRED OR RESOLD WITHOUT EXPLICIT APPROVAL OF COMPANY, WHICH, IF EVER PERMITTED MUST BE COMPLIANT AND PURSUANT ALL STATE AND FEDERAL LAWS AND REGULATIONS AND THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND PURSUANT TO COMPANY MANAGING MEMBER'S/PRESIDENT'S APPROVAL. THE INVESTMENT AND INVESTMENT PRINCIPAL IS FURTHER **SUBJECT TO CERTAIN RETENTION AND ILLIQUIDITY RESTRICTIONS PURSUANT TO THE SUBSCRIPTION DOCUMENTS AND THE COMPANY'S OPERATING AGREEMENT** AND ANY SUPPLEMENT OR AMENDMENT THERETO. PROSPECTIVE INVESTORS SHOULD BE AWARE THAT THEY MIGHT BE REQUIRED TO **BEAR FINANCIAL RISKS OF THIS INVESTMENT** FOR THE DURATION OF THEIR INVESTMENT.

IN ACCORDANCE WITH THE TERMS OF THIS MEMORANDUM, ALL INVESTMENTS ARE STRICTLY SUBJECT TO THE COMPANY'S ACCEPTANCE OF PROSPECTIVE INVESTOR'S SUBSCRIPTIONS TO INVEST. ANY DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS TO OTHER THAN SUCH PROSPECTIVE INVESTOR OR HIS, HER OR ITS ADVISORS, IS STRICTLY PROHIBITED. NEITHER THE

DELIVERY OF THIS MEMORANDUM, NOR ANY INVESTMENT MADE PURSUANT HERETO, WILL IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE SET FORTH ON THE COVER HEREOF. HOWEVER, COPIES OF THE MEMORANDUM DELIVERED AFTER THE OCCURRENCE OF ANY SUCH MATERIAL CHANGE WILL BE AMENDED OR SUPPLEMENTED ACCORDINGLY.

NO OFFERING LITERATURE SHALL BE USED IN CONNECTION WITH THIS OFFERING EXCEPT THE INFORMATION CONTAINED IN THIS MEMORANDUM. **NO PERSON HAS BEEN AUTHORIZED BY THE COMPANY TO MAKE ANY REPRESENTATIONS OR GIVE ANY INFORMATION WITH RESPECT TO THE INVESTMENT EXCEPT THE INFORMATION CONTAINED HEREIN. IN NO CASE MAY ANY COMPANY REPRESENTATIVE SERVE AS AN INVESTMENT OR FINANCIAL ADVISOR TO ANYONE, AND NO THIRD-PARTY MAY ACT AS SUCH IN RELATION TO THE COMPANY.**

IN MAKING AN INVESTMENT DECISION, PROSPECTIVE INVESTORS **MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY, ITS EXPECTED BUSINES OPERATIONS, AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.** PROSPECTIVE INVESTORS MAY NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY OTHER DOCUMENTS DELIVERED HEREWITH AS INVESTMENT, TAX, ACCOUNTING, FINANCIAL, OR LEGAL ADVICE. THIS MEMORANDUM, AS WELL AS THE NATURE OF ANY INVESTMENT, SHOULD BE REVIEWED BY EACH PROSPECTIVE INVESTOR AND SUCH INVESTOR'S INVESTMENT, TAX, LEGAL, ACCOUNTING AND OTHER ADVISORS AS A FUNCTION OF THE INVESTOR'S RELATIONSHIP TO SUCH ADVISORY INDIVIDUALS OR ENTITIES AND NO ONE ELSE.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, THE PROSPECTIVE INVESTOR CERTIFIES AN OBLIGATION PURSUANT TO A PRIOR EXECUTED NON-DISCLOSURE AGREEMENT AND FURTHER AGREES TO: (I) KEEP THE MEMORANDUM AND ITS CONTENTS CONFIDENTIAL, (II) NOT DISSEMINATE THE MEMORANDUM OR DISCLOSE ITS CONTENT OR TERMS TO ANY THIRD PARTY, (III) NOT USE THE MEMORANDUM OR ITS CONTENT OR TERMS FOR ANY PURPOSE OTHER THAN EVALUATION BY SUCH PROSPECTIVE INVESTOR OF A POTENTIAL PRIVATE INVESTMENT IN THE COMPANY. MOREOVER, THE PROSPECTIVE INVESTOR AGREES TO RETURN THE **MEMORANDUM** TO THE COMPANY AS FOLLOWS: C/O **MR. JEFFREY JUDD, PRESIDENT, J AND J PURCHASING, LLC AT 9 SKY ARC COURT, HENDERSON, NV 89012**. IF: (A) THE PROSPECTIVE INVESTOR DOES NOT SUBSCRIBE PURSUANT TO THE TERMS HEREOF, (B) THE PROSPECTIVE INVESTOR'S SUBSCRIPTION IS NOT ACCEPTED BY THE COMPANY, OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN. THE SUMMARIES AND DESCRIPTIONS OF DOCUMENTS IN THIS MEMORANDUM DO NOT PURPORT TO BE COMPLETE AND THE FULL TEXT OF SUCH DOCUMENTS IS EITHER ATTACHED AS EXHIBITS HERETO OR AVAILABLE FOR INSPECTION THOUGH COMPANY'S PRESIDENT, MR. JEFFREY JUDD.

THERE IS NO TRADING MARKET FOR A **PARTIAL BENEFICIAL INTEREST** AND THERE IS CURRENTLY NONE EVER ANTICIPATED. MOREOVER, ANY BENEFICIAL INTEREST DOES NOT HAVE AN ESTABLISHED PUBLIC MARKET NOR WILL ANY SUCH MARKET DEVELOP ANY OF WHICH IS NONETHELESS RESTRICTED PURSUANT TO THE TERMS OF THIS OFFERING. PROSPECTIVE INVESTORS MUST CONSIDER THIS INVESTMENT TO BE ILLIQUID **FOR THE THREE-MONTH "PLACEMENT PERIOD"** AND THE UP TO FIVE (5) BUSINESS DAY INVESTMENT PRINCIPAL RETURN PERIOD SUBSEQUENT INVESTOR'S EXERCISE OF INVESTOR'S **RIGHT OF REDEMPTION**. INVESTMENT IN THE SECURITIES IS SUITABLE ONLY FOR PERSONS WITH **SUBSTANTIAL FINANCIAL RESOURCES** WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT **AND WHO CAN AFFORD A TOTAL LOSS OF THEIR INVESTMENT**. SEE CONFLICTS OF INTEREST AND INVESTOR SUITABILITY STANDARDS.

THE INVESTMENT UNDER THIS OFFERING FOR ONE OR MORE **PARTIAL BENEFICIAL INTERESTS** WILL BE OFFERED AND SOLD SOLELY TO **ACCREDITED INVESTORS** WHO REPRESENT THAT THE **PARTIAL BENEFICIAL INTEREST(S)** ARE BEING ACQUIRED FOR HIS, HER, OR ITS OWN ACCOUNT FOR INVESTMENT ONLY AND NOT WITH A VIEW TOWARD THE SALE OR DISTRIBUTION THEREOF. COMPANY EXPECTS AND HIGHLY RECOMMENDS THAT INVESTORS HAVE SUFFICIENT KNOWLEDGE AND EXPERIENCE IN BUSINESS AND FINANCIAL MATTERS TO EVALUATE THE MERITS AND RISKS OF THIS INVESTMENT, AND NONETHELESS, INVESTORS SHOULD SEEK SEPARATE AND INDEPENDENT LEGAL, FINANCIAL, ACCOUNTING, INVESTMENT AND TAX ADVICE. EACH INVESTOR SHOULD BE ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISKS OF THIS INVESTMENT AND AT THE PRESENT TIME CAN AFFORD A COMPLETE LOSS OF SUCH INVESTMENT.

THIS OFFERING CAN BE MODIFIED, WITHDRAWN OR TERMINATED AT ANY TIME WITHOUT NOTICE AND ANY OFFER IS SPECIFICALLY MADE SUBJECT TO THE CONDITIONS DESCRIBED IN THIS **MEMORANDUM**. IN CONNECTION WITH THE OFFERING AND SALE OF THE PARTIAL BENEFICIAL INTERESTS, COMPANY RESERVES THE RIGHT, IN PRESIDENT'S SOLE DISCRETION, TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART, AND TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE NUMBER OF PARTIAL **BENEFICIAL INTERESTS** WHICH SUCH INVESTOR INVESTS FOR (SEE **CONFLICTS OF INTEREST** IN THIS MEMORANDUM) OR WISHES FOR COMPANY TO PLACE UNDER PURCHASE CONTRACTS. COMPANY MAY REJECT ANY SUBSCRIPTION FOR ANY REASON.

THIS CONFIDENTIAL PRIVATE PLACEMENT **MEMORANDUM** AND THE EXHIBITS AND APPENDICES THERETO MAY CONTAIN REFERENCES TO OR SUMMARIES OF MATERIAL DOCUMENTS. ALTHOUGH SUCH SUMMARIES ARE BELIEVED TO BE ACCURATE, THEY DO NOT PURPORT TO BE A COMPLETE DESCRIPTION OF EVERY TERM AND CONDITION AND REFERENCE IS HEREBY MADE TO THE ACTUAL DOCUMENTS FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES THERETO. THE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THIS REFERENCE. ALL DOCUMENTS RELATING TO THIS INVESTMENT WILL BE MADE AVAILABLE FOR INSPECTION BY THE PROSPECTIVE INVESTOR OR HIS REPRESENTATIVES AND OTHER ADVISORS THROUGH COMPANY'S PRESIDENT AND UPON NOTICE TO PRESIDENT.

NO OFFERING LITERATURE OR ADVERTISING, IN WHATEVER FORM, MAY BE RELIED ON BY THE POTENTIAL INVESTOR IN EVALUATING THE OFFERING OF THESE PARTIAL BENEFICIAL INTERESTS OTHER THAN THIS CONFIDENTIAL PRIVATE OFFERING **MEMORANDUM** AND THE APPENDICES AND EXHIBITS THERETO. **NO PERSON** HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THIS OFFERING OR THE INVESTMENT THEREIN, EXCEPT THE INFORMATION CONTAINED HEREIN, AND ANY INFORMATION OTHER THAN THAT CONTAINED HEREIN MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY COMPANY OR ANY OF OUR AUTHORIZED OFFICER REPRESENTATIVES. ANY PREDICTIONS AND REPRESENTATIONS, WRITTEN OR ORAL, WHICH DO NOT CONFORM TO THOSE CONTAINED IN THE **MEMORANDUM** SHOULD BE DISREGARDED AND THEIR USE IS A VIOLATION OF THE LAW. THE PRESIDENT AND ANY AFFILIATED PERSON SHALL NEVER SERVE AS A FINANCIAL OR INVESTMENT ADVISOR, WITH THE CONTENTS OF THIS MEMORANDUM BEING THE SOLE SOURCE OF INFORMATION FROM WHICH ANY INVESTOR MAY RELY ON. **THE LAW FIRM THAT DRAFTED THIS MEMORANDUM DISCLAIMS ALL LIABILITY FOR THE CONTENTS OF THIS MEMORANDUM AND DOES NOT SERVE TO VERIFY ANY CONTENT OF SAME OR THAT OF THE COMPANY'S OPERATIONS**.

THE INFORMATION CONTAINED IN THE OFFERING DOCUMENT MAY CHANGE AFTER ISSUE AND THE COMPANY ACCEPTS NO FORMAL OBLIGATION TO UPDATE THE INFORMATION CONTAINED IN THIS OFFERING DOCUMENT EXCEPT TO CORRECT ANY MEMORANDUM MISSTATEMENT OR ANY INFORMATION THAT BECOMES UNTRUE.

THE CONTENT OF THIS OFFERING DOCUMENT AND ANY OTHER PRIOR OR SUBSEQUENT COMMUNICATIONS FROM OR WITH THE COMPANY OR ANY OF ITS REPRESENTATIVES, OR ANY PERSON, FIRM OR ENTITY ASSOCIATED WITH THE OFFERING **DOES NOT CONSTITUTE LEGAL, INVESTMENT, TAX OR ANY OTHER FORM OF PROFESSIONAL ADVICE NOR IMPLIES OR CREATES ANY RELATIONSHIP THEREWITH**.

YOU MUST CONSULT YOUR OWN COUNSEL, ACCOUNTANT, AND BUSINESS, FINANCIAL OR INVESTMENT ADVISOR AS TO LEGAL, TAX, AND OTHER MATTERS RELATING TO THE INVESTMENT IN THE PARTIAL BENEFICIAL INTEREST(S). PRIOR TO SIGNING THE SUBSCRIPTION AGREEMENT, ANY PROSPECTIVE INVESTOR MAY ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE PRESIDENT OF THE COMPANY CONCERNING (A) THE TERMS AND CONDITIONS OF THE OFFERING, AND (B) ANY ADDITIONAL RELEVANT INFORMATION IN THE COMPANY'S POSSESSION. YOU MUST RELY ONLY UPON WHAT IS CONTAINED IN THIS MEMORANDUM UNLESS ADDITIONAL INFORMATION IS PROVIDED TO YOU IN DOCUMENTED FORM RESULTING FROM CONVERSATIONS YOU MAY HAVE WITH THE AUTHORIZED REPRESENTATIVES OF THE COMPANY IN REGARD TO THIS OFFERING.

INVESTORS IN THIS OFFERING ARE BEING PROVIDED WITH A SPECULATIVE PROJECTION OR ESTIMATE OF PERFORMANCE. AS A NEW COMPANY, AUDITED FINANCIAL STATEMENTS OF THE COMPANY ARE NOT AVAILABLE. PROJECTIONS AND ASSUMPTIONS CONTAINED HEREIN ARE BASED UPON MANAGEMENT ESTIMATES AS OF THE DATE OF THIS **MEMORANDUM**. WE CAN PROVIDE NO ASSURANCES THAT MANAGEMENT ESTIMATES OF FINANCIAL PERFORMANCE, MARKETPLACE AVAILABILITY, AND ASSUMPTIONS GERMANE TO ANY PURCHASE CONTRACT OR THE AVAILIABILITY THEREOF WILL BE PROVEN CORRECT.

ACCORDINGLY, RELIANCE ON PROJECTIONS IS SPECULATIVE. SEE "RISK FACTORS AND OTHER DISCLOSURES." NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE PROJECTED ECONOMIC RETURN, I.E., THE INVESTMENT RETURN WHICH MAY ACCRUE TO INVESTORS. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS CONFIDENTIAL **MEMORANDUM** AS LEGAL, TAX OR INVESTMENT ADVICE. EACH INVESTOR SHOULD CONSULT THE INVESTOR'S OWN COUNSEL AND ACCOUNTANT AND FINANCIAL ADVISER AS TO LEGAL, FINANCIAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

# PRIVATE PLACEMENT MEMORANDUM
## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | SUMMARY OF THE OFFERING | 6 |
| II. | REQUIREMENTS FOR INVESTORS | 13 |
| | A. General Suitability Standards | 13 |
| | B. Accredited Investors | 13 |
| | C. Other Requirements | 13 |
| III. | FORWARD-LOOKING STATEMENTS | 14 |
| IV. | THE BUSINESS - EXECUTIVE SUMMARY | 15 |
| V. | RISK FACTORS AND OTHER DISCLOSURES | 16 |
| | A. Risks Related to the Company | 16 |
| | B. Legal - Regulation | 19 |
| | C. Insurance | 20 |
| | D. Background of Company's President | 20 |
| | E. Conflicts of Interests | 20 |
| | F. Pro Forma Capitalization | 22 |
| VI. | COMPANY STRUCTURE | 23 |
| VII. | TAX STATUS | 24 |
| VIII. | USE OF PROCEEDS | 25 |
| IX. | FINANCIAL PROJECTIONS | 26 |
| X. | FEDERAL AND STATE INCOME TAX ASPECTS | 27 |
| XI. | ADDITIONAL INFORMATION | 28 |

| | |
|---|---|
| **EXHIBIT A** | **ARTICLES OF ORGANIZATION – CORPORATE DOCUMENTATION** |
| **EXHIBIT B** | **COMPANY OPERATING AGREEMENT** |
| **EXHIBIT C** | **SAMPLE INSURANCE SETTLEMENT AGREEMENTS ($80,000.00 AND $100,000.00)** |
| | **COMPANY'S CODE OF ETHICS AND BUSINESS CONDUCT** |
| **EXHIBIT D** | **INVESTOR QUESTIONNAIRE** |

# I.     SUMMARY OF THE OFFERING

THE FOLLOWING CONTAINS CERTAIN INFORMATION REGARDING THE OFFERING BUT DOES NOT CONTAIN ALL THE INFORMATION THAT MAY BE IMPORTANT TO POTENTIAL INVESTORS. POTENTIAL INVESTORS SHOULD READ THIS ENTIRE DOCUMENT AND EACH EXHIBIT CAREFULLY BEFORE THEY DECIDE TO INVEST UNDER THIS OFFERING FOR THE PLACEMENT OF THEIR INVESTMENT TO SECURE A PARTIAL BENEFICIAL INTEREST IN PURCHASE CONTRACTS TIED TO THE FUNDING OF THIRD-PARTY BENEFICIARY INSURANCE SETTLEMENT AGREEMENTS.

**THE COMPANY'S LEGAL OR OTHER COUNSEL DISCLAIM ALL LIABILITY UNDER THIS OFFERING AND ARE NOT ADVISING THE PROSPECTIVE INVESTORS, NOTING THAT LEGAL OR OTHER COUNSEL HAS NOT PERFORMED ANY DUE DILIGENCE REGARDING ANY CONTENT IN THIS MEMORANDUM WITH ALL INFORMATION SOLELY PROVIDED BY COMPANY. ALL POTENTIAL INVESTORS SHOULD SEEK INDEPENDENT TAX, LEGAL, FINANCIAL, INVESTMENT, ACCOUNTING AND OTHER COUNSEL TO ADVISE THEM WITH RESPECT TO ANY INVESTMENT UNDER THIS OFFERING.**

| | |
|---|---|
| **THE COMPANY AND THIS OFFERING GENERALLY** | **J and J Purchasing, LLC** (the "**Company**") is a new Florida limited liability company that has no operating history but will hereafter under this Offering: (1) receive, certify, and manage the Investments Proceeds from this Offering as transferred by Investor to the Company's Escrow Account in full compliance with all Subscription Documentation matters hereto and concomitant Due Diligence by Company thereon; (2) utilize the Investor's Investment Principal as consideration for a Third-Party Beneficiary (owner of claims settled through an existing/expected Insurance Settlement Agreement) to assign certain beneficial interests under such Insurance Settlement Agreement to the Company and through a "Purchase Contract" instrument that is funded by the Investment Principal, and whereby a part of such Third-Party Beneficiary-assigned beneficial interest is retained on behalf of the Investor and will be paid to the Investor as Investor's "Partial Beneficial Interest" and which sum is the "Investment Return;" (3) provide Investors a monthly statement germane to the activity of their relevant Partial Beneficial Interest(s) under one or more Purchase Contract(s) and pay to Investors their Partial Beneficial Interest (the "Investment Return" upon the expiration of the relevant "Placement Period;" and (4) comply with Investor's right to redeem their Investment Principal pursuant to Investor's retained "Right of Redemption" or act consistent with Investor's "Option to Reinvest" as further delimited below.<br><br>The opportunity to invest in Partial Beneficial Interests is offered by the Company with no commission or other remuneration paid to any person, directly or indirectly, for solicitation of Investors or otherwise for the offering and sale of Partial Beneficial Interests hereunder. Any "Finder" directly or indirectly affiliated with the Company may not serve or act in any way as a financial or investment advisor, any of which act would be prohibited under the Act or any other SEC limitations. |
| **PRESIDENT AND OPERATION OF THE COMPANY** | The Company, and all relationship permutations as between the Company, the Company's sole owner, or future owners and Managing Member/President (Mr. Jeffrey Judd, hereafter "President") and the Investors under this Offering is governed by the Company's Operating Agreement, attached hereto as Exhibit B (the "Operating Agreement").<br><br>Because the Investors **join the Operating Agreement only as Investors** in Partial Beneficial Interests under Company-negotiated and otherwise secured Purchase Contracts and **not as owners or members of the Company,** Investors do not, and will not, participate in the management of, nor control the, Company's business, nor transact any business for the Company, nor have any right to any Company Units, stock or other ownership or distribution interest in, or of, Company nor power to bind the Company and will not receive any profit or other distribution germane to any Company revenue or operations, including but not limited to, the beneficial interests that belong solely to the Company (and are strictly retained for the benefit of the Company) under all Purchase Contracts.<br><br>**The Investor's sole interest and expected potential investment profit under this Offering and provided for in the Operating Agreement is the "Investment Return"** (as defined in herein and the Operating Agreement) that is retained under a "Purchase Contract" as the Investor's specific "Partial Beneficial Interest." Separately, the Investor herein retains the Right of Redemption of the Investor's "Investment Principal."<br><br>The Company is Member Managed by Mr. Jeffrey Judd, President of the Company. The sole Company Member is Mr. Judd, owning 100% of the Units in the Company. Mr. Judd's management activities will include the Company's day-to-day operations and all matters described in this summary of the Offering and where otherwise described including the retention of services relevant to the negotiation and securing of Purchase Contracts. The Operating Agreement sets forth the obligation for President to act on behalf of the Investors germane to Investor's Partial Beneficial Interest, Investment Return lump sum payment, Right of Redemption, and if relevant, Option to Reinvest. The capitalization of the Company is set forth in the Operating Agreement (Exhibit B). The Company's principal place of business will be determined by the President but is currently 9 Sky Arc Court, Henderson, NV 89012. |

| | |
|---|---|
| **INSURANCE SETTLEMENT AGREEMENT INTERESTS** | President will apply the Investment Principal to fund a Purchase Contract germane to a Third-Party Beneficiary's interest in the proceeds from an Insurance Settlement Agreement. Redacted examples of such $80,000.000 and $100,000.00 Purchase Contracts are found in Exhibit C. Company states that the causes of action, claims, or liability circumstances implicated or relevant to any Insurance Settlement Agreement, and the beneficial interest that is secured therein by Company under a Purchase Contract, **do not involve pending lawsuits or other court proceedings** (such controversy is not being prosecuted or defended in pending court proceedings with the controversy being settled through the relevant Insurance Settlement Agreement by the Third-Party Beneficiary prior to the institution of court action).
|  | President explicitly discloses that there may exist circumstances where Insurance Settlement Agreements that are the basis for a Purchase Contract are depleted in the marketplace or are preferentially secured on behalf of Company or any affiliated individual or Member of same, including the President (See Conflict of Interest and regarding "Conflicted Parties"). In such a case, and as a non-exclusive example, the Investor's Investment will not be applied/converted to any Partial Beneficial Interest, e.g., without limitation, when the Investor asks the Company to effectuate an Option to Reinvest or otherwise. |
|  | In the unlikely case where an Investor's Investment is unable to fund the consideration under a Purchase Contract or otherwise secure the Investor's Partial Beneficial Interest under a Purchase Contract, then President will return the Investment Principal to the Investor as soon as commercially practicable, generally **within five (5) business days**, and terminate Investor as a Company Investor, without further recourse by Investor. No Investment Return will be due to Investor under these types of circumstances noting that the Placement Period has not been met with the sole action by Company being to return to the Investor their Investment Principal and after such return, the Investor shall have no other recourse or right germane to any Investment Return or continued relationship with the Company in any way subject to the President's sole and unrestricted discretion. |
| **TERMS OF THE INVESTMENT OFFERING** | The Company offers pursuant to this Offering the potential to place Investor's Investment Principal as consideration for Purchase Contracts and the Investor's retained Partial Beneficial Interest therein of the profits from such Purchase Contract. The "Purchase Contract" is an instrument whereby the Company becomes the owner of a beneficial interest in the expected sums to be paid to Third Parties for their claims through and pursuant to an Insurance Settlement Agreement.
|  | The Purchase Contract provides that the Third-Party Beneficiary is advanced the sum of $80,000.00 or $100,000.00 (the Investor's "Investment Principal") and such Third-Party Beneficiary assigns to Company a sum larger than the Investment Principal when their relevant Insurance Settlement Agreement is funded at some time during, or at the conclusion of, the Placement Period. The Company expects to receive all the Investment Principal under the Purchase Contract and additional profits and revenues expected consistent with the terms of the Purchase Contract. From these additional profits and revenues under the Purchase Contract, the Company will **only pay the Investor their retained Partial Beneficial Interest which sum is specifically the Investment Return**. |
|  | The Investor may invest at an Offering price of $100,000.00 or $80,000.00 per Partial Beneficial Interest/the Investment Return. The Minimum Investment Subscription is $80,000.00 which funds the potential placement of one Purchase Contract and the relevant Investment Return from the Investor's retained Partial Beneficial Interest in such $80,000.00 Purchase Contract. As to $100,000.00 Purchase Contracts, the Minimum Investment Subscription is $100,000.00 which funds the potential placement of one Purchase Contract and the relevant Investment Return from the Investor's retained Partial Beneficial Interest in such $100,000.00 Purchase Contract. |
|  | The Company reserves the right to offer Partial Beneficial Interests to Investors in whatever proportion the President, in the exercise of his unrestricted discretion so decides, except in relation to an Investment under this Offering that does not meet the Minimum Investment Subscription amount. **The President reserves the right, in President's sole discretion, to reject any subscription under this Offering.** |
|  | The Partial Beneficial Interests are only being offered to Investors who meet certain suitability requirements and are satisfactory to the Company under its Due Diligence standards and otherwise, in its sole discretion, for admission as Investor for a (specific to such Investor) Partial Beneficial Interest. |
|  | **Investors will not become Members of the Company** but only hold a beneficial interest as Investors in Company negotiated Partial Beneficial Interests, i.e., for a part of the proceeds from Purchase Contracts which sum is equal, and will never exceed, the "Investment Return." No fractional Partial Beneficial Interests may be subscribed for, except as the President may otherwise decide on a case-by-case basis and in President's sole discretion for such subscriptions meeting the Minimum Investment Subscription. Any Investment under this Offering will be made by ETF (wire transfer) upon subscription and acceptance of all Subscription Documents by President and which investment sums will be transferred to and deposited in the Company's Escrow Account at the following financial institution: **Well Fargo Bank NA (Nevada) Routing Number: 121000248, Account Name, Beasley Law Group IOLTA** (noting that, upon the Company's acceptance by Company of the Subscription Documents, an authorized Company officer will inform the prospective Investor of the Account Number). |

| | |
|---|---|
| **THE EXPECTED INVESTMENT RETURN –**<br><br>**INVESTMENT RETURN DEFINED** | Under this Offering, the Company offers Investors an expected **twelve and one half (12.5%) Investment Return** for each Purchase Contract/Partial Beneficial Interest funded by the Investor's Investment Principal. The Investment Principal, as used to fund the consideration of a Purchase Contract of either a $80,000.00 or $100,000.00 increment, and the Investment Return sum will be paid to the Investor in a lump sum after the expiration of the required **90-day Placement Period if no Event of Default occurs**. The Placement Period ends when the Purchase Contract Proceeds are received by the Company from the Third-Party Beneficiary's agent/representative. |
| | When Investor submits their Subscription Documentation and funds their Investment, the President or his delegate is expected to execute the relevant Purchase Contract with the Third-Party Beneficiary to the Insurance Settlement Agreement ("Third-Party Beneficiary") and which Purchase Contract consideration on the part of the Company will be funded by the Investor's Investment Principal and transferred by wire to the relevant Third-party Beneficiary or their agent/representative. The execution of the Purchase Contract by Company and the relevant Third-party Beneficiary is expected to occur generally within **three (3) business days** after receipt of the Investment Principal by Company into its Escrow Account. The wiring of the Investment Principal to the Third-Party Beneficiary will occur after the Purchase Contract is executed. |
| | When the Investor relevant Purchase Contract is executed by the Company and the Third-Party Beneficiary and the wire of the relevant amount is wired to the Third-Party Beneficiary, the **ninety-day (90) "Placement Period" will begin**. During the Placement Period, no Investment Return will be due Investor or paid by the Company. At the conclusion of the Placement Period, if the Insurance Settlement Agreement funds the Purchase Contract beneficial interest (the "Proceeds of the Purchase Contract") and under its terms, and specifically when there is no Default Event as to either, the Investor can expect to receive the Investment Return in one lump sum and within five (5) business days after the expiration of the Placement Period/when the Company receives the Proceeds of the Purchase Contract. |
| | Under the preceding circumstances, If the Investor-retained Partial Beneficial Interest and Principal Investment relate to: (1) an $80,000.00 Purchase Contract, then the lump sum payment of the Investment Return to the Investor **will equal only $10,000.00** of the Proceeds of the Purchase Contract; or (2) a $100,000.00 Purchase Contract, then the lump sum payment of the Investment Return to the Investor will **equal only $12,500.00** of the Proceeds of the Purchase Contract. Company will issue and forward to each Investor a yearly appropriate Tax reporting form setting out all Investment Return amounts paid to Investor under any Purchase Contract. |
| | When the Company wires the Investment Return to the Investor after the expiration of the Placement Period, the Investor may inform the Company of the Investor's exercise of their Right of Redemption. If the Investor so notifies the Company, the Company will also wire to the Investor their Investment Principal, e.g., either $80,000.00 or $100,000.00 **and within five (5) business days** of Company's receipt of the Investor's notice to redeem. Each Investment Principal and Investment Return transfer may be subject to relevant wiring fees and which operating expense may be charged to the Investor and deducted from the Investment Principal/Investment Return, noting that Investor's financial organization may also charge the Investor a separate wiring fee. |
| | The opportunity to invest in Partial Beneficial Interests are being offered by the Company with no commission or other remuneration paid to any person for solicitation of Investors or for the offering and sale of Partial Beneficial Interests. The only individual authorized to communicate with the Potential Investor/Subscriber regarding any aspect of this Offering or the Subscription Documents is a Company officer; currently, only Mr. Judd is an authorized Company officer and will be able to answer certain matters regarding the Offering. Company notes that Mr. Judd, or any other person speaking on the Company's behalf, are not financial or investment advisors, and may not act or communicate in any way that is reserved to licensed/professional investment or financial advisors. In short, Mr. Judd and anyone authorized to speak on Company's behalf are not financial or investment advisors and will never act in such capacity. |
| **RIGHT OF REDEMPTION**<br><br>**OPTION TO REINVEST** | Investors may exercise an absolute Right of Redemption on the Investment Principal Invested under this Offering after (or concomitant to) Company's payment to the Investor of their Investment Return after the expiration of the Placement Period. The Right of Redemption is exercised by Investor notifying the Company's President in writing and President shall refund to Investors their Investment Principal within five (5) business days from the Investor's Right of Redemption notice. Subject to Investor's instruction to do so, and President's approval and concurrence, the Investor may benefit from the Option to Reinvest the Investment Principal invested under this Offering (after Company pays the Investor their Investment Return after the expiration of the Placement Period). |
| | The Option to Reinvest exists, if at all, only after the Investment Principal is due to Investor and after the Investment Return is paid. Specifically, if the Investor requests that Company fund the purchase of an additional and subsequent Purchase Contract, and Company so concurs in its sole discretion, then the Company will act accordingly with the Company informing the Investor of when a new Purchase Contract is funded and the concomitant start of that Purchase Contract's Placement Period. |

| | |
|---|---|
| **CONFLICTS OF INTEREST**<br><br>**COMPANY CONFLICTED PARTIES** | Investors, by their signature to the Subscription Documents, certify their understanding and agreement that, except for their Investments applied to securing/placement/assignment of Partial Beneficial Interests, all profits or revenues realized under the relevant Purchase Contract beyond what is due Investors (under their beneficial interest right to receive the Investment Return) **SHALL BE RETAINED BY THE COMPANY AND IS, WITHOUT LIMITATION, OWNED BY COMPANY (OR ITS OWNERS OR PARTNERS) AND WHETHER AS BENEFICIARY INTEREST RECIPIENT OR OTHERWISE; NOTING THAT PORTIONS OF THE BENEFICIAL INTEREST RETAINED UNDER PURCHASE CONTRACTS ARE DUE TO COMPANY THIRD PARTY SERVICES PROVIDERS.**<br><br>In short, except for the right to receive the potential Investment Return (and their Investment Principal) Company **shall retain all and any other profit or revenue that may be associated with their activities under this Offering**, whether as profit beyond the due the Investment Return to Investors or as may be otherwise realized by Company, and whether as part of their services agreements, any Purchase Contract, or their, or their owners, managers or affiliated individuals' investments which may or will be treated as preferential to the placement of any Investment for Partial Beneficial Interests on behalf of the Investors any of which activities of Company, or its owner, or President may so choose.<br><br>An Investment under this Offering can only be understood to be for potential placement by Company, but not assured to be so placed. As Company is, and will be self-funded (i.e., separate from any Investment made under this Offering which are potentially designated to fund Investment in Partial Beneficial Interests on behalf of the Investor), Company, and its owner, President and/or partners (collectively, "Conflicted Parties") may invest on their own behalf and **preferentially** secure interests germane to Insurance Settlement Agreement interests available in the marketplace **with their own funds,** except that at no time will any Investment Principal or Investment Return hereunder be effectively comingled with or used by the Conflicted Parties to secure any such personally amenable interests in purchase contract beneficial interests.<br><br>In short, Company, its President, and certain other partners do not have to preferentially secure Partial Beneficiary Interests on behalf of Investors beyond any time other than the specific Placement Period that applies to their specific Investment Principal applied to their specific Purchase Contract. Company has no duty, without limitation, to accept any Investor requested Option to Reinvest.  Other than payment of the Investment Return and refund of the Investment Principal, the Company and all affiliated individuals and entities have not duty to continue the Investor's Investment relationship to Company or as applicable to any additional Purchase Contract relationship or otherwise.<br><br>What the Investor can expect is that their Investment Principal will be utilized to secure the specific Partial Beneficial Interests at the discretion of President which does not guarantee that President will at any time preferentially place the Investor's Investment ahead of the Conflicted Parties' securing/placement/ assignment/purchase of the very Partial Beneficial Interest that could be secured on behalf of an Investor.<br><br>The Conflicted Parties are not restricted to fulfil their separate business or investment goals (except that the Conflicted Parties shall never utilize investment funds received under this Offering to secure a beneficial interest under Purchase Contracts for themselves or on their own account).<br><br>President disclaims any fiduciary or other duty to place Investor's Investment Principal ahead of Company or President's or their owners' or partner's personal funds to securing/placement/assignment/purchase beneficial interests in Purchase Contracts for, as relevant, their individual benefit and **ahead** of Investors. Nonetheless, President certifies that at no time will any Investment under this Offering be applied to any such individual benefit in securing/placement/assignment of Purchase Contracts. |
| **TRUST ACCOUNT** | President has secured that all Investments received hereunder will be held in a trust account before any disbursement is made from such Trust Account to place/secure a Partial Beneficial Interest germane to any Investor. If no Purchase Contract/Partial Beneficial Interest is secured on behalf of the Invest, the Investment Principal will remain in the Trust Account until returned as otherwise described in this Offering. |
| **PERIOD OF THE PRIVATE OFFERING** | The subscription period begins on the effective date of this Memorandum and closes at 5:00 p.m. Central Standard Time on December 31, 2022 (the "Closing Date") unless completed or terminated sooner or extended in the sole discretion of the Company. The Closing Date may not be extended except by the terms in this Memorandum and applicable law. Subscribers may submit their Subscription Agreement at any time before the Closing Date. |
| **THE COMPANY'S RIGHT TO AMEND, ACCEPT, REJECT, AND/OR CLOSE** | The Company retains the right, in its sole discretion and for any reason whatsoever, to:<br><br>(1) modify, amend, and/or withdraw all or a portion of the Offering, (2) accept or reject, in whole or in part, any prospective investment in the Partial Beneficial Interests or to allot to any prospective investor less than the number of Investor Partial Beneficial Interests such investor desires to secure, and/or (3) to close the Offering regardless of the number of Investor Partial Beneficial Interests subscribed hereunder.<br><br>The Company will have no liability whatsoever to any offeree and/or subscriber if any of the foregoing |

occurs, noting that if no Investment has been placed and the Placement Period has not begun as to any such amounts, then no Investment Return will accrue or be due Investor with the Investment Principal being returned to Investor if any such transfer of funds has occurred.

| | |
|---|---|
| **USE OF PROCEEDS**<br><br>**EVENT OF DEFAULT** | The proceeds from Investments under this Offering are to be solely allocated to the negotiated Purchase Contracts germane to Third-Party Beneficiary Insurance Settlement Agreement interests (that will yield the Investor's Partial Beneficial Interest's Investment Return) by the Company and not to any other Company expense.<br><br>**COMPANY EXPLICITLY DISCLAIMS TO AND WARNS INVESTORS THAT THE INVESTOR'S PRINCIPAL INVESTMENT AND INVESTMENT RETURN ARE NOT INSURED IN ANY WAY. PURSUANT TO ANY EVENT WHEREBY THE RELEVANT PURCHASE CONTRACT DEFAULTS — AND WHETHER SUCH DEFAULT OF THE PURCHASE CONTRACT OBLIGATIONS IS DUE TO A CONCOMITANT DEFAULT OF THE APPLICABLE INSURANCE SETTLEMENT AGREEMENT OR OTHERWISE — THE INVESTOR'S INVESTMENT PRINCIPAL MAY BE LOST IN ITS ENTIRETY AS WELL AS THE EXPECTANCY AND RIGHT TO RECEIVE THE INVESTMENT RETURN.**<br><br>The investment in Partial Beneficiary Interests in Purchase Contracts, which beneficial interest payout is tied to the payout of the source Third-Party Beneficiary Insurance Settlement Agreement at the end of the Placement Period, could fail and which circumstance will constitute an Event of Default. Investors must understand that, if the source Third-Party Beneficiary Insurance Settlement Agreement fails to fund for whatever reason, then this circumstance will generally present with a Default Event as to its relevant Purchase Contract. In such an Event of Default, then the entire Investment Principal will be lost in addition to the Investment Return. While not expected, any such Event of Default is not possible to predict, and its occurrence will result in the Investor losing the Investment Principal and Investment Return. If such Event of Default occurs, it may also lead to the Company not being able to continue to operate. |
| **SUBSCRIPTION** | All submitted Subscription Documentation (Subscription Agreement, Investor Questionnaire, etc.) and Investment Principal funds may, in the sole discretion of the President, be returned to the putative subscriber and without interest and deductions and within five (5) business days. Any subscriptions for Partial Beneficial Interests may not be withdrawn by subscribers once submitted. Each investor will be required to fill out and sign an Investor Questionnaire to affirm that subscriber meets the requirements of being an Accredited Investor and that they have such sufficient business and investment experience to evaluate the advantages and disadvantages of an investment in the Partial Beneficial Interests, and further, that the subscriber meets all Due Diligence matters for being included as an Investor under this offering and in all cases is otherwise financially able to bear the risk of loss of such Investment.<br><br>In order to subscribe for Partial Beneficial Interests, a prospective investor must provide the following to the Company at the address below at or before 5:00 p.m. Central Standard Time on December 31, 2022 (the "Closing Date"): (i) completed, signed and notarized (where applicable) Subscription Agreement, Investor Questionnaire, and Power of Attorney attached hereto as Exhibit D to this Memorandum; (ii) a joinder to the Company Operating Agreement in the form attached as Exhibit B to this Memorandum; and (iii) an ETF wire for the benefit of **J and J Purchasing, LLC** in the amount equal to the number of Partial Beneficial Interests being subscribed for multiplied by the applicable price ($80,000.00 or $100,000.00). The documents may be sent either as the President requests or in the alternative, foregoing items may be delivered to: **J and J Purchasing, LLC c/o Mr. Jeffrey Judd - 9 Sky Arc Court, Henderson, NV 89012**.<br><br>Subscribers may submit their subscriptions at any time before the Closing Date and the President may accept or reject such subscriptions prior to the Closing Date. The date or dates of the acceptance prior to the Closing Date of any such subscriptions is referred to herein as "Interim Closing Date." The Company retains the right, in its sole discretion and for any reason whatsoever to: (1) modify, amend, and/or withdraw all or a portion of the Offering; (2) accept or reject, in whole or in part, any prospective investment in the Partial Beneficial Interests or to allot to any prospective investor less than the number of Partial Beneficial Interests such investor desires to invest in; (3) to close the Offering with fewer than the potential number of Partial Beneficial Interests offered and whether same be consistent or inconsistent with the Aggregate Offering Amount; (4) extend the Offering period and the Closing Date; or (5) have multiple Interim Closing Dates. The Company will have no liability whatsoever to any offeree and/or subscriber if any of the foregoing occurs.<br><br>After the Closing of the Offering, or throughout Company's and Investor's relationship under this Offering, each Investor whose subscription has been accepted by the Company, may or will be required to execute any other documents as presented to the Investor by the Company in accordance with this Memorandum, noting that such documentation will generally relate to **Due Diligence** and **Compliance Certifications** matters. The opportunity to invest in Partial Beneficial Interests is being offered by the Company with no commission or other remuneration paid to any person for solicitation of investors or for the offering and sale of Partial Beneficial Interests.<br><br>No sales literature has been authorized for use in connection with the offering of Partial Beneficial Interests except this Memorandum. The Company is delivering this Memorandum to each individual who is, or is |

| | anticipated to be, a direct or indirect investor in the Company, and urges each individual to closely review this Memorandum and the attachments in their entirety so that each individual can decide whether he or she wishes to invest directly or indirectly in the Partial Beneficial Interests offered hereby. |
|---|---|
| **THE INVESTORS JOIN THE OPERATING AGREEMENT BUT NOT AS MEMBERS** | The Company's affairs will be conducted in the manner described in the Operating Agreement, a copy of which is attached as Exhibit B, hereto. Section 1 of the Operating Agreement contains definitions of some of the capitalized terms used in this Memorandum.<br><br>The Operating Agreement governs, restricts, and controls the President's actions on behalf of Investors under this Offering and any Member's ownership interest in the Company. It is important that prospective investors carefully read and understand its provisions as they are required to join the Company Agreement as Investors but not Members.<br><br>The distribution of available cash flow and proceeds and the allocation of taxable income or loss as germane to the Company's Members are governed by the Operating Agreement. Prospective Investors should read and become familiar with the Operating Agreement in its entirety, as they will be subject to the provisions set forth in the Operating Agreement if they invest in the Company pursuant to its Offering considering that **they will not become members in the Company, owners of Units, or otherwise will have no ownership or other voting power in any Company matter or any expectancy of Company profits or liabilities other than the Investor's Investment Return and Right of Redemption**.<br><br>The Investor's sole retained interest hereunder and thereunder will be that Investor's specific Partial Beneficial Interest/Investment Return in that Investor's specific Purchase Contract attributable to that Investor's specific Investment Principal so invested by Investor under this Offering. |
| **NO ADDITIONAL CAPITAL CONTRIBUTIONS FROM INVESTORS** | The Company does not require any or additional capital contributions from the Investors under this Offering. Only the Company's Members may be looked at for additional capital not the subject of Partial Beneficial Interest securing/placement/assignment/purchase. The Company's profits and losses are not matters inuring to Investors except as may be related to any Event of Default germane to any Purchase Contract or Insurance Settlement Agreement. |
| **NO VOTING RIGHTS OR COMPANY OWNERSHIP BY INVESTORS** | Explicitly, Investors understand that they are not owners/Members of the Company. For their part, each Member is entitled to one vote per share or a fraction of one vote per fraction of a Unit, as applicable. Investors do not have any voting rights. Nonetheless, Member Jeffrey Judd may be the Trustee in the future regarding a Voting Trust Agreement for some Members and, as such, Mr. Judd may have the discretion to vote more Units than his then existing holding — noting that the Operating Agreement defines Majority in Interest as the "Member who hold more than 50% of the aggregate Units held by all Members." |
| **PROFITS, LOSSES, AND INVESTMENT RETURN PER SHARE FOR MEMBERS** | In general, Investors understand that they are not, and will never be, owners/Members of the Company. The President, as sole Company Member, and any other further Company Member, will share in the Company's profits, losses and distributable cash pro rata based upon the number of Units owned by that Member and the percentage of total issued Units that those Units represent.<br><br>The allocation of Profits and Losses will be done subject to US Internal Revenue Code rules and regulations applicable to entities taxed as so designated, and as further outlined in the Company Operating Agreement. Prospective Investors are advised to read the Company Operating Agreement and discuss with their tax and legal advisors to determine all tax implications involved in their Investor Partial Beneficial Interest(s). |
| **RISK FACTORS** | The general economic, financial, and regulatory risks of securing Purchase Contracts germane to Insurance Settlement Agreement Third-Party Beneficiary Interests are (and are deemed to be considered) substantial and such risks could adversely affect the ability of the Company to ensure Investment Return or Investment Principal to Investors.<br><br>An investment for the potential securing/placement/assignment/purchase of Partial Beneficial Interests under a Purchase Contract involves a high degree of risk. Many of the factors which may affect the Company are subject to change or are not within the control of, without limitation, the Company, or its President. See "Risk Factors and Other Disclosures." |
| **TAX RULINGS** | The Company has not sought and will not seek a ruling from the Internal Revenue Service (the "IRS" or the "Service") with respect to its tax classification or other tax matters whether germane to the Company, or any Investor. |
| **DEFINITIONS** | Terms with capitalized first letters have the same definitions as set out in the Company Operating Agreement attached hereto as Exhibit B and/or the Company's Code of Ethics and Business Conduct |

## II.  REQUIREMENTS FOR INVESTORS

**PROSPECTIVE INVESTORS** FOR THE **INVESTMENT** AND INVESTMENT RETURN UNDER THIS OFFERING SHOULD GIVE CAREFUL CONSIDERATION TO VARIOUS RISK FACTORS DESCRIBED UNDER THE "**RISK FACTORS AND OTHER DISCLOSURES**" SECTION OF THIS **MEMORANDUM** AND ESPECIALLY TO THE SPECULATIVE NATURE OF THIS INVESTMENT AND THE LIMITATIONS DESCRIBED UNDER THAT CAPTION WITH RESPECT TO THE LACK OF A READILY AVAILABLE MARKET FOR THE INTEREST SECURING/PLACEMENT/ASSIGNMENT/PURCHASE HEREUNDER AND THE RESULTING **3 MONTH PLACEMENT PERIOD** TERM OF ANY INVESTMENT IN THE COMPANY, OR AS RESTRICTED BY COMPANY'S OR ITS PRESIDENT'S, PARTNER OR OWNER'S PREFERENTIAL INDEPENDENT INVESTMENT IN INSURANCE SETTLEMENT AGREEMENT INTERESTS AHEAD OF INVESTOR. **THIS OFFERING IS AVAILABLE ONLY TO SUITABLE ACCREDITED INVESTORS, HAVING ADEQUATE MEANS TO ASSUME SUCH RISKS AND OF OTHERWISE PROVIDING FOR THEIR CURRENT NEEDS AND CONTINGENCIES**. ACCREDITED INVESTORS SHOULD CONSIDER THEIR INVESTMENT THROUGH THIS OFFERING FOR THE PLACEMENT OF **PARTIAL BENEFICIAL INTEREST(S)** IN PURCHASE CONTRACT(S) TO REQUIRE THE FOLLOWING:

A.  GENERAL SUITABILITY STANDARDS. The investment in Partial Beneficial Interests will not be afforded to any prospective Investor unless the Subscriber or Subscriber's duly authorized representative represents in writing to the Company in a Subscription Agreement that:

(1)  The prospective purchaser has adequate means of providing for his or her current needs and personal contingencies and has no need for liquidity in the investment, subject to their **Redemption Rights** under this Offering.

(2)  The prospective purchaser's overall commitment to investments which are not readily marketable is not disproportionate to Subscriber's net worth and the investment through this Offering will not cause such overall commitment to become excessive.

(3)  The prospective purchaser is an "**Accredited Investor**" (as defined below) suitable for investment under this Offering.

(4)  Each person acquiring a Partial Beneficial Interest in Partial Beneficial Interests hereunder will be required to represent that such person is investing for his, her, or its own account for investment purposes and not with a view to resale or transfer.

B.  ACCREDITED INVESTORS. The Company will conduct the Offering in such a manner that the Partial Beneficial Interest may be sold to "Accredited Investors as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933 (the "Securities Act").

In summary, a prospective investor will qualify as an "Accredited Investor" if the prospective investor meets the following criteria as further described in the Subscription Documents:

(1)  Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of this purchase, exceeds $1,000,0000 excluding the value of the primary residence of such natural person;

(2)  Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who has a reasonable expectation of reaching the same income level in the current year; and

(3)  Any entity in which all the equity owners are Accredited Investors.

C.  OTHER REQUIREMENTS. No subscription for the Partial Beneficial Interests will be accepted from any investors unless the investor is acquiring the Partial Beneficial Interests for his/her own account (or accounts as too which he/she has sole investment discretion), for investment and without any view to sale, distribution, or disposition thereof. Each prospective investor in the Partial Beneficial Interests may be required to furnish such information as the Company may need to determine whether any person or entity so investing is an Accredited Investor and any other certifications required of the Investor under the Company's compliance program.

## III.    FORWARD-LOOKING STATEMENTS

This **Memorandum** contains certain forward-looking statements, as defined in the private Securities Litigation Reform Act of 1995, including or related to the Company's future results (including certain future projections), including but not limited to those pro forma projections, if any, set forth in Section IX hereto. (*See, "Financial Projections"*).

These and other statements are based largely on current expectations, beliefs, estimates, projections, and assumptions of the Company and are subject to a number of risks and uncertainties that could cause actual results to differ materially from those contemplated by such forward-looking statements. These risks and uncertainties include, among others, those described in Section III, "Risk Factors and other Disclosures."

Assumptions relating to forward-looking statements involve judgments with respect to future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and subject to the Conflict of Interest disclosures in this Memorandum. Although the Company believes that assumptions underlying any forward-looking statements are reasonable, any of the assumptions could prove to be inaccurate and there can therefore be no assurance that the results contemplated in the forward-looking information will be realized. In light of the significant uncertainties inherent in the forward-looking information herein, the inclusion of such information should not be regarded as the Company's representation that any business objectives will be achieved.

These along with other risks, which are described under "Risk Factors and Other Disclosures" may be described in future communications with Investor. The Company makes no representation and undertakes no obligation to update the forward looking statements to reflect actual results or changes in assumptions or other factors that could affect those statements.

# IV.   THE BUSINESS

***Executive Summary***

The Company operates as the Florida Limited Liability Company "***J and J Purchasing, LLC.***" The Company's Management structure is set out in the Company's Operating Agreement, to which all Investors and separately the Company Members are bound.

The Company will engage in the business of: (1) receiving, certifying and managing the **Investments Proceeds** from this **Offering** for **Partial Beneficial Interests**; (2) effectuate the potential securing/placement/assignment/purchase of **Insurance settlement Agreement interests** from the **Investment Proceeds** of this **Offering**, (3) provide Investors a monthly statement germane to their relevant **Partial Beneficial Interests** and pay to **Investors** the **Investment Return** for placed Investments, **and** (4) Comply with Investor's right to redeem their Investment Principal pursuant to Investor's retained **Right of Redemption**.

The Company offers Investors a **12.5% Investment Return** for each **Partial Beneficial Interest** placed by their Investment in a Purchase Contract. When Investor submits their Investment Documentation and funds their Investment, the President will **place the Investment** to fund the securing/placement/assignment/purchase of potentially and at least one $80,000.00 or $100,000.00 **Purchase Contract from which the Investor retains a Partial Beneficial Interest which is equal to the Investment Return and their Investment Principal and no more**.  All other revenue, profit or realized revenue germane to any Purchased Purchase Contract will belong solely to the Company.

The time period between the receipt of the Investor's Investment and such assignment/purchase of a Purchase Contract germane to an Insurance Settlement Agreement is expected to range from 24 to 72 hours after the Investment Principal is transferred. On the expiration of the 90-Day **Placement Period** the Investor is expected to receive a lump sum payment of the Investment Return. In the unexpected case that the Investor's Investment is not placed pursuant to a Purchase Contract, such Investment Principal transferred to Company will be returned to the Investor. During the Placement Period, no interest will accrue or issue.

At the expiration of the Placement Period, each Partial Beneficial Interest will, if no Event of Default occurs, earn the Investment Return, which specifically means that each $ 80,000.00 Investment/each Partial Beneficial Interest is expected to secure $10,000.00 paid to Investor within five (5) business days after the expiration of the Placement Period or for each $100,000.00 Investment/each Partial Beneficial Interest is expected to secure $12,500.00 paid to Investor within five (5) business days after the expiration of the Placement Period. Company will issue and forward to each Investor a yearly 1099 Tax reporting form setting out amounts paid to Investor.

For purposes of establishing the exact date the Investor can expect to receive **Investment Return**, and for example, if an Investor's Investment is made on January 1, 2022, and such Investment is immediately placed, then the Investment Return will be due and paid on the expiration of five (5) business days after 90 days after January 1, 2022.

Similarly, and for example, if the same Investor exercises their **Right of Redemption** after the Placement Period and on April 1, 2022, and the President effectuates the Right of Redemption — pursuant to be determined procedures and consistent with the refunding, terminating or other terms germane to any Insurance Settlement Agreement/any Partial Beneficial Interest so funded, the Investment Return (along with the Investment **Principal**) will be paid to Investor within five (5) business days after the expiration of the Placement Period.

Investors may exercise an absolute **Right of Redemption** on the **Investment Principal** invested under this Offering but only after the expiration of the **Placement Period**. The Right of Redemption is exercised by Investor notifying President in writing and President shall refund to Investors their Investment Principal within five (5) business days from the Investor's Right of Redemption notice.

Subject to the disclosures in this Offering, Company's President or services provider will negotiate and secure a Purchase Contract tied to the Investment Principal in the form generally as is found in **Exhibit C**.

Company's President explicitly discloses that there may exist circumstances where Third-Party Beneficiary Insurance Settlement Agreements are depleted in the marketplace. In such a case: (a) Investor's Investment Principal may not be applied/converted to any Partial Beneficial Interest under a Purchase; in effect, the Placement Period will not begin. Accordingly, if Investor's Investment Principal is unable to be converted to a Partial Beneficial Interest, then President will return the Investment Principal to the Investor as soon as commercially practicable and terminate Investor as a Company Investor, without further recourse by Investor. No Investment Return will be due under this circumstance noting that the Placement Period has not been met; or (b) In cases where the one or more Investment Principal have been converted to Partial Beneficial Interests under this Offering, the president retains sole discretion to exercise the President's right to return part or all of Investor's Investment along with any partially earned Investment Return, as determined in the President's sole discretion and if any, and terminate Investor's Partial Beneficial Interest(s) without further recourse by Investor. Without limitation, the preceding may relate to Company Due Diligence efforts at any time, which efforts may reveal information regarding Investor that establishes a violation of the Company's compliance program.

The Company's operations will be consistent with applicable State and Federal law and this Memorandum and the Company's Operating Agreement (*See*, this **Memorandum**, "Risk Factors and Related Disclosures). The Company expects to encounter competition in the form of similar businesses existing within the same market. The Company cannot forecast the level of competition the Company will have to manage or endure.

# V.    RISK FACTORS AND OTHER DISCLOSURES

**INVESTMENT IN A PARTIAL BENEFICIAL INTERESTS OFFERED UNDER THIS OFFERING INVOLVES SIGNIFICANT RISKS DESCRIBED BELOW. PROSPECTIVE INVESTORS SHOULD CONSIDER CAREFULLY THE FOLLOWING RISK FACTORS — TOGETHER WITH ALL OTHER INFORMATION SET FORTH IN THIS MEMORANDUM — PRIOR TO INVESTING FOR THE PARTIAL BENEFICIAL INTERESTS OFFERED HEREBY. THE COMPANY CAN MAKE NO ASSURANCE THAT ITS FINANCIAL CONDITION WILL NOT BE ADVERSELY AFFECTED IN THE FUTURE BY ONE OR MORE OF THE RISK FACTORS OR OTHER RISK FACTORS NOT ENUMERATED.**

A.    **RISKS RELATED TO THE COMPANY**.

   1.    ***The Company Has No Operating History***. The Company can provide no assurances that the Company will be able to place the Investor's Investment Principal under the Offering. Generally, the President anticipates that the Company will initially generate cash deficits, which may or may not be overcome. For example, the Company may fail to: (i) generate sufficient business, (ii) meet contractual relationships with third party entities or individuals, and/or (iii) negotiate for the securing/placement/assignment/purchase of Purchase Contracts tied to Insurance Settlement Agreements and the associated Partial Beneficial Interest on behalf of the Investor.

   2.    ***Events of Default***. The investment in Partial Beneficiary Interests in Purchase Contracts — which beneficial interest payout is tied to the payout of the source Third-Party Beneficiary Insurance Settlement Agreement at the end of the Placement Period — could fail and may constitute an Event of Default. In short, if the source Third-Party Beneficiary Insurance Settlement Agreement fails to fund, which in turn would cause a Default Event as to its relevant Purchase Contract, then the entire Investment Principal may be lost in addition to the Investment Return. While not expected, any such Event of Default is not possible to predict, and its occurrence will result in the Investor losing the Investment Principal and Investment Return. If such Event of Default occurs, it may also lead to the Company not being able to continue to operate. Additional Event of Default circumstances include Referral Source or Third Party Beneficiary of Insurance Settlement Agreement misrepresentation, and as to any, whether negligent, reckless, knowing or willful fraud. Additionally, any claim so settled in a Third party Beneficiary Insurance Settlement Agreement may be breached or withdrawn by such Third Parties for a variety of reasons, including but not limited to, fraud in the inducement of the Insurance Settlement Agreement, bankruptcy of the insurance payor, or other circumstances whereby an Insurance Settlement Agreement fails to fund, including recission by any Third Parties.

   3.    ***No Assurance of Insurance Settlement Agreement Marketplace Availability***. The success of the Company's Investor operations will depend in part upon availability in the marketplace of Third-Party Beneficiary Insurance Settlement Agreements. Indeed, any Company Investment Return may be adversely affected by the market pressures in or regarding the geographic area the Company serves and furthermore, such cost and other factors over which the Company has or may have no control. Moreover, the Company's ability to pay Investment Returns will result from the number and kinds of Purchase Contracts it can negotiate and secure and the types and amounts of Third-Party Beneficiary Insurance Settlement Agreement interests it can identify. The identification and availability of Third-Party Beneficiary Insurance Settlement Agreements is not secured. Such identification and availability are subject to market pressures, Third Party relationships, marketing and sales activities, local laws and regulations, among others. If an Investor's Investment Principal is not placed with a Purchase Contract, the Investor will not be entitled to any Investment Return, only to the return of the Investment Principal.

   4.    ***Present and Future Competitors***. There is no assurance that competitors will not, presently or in the future, provide similar investment opportunities in competition with the Company and which competition is explicitly disclosed to Investors separately and significantly by the Conflicted Parties as to their own and superior activities to secure for themselves any beneficial marketplace interest in Partial Beneficial Interests (i.e., ahead of Investors).

   Nonetheless, any such future competition could lead to a decrease in Company profitability any of which, including Events of Default, could lead to Company not being able to continue operations. Moreover, there is no guarantee that the target market, whether as a source of Third-Party Beneficiary Insurance Settlement Agreements or otherwise, will not prefer Purchase Contract relationships with present or future competitors who may or do offer, whether to such Third-Party Beneficiaries or other Third Parties, more cost-effective investment opportunities or Purchase Contract terms and conditions than those to be potentially acceded to or negotiated or provided by the Company. Accordingly, some potential outcomes include that Third-Party Beneficiaries may prefer other Third Parties with which to execute Purchase Contracts or similar undertakings; in short, the Company could lose business to these competitors and/or the Conflicted Parties. Many of the Company's existing and potential competitors may have greater financial and other resources than the Company and there can be no assurance that the Company will be able to compete successfully against those competitors.

   At all times, the Conflicted Parties are deemed in no way limited to invest on their own account and secure beneficial interests in Purchase Contracts ahead of Investors (the Conflicted Parties can invest their own funds to secure Purchase Contracts on their own account). Company, President, or their owners, partners or affiliated individuals have no fiduciary or other duty to Investors to preferentially place Investor's Investments ahead of their own investment activities.

5. ***The Company May Incur Losses and Negative Cash Flow***. The Company may incur negative cash flow. There can be no assurance that the Company will eventually operate profitably. The marketplace cannot assure the provision of Investment Returns. Investors must remember that they are not and will never be Company Members or own any part of the Company and therefore have no Voting Rights in Company.

6. ***The Availability of Additional Working Capital Is Uncertain***. The Company believes that the proceeds from the Offering will allow the Company to implement its proposed business plan and to satisfy expected Investment Returns cash requirements. However, the Company's continued operations thereafter will be dependent on the availability of revenue from its operations. In the event there is insufficient cash flow from operations, the Company may be required to obtain additional financing. There can be no assurance that such financing will be available or, if available, that the financing will be on terms satisfactory to the Company. If financing is needed, but is not available, the Company may not be able to operate successfully and any investment made may be lost, for example, concomitant an Event of Default.

7. ***The Company May Undertake Leverage in Order to Fund its Operations***. With the approval of the Majority in Interest (as defined in the Company Operating Agreement), the Company may incur indebtedness. While the Company anticipates that cash generated from operations will enable the Company to repay any indebtedness in accordance with its terms, lower-than-anticipated revenues, greater-than-anticipated expenses, or delays in commencing operations could result in the Company failing to make payments of Investment Principal or Investment Return when due under indebtedness circumstances. In such events and/or concomitant an Event of Default, the Investor could lose their entire investment.

8. ***Competition - Projected Profits of the Company Are Based upon Assumptions that May Be Incorrect***. Section IX (Financial Projections), if any, sets out the potential financial status from the Company's operations. If any, such projections are based upon a great number of variables, estimates, and judgments on matters over which the Company will have no control including, without limitation: (i) the market for the Company's proposed business operations, (ii) economic conditions generally, (iii) insurance costs, (iv) the effects of competition, and (v) the legal and regulatory environment. Such projections are principally intended for use as objectives and are not intended, and should not be taken, as assurance that the Company will accomplish such projections. Nonetheless, the Company will encounter direct competition in the form of similar businesses existing within the same market. Indeed, some of these competitors may be well capitalized and may presently control a significant market share. Moreover, such competitors may enjoy long established and better market relationships. Accordingly, the Company cannot forecast the level of competition the Company will have to manage or endure. As a result of this competition, the Company cannot guarantee that it will achieve be able to grow, establish or maintain market share or become profitable. Concomitant any Event of Default, the Company may have to stop operations altogether.

9. ***Conflicts of Interest***. The activities of the Company will give rise to numerous immediate and potential conflicts of interest between the Company and certain of the Investors or their affiliates, some of which may be partially owned by such Investor or Member owners (*See*, Conflicts of Interests, Section F, below). As disclosed herein and as established in the Company Operating Agreement, President will have significant authority to manage the Company's business and decisions may be taken by President contrary to desires of Investor. Thus, the President may make decisions with which the other Investor may disagree.

10. ***Contract Negotiations***. As part of the Company's operations, it will be necessary for the Company to negotiate and maintain services contracts with Third Parties. The Company will not be able to guarantee the continuation or quality of such relationships. The Company's failure to maintain any such relationships means that the Company cannot guarantee that relationships may be even established. Accordingly, the potential inability of the Company to negotiate and maintain agreements on favorable terms could reduce its revenues and adversely affect its operations.

11. ***Lack of Diversification***. Because the Company may only provide, or may continue to provide, a limited number of investment opportunities, the Company may not be competitive in the target market. Moreover, due to a lack of diversification, the Company is or may be subject to a greater risk than would be the case with a more diversified business.

12. ***No Participation in Management***. The Company Operating Agreement provides that its President maintains unhindered and broad day-to-day and discretionary management over Company activities. Investors are not Members of the Company and retain solely the right to receive the Investment Return and maintain their Right of Redemption if no Event of Default occurs.

13. ***Participation in the Management of the Company by Investor Is Non Existent***. As set forth in the Company Operating Agreement, the powers of the Company will be exercised by — and under the authority and direction of — the President. Neither the President nor the Company's employees are required to devote their full time to the Company's affairs. The President intends to devote time and effort in organizing and operating other businesses or ventures throughout the United States that may be similar to the Company. Nonetheless, the President will devote such time to the Company's business and affairs as deemed necessary and appropriate in the exercise of reasonable judgment but unforeseen circumstances may require the President to devote more time to other activities to the detriment of the Company and may include President's activities as a Conflicted Party.

14. ***Member Liability***. Generally, because the Company is a Limited Liability Company, a Member is not individually liable for the Company's debts or negligence in the course of Company business arising from the acts or omissions of another Member of the Company (including agents or employees) who is not working under the supervision or direction of the President. A Member may be individually liable if the Member: (i) was directly involved in the specific activity in which the errors, omissions, negligence, incompetence, or malfeasance were committed by the other Member or representative; or (ii) had notice or knowledge of the errors, omissions, negligence, incompetence, or malfeasance by the other Member or representative at the time of occurrence and then failed to take reasonable steps to prevent or cure the errors, omissions, negligence, incompetence or malfeasance.

15. ***Business Sources***. The Company's operations will depend upon establishing and maintaining relationships with Third Parties including individuals and entities any of which may be Referral Sources. Such Third-Party business may depend on the Company being perceived as providing, among others, reasonable, convenient, cost effective or quality Third-Party Insurance Settlement Agreement benefits as secured under Purchase Contracts. The Company foresees that a significant amount of business will have to be sourced from Insurance Settlement Agreement germane professionals and industry ventures in the target market area. Should the Company's business sources decline or if the Company fails to manage such relationships, the Company could be significantly and adversely affected. The Company makes no guarantee that any federal or state laws or any regulatory, whether professional licensing or otherwise, may make or limit the availability of Settlement Insurance Agreements or Company's negotiation of same via Purchase Contracts.

16. ***The Company May Be Affected by Operating Risks Beyond its Control***. The costs of operating the Company may be affected by factors beyond the Company's control including Events of Default and other environmental problems, fire, strikes, energy shortages, inflation, adverse weather conditions (including Acts of God, such as tornadoes, hail, flooding, and other risks), and other unknown contingencies. Moreover, income may be adversely affected by various changing local factors such as an increase in local unemployment, a change in the characteristics or demographics of the target market, governmental regulations, various uninsurable risks, and unforeseen changes in the Insurance Settlement Agreement industry. Indeed, there can be no assurance that the Company will generate sufficient revenues whether tied directly to the revenues under Purchase Contracts or otherwise, for example, concomitant Events of Default. In addition, the Company will have normal business risks including disruptions from malfeasance or embezzlement by the Company's employees or contractors, malfeasance or embezzlements, or lawsuits brought by Third Parties against the Company and/or any agent, employee, contractor, or person acting on behalf of the Company. The Company will have general liability risks in that any of those types of disruptions could cause material change in the Company's ability to operate and any of which may place the Investor's Investment Principal and Investment Return in peril of complete loss.

17. ***The Company May Be Sold***. The Company and other affiliates companies may be sold in the future. There is no guarantee, however, that such an event will generate a net profit for the Company or its Members, but in any case, such event shall NOT result in any benefit germane to or for any existing Investor noting that Investors do not and shall not hold any ownership interest in the Company or its Units. In particular, Jeffrey Judd may sell any or all of his Units in the Company without prior consent or notice of Members or Investors (who have no voting rights or ownership rights in the Company) or any distribution of any profits from such sale to Members or Investors. Any future Members in addition to Mr. Judd may be compelled to sell some or all of their Units upon the occurrence of various events as described in the Company Operating Agreement.

18. ***The Company may be Subject to Leasehold Risks***. The Company may be subject to all of the risks inherent in being a tenant under a lease of real property, including risks of additional costs, delays, and possible complete loss of investment due to matters such as compliance with governmental laws and regulations, new or increased fees or charges imposed on leasehold improvements or ownership, termination of the leasehold interest following a casualty or condemnation, new or increased real estate taxes, restrictive governmental rules or actions, and outside forces, such as flood or earthquakes, which may result in irreparable damage or insured losses and termination of a lease. The occurrence of any such events could have a material adverse effect on the Company.

19. ***No Transferability and Illiquidity of Investments***. Transferability of the Partial Beneficial Interests is explicitly proscribed during the Placement Period by the Company Operating Agreement and the Subscription Agreement executed by the Subscriber. No public market for the Partial Beneficial Interests exists and none is expected to develop even if President so approves. The Company will be under no obligation to allow the transfer of Partial Beneficial Interests or otherwise take any action that would enable, without limitation, the assignment or transfer of any Partial Beneficial Interests. Thus, an Investor will not be able to liquidate an investment in the Partial Beneficial Interests during the Placement Period in the event of an emergency or otherwise and the Partial Beneficial Interests may not be pledged, without limitation, as collateral for loans or otherwise. Accordingly, the placement of Partial Beneficial Interests must be considered a term and illiquid investment during the Placement Period. Additionally, Investors may not pledge, hypothecate, assign, sell, or use their Partial Beneficial Interest/Investment Principal refund/or Investment Return and may not transfer any Partial Beneficial Interests except as permitted by the Company Operating Agreement.

20. ***There Is No Prior Public Market for Partial Beneficial Interests in the Company***. There has been no prior market for the any Partial Beneficial Interests **and no such transfer is allowed under the Operating Agreement**. The Company

does not expect that a trading market will develop in the foreseeable future and transfer, or resale of the Partial Beneficial Interests is severely restricted under the Company Operating Agreement. There can be no assurance that any such trading market will develop, or if such trading market develops, that it will be sustained or allowed to be accessed by the President.

21. **The Failure to Retain Key Management Personnel Could Adversely Impact the Company**. The President may elect, appoint, or hire officers to manage the Company and perform certain operational duties on behalf of the Company. The Company may be largely dependent upon the resources and efforts of such individuals to provide governance of the Company. Such individuals may have limited experience in managing business such as that of the Company. The inability or failure of such individuals to adequately perform those duties could have a material effect on the Company and any investment in Partial Beneficial Interests.

Similarly, the President may contract with Third Party services providers to perform certain operational duties on behalf of the Company. The Company may be largely dependent upon the resources and efforts of such Third Party services providers to, without limitation, secure business opportunities on behalf of the Company. Such Third Party services providers may fail to secure business opportunities. The inability or failure of such Third Party services providers to adequately perform those duties could have a material effect on the Company or any investment in Partial Beneficial Interests.

22. **The Company's Cash Flow and Operating Results Could Be Adversely Affected by Legal Actions**. Companies providing services germane to the Insurance Settlement Agreement marketplace/industry can be subject to legal actions. The Company may be named as a defendant in any cause of action arising from, *without limitation*, alleged, or actual tortuous interference, breach of contract, and fraud, which actions may be brought by competitors or other Third Parties or Governments. These actions may involve large monetary claims and significant defense costs. Additionally, there can be no assurance that insurance maintained by the Company, if any, will adequately cover any liabilities that may occur.

23. **The Company Has Not Provided Advice Regarding Tax and Legal Risks Related to Investing in the Partial Beneficial Interests**. The Company and its legal or other advisors have not advised potential Investors with respect to any tax or legal risk or consequences of an investment in beneficial interests in Partial Beneficial Interests. The Company has not advised potential investors with respect to any legal risks or consequences of an investment in beneficial interests germane to Partial Beneficial Interests. Accordingly, potential Investors are encouraged and expected to consult with their own legal, tax, financial, investment, and other counsel regarding potential legal issues.

24. **The Terms of this Offering May Be Amended or Withdrawn by the Company**. The Company reserves the right, in its sole discretion and for any reason whatsoever, to modify, amend, and/or withdraw all or a portion of the Offering and/or to accept or reject in whole or in part any prospective investment or to allot to any prospective Investor less than the number of investment that such Investor desires to purchase.

25. **Conflicts of Interest by Investors and Cross-Ownership of Other Ventures**. Investors are expected to avoid conflicts of interest, to secure and maintain the integrity and confidentiality of Company operations, Investment Return, and management in full consideration and awareness of their respective beneficial interest and deemed accompanied duties of loyalty and care, under, without limitation, the Investor's and Company's non-disclosure obligations.

Accordingly, the Company Operating Agreement explicitly states that Investors, are barred from directly or indirectly, alone or with others, to develop, own, manage, operate, license, control, or serve as a partner, employee, principal, agent, consultant or otherwise contract with, or have any financial interest (in any manner including but not limited to equity, debt, or bond financing) that offers or provides any of the investment services offered by the Company (*See*, the Confidentiality Agreement and Company Operating Agreement). A breach by an Investor of the Company Operating Agreement will cause, at its discretion, to return such Investor's Investment Principal and institution of legal action against the Investor.

B.  **LEGAL - REGULATION**.

(1)  **Introduction**. The matters set out in this Memorandum represents the President's and Company's current understanding of the legality of its business model. Nonetheless, in light of the complexity, unpredictability, and ever evolving nature of businesses and applicable rules, no statement herein may be construed as a representation or guarantee as to any present or future legal position(s) that the federal or a state Government, regulators or any other adjudicative, ethical, or other body might take in relation to the Company, its President, its business, Investors, if any, or the investments set out herein. All explanations herein are subject to and may be limited by future legislation, case law, and enforcement of either. Accordingly, the statements are limited to the matters stated herein, and no opinion is implied or may be inferred beyond the matters expressly stated.

(12) **The Company Could Become Involved in a Proceeding**. At any time, the Company, its President or its officer or affiliates may be subject to litigation, regulatory or enforcement actions, or other proceedings (a "Proceeding") any of which may brought by varied individuals or entities including, but not limited to, federal, state, or local Governments, potential or actual competitors, or Investors. Any such Proceeding could delay the commencement of or suspend the operations of the Company temporarily or indefinitely regardless of the Proceeding's merit. If such a Proceeding is successful, the Company or its President, officers or affiliates could be permanently prevented from operating the business as described in this Memorandum or the Company Operating Agreement or lack the financial means to commence or continue operations.

Nonetheless, each Investor certifies — in their Subscription and Company Operating Agreement — their agreement to support the Company in such Proceeding, (i) either when holding a Partial Beneficial Interest or after termination of same, or (ii) during the existence, or after the dissolution, of the Company.

(13) *If the Company Fails to Comply with Applicable Laws and Regulations, the Company Could Suffer Sanctions and Be Required to Dissolve or Make Significant Changes to its Operations.* While Investors will not manage or otherwise be involved as owners/Member of the Company the Company nonetheless notes that Company's operations are subject to Government regulation. As such, the ability of the Company to operate legally and be profitable may be adversely affected by changes in governmental regulations on a federal, state, and municipal level. Any Government law or regulation may adversely affect the economic viability of the Company. These laws are broad in scope, and interpretations by courts have been limited, inconsistent, and tailored to specific facts that may vary from case to case. Implementation of these laws or regulations could subject the Company, its President, its officers, any affiliate and the Investor to Government scrutiny and/or prosecution and punishment.

## C. INSURANCE.

(1) *Liability.* The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is or may be entitled to indemnification against any expense, liability, or loss, whether or not the Company would have the ability to indemnify such person.

(2) *The Company's Liability Insurance May Not Be Sufficient to Cover All Potential Liability.* The Company may be liable for damages to persons or property for activities that occur in the Company's offices or on the Company's premises. Although the Company may attempt to obtain and maintain adequate insurance coverage for personal injury, property damage, general and professional liability, officer and director insurance, workers compensation insurance, the Company will not be able to obtain coverage in amounts sufficient to cover all potential liability. Since most insurance policies contain various exclusions, the Company will not be insured against all possible occurrences.

(3) *No Insurance to Protect Investors from Events of Default of any Purchase Contract or otherwise.* A Purchase Contract may default and the Company and Investor will not receive any revenue for same. **THE COMPANY WILL NOT SECURE INSURANCE COVERAGE FOR ANY PURCHASE CONTRACT OR THIRD-PARTY BENEFICIARY INSURANCE SETTLEMENT AGREEMENT EVENT OF DEFAULT. THE POTENTIAL OF ANY EVENT OF DEFAULT WILL NOT BE INSURED BY THE COMPANY AND IF SUCH EVENT OF DEFAULT OCCURS, THE INVESTOR'S ENTIRE INVESTMENT PRINCIPAL AND INVESTMENT RETURN MAY BE LOST**

## D. BACKGROUND OF COMPANY PRESIDENT - MR. JEFFREY JUDD

Mr. Jeffrey Judd is the current Managing Member and President of J and J Purchasing, LLC. Prior to serving as Company President, Jeffrey worked in various industries. His first job out of college was with Bristol Myers as a Pharmaceutical Sales Representative. Jeffrey held this same position with Schering Plough. In the early 2000's the real estate sector was the place to be for someone like Jeffrey who excelled at sales, so he left the Pharmaceutical Industry and took a position with Countrywide Home Loans. When the bubble burst in 2009, Jeffrey took an ownership position in Partell Specialty Pharmacy serving as Vice - President of Sales and Marketing.

Jeffrey was born and raised in Las Vegas, Nevada. He received a Bachelor of Science from the University of Nevada Las Vegas in 1998, where he met his wife of 27 years, Jennifer Rowland Judd, also born and raised in Las Vegas. Jeffrey and Jennifer have 4 children and one daughter in law — Parker an insurance agent, Preston a professional soccer player in LA Galaxy system, Rachel Utley Judd, Preston's wife, who is studying to be a nurse, Kennedy an esthetician and the baby of the family Khloe who is a fantastic singer and performer.

## E. ACTUAL OR POTENTIAL CONFLICTS OF INTEREST.

(1) *Transactions with the Company.* In his discretion, the President may cause the Company to enter into agreements with companies and service entities that may be totally or partially controlled by Members of the Company or President of the Company (the "President or Member Affiliated Entity(ies)"). President or Member affiliated entities or Members and their owners, affiliates, or representatives may: (i) provide operational support to the Company and may engage its affiliates to perform certain services, (ii) be paid or reimbursed by the Company the out-of-pocket costs (including, but not limited to, legal or other professional expenses) incurred with respect to establishing the Company or its operations; (iii) have interests in other programs, organizations, or ventures that may compete with the Company, (iv) be involved in other operations of ventures, including entities that have the exact same or similar business operating plan and operate exactly or similarly as the Company, and may continue to develop additional beneficial interests offers germane to Insurance Settlement Agreements ventures in the future. When the Company or President enter such arrangements, the President is not required to assure they are consistent with arrangements that would be obtainable from unaffiliated Third Parties. Prospective Investors who have questions concerning the duties of the President should consult with their own counsel.

(2) *Investors under this Offering Invest only for the potential Investment Return and Right of Redemption and will receive no other benefit.* **ALL PROFITS OR REVENUE BY COMPANY OR OTHERWISE REALIZED BEYOND WHAT IS DUE INVESTORS UNDER THEIR RIGHT TO RECEIVE THE POTENTIAL INVESTMENT RETURN, IS RESERVED TO AND OWNED BY COMPANY (AND ITS OWNERS OR PARTNERS) AND WHETHER AS BENEFICIARY INTEREST RECIPIENT UNDER A PURCHASE CONTRACT OR OTHERWISE. THIS MEANS THAT ANY PROFIT OR REVENUE REALIZED AT ANY TIME BEYOND WHAT IS DUE INVESTORS (THEIR INVESTMENT RETURN) SHALL NEVER BE DUE INVESTORS AND SHALL BE RETAINED FOR THE BENEFIT OF COMPANY AND THEIR MEMBERS OR PARTNERS.**

Company retains all other profit or revenue that may be associated with a Purchase Contract funded by Investor under this Offering. Specifically, this means that any profit or revenue beyond the Investment Return and Right of Redemption due to Investors is owned by Company and Investor has no right to such profits or revenues. Moreover, any additional profits or revenues realized by Company (and whether as part of any services agreement, or the President's, Member's, or affiliated individuals' or entity's separate investments in Third-Party Beneficiary Insurance Settlement Agreements) will never be due to Investors. Any of the preceding-sentence-described activities or purchases or activities may or will be treated as preferential to the placement of any Partial Beneficial Interests so secured on behalf of Investor any of which activities of Company, or as to either their owners, partners or officers may so choose and are unrestricted to so pursue. In short, when an Investor's Partial Beneficiary Interest is negotiated and funded by the Investor's Investment Principal, the Investor retains no expectancy in the future as to any other Purchase Contract not funded by Investor, but nonetheless subject to any Event of Default.

An Investment under this Offering can only be understood to be potentially placed by Company, but not assured to be so placed. As Company is and remain be self-funded (i.e., separate from any Investment made under this Offering which are potentially designated to fund the potential Partial Beneficial Interest on behalf of the Investor) Company, and its owners, managers, and/or partners (collectively, "Conflicted Parties") may invest on their own behalf with their own funds and negotiate and secure beneficial interests in Third-Party Beneficiary Insurance Settlement Agreement on their own account and for their own benefit except that at no time will any Investment Principal hereunder be comingled with or used by the Conflicted Parties to secure any such personal beneficial interests.

What the Investor can expect is that their Investment Principal will be utilized to negotiate and secure one or more Partial Beneficial Interests in one or more Purchase Contracts in and at the discretion of President (and as may be consistent with the availability of same in the marketplace and the amount of the Investment Principal Subscribed under this Offering), which does not guarantee that President will at any time preferentially place the Investor's Investment ahead of the Conflicted Parties' interest in securing a beneficial interest under a Purchase Contract of the very Insurance Settlement Agreement interest that Investor may otherwise want to Invest in and that could be secured on behalf of an Investor.

The Conflicted Parties are not restricted to fulfil their individual and separate business or investment goals (except that the Conflicted Parties shall never utilize any Investor's Investment Principal or Investment Return realized under this Offering to secure Insurance Settlement Agreement beneficial interests for themselves or under their own account).

**THE PRESIDENT DISCLAIMS ANY FIDUCIARY OR OTHER DUTY TO PLACE INVESTOR'S INVESTMENT PRINCIPAL AHEAD OF COMPANY, OR PRESIDENT'S OR THEIR OWNERS' PERSONAL FUNDS TO SECURING/PLACEMENT/ASSIGNMENT/PURCHASE OF PURCHASE CONTRACTS GERMANE TO INSURANCE SETTLEMENT AGREEMENT INTERESTS FOR, AS RELEVANT, THEIR INDIVIDUAL BENEFIT AND AHEAD OF INVESTORS. COMPANY AND PRESIDENT CERTIFY THAT AT NO TIME WILL ANY INVESTMENT PRINCIPAL UNDER THIS OFFERING BE APPLIED TO ANY SUCH INDIVIDUAL OR SEPARATE ACTIVITY.**

(3) *Competition With the Company.* Company's President, Members, Investors, and owners of Members or Investors (whether directly or indirectly or individually or through entity held interests), officers, directors and affiliates of the Company or the Member or Investor, will provide or may provide services or products to, and intend in the future to continue to own or provide services or products to other businesses or operating entities, some of which may have the same or similar investment objectives or business activities as the Company or otherwise may compete with the Company and Investors' interest in having their Investment Principal placed. The Company Operating Agreement does not prohibit these activities and does not impose any duty or obligation on President or any entity Member or his its officers, directors, investor or affiliates or the President to disclose or offer to the Company or the Members or Investor any venture, opportunity, activity, or interest therein, including the acquisition, financing, operation, or sale of other competing businesses or Partial Beneficial Interests/Personal interests. The President, Jeffrey Judd and certain other Investors or other Third Parties may engage in activities of any nature or description. Accordingly, the Company may be in competition with other entities formed or managed by Jeffrey Judd or his affiliates.

F.   **PRO FORMA CAPITALIZATION TABLE**. The following capitalization table summarizes, on a pro forma basis as of November 1, 2021, the capitalization of the Company.

| NAME | UNITS | SHARING RATIO | CAPITAL CONTRIBUTION |
|------|-------|---------------|----------------------|
| **MEMBERS** | | | |
| Jeffrey Judd | 100 | 100.00% | $1,000 plus in-kind contributions |
| | | | |
| Total | 100 | 100.00% | |

# VI.   COMPANY STRUCTURE

*Capitalized terms not otherwise defined herein will have the same meaning that is set forth in the Company Operating Agreement or the Code of Ethics and Business Conduct.* The Company is a Florida limited liability company that is owned by its President with an ownership interest, in isolation or in the aggregate, of one hundred (100%) percent of all the outstanding Units of the Company.

A.   **Management**. The Company Operating Agreement sets forth the obligations, rights, and powers of the President as to the Company and, among other things, regarding the **Investment Return** to the Investors. **Jeffrey Judd** is the sole Member and is the President of the Company.

B.   **Determination of Offering Investment Amounts**. There is no public market for the Partial Beneficiary Interest investments made herein. The Partial Beneficial Interest is established arbitrarily by the President without any arms-length negotiations or appraisal. Further, any Investment through this Offering does not bear any relationship to the Company's assets (tangible or intangible), book value, net worth or expected or earnings. The Third-Party Beneficiary Insurance Settlement Agreement Partial Beneficiary Interest assigned with the Investment Principal under this Offering only entitles the Investor to the potential of **Investment Return** and a **Right of Redemption**, subject to any Event of Default.

C.   **The Partial Beneficial Interest affords Investors only a straight debt germane Partial Beneficiary Interest and its concomitant Investment Return and a Right of Redemption**. An Investor's Offering Investment of a minimum $80,000.00 is expected to fund **one (1) $80,000.00 Purchase Contract germane to an Insurance Settlement Agreement and Partial Beneficial Interest** or if the Investment Principal is $100,000.00 then it will fund **one (1) $100,000.00 Purchase Contract germane to an Insurance Settlement Agreement interest**. Once each $80,000.00 or $100,000 Investment Principal increment is placed with a Purchase Contract germane to an Insurance Settlement Agreement, then the Investment Return may be expected to be due at the expiration of the Placement Period on behalf of the Investor.

At the expiration of the Placement Period, Investors will be expected to receive from Company, as their **Investment Return**, a minimum of the distributed 12.5% ($12,500 per 100K contract or $10,000 per 80K contract) germane to the relevant Partial Beneficial Interest so invested.  Also, for each $100,000.00 or $80,000.00 tranche so invested that funds the relevant Purchase Contract as to a particular Insurance Settlement Agreement. Investors retain an absolute right to call back ("**Redeem**" through a "**Right of Redemption**") their Investment Principal in Partial Beneficial Interests any time after **the expiration of the 90-day Placement Period** through this Offering. Any redemption may be made and settled no later than five (5) **business days after** Investor informs Company in writing of their exercise of their **Right of Redemption**.

D.   **Capital Contributions-Contributed Assets** - The capital contributions/contributed assets made by Jeffrey Judd includes intellectual property contributions and expenses as incurred by such Member President on behalf of the Company. For example, such Member President has or may contribute, among others: (i) business management expertise in Company, Insurance Settlement Agreement placed/secured/assigned/purchased, manages and attendant operations; (ii) the formation and structural guidance for the Company's management operations; or (iii) an understanding of best practices.

---

**THE PRECEDING CONSTITUTES A PARTIAL AND GENERAL DESCRIPTION OF THE COMPANY AND SOME OF THE TERMS OF THE COMPANY OPERATING AGREEMENT INVESTORS MUST CAREFULLY REVIEW THE COMPANY'S OPERATING AGREEMENT IN ITS ENTIRETY PRIOR TO SUBMITTING THEIR DECLARATIONS AND SUBSCRIPTION AGREEMENT TO INVEST AND IN CONJUCTION WITH THEIR LEGAL, FINANCIAL AND TAX ADVISOR.**

---

**ACKNOWLEDGMENT OF LEGAL RISK**

EACH POTENTIAL AND ACTUAL INVESTOR OF THE COMPANY PURSUANT TO THIS MEMORANDUM AND THROUGH THEIR EXECUTED DECLARATIONS AND SUBSCRIPTION AGREEMENT ACKNOWLEDGES AND CERTIFIES THAT HE OR SHE WILL RELIES SOLELY ON THEIR OWN LEGAL, FINANCIAL AND TAX ADVISORS TO ASSESS AND EVALUATE THE ALL RISKS AND LAWFULNESS ASSOCIATED WITH THE INVESTMENT AND ALL ASPECTS OF THE INVESTOR'S RELATIONSHIP TO THE COMPANY UNDER ALL APPLICABLE FEDERAL AND FLORIDA STATE OR ANY OTHER STATE'S LAWS (OR STATE LAW SERVING AS AN EQUIVALENT TO A FEDERAL LAW).

## VII.   TAX STATUS

An investor's basis is expected to be his or her Investment Principal and noting that the Partial Beneficial Interests will equal the amount paid for that Partial Beneficial Interest. Investors may or will recognize a taxable event on the revenue germane to the Investor Partial Beneficial Interests equal to the difference between the investor's basis in the Investor Partial Beneficial Interests and the amount the investor realizes on the revenue of those Investor Partial Beneficial Interests, if any. An investor is advised to seek tax counsel from either its attorney or certified public accountant before investing in the Investor Partial Beneficial Interests in order to fully understand the ramifications of investing in the Investor Partial Beneficial Interests. The Company is not providing any tax advice to any Investor as part of this Offering.

# VIII.  USE OF PROCEEDS

The following paragraph discloses the Company's proposed sources and uses of the capital **Investment** raised pursuant to this **Offering**. Varying circumstances may dictate other uses of the **Investment Proceeds** different from those set forth below. The President, in his sole discretion, may determine the use of the **Investment Proceeds**, which may be different than is set forth in the following paragraph.

The Company plans to use the proceeds from Investment to placed/secured/assigned/purchased **Insurance Settlement Agreement beneficial interests**. The Company will be self-funded to settle its other **Offering Expenses** and **Operational Expenses**. The portion of the **Investment** that has been allocated to settle Company's **Offering Expenses** and **Operational Expenses**: $ 0.

Any wiring fee germane to the delivery of any Investment Return or Investment Principal may be deducted from the Investment Return.

The purpose of this Offering is for capitalization and financial flexibility for the placement of Partial Beneficial Interests germane to Third-Party Beneficiary **Insurance Settlement Agreements**. As of the date of this **Memorandum**, the President cannot specify with certainty all particular uses it will have for the Investment Proceeds except that they are deposited in the Escrow Accounts and earmarked solely for the placement of Partial Beneficial Interests. Accordingly, the President does not retain broad discretion in the allocation and use of the proceeds from this Offering. The President will commence Company operations in his sole discretion and may cancel this Offering if an insufficient number of Subscriptions are achieved pursuant to this Offering.

**Offering Expenses**, include, but are not limited to: (i) Legal Costs; (ii) Licensing Costs; (iii) Filing Expenses; (iv) Form Fees; (v) Accounting Fees; (vi) Equipment; (vii) Computers; (viii) Small Equipment;

**Operating Expenses**, include, but are not limited to: (i) Staff; (ii) Office leases; (iii) Office Supplies; (iv) Shipping Expenses; (v) Compliance Costs; (vi) Marketing Expenses; (vii) Banking Costs and Fees; (viii) Communications Costs such as Telephone and Internet; or (x) Taxes;

## IX.   NO FINANCIAL PROJECTIONS FOR COMPANY OR ANY INVESTMENT OPERATIONS

As an offering for Partial Beneficial Interests in Purchase Contracts and relevant to the operations of a newly formed Company, See Exhibit A, the Company does not provide for any audited or unaudited financial statements or financial projections. Company reiterates that it is a newly formed entity without any prior business operations. In all cases, there is no assurance that the placement of investments in this offering for Partial Beneficial Interests in Purchase Contracts will be achieved.

# X.   FEDERAL AND STATE INCOME TAX ASPECTS

A.   **INTRODUCTION**.

The federal income or other tax aspects of limited liability companies are complex and this disclosure is set out germane to the tax considerations relating to the Company and its Members. Generally, any matter set out below summary is based upon the Code, the Regulations, current published administrative positions of the Internal Revenue Service (the "IRS") contained in Revenue Rulings, Revenue Procedures, Private Letter Rulings, Technical Advice Memorandums, and existing judicial decisions.

Assurance cannot be given that there will not be legislative or administrative changes or court decisions that would significantly modify the statements in this summary. Bills may have been introduced in past sessions and may be introduced in the future that, if enacted, could materially alter the tax consequences of any investment, which changes may or may not be retroactive. Furthermore, numerous provisions in the Code that were enacted during the last several years have not yet been the subject of significant administrative or judicial interpretation or clarification as of the date of this Memorandum.

Nonetheless, a prospective Investor should be advised that this discussion is necessarily general and the applicability or effect of the matters discussed may vary, depending on an Investor's individual circumstances and must be discussed with their own tax advisors. The following summary does not include any discussion of general principles of taxation or of the sections of the Code and the Regulations that implement those principles. In addition, the availability, timing, and amount of deductions taken by an Investor regarding any aspect of this Offering depends not only on the tax aspects generally set out below, but also upon various determinations relating to each Investor and the activities of the Company, all of which are subject to potential challenge by the IRS on factual or other grounds.

Therefore, there can be no assurance that the anticipated treatment of tax items with respect to an Investment may not be challenged or otherwise categorized by the IRS. Finally, this disclosure does not discuss any foreign, state, or local tax considerations related to an investment through the Company.

B.   **TAX ASPECTS OF THE OFFERING**.

**THE TAX CONSIDERATIONS RELATING TO FOR INVESTORS ACQUIRING THE PARTIAL BENEFICIAL INTERESTS MAY BE SIGNIFICANT. IT IS IMPOSSIBLE FOR ANY MEMORANDUM SUCH AS THIS TO ADDRESS ALL OF THE TAX CONSIDERATIONS THAT MAY BE RELEVANT TO PARTIAL BENEFICIAL INTEREST HOLDERS IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES OR TO PARTIAL BENEFICIAL INTEREST HOLDERS SUBJECT TO SPECIAL RULES UNDER U.S. FEDERAL INCOME OR OTHER TAX LAWS.**

**THEREFORE, ALL PROSPECTIVE INVESTORS ARE URGED TO CONSULT THEIR INDIVIDUAL TAX ADVISORS WITH RESPECT TO THE TAX RAMIFICATIONS OF ANY INVESTMENT IN, OR HOLDING OF, ANY INVESTMENT RETURN OR PARTIAL BENEFICIAL INTEREST OR OTHERWISE AS TO THIS OFFERING.**

**AS REQUIRED BY U.S. TREASURY REGULATIONS GOVERNING TAX PRACTICE, YOU ARE HEREBY ADVISED THAT ANY WRITTEN TAX MATTER CONTAINED HEREIN WAS NOT WRITTEN OR INTENDED TO BE USED (AND CANNOT BE USED) BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE OR U.S. FEDERAL, STATE, AND LOCAL INCOME TAX CONSEQUENCES IN THE PARTICULAR SITUATIONS OF THE PURCHASE, OWNERSHIP, AND DISPOSITION OF INTERESTS, AS WELL AS ANY CONSEQUENCES UNDER THE LAWS OF ANY OTHER TAXING JURISDICTION.**

THE FOREGOING INFORMATION OF CERTAIN OF THE FEDERAL INCOME TAX CONSIDERATIONS APPLICABLE TO AN INVESTMENT IS NOT INTENDED TO BE A SUBSTITUTE FOR FEDERAL OR STATE TAX PLANNING, WHICH FOR EVERY INVESTOR MUST BE SOUGHT OUT INDEPENDENTLY BY EACH INVESTOR. NOTHING IN THIS MEMORANDUM MAY BE CONSTRUED BY INVESTORS (OR ANYONE) TO CONSTITUTE INVESTMENT, FINANCIAL OR TAX ADVICE.

ANY PERSON OR ENTITY CONTEMPLATING AN INVESTMENT IN THIS OFFERING IS URGED AND REQUIRED TO CONSULT THEIR FINANCIAL, LEGAL AND TAX ADVISORS, PARTICULARLY WITH RESPECT TO THEIR OWN TAX SITUATIONS. NO STATEMENT IN THIS MEMORANDUM IS INTENDED TO BE, NOR SHOULD ANY STATEMENT BE CONSTRUED AS, "WRITTEN TAX ADVICE" WITHIN THE MEANING OF CIRCULAR 230 (ENTITLED "REGULATIONS GOVERNING THE PRACTICE OF ATTORNEYS, CERTIFIED PUBLIC ACCOUNTANTS, ENROLLED AGENTS, ENROLLED ACTUARIES, AND APPRAISERS BEFORE THE INTERNAL REVENUE SERVICE"), OF INVESTMENT OF FINANCIAL ADVICE.

# XI.   ADDITIONAL INFORMATION

Attached hereto for review by Prospective Investors and their representatives are the Exhibits containing the Company's Articles of Organization, Company Operating Agreement, its Code of Ethics and Business Conduct, Sample Purchase Contracts germane to Insurance Settlement Agreements, and Subscription Documents. The information in the Exhibits, as well as the information in this Memorandum, and any supplements or addenda thereto or to the Exhibit — is strictly CONFIDENTIAL and subject to Subscriber's and Company's prior executed Non-Disclosure Agreement.

Prospective investors may not rely on any representations or statements relating to the offering other than the information set forth in this Memorandum.

LEGAL COUNSEL HAS PARTICIPATED IN THE PREPARATION OF THE COMPANY OPERATING AGREEMENT AND CERTAIN OTHER AGREEMENTS THAT ARE EXHIBITS TO THIS MEMORANDUM. SUCH COUNSEL **DOES NOT CREATE** AN ATTORNEY-CLIENT RELATIONSHIP BETWEEN ANY POTENTIAL INVESTOR, SUBSCRIBER OR MEMBER AND SUCH COUNSEL. SUCH COUNSEL DOES NOT PURPORT TO HAVE MADE ANY INVESTIGATION OR TO HAVE ACTED INDEPENDENTLY ON BEHALF OF THE INVESTORS OR ANY MEMBER. EACH INVESTOR MUST LOOK TO HIS OR HER OWN LEGAL AND TAX COUNSEL IN CONNECTION WITH AN INVESTMENT IN THE COMPANY.

Exhibit 1, Page 77

# EXHIBIT A
# CORPORATE DOCUMENTS
# J AND J PURCHASING, LLC

# Electronic Articles of Organization For
# Florida Limited Liability Company

**L21000447754**
**FILED 8:00 AM**
**October 13, 2021**
**Sec. Of State**
bcoates

## Article I

The name of the Limited Liability Company is:

J AND J PURCHASING, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

7901 4TH ST N STE 300
ST. PETERSBURG, FL. US  33702

The mailing address of the Limited Liability Company is:

7901 4TH ST N STE 300
ST. PETERSBURG, FL. US  33702

## Article III

The name and Florida street address of the registered agent is:

NORTHWEST REGISTERED AGENT LLC
7901 4TH ST N STE 300
ST. PETERSBURG, FL.   33702

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   TOM GLOVER

# Article IV

The name and address of person(s) authorized to manage LLC:

L21000447754
FILED 8:00 AM
October 13, 2021
Sec. Of State
bcoates

Title: AMBR
JEFFREY JUDD
9 SKY ARC COURT
HENDERSON, NV. 89012 US

Signature of member or an authorized representative

Electronic Signature: MORGAN NOBLE

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# EXHIBIT B
# OPERATING AGREEMENT
# J AND J PURCHASING, LLC

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**J AND J PURCHASING, LLC**

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF J AND J PURCHASING, LLC (the "Operating Agreement" or "Agreement") made effective as of November 1, 2021, is adopted, executed, and agreed to, for good and valuable consideration, by the Members (as defined below).

ARTICLE 1
DEFINITIONS

Capitalized words and phrases used and not otherwise defined elsewhere in this Agreement will have the following meanings:

1.1. "Act" means the Florida Revised Limited Liability Company Act or, from and after the date any successor statute becomes, by its terms, applicable to the Company, such successor statute, in each case as amended at such time by amendments that are then applicable to the Company (to the extent the provisions of the Act are not modified by the Articles of Organization or this Agreement "Certificate"). All references to sections of the Act include any corresponding provision(s)of any such successor statute.

1.2. "Additional Capital Contributions" means any Capital Contributions required by the Company other than the Initial Capital Contributions described in this Agreement.

1.3. "Adjusted Capital Account" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after: (a) adding to such Capital Account the amount that such Member is deemed to be obligated to restore pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (b) subtracting from such Capital Account such Member's share of the items described in Regulations Sections 1.704 1(b)(2)(ii)(d)(4), (5) and (6).

1.4. "Affiliate" means, with reference to a specified Person: A Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by or is under common Control with, the specified Person.

1.5. "Agreement" means this Operating Agreement.

1.6. "Applicable Law" or "Applicable Laws" means all laws and regulations applicable to the Members and/or the Company.

1.7. "Board of Members" "Members" or "Shareholders" means every Member of the Company acting collectively as a whole.

1.8. "Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Florida are closed.

1.9. "Capital Account" means a capital account established and maintained for each Member with respect to the Company in which the Member has an interest in accordance with the following provisions: (1) To the Member's Capital Account there will be added (i) such Member's Capital Contributions to the Company and (ii) such Member's allocable share of Net Profits and any items in the nature of income or gain to the Company that are allocated to such Member; (2) From each Member's Capital Account there will be subtracted by the Company (i) the amount of (1) cash and (2) the Gross Asset Value of any assets distributed from the Company to such Member pursuant to any provision of this Agreement (net of liabilities encumbering the distributed assets that such Member is considered to assume or take subject to under Code Section 752), (ii) such Member's allocable share of Net Losses and any other items in the nature of expenses or losses that are allocated from or with respect to the Company to such Member and (iii) liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company, calculated by reference to Code Section 752. With respect to distributions of assets from the Company, the Capital Accounts of the Members of the Company will first be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such property (that has not been previously reflected in Capital Accounts) would be allocated to the Members of the Company if there were a taxable disposition of such property for its fair market value (taking Code Section 7701(g) into account) on the date of distribution; (3) the Managing Member may cause an increase or decrease to the Capital Accounts of the Members to reflect a revaluation of assets on the books and records of the Company. Any such adjustments will be made in accordance with Regulations Section 1.704-1(b)(2)(iv)(g); (4) Additional adjustments will be made to the Members' Capital Accounts as required by Regulations Sections 1.704-1(b) and 1.704-2 or, as permitted but not required, in the reasonable discretion of the Managing Member; (5) Adjustments to Capital Accounts in respect of the Company income, gain, loss, deduction and non-deductible expenditures (or any item thereof) will be made with reference to the federal tax treatment of such items (and, in the case of book items, with reference to federal tax treatment of the corresponding tax items) at the Company level, without regard to any requisite or elective tax treatment of such items at the Member level; (6) The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Sections 1.704-1(b) and 1.704-

2 and will be interpreted and applied in a manner consistent with such Regulations, as reasonably determined by the Managing Member.

1.10. "Capital Contributions" means, with respect to any Member, the total amount of money and the fair market value of property (other than money) contributed to the capital of the Company by such Member, whether as an Initial Capital Contribution or as an Additional Capital Contribution.

1.11. "Cash Available for Distribution" means, all the Company cash receipts (excluding the proceeds from any Terminating Capital Transaction), after deducting payments for Operating Cash Expenses and payments required to be made in connection with any loan to the Company or any other loan secured by a lien on any Company Assets, capital expenditures, and any other amounts set aside for the restoration, increase, or creation of reasonable Reserves.

1.12. "Certificate" means the relevant incorporation document(s) and supplements and amendments thereto of the Company filed in the Office of the Secretary of the State of Florida for the purpose of forming the Company as a Florida limited liability company, and any duly authorized, executed and filed amendments or restatements thereof.

1.13. "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

1.14. "Company" or "J&J" means J and J Purchasing, LLC.

1.15. "Company Assets" means all direct and indirect interests in real and personal property owned by the Company from time to time and will include both tangible and intangible property (including cash).

1.16. "Control," "Controlled," or "Controlling" means (a) with respect to any corporation or other entity having, whether directly or through another corporation or entity, voting shares or the equivalent, the ownership or power to vote equal to or greater than fifty-one percent (51%) of the outstanding shares or the equivalent; or, (b) with respect to any partnership, limited liability company, professional association, non-profit corporation, joint venture or other entity, directly or through another entity, the power to elect, appoint, or approve of fifty-one percent (51%) or more of the directors, Members, or Persons performing similar functions or the ability to direct its business and affairs.

1.17. "Delinquent Member" means a Member who does not contribute by the required date all of a Capital Contribution that the Member is required to make as provided in this Agreement.

1.18. "Economic Interest" means a Person's: (i) right to share in the Net Profits, Net Losses, or similar items of, and to receive distributions from, the Company in proportion to the Member's Percentage Interest, and (ii) obligation to make any required Additional Capital Contributions, but does not include any other rights of a Member including, without limitation, the right to vote or to participate in the management of the Company or, except as specifically provided in this Agreement or required under applicable state law, any right to information concerning the business and affairs of the Company.

1.19. "Economic Interest Holder" means any Person (a) to whom a Member Transfers all or any part of its interest in the Company, and (b) which has not been admitted to the Company as a Substitute Member pursuant to this Agreement. An Economic Interest Holder only has an Economic Interest in the Company.

1.20. "General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate, as quoted in the money rates section of The Wall Street Journal, plus one percent or (b) the maximum rate permitted by applicable law.

1.21. "Gross Asset Value" means, with respect to any Company Asset, Company Asset's adjusted basis for federal income tax purposes, except as follows:

    1.21.1 The initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset, as provided herein.

    1.21.2 Except as otherwise provided in this Agreement, the Gross Asset Values of all assets immediately prior to the occurrence of any event described in subsections (a), (b), (c), or (d) of this Section 1.21.2 will be adjusted to equal their respective gross fair market values, as of the following times: (a) the acquisition of an additional interest in the Company; (b) the distribution by the Company to a Member of more than a de minimis amount of assets as consideration for an Interest in the Company; (c) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (d) at such times as the Company may determine as necessary or advisable in order to comply with Regulations Sections 1.704-1(b) and 1.704-2.

    1.21.3 The Gross Asset Value of any Company Asset distributed to a Member will be the gross fair market value of such Company Asset on the date of distribution.

    1.21.4 The Gross Asset Values of the assets of the Company will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are considered in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m). If the Gross Asset Value of a Company Asset has been determined or adjusted pursuant to Section 1.21.1, 1.21.2 or 1.21.4 above, such Gross Asset Value will thereafter be adjusted by the depreciation taken into account with respect to such Company Asset for purposes of computing Net Profits and Net Losses.

1.22. "Interest" means a Member's Membership Interest and/or a Person's Economic Interest.

1.23. "Investor" means an Investor pursuant to Company's Private Placement Memorandum which investment is managed by Company. An Investor is not a Member of and owns no Units in Company. An Investor is not a Person and is such individual Investor in Company negotiated Purchase Contracts and which Investor does not have any form or ownership or other right or expectancy in or otherwise relevant to Company, nor its profits or revenues, except that such Investor has a right to the Investment Return which is their retained Partial Beneficial Interest in Purchase Contracts and retained Right of Redemption, subject to any Event of Default. Investors have no voting right or ownership in or related to this Operating Agreement or otherwise.

1.24. "Investment Return" means and encompasses the following: pursuant to the Company's Private Placement Memorandum and investment Offering for the investment in Purchase Contract(s), the Company has offered Investors an expected 12.5% or $12,500 for a $100,000 Purchase Contract's Return or 12.5% or $10,000 for an $80,000 Purchase Contract's Investment Return (i.e., the specific sum constituting the Investor's Partial Beneficial Interest in the relevant Purchase Contract due to be paid in a lump sum subsequent the expiration of the Placement Period in addition to the refundable Investment Principal pursuant to the Investor's retained Right of Redemption). The $100,000.00 or $ 80,000.00 consideration/price for the Purchase Contract is funded by the Investor's Investment Principal under the Offering and as so attributed/placed by Company. When Investor submits their Investment Documentation and funds their Investment Principal, the President will place the Investment Principal to fund the assignment/purchase of the relevant $100,000.00 or $80,000.00 Purchase Contract. The time period between the receipt of the Investor's Investment by Company and such assignment/purchase may vary, but generally will be less than three business days. The ninety-day "Placement Period" begins on the day the Purchase Contract is signed. At the end of the Placement Period, the Investor is expected to receive a lump sum payment of the relevant Investment Return (i.e., depending on whether the Purchase Contract is for $100,000 or $ 80,0000), subject to any Event of Default and described or defined in the Private Placement Memorandum. Manager will issue and forward to each Investor a yearly 1099 Tax reporting form setting out amounts paid to Investor.

1.25. "Majority of Interest" means 51% or more of the Membership Interests in Company and a "Super Majority Vote" means 70% or more of the Membership Interests in Company.

1.26. "Managing Member" means each Person elected as the Managing Member of the Company in accordance with this Agreement, but only for so long as each such Person remains a Managing Member of the Company in accordance with this Agreement. References to Manager/President in this Agreement means Managing Member.

1.27. "Member" or "Shareholder" means any Person named in the relevant Certificate as an initial Member of the Company and any Person hereafter elected or appointed as a Member of the Company as provided in this Agreement but does not include any Person who has ceased to be a Member of the Company.

1.28. "Membership Interest" means the entire ownership interest of a Member in the Company at any particular time and any and all rights hereunder.

1.29. "Net Profits" or "Net Losses" means, with respect to the Company, for each fiscal year or other period, an amount equal to the taxable income or loss of the Company for such year or period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments: (a) any income that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section 1.27 will be added to such taxable income or loss; (b) Any expenditure described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section, will be subtracted from such taxable income or loss; (c) Gain or loss resulting from any disposition of assets where such gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the assets disposed of, notwithstanding that the adjusted tax basis of such assets differs from its Gross Asset Value; (d) To the extent an adjustment to the adjusted tax basis of any Company Asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the basis of Company Asset) or loss (if the adjustment decreases the basis of Company Asset) from the disposition of Company Asset and will be taken into account for the purposes of computing Net Profits and Net Losses; (e) If the Gross Asset Value of any Company Asset is adjusted in accordance with the terms of this Agreement, the amount of such adjustment will be taken into account in the taxable year of such adjustment as gain or loss from the disposition of such Company Asset for purposes of computing Net Profits or Net Losses.

1.30. "Operating Cash Expenses" means, with respect to any fiscal period, the amount of cash disbursed in the ordinary course of business during the period to pay the expenses of the Company including, without limitation, all cash expenses, such as advertising, promotion, property management, insurance premiums, taxes, utilities, repair, maintenance, legal, accounting, bookkeeping, computing, equipment use, travel on the Company business, telephone expenses, and salaries, and direct expenses of the Company employees and agents while engaged in the Company business. Operating

Cash Expenses will include the actual cost of goods, materials and administrative services used for or by the Company in performing functions set forth in this Agreement reasonably requiring the use of such goods, materials, or administrative services. Operating Cash Expenses will not include expenditures paid from Reserves (as defined below). Operating Cash Expenses will be calculated in accordance with generally accepted accounting principles.

1.31. Partial Beneficial Interest" means an Investor's Partial Beneficial Interest that through their investment pursuant to Company's Private Placement Memorandum subscription gives rise to their interest in Investment Return under a Purchase Contract and subject to any Event of Default as defined or described in the Company's Private Placement Memorandum.

1.32. Person" means and includes an individual, a corporation, a company, a limited liability company, a trust, an unincorporated organization, a government or any department or agency thereof, or any entity similar to any of the foregoing that holds or is owner of Units in Company, but not Investor.

1.33. "Regulations" means proposed, temporary, and final Treasury Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding Treasury Regulations).

1.34. "Reserves" means funds set aside or amounts allocated to reserves that will be maintained in amounts deemed sufficient by the Managing Member for working capital, to pay taxes, insurance, debt service, and other costs or expenses incident to the conduct of business by the Company as contemplated hereunder

1.35. "Terminating Capital Transaction" means any sale or other disposition of all or substantially all of the assets of the Company or a related series of transactions that, taken together, result in the sale or other disposition of all or substantially all of the assets of the Company.

1.36. "Transfer" means, with respect to any interest in the Company, a sale, conveyance, exchange, assignment, pledge, encumbrance, gift, bequest, hypothecation, or other transfer or disposition by any other means, whether for value or no value and whether voluntary or involuntary or directly or indirectly (including, without limitation, by operation of law), or an agreement to do any of the foregoing; provided however, (i) the pledge of Membership Interests or assets of the Company to a third party as collateral for the financing of the purchase of real estate or other property owned by the Company, and (ii) the assignment by a Member to (a) an entity that is wholly-owned by such Member, or (b) a trust for which such Member is a beneficiary (provided that Control of such trust remains with such Member), will not be construed as a "transfer" as that term is used herein. Used as a verb, the term will mean effecting any of the foregoing.

1.37. "Units" means Membership Units.

## ARTICLE 2
## ORGANIZATIONAL MATTERS

2.1 FORMATION. The Company was formed under Florida law and will be governed by such law for the purposes and upon the terms and conditions set forth in this Agreement. The rights, duties, powers and liabilities of the Members will be as provided in the relevant Florida State statutes, except as otherwise expressly provided in this Agreement. In the event of any inconsistency between any provision contained in this Agreement and any non-mandatory provision of Florida State law, the provision contained in this Agreement will govern.

2.2 NAME. The name of the Company is **J and J Purchasing, LLC.**

2.3 PRINCIPAL PLACE OF BUSINESS; OTHER PLACES OF BUSINESS. The principal place of business of the Company is located at 9 Sky Arc Court, Henderson, NV 89012, or such other place within or outside the State of Florida as the Manager may from time to time designate.

2.4 BUSINESS PURPOSE. The Company is formed to conduct lawful business.

2.5 FILINGS. The Managing Member may execute and file any duly authorized amendments to the Certificate of Formation of the Company (the "Certificate") from time to time in a form prescribed by Florida State law. The Managing Member will also cause to be made, on behalf of the Company, such additional filings as the Managing Member will deem necessary or advisable.

2.6 DESIGNATED AGENT FOR SERVICE OF PROCESS. The Company will continuously maintain a registered office in the State of Florida at its principal place of business. Until the Managing Member decides otherwise, the designated and duly qualified agent for service of process on the Company in Florida will be the Managing Member of the Company.

2.7 COMPANY PROPERTY. All Company assets will be held and owned, and conveyance made, in the Company's name. Instruments and documents providing for the acquisition, mortgage, or disposition of any Company asset will be valid and binding upon the Company if executed by the Person authorized by the Managing Member.

2.8 BANK ACCOUNT. All funds of the Company will be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company at such locations as determined by the Managing Member

from time to time. Withdrawal from such accounts will require the approval/signature of the Managing Member or the Person designated by the Managing Member.

2.9     TERM. The Company commenced upon the filing of the Certificate with the Secretary of State of the State of Florida and will continue perpetually until duly terminated.

2.10    WARRANTIES. The Company and current Members represent and warrant as part of Member's Unit purchase the following: (a) Company and all subsidiaries are duly and legally formed and in good standing in their state of incorporation or will be within five (5) business days from executing this Agreement; (b) There are no liabilities other than those disclosed in the balance sheet at closing; (c) All related party transactions shall be scheduled at closing; (d) There are no threatened or filed legal actions against the Company by governmental agencies or other plaintiffs.

ARTICLE 3
MANAGING MEMBER AND BOARD OF MEMBERS

3.1     MANAGING MEMBER. Broadly, Company's daily operations shall be managed solely by its Manager/President and not by its Members. The Manager/President is **Mr. Jeffrey Judd**. Daily operations include all services and affairs that do not require approval by the Board of Members as outlined in this Agreement. Unless the action of the Members is otherwise required by this Agreement, the Company's Certificate or the Act, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be solely managed under the direction, supervision, and responsibility of the Manager/President. Subject to the limitations contained in Section 3.2, the Manager shall make all decisions and may take all actions for, or on behalf of, the Company in furtherance of its business and affairs as he may deem necessary or appropriate. The Members approve the appointment of **Mr. Judd** as President, the Manager and Attorney-in-Fact of the Company.

Mr. Judd's authority shall include but is not limited to: (i) entering into and performing contracts, agreements, and other undertakings binding the Company that may be necessary to further the Company's purposes in the sole discretion of Manager; (ii) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders of the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements; (iii) maintaining the Company's Assets; (iv) collecting sums due the Company; (v) paying the Company's debts and obligations; (vi) borrowing money or opening a line of credit either in an amount deemed necessary by Manager and voluntary prepayment or debt extensions of same for Company purposes and to secure the repayment by pledging Company Assets; (vii) selecting removing and changing the authority and responsibility of lawyers, accountants and other advisers and consultants; (viii) obtaining insurance for the Company and as germane to its operations; (ix) determining method(s) for and amounts regarding the distribution of Company cash; (x) hiring of personnel, staff or professionals and leasing, purchasing or otherwise retaining the use or title for equipment, furniture and other property; (xi) establishing, amending or extending credit relationships in amounts and with terms in the sole discretion Manager, (xii) setting of the date and time for the annual, quarterly, or other meeting of Members; (xiii) managing the negotiation of Purchase Contracts tied to Third-Party Beneficiary Insurance Settlement Agreements matters germane to the private investment of relevant Investors, issuing monthly statements and Investment Returns pursuant to the Offering; (xiv) waiving of requirements regarding waivable matters set forth in this Agreement; (xiv) approving of annual, quarterly or monthly budgets; (xv) commencing, amending or terminating relationships with insurance providers or other products or services provider in Manager's sole discretion; (xvi) terminating any employment, independent contractor, or other agreement and secure that all taxes, payments, compensation to any is compliant with all laws and regulations; (xvii) distributing Assets; (xviii) determining and implementing a formula or methodology to determine distributions of Investment Returns germane to Partial Beneficial Interests to Investors or compensation to Members; (xx) approving the commencement of any lawsuit or legal proceeding that Manager considers necessary and in the best interest of Company; (xxi) determining method(s) for and regarding dilution of Units; (xxii) settle or resolve of any dispute of any claim made against the Company; (xxiii) create or propose amendments to this Agreement; (xxiv) cause Company to engage in additional business activities or streams; (xxv) instituting, managing, auditing and ensuring ongoing adherence to a Company compliance program regarding Applicable Laws (and further, all industry laws regulations) governing or relevant to the Company's operations and all Company policies and procedures; and, (xxvi) delegating an authorized agent of the Company to take any of the actions referred to in the foregoing clauses. In general, Mr. Judd shall have a broad right to manage the day-to-day operations of the Company.

3.3.    BOARD OF MEMBERS. The Board of Members consists of all Shareholders of Company. By Majority of Interest, the Board of Members retain the right to decide on fundamental and structural changes to Company, specifically, (1) amendments to this Agreement, (2) the sale/liquidation of Company, and (3) appointment of a Managing Member. In the event a deadlock on a matter requiring a Majority of Interest vote occurs and is not resolved within thirty (30) days from the date of the initial vote, then the vote of Managing Member shall decide, with binding force, over the affair/matter.

3.3.1   PLACE AND MANNER OF MEETING. All Member meetings will be held at the time and place stated in the meeting notice or in an executed waiver of the meeting notice. Participation in a meeting will constitute a Member's presence at the meeting, except when the Member attends the meeting for the express purpose of stating that the meeting is not lawfully called or convened. The Members may participate in a meeting by means of telephone, video conference, electronic (for example, GoToMeeting) or similar communications equipment by means of which all persons participating

in the meeting can hear each other. Such participation in a meeting will constitute presence in person at the meeting. If all Members are participating by conference telephone or similar communications equipment, the meeting will be deemed to be held at the principal place of business of the Company.

3.3.2   CONDUCT OF MEETINGS. All Member meetings will be presided over by the President. The President, in the President's discretion, may determine the order of business and procedure at the meeting, including regulating of the voting manner and the discussion conduct. If the President is unavailable for a meeting, the President's designee will preside over the Member meeting.

3.3.3   ANNUAL MEETING. The Members shall meet at least once a year at a time and place to be determined by the Managing Member. Failure to hold the annual meeting at the designated time will not result in a dissolution of the Company.

3.3.4   SPECIAL MEETINGS. Special meetings may be called at any time by the President, Managing Member, or by the written request of holders of at least twenty-five percent (25%) of the Membership Units. The request must state the meeting purposes and the matters proposed to be acted on at the meeting.

3.3.5   NOTICE. Notice of the meeting must be in writing and state the meeting's place, day and hour, and, in case of a special meeting, the purposes for which the meeting is called. The notice must be delivered not less than ten (10) or more than sixty (60) days before the meeting date either personally, by first class mail, by facsimile, or by electronic mail to each Member. Notice may be waived as provided in this Agreement. If mailed, the notice will be deemed to be delivered when deposited, postage prepaid, in the United States mail addressed to the Member at the Member's address as it appears on the Company's records.

3.3.6   QUORUM OF MEMBERS. Unless otherwise provided in the Certificate, the holders of at least fifty-one percent (51%) of the Membership Units represented in person or by conference telephone or similar communications as described above will constitute a quorum at a Members meeting.

3.3.7   MAJORITY VOTE; WITHDRAWAL OF QUORUM. When there is a quorum, the holders of a majority of all of the Membership Units present at the meeting or participating in the meeting will decide the matters brought before the meeting unless a different vote is required by the Certificate, this Agreement, or Florida law. The Members present at a meeting may not continue to transact business if a quorum is not present or is no longer present.

3.3.8   VOTING OF MEMBERSHIP UNITS. Each Member entitled to vote is entitled to one (1) vote per Membership Unit or a fraction of one (1) vote per fraction of a Membership Unit on each matter submitted to a vote at a Member meeting on which that Member is entitled to vote. A Member may vote in person, by electronic mail, by facsimile, or other written means. A Member may not vote by proxy.

3.3.9   CONSENT FOR ACTION WITHOUT MEETING. Any action required to be taken or that may be taken at a Member meeting, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, has been signed by not fewer than the minimum number of holders of Membership Units that would be necessary to take the action at a meeting at which the holders of all Membership Units entitled to vote with respect to that action were present and voted. Within ten (10) days after such authorization, notice of the taking of any action by the Members without a meeting by less than unanimous consent will be given to the Company and those Members who did not consent in writing to the action or who are not entitled to vote on the action.

3.3.10 REQUIREMENTS FOR WRITTEN CONSENT. Each written consent must be signed, dated and delivered by the Member. The consent will become effective at the time and remain effective for the period specified in the consent. A telegram, telex, cablegram, or similar transmission by a Member, or a photographic, electronic, facsimile, or similar reproduction of a writing signed by a Member, will be regarded as signed by the Member.

3.4   WARRANTIES. Each Member agrees to the following clauses: (a) Only one class of stock (Units) is authorized; (b) Each Shareholder of Company is guaranteed a right to participate in future equity offerings pro-rated to their Membership Interest at the time of the offering; (c) Distributions and dividends will be pro-rata to stock ownership and subject to Managing Member's approval; (d) Each Shareholder agrees to accept and follow any transaction approved by a Majority of Interest. Each Shareholder's right to sell Units shall be pursuant Article 7; (e) In the event a Shareholder desires to sell Units in the Company or transfer Units as part of a divorce proceeding, each Shareholder and their spouses who join this Agreement agrees to a right of first refusal for the Company or existing Shareholders to repurchase the Units at Book Value. Such purchase may be funded by the Company over time rather than through an immediate cash payment. Nonetheless, by their execution of a joinder to this Agreement, each Shareholder spouse acknowledges and accepts the Company's or existing Shareholders' right of first refusal described herein in favor of the relevant Shareholder. Each Shareholder spouse agrees and recognizes that should any provision of this Agreement or joinder to this Agreement by a Member spouse for any reason be held to be invalid, unenforceable, or contrary to public policy or law, the right of first refusal set out herein shall remain inviolate; (f) A Majority In Interest may decide to dilute the Units of Shareholders provided that (i) such dilution was made in good faith and in the best interest of Company, (ii) Company had no intent to harm minority Shareholders, (iii) is justified by a viable business reason, (iv) Company received a fair market value for the

stock, and (v) the dilution does not violate a preemptive right. An increase of distribution in the aftermath of six months from the time of the dilution may serve as a non-rebuttable justification for the decision in favor of dilution.

3.5   RECORDS AND REPORTS.  Managing Member will cause to be kept at the principal place of business of the Company, or at such other location as the Managing Member will reasonably deem appropriate, full and proper ledgers, other books of account, and records of all receipts and disbursements, other financial activities, and the internal affairs of the Company for at least the current and past four (4) fiscal years.  All Members will be granted access to the books and records of the Company at reasonable times. Managing Member will cause to be sent to each Member the following:  (a) following the end of each fiscal year of the Company, a report that will include all necessary information required by the Members for preparation of their federal, state, and local income or franchise tax or information returns, including each Member's pro rata share of Net Profits, Net Losses, and any other items of income, gain, loss, and deduction for such fiscal year; and (b) a copy of the Company's federal, state, and local income tax or information returns for each fiscal year, concurrent with the filing of such returns, and (c) an annual unaudited financial report for the activities of the Company.

3.6   REIMBURSEMENTS; COMPENSATION.  If any, the Company will reimburse the Members, and their duly authorized representatives, for all ordinary and necessary out-of-pocket expenses incurred by them on behalf of the Company, in accordance with policies established by the Managing Member.  Such reimbursement will be treated as an expense of the Company that will be deducted in computing the Operating Cash Expenses and will not be deemed to constitute a distributive share of Profits or a distribution or return of capital to any Member.  Each Board of Members (the Members) that provide services to the Company, if any, may be reasonably compensated for services rendered to the Company upon approval of the Members and the Managing Member.  This compensation will be a guaranteed payment pursuant to Code Section 707(c).  The Members may adjust the compensation based upon performance and dedication of time to the Company's business.  Reasonable compensation must comply with Code Section 704(e), if applicable, and will be measured by (i) the time required in the Company's administration; (ii) the value of property under administration; and (iii) the responsibilities assumed in the discharge of duties of office.

3.7   COMPLIANCE.  The Company will be managed and operated in a manner that complies with all laws and regulations all germane to which the Members rely on the Managing Member as consistent with Section 3.1 and otherwise.

ARTICLE 4
MEMBER CAPITAL, LOANS, AND LIABILITY

4.1   CAPITALIZATION AND INITIAL CAPITAL CONTRIBUTIONS OF MEMBERS.  The name and address of the Capital Contributions made by, and the Percentage Interest of each Member are set forth on Exhibit 4.1 attached hereto and made a part hereof. All Members acknowledge and agree that "Initial Capital Contributions" represents the amount of cash initially contributed by the Members.

4.2   ADDITIONAL CAPITAL CONTRIBUTIONS BY MEMBERS.  Except as otherwise provided in this Agreement, no Member will be required to make any Additional Capital Contributions to the Company.  Nonetheless, equity offerings shall be offered to all Members according to their pro-rated interest in Company as approved by the Managing Member.

4.3   CAPITAL ACCOUNTS.  A Capital Account will be established and maintained for each Member in accordance with the terms of this Agreement.

4.4   MEMBER CAPITAL AND PERCENTAGE INTERESTS.  Except as otherwise provided in this Agreement or except as approved in writing by the Managing Member: (a) no Member will be entitled to receive a return of, or interest on, the Member's Capital Contributions or Capital Account; (b) no Member will withdraw any portion of the Member's Capital Contributions or receive any distributions from the Company as a return of capital on account of such Capital Contributions; and (c) the Company will not redeem or repurchase the Interest of any Member without first offering the interest to other Members pro-rata.  Upon any withdrawal of capital by a Member, the Percentage Interests of all Members will be adjusted so that each remaining Member has a Percentage Interest proportionate to the remaining Member's total Capital Contributions (minus any capital withdrawals) relative to the total of all Capital Contributions (minus capital withdrawals) made to the Company.

4.5   MEMBER LOANS.  No Member will be required or permitted to make any loans or otherwise lend any funds to the Company, without first obtaining the prior written consent of the Managing Member.  In addition, any Member will be permitted (but not required) to make loans to the Company only to the extent the Managing Member reasonably determines that such loans are necessary or advisable for the business of the Company, pursuant to terms that are consistent with fair market value, and subject to interest accruing at the General Interest Rate from the loan date until the date on which such loan is repaid.  No loans made by any Member to the Company will have any effect on such Member's Percentage Interest.  Such loans will represent a debt of the Company payable or collectible solely from the assets of the Company in accordance with the terms and conditions upon which such loans were made.

4.6   LIABILITY OF MEMBERS.  Except as otherwise required by any non-waivable provision of Florida state law or other Applicable Law: (a) no Member will be personally liable in any manner whatsoever for any debt, liability, or other obligation of the Company, whether such debt, liability, or other obligation arises in contract, tort, or otherwise; and (b) no

Member will in any event have any liability whatsoever in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed profits of the Company, (iii) the amount of any unconditional obligation of such Member to make additional Capital Contributions to the Company pursuant to this Agreement, and (iv) the amount of any wrongful distribution to such Member, unless, and only to the extent, such Member has actual knowledge (at the time of the distribution) that such distribution is made in violation of Florida state law.

## ARTICLE 5
## DISTRIBUTIONS

5.1    DISTRIBUTIONS OF CASH AVAILABLE FOR DISTRIBUTION.  The income, gains, losses, deductions and credits of the Company (the "Net Profits" and "Net Losses") shall be determined for each Fiscal Year in accordance with generally accepted accounting principles as promulgated in the United States pursuant to the accounting method followed by the Company, regardless of the accounting method used for federal income tax purposes.

5.2    DISTRIBUTIONS.  Cash will be distributed according to the Membership Interest based on cash available for distribution allowing the Company to keep necessary reserves for future expenses and liabilities.  Cash distribution will not be equal to net income and in fact could vary substantially from net income.  It is anticipated that Company will strive to make cash distributions that at a minimum are adequate to fund Shareholder tax liability arising from the taxable earnings of the Company.  Distributions made in conjunction with the final liquidation of the Company, including, without limitation, the net proceeds of a Terminating Capital Transaction, will be applied or distributed as provided in this Agreement.

5.3    WITHHOLDING.  The Managing Member may withhold distributions or portions thereof if the Company is required to do so by any applicable rule, regulation, or law, and each Member hereby authorizes the Managing Member to withhold from or pay on behalf of or with respect to such Member any amount of federal, state, local, or foreign taxes that the Managing Member determines that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement.  Any amount paid or withheld on behalf of or with respect to a Member pursuant to this Section will be treated as having been distributed to the Member.

5.4    DISTRIBUTIONS IN KIND.  No right is given to any Member to demand or receive property other than cash as provided in this Agreement.  The Managing Member may determine in his sole discretion to make a distribution in kind of Company Assets to a Member or the Members, which the Members will accept, and such Company Assets will be distributed in such a fashion as to ensure that the fair market value thereof is distributed and allocated in accordance with this Agreement.

5.5    LIMITATIONS ON DISTRIBUTIONS.  Notwithstanding any provision to the contrary contained in this Agreement, the Company will not knowingly make a distribution to any Member on account of its Membership Interest in the Company (as applicable) in violation of Florida state laws.

5.6    INVESTMENT RETURN AS TO INVESTORS. As to Investors, the Manager will effectuate the Investment Return as consistent with the Investor's Subscription Agreement and relevant Investment Principal and consistent with the conclusion of the Placement Period subject to any Event of Default.

## ARTICLE 6
## ALLOCATIONS OF NET PROFITS AND NET LOSSES

6.1    GENERAL ALLOCATION OF NET PROFITS AND LOSSES.  Subject to this Agreement, Net Profits, Net Losses and any other items of income, gain, loss and deduction of the Company for any fiscal year will be allocated, for purposes of adjusting the Capital Accounts of the Members, as follows:

6.1.1    The Net Losses of the Company will be allocated as follows: (i) First, to the Members with positive Adjusted Capital Account Balances, in proportion to and to the extent thereof; (ii) Second, to the Members who are allocated a share of the Company's indebtedness pursuant to Code Section 752, in proportion to and to the extent of each such Member's share of the indebtedness that funded the Net Losses being allocated pursuant to this Agreement (determined by assuming that, once no Member's Adjusted Capital Account is positive, the Net Losses of the Company are funded in inverse order of, and to the extent of, the Company's creditors' claims to the assets of the Company); and (iii) Thereafter, to the Members in proportion to their Percentage Interests in the Company.

6.1.2    The Net Profits will be allocated as follows: (i) First, to the Members in proportion to and to the extent of the Net Losses as outlined in this Agreement; (ii) Then, to the Members in the proportion and to the extent of the Net Losses as outlined in this Agreement; (iii) Then, to the Members in proportion to their respective Percentage Interest in the Company.

6.2    SPECIAL ALLOCATIONS.

6.2.1    Tax items with respect to an asset contributed to the Company with a Gross Asset Value that varies from its basis in the hands of the contributing Member immediately preceding the date of contribution will be allocated among the Members for income tax purposes pursuant to Regulations promulgated under Code Section 704(c) so as to consider such variation.  The Company will account for such variation under any method approved under Code Section 704(c) and

the applicable Regulations, including the so-called "remedial method," as selected by the Managing Member, in its sole discretion. If the Gross Asset Value of any Company Asset is adjusted pursuant to Section 1.21.2 hereof or a similar adjustment is made pursuant to Section 1.21.2 hereof, subsequent allocations of income, gain, loss and deduction with respect to such asset will take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations promulgated thereunder. Allocations pursuant to this Agreement are solely for purposes of federal, state, and local taxes and will not affect, or in any way be considered in computing, any Member's Capital Account or share of Net Profits, Net Losses, and any other items or distributions pursuant to any provision of this Agreement.

6.2.2    If any Member unexpectedly receives an adjustment, allocation, or distribution of the type contemplated by Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes or increases a deficit Adjusted Capital Account (for this purpose, combining all Capital Accounts of such Member), items of income and gain will be allocated to all such Members (in proportion to the amounts of such deficit Adjusted Capital Accounts) in an amount and manner sufficient to eliminate the deficit balances in such Members' Adjusted Capital Accounts as quickly as possible as of the end of the Company's taxable year to which adjustment, allocation or distribution relates. It is intended that this Section 6.2.2 qualify and be construed as a "qualified income offset" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(d).

6.2.3    To the extent that an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's Membership Interest, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of Company Asset) or loss (if the adjustment decreases such basis), and such gain or loss will be specially allocated to the Members in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

6.2.4    The allocations set forth in Section 6.2.2 and Section 6.2.3 (the "Regulatory Allocations") are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2(i). The Regulatory Allocations may not be consistent with the manner in which the Members intend to distribute the assets of the Company or allocate income or loss from the Company. Accordingly, the Managing Member is hereby authorized to cause the allocation of Net Profits, Net Losses and other items of income, gains, loss and deductions of the Company not to distort the manner in which distributions will be divided among the Members and, further, to ensure that the allocations set forth herein meet the requirements of the Code and the Regulations.

6.2.5    For any fiscal year during which any part of a Membership Interest is Transferred between the Members, the portion of the Net Profits, Net Losses, and other tax items that are allocable with respect to such part of a Membership Interest will be apportioned between the transferor and the transferee under any method allowed pursuant to Code Section 706 as determined by the Managing Member.

6.2.6    In the event that the Code requires allocations of tax items different from those set forth in this Agreement, the Managing Member is hereby authorized to make new allocations in reliance on the Code. Specifically, the Managing Member is authorized to take such steps as the Managing Member deems necessary or advisable in order to comply with the rules under Regulations §§1.704-1 and 1.704-2 dealing with "substantial economic effect" as it affects the allocation of income and loss. No such new allocation will be grounds for any claim or cause of action by any Member. The Members will be bound by the provisions of this Agreement in reporting their Units of Net Profits, Net Losses, and other tax items for federal, state, and local income tax purposes.

6.2.7    The Members acknowledge and are aware of the income tax consequences of the allocations made by this Agreement and hereby agree to be bound by the provisions of this Agreement in reporting their Units of Net Profits, Net Losses, and other items of income, gain, loss, deduction, and credit for federal, state, and local income tax purposes.

## ARTICLE 7

### PRICE & TRANSFER OF UNITS, RIGHT OF FIRST REFUSAL

7.1    PURCHASE PRICE AND TERMS OF PURCHASE. (i) In case of any divorce or bankruptcy that may be in any way related to or affect the Membership Units, the Company retains its right of first refusal to buy back the relevant Units at Book Value; (ii) In case of death or judicially determined incapacity of a Member, the Company retains its right of first refusal but not an obligation to buy back the relevant Units at Fair Market Value. The Company and Shareholder shall endeavor to designate a mutually acceptable appraiser to determine such value. If the parties have not agreed on an appraiser within forty days after the Company's exercise of the option, each party shall appoint its own appraiser within thirty days thereafter. The two appraisers shall determine the value of the Units within sixty days after their appointment. If the higher of the two appraisals is less than 110% of the lower appraisal, the value of the Units shall be the average of such values. If the higher of the two appraisals is 110% or more of the lower appraisal, the appraisers shall within twenty days appoint a third appraiser. If the two appraisers fail to appoint or agree upon a third appraiser within such period, a third appraiser shall be appointed by the parties if they so agree within further period of twenty days. If an appraiser is not

appointed or agreed upon with the time herein provided, either party may apply to an appropriate court of competent jurisdiction for the appointment of such appraiser. The third appraiser shall determine the value of the Units pursuant to the provisions of this Article within thirty days after such appraiser's appointment and the value so determined shall be determinative as to the value of the Units unless it is higher than the higher, or lower than the lower, of the two original appraisals, in which case such previous high and previous low determination shall be averaged and shall establish the value.

7.2   If a person appointed as an appraiser by or on behalf of either party fails or ceases to act for any reason, and the party by or on behalf of whom such appraiser was appointed fails to appoint a substitute or successor appraiser within ten days after being requested to do so by the other party, the appraiser in question shall be appointed by an appropriate court of competent jurisdiction upon application of either party.

7.3   Each appraiser shall execute such agreements as the Company reasonably requests whereby the appraiser agrees to treat as confidential any proprietary information of the Company obtained by the appraiser in connection with the appraisal. The Company will fully cooperate to effectuate the appraisal.   For purposes of the preceding sentence, the Company shall be deemed to be a Florida corporation and Shareholder shall be deemed to own such number of Units of the Company's stock as to the enable Shareholder to inspect and review the Company's books and records under Florida law. Each party shall bear one-half of the cost of a mutually appointed appraiser. If there is no mutual agreement, each party shall bear and pay the cost of the appraiser appointed by (or for) such party, and the cost of any third appraiser shall be borne equally by the parties. Both parties shall be given reasonable advance notice of the time and place of any appraisal proceedings and shall have the right to be present, heard, and represented by counsel.

7.4   Shareholder shall retain and the Company grants a security interest in the Units purchased by the Company to secure the Company's obligation to pay the purchase price for the Units. In such regard, Shareholder shall have all the rights and remedies of a secured party now or hereafter under Florida and any other applicable laws for the collection of the Company's obligation and the enforcement of the security interest. Unless and until Shareholder disposes of the Units pursuant to Shareholder's enforcement of the security interest after the Company's default in the payment of the purchase price, the Units shall be treasury Units of the Company.   Upon Shareholder's disposition of the Units pursuant to Shareholder's enforcement of the security interest, the Units shall be deemed to be validly issued and outstanding and fully paid and non-assessable. At the closing, the Company shall deliver possession of the certificate evidencing the Units, shall execute such financing statements relating to the Units and shall perform such other acts as Shareholder requests so that Shareholder's security interest in the Units is perfected as a first lien on the Units. Shareholder's resort as a secured party to any remedy provided by law shall not prevent the concurrent or subsequent employment of any other appropriate remedy.

7.5   The closing of the sale and purchase of Units pursuant to the exercise of the Company's option shall occur within thirty days after the value of the Units is determined. The closing shall occur at the Company's principal office in Florida. At the closing, Shareholder shall convey ownership of the Units to the Company free of any lien, claim or encumbrance, except for Shareholder's retained security interest.   If Shareholder fails to convey the Units to the Company at the closing, the Company may obtain ownership thereof by tendering the purchase price to Shareholder whereupon the Units shall be registered in the Company's name on the Company's books.   All obligations of each party under this Agreement shall survive the closing.

7.6   Each Shareholder in the Company agrees to this Agreement's following clauses: (a) Only one class of stock is authorized; (b) Each Shareholder of Company is guaranteed a right to participate in future equity offerings and will not be diluted; (c) Distributions and dividends will be pro rata to stock ownership and subject to Board of Director's approval; (d) Each Shareholder agrees to accept and follow any transaction approved by a Majority of Interest; (e) Each Shareholder will agree to a right of first refusal for the Company or existing Shareholders to repurchase stock at fair market value as determined by a formula and the terms of this Agreement.   Such purchase may be funded by the Company or Shareholders over time rather than through an immediate cash payment.   By their execution of a joinder herein, each Shareholder's spouse acknowledges and agrees that the expected shareholder agreement will contain the Company's or existing Shareholder's right of first refusal described herein and the Shareholder's spouse shall further execute such agreement.   Each Shareholder spouse further agrees and recognizes that should any provision of the shareholder agreement or any Joinder by a spouse of a Member for any reason be held to be invalid, unenforceable, or contrary to public policy or law, the right of first refusal set out herein shall remain inviolate.

7.7   Any attempted assignment or other transfer of Units in breach of this Agreement shall be void and of no effect.   This Agreement shall be specifically enforceable and upon the breach or attempted breach of this Agreement by a party, the other party shall be entitled to injunctive relief against such breach or attempted breach in addition to any other remedy at law or in equity, including the recovery of damages.   In addition, the prevailing party in any suit brought to enforce or interpret this Agreement shall be entitled to recover reasonable attorneys' fees and necessary disbursements in addition to all other relief awarded.

7.8    Except as permitted under this Agreement, neither the Units nor any interest therein may be transferred, whether voluntarily or involuntarily, by operation of law or otherwise, whether through a sale, gift, partition, pledge, or otherwise, without the advance written consent of the Company.  The Company may grant or withhold its consent to a transfer as to which its consent is required in its sole and uncontrolled discretion.

7.9  Units held by Shareholders may be transferred without the consent of the Company: (a) to the personal representatives, heirs and distributees of the estate of Shareholder following the death of Shareholder; (b) to the guardian of the estate of Shareholder following the judicially- determined incapacity of Shareholder; or (c) in or by virtue of an involuntary proceeding involving Shareholder (An involuntary proceeding means a proceeding or event by which Units or an interest therein are transferred by or subject to a charging order, attachment, execution, bankruptcy, receivership, foreclosure or other proceeding similar to the foregoing).

Provided, however that this Clause 7.9 shall not affect or diminish the Company's right of first refusal and option to purchase the Units from the transferee as provided for in this Agreement. Upon a permitted transfer of Units, the transferee shall be included within the term "Shareholder" for all purposes of this Agreement and the transferred Share shall continue to be subject to this Agreement.

7.10    No purported transfer of Units shall be permitted or effective, and any purported transfer of Units shall be void: (a) if the transferee's ownership of the Units would disrupt the status of the Company as an S corporation if the Company is an S corporation at the time of the proposed transfer; or (b) if Shareholder or the transferee of the Units (or any spouse of transferee fails to execute such documents as the Company designates (and in the form and substance designated by the Company) to further evidence the applicability of this Agreement to the transferee (and the transferee's spouse) and to the Units transferred to the transferee, including the applicability of the Company's option to purchase the Units as provided in this Agreement.

7.11    This Agreement shall apply to the interest, if any, which the spouse of Shareholder owns or may acquire in the Units held by Shareholder, including any interest of the spouse arising by the virtue of community property laws in the case that the Partition Agreement evidenced by a Joinder or otherwise to this Agreement is held to be unenforceable by a Court of competent jurisdiction. If pursuant to the terms of this Agreement, Shareholder is obligated to sell any Units held by Shareholder, all interest held or claimed in such Units by the spouse of Shareholder shall be included therewith and acquired by the purchaser of such Units; provided, however, that such spouse's interest shall continue in the proceeds of the sale of the Units.

7.12    The restrictions imposed by this Article shall terminate upon a Public Offering. A "Public Offering" means the first date, if any, that Units of the Company's capital stock are publicly traded on an established securities market or are admitted to quotation on the National Association of Securities Dealers Automated Quotation System.

7.13    This Agreement shall be binding upon the personal representatives, heirs, successors and permitted assigns of a Shareholder and shall inure to the benefit of the Company's successors and assigns.  Upon the death or the judicially-determined incapacity of a Shareholder, the surviving spouse or any other person the deceased has declared to be his successor-in-law shall receive and continue to represent the interests and the ownership interest of the deceased or incapacitated Shareholder.  This personal representative of Shareholder (if Shareholder is decreased) or to the guardian of the estate of Shareholder (if Shareholder is decreased) or to the guardian of the estate of Shareholder (if Shareholder is incapacitated) shall have no voting rights and shall have no veto rights in Company.   Company shall have the option to purchase all, but not less than all, of the Units held by the personal representative of the decreased or incapacitated Shareholder. The option shall be exercisable by notice to the personal representative of Shareholder (if Shareholder is decreased) or to the guardian of the estate of Shareholder (if Shareholder is decreased) or to the guardian of the estate of Shareholder (if Shareholder is incapacitated) during the period beginning on the date of Shareholder's death or date of determination of incapacity, as applicable and ending one hundred twenty days after the Company receives a request to transfer the Units as the result of the death or determination of incapacity of Shareholder.

7.15    Upon the transfer of any Units in or by virtue of an involuntary proceeding involving Shareholder, the Company shall have the option to purchase all or any portion of the transferred Units at any time thereafter. The option shall be exercisable by notice to the transferee at any time after the Company receives a request to transfer the Units as the result of the involuntary proceedings.

7.16    If Shareholder receives a bona fide offer for all or a portion of the Units held by Shareholder and Shareholder desires to sell pursuant to such offer, Shareholder shall notify the Company of the identity of the offeror (the "offeror"), the amount and method of payment of the purchase price and all other terms and conditions of the offer (the "Third Party Offer"). The Company shall thereupon have the option, exercisable for period of thirty days after the date the notice is given, to purchase the Units covered by the Third Party Offer at the price and on the terms set forth therein, except that the Company shall have not less than ninety days after the date the notice is given to close the purchase of the Units after the Company's exercise of the option and the closing shall occur at the Company's principal office in Florida.

7.17    If the Company does not exercise such option, Shareholder shall be free to sell the Units covered by the Third Party Offer if such sale is made to the Offeror and at the price and in accordance with all other terms of the Third Party

Offer, except that in all events the sale must be closed not later than ninety days of the notice of the Third Party Offer is given by Shareholder.

7.18 **Notwithstanding the restrictions set out in this Article,** in the event that a Majority of Interest approves a sale transaction regarding Company Units (to a "Drag-Along Right Holder"), whether such sale is in one transaction or a series of related transactions, to an third party purchaser (or group of related purchasers) or whether directly or indirectly or by way of sale, merger, statutory share exchange, recapitalization, reclassification, consolidation, or other business combination transaction or purchase of beneficial ownership (a "Sale Transaction"), the Drag-Along Right Holder may send written notice (the "Drag-Along Notice") to the Company and the remaining Members (the "Drag-Along Sellers") notifying them of such proposed Sale Transaction and of their obligations pursuant to the Sale Transaction. In a case of a Drag-Along Right Holder's entering into a Sale Transaction, such Sale Transaction's monetary terms and conditions will be the same for both the Drag-Along Sellers and for the Drag-Along Right Holder.

(a) The Drag-Along Sellers shall have the right to receive from the Drag-Along Right Holder either (i) the most recent purchase agreement, and related documents, pursuant to which the Sale Transaction will occur or (ii) a brief summary of the material terms and conditions of such purchase agreement and related documents. Upon receipt of a Drag-Along Notice, each Drag-Along Seller receiving such notice shall be obligated to (i) sell their Units through the Sale Transaction (including a sale or merger) contemplated by the Drag-Along Notice on the terms and conditions of such notice, and (ii) otherwise take all necessary action to cause the consummation of such transaction, including voting all of its Units in favor of such Sale Transaction and not exercising any appraisal or dissenters rights in connection therewith all of which rights the Members hereby explicitly waive. Each Drag-Along Seller further agrees to (A) take all actions (including executing documents) in connection with the consummation of the proposed Sale Transaction as may reasonably be requested of him, her or it by the Drag-Along Right Holder and (B) appoint the Drag-Along Right Holder, as its attorney-in-fact to do the same on its behalf. In connection with any Sale Transaction, no Drag-Along Seller shall be required to (1) make any representations or warranties (except as they relate to such Drag-Along Seller's ownership of and authority to sell its Units), (2) agree to any noncompetition or non-solicitation covenants beyond such already entered into, or (3) provide any indemnity.

(b) Each Member covenants and agrees to this Section and that the Member shall not raise any objections against any Sale Transaction that has been approved by a Majority of Interest. Moreover, all Members shall fully cooperate with and take all necessary and desirable actions in connection with the consummation of such Sale Transaction, without limitation, executing and delivering any document consenting to the sale or for exchange of Units, as applicable. As such, the Members acknowledge and agree that no dissenter's rights of any kind are granted to the Members and that no part of this Agreement shall be deemed to establish any right under the Act regarding dissenter's rights or as a dissenting shareholder or owner or regarding any fundamental business transaction.

ARTICLE 8
DISSOLUTION, LIQUIDATION, AND TERMINATION OF THE COMPANY

8.1 LIMITATIONS. The Company may be dissolved, liquidated, and/or terminated only pursuant to the provisions of this Agreement, and the Members do hereby irrevocably waive any and all other rights they may have to cause a dissolution of the Company or a sale or partition of any or all of the Company's assets.

8.2 EXCLUSIVE CAUSES. Notwithstanding Florida state law, the following and only the following events singly or in concert will cause the Company to be dissolved, liquidated, and/or terminated: (i) The occurrence of a Terminating Capital Transaction; (ii) By the vote of at least a Majority in Interest pursuant to this Agreement; (iii) Applicable Law dissolution as provided in Section 8.6; or, (iv) Judicial dissolution.

8.3 EFFECT OF DISSOLUTION. The dissolution of the Company will be effective on the day on which the event occurs giving rise to the dissolution, but the Company will not terminate until it has been wound up and its assets have been distributed as provided in Section 8.5 of this Agreement. During the dissolution of the Company, prior to the termination of the Company, the business of the Company and the affairs of the Members, as such, will continue to be governed by this Agreement.

8.4 NO CAPITAL CONTRIBUTION UPON DISSOLUTION. Each Member will look solely to the assets of the Company for all distributions with respect to the Company, its Capital Contribution thereto, its Capital Account and its share of Net Profits or Net Losses and will have no recourse therefore (upon dissolution or otherwise) against any other Member. Accordingly, if any Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which the liquidation occurs), then such Member will have no obligation to make any Capital Contribution with respect to such deficit, and such deficit will not be considered a debt owed to the Company or to any other person for any purpose whatsoever.

8.5 LIQUIDATION.

8.5.1 Upon dissolution of the Company, the Board of Members will liquidate the assets of the Company, and after allocating all income, gain, loss and deductions resulting therefrom, will apply and distribute the proceeds thereof as

follows: First, to the payment of the obligations of the Company, to the expenses of liquidation, and to the setting up of any Reserves for contingencies which the Board of Members may consider necessary. Thereafter, to the Members in proportion to the positive balances in the Members' respective Capital Accounts, determined after considering all Capital Account adjustments for the Company taxable year during which such liquidation occurs by the end of the taxable year in which such liquidation occurs or, if later, within ninety (90) days after the date of liquidation.

8.5.2  Notwithstanding Section 8.5.1, in the event that the Board of Members determines that an immediate sale of all or any portion of Company Assets would cause undue loss to the Members, the Board of Members, in order to avoid such loss to the extent not then prohibited by Florida state law, may either defer liquidation of and withhold from distribution for a reasonable time any Company Assets except those necessary to satisfy the Company's debts and obligations, or distribute Company Assets to the Members in kind.

8.6  MODIFICATION OR DISSOLUTION TO COMPLY WITH APPLICABLE LAWS.  The Managing Member is authorized and required by this Agreement to undertake all acts or amendment without consulting any Member in order to ensure that the Company operates at all times in a manner consistent with Applicable Laws.  Written notice of such act or amendment will promptly be given to the Members.  If the Managing Member determines in good faith that compliance with Applicable Laws is impossible or infeasible, the Managing Member must delegate the authority to the Board of Members and the Board of Members may cause the Company to dissolve and liquidate pursuant to this Section 8.6.

ARTICLE 9
LIABILITY; INDEMNIFICATION

9.1  LIABILITY OF MEMBERS.  Except as otherwise required by any non-waivable provision of Florida state law or other Applicable Law: (a) no Member or Managing Member will be personally liable in any manner whatsoever for any debt, liability or other obligation of the Company, whether such debt, liability or other obligation arises in contract, tort, or otherwise; and (b) no Member will in any event have any liability whatsoever in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed profits of the Company, (iii) the amount of any unconditional obligation of such Member to make Additional Capital Contributions to the Company pursuant to this Agreement, and (iv) the amount of any wrongful distribution to such Member, if, and only to the extent, such Member has actual knowledge (at the time of the distribution) that such distribution is made in violation of Florida state law.  The debts, obligations, and liabilities of the Company, whether arising in contract, tort or otherwise, will be solely the debts, obligations and liabilities of the Company.

9.2  INDEMNIFICATION.  Except and otherwise resolved by the members, the Company will indemnify and hold harmless each member that is a Managing Member, and each Member of the Board of Members all other officers of the Company, if any, (each, a "Covered Person"), to the full extent permitted by law from and against any and all losses, claims, demands, costs, damages, liabilities, joint and several, expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved as a party or otherwise, relating to the performance or nonperformance of any act concerning the activities of the Company, if (i) the Covered Person's conduct did not constitute bad faith, willful or intentional misconduct, or a knowing violation of the law; (ii) the relevant transaction was not one from which the Covered Person derived an improper personal benefit; (iii) no improper distribution circumstances are germane to the Covered Person; and, (iv) the Covered Person has not breached duties or obligations under the standard of conduct for the Covered Person as Member or Managing Member under state law.  The termination of an action, suit or proceeding by judgment, order, settlement, or upon a plea of nolo contendere or its equivalent, will not, in and of itself, create a presumption or otherwise constitute evidence that the Covered Person acted in a manner contrary to that specified in clauses (i) - (iv) above.  This Section will not be deemed to create any rights for the benefit of any other Person.

9.3  EXPENSES.  To the fullest extent permitted by Applicable Law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding will, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of a written undertaking by or on behalf of the Covered Person to repay such amount if it will be determined that the Covered Person is not entitled to be indemnified as authorized in Section 9.3.

ARTICLE 10
CONFIDENTIALITY

10.1  The Members acknowledge that they will have access to confidential information relating to the Company including this Agreement, business plans, financial information, patient treatment information, trade secrets, statistical data, diagrams, drawings, specifications or other proprietary information relating thereto, together with all analyses, compilations, studies or other documents, records or data prepared by the Managing Member or his duly authorized representatives which contain or otherwise reflect or are generated from such information ("Confidential Information"). The term "Confidential Information" includes the business plans and financial information relating to the Company provided by the Members.  The term "Confidential Information" does not include information received by Members in connection

with the transactions contemplated by this Agreement which (i) is or becomes generally available to the public other than as a result of a disclosure by such Member or its duly authorized representatives, (ii) was within such Member's possession prior to its being furnished to such Member in connection with the transactions contemplated by this Agreement or (iii) becomes available to such Member on a non-confidential basis from a source other than the other Members or any of their respective duly authorized representatives. For purposes of this Agreement, Confidential Information will not include, and no Member's obligations under this Agreement will extend to, (i) information that is generally available to the public or within the industry, and (ii) information obtained by such Member from Persons not under agreement to maintain the confidentiality of the same.

10.2    The Members will treat all Confidential Information as confidential, preserve the confidentiality of such Confidential Information and not disclose any Confidential Information to any person or entity, except to their respective duly authorized representatives who need to know such Confidential Information in connection with the transactions contemplated by this Agreement or in connection with the Member's exercise of rights under this Agreement. The Members will use all reasonable efforts to cause their respective duly authorized representatives to treat all Confidential Information as confidential, preserve the confidentiality of such Confidential Information and not disclose any Confidential Information. Each Member will be responsible for any breach of this Agreement by any of their respective duly authorized representatives. If Confidential Information is disclosed, the Member responsible for such disclosure will immediately notify the Managing Member in writing and take all reasonable steps required to prevent further disclosure.

10.3    Following the date upon which any Member no longer owns any Membership Interests in the Company, and as soon as possible after the Company's written request, such Member will return to the Company all written Confidential Information of the Company that has been provided to such Member, and such Member will destroy all copies of any analyses, compilations studies or other documents containing or reflecting any Confidential Information of the Company. Each Member will, upon written request of the Company and within five (5) Business Days of the receipt of such request, deliver to the Company a notarized document certifying that such written Confidential Information of the Company have been returned or destroyed in accordance with this Agreement.

10.4    If a Member or any of its respective duly authorized representatives are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) or are required by operation of law to disclose any Confidential Information, the Member requested or required to disclose such Confidential Information will provide the Managing Member with prompt written notice of such request or requirement, which notice will, if practicable, be at least forty-eight (48) hours prior to making such disclosure, so that the Managing Member may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of such a waiver, the Member requested or required to disclose Confidential Information or any of its duly authorized representatives are nonetheless, in the opinion of counsel, legally compelled to disclose Confidential Information, then the Member requested or required to disclose Confidential Information may disclose that portion of the Confidential Information which such counsel advises is legally required to be disclosed, provided that the Member requested or required to disclose Confidential Information use their reasonable efforts to preserve the confidentiality of the Confidential Information, whereupon such disclosure will not constitute a breach of this Agreement.

ARTICLE 11
RESTRICTIVE COVENANT

11.1    COVENANT NOT TO COMPETE. In consideration of the mutual promises contained herein and the Company's obligation to provide access to information and Confidential Information herein, the Members agree that, for as long as the Members own, directly or indirectly, any Membership Interest in the Company and for a period of two (2) years after the date of termination of a Member's ownership of Membership Units, a Member will not, either directly or indirectly, own a beneficial interest in a Company competitive with PTLT as of the effective date of termination: (A) provide competitive services (as defined below), nor (B) Control, have any beneficial or ownership interest (excluding ownership of less than five percent (5%) of the equity of any publicly-traded entity), develop, manage, operate, or be employed by, or provide any administrative services to any company competitive to PTLT. The Members and the Company agree that a reasonable price for a Member to buy-out of this restrictive covenant is Five Hundred Thousand Dollars ($500,000) ("Buy-Out Amount") payable in cash or by cashier's check to the Company. Upon full payment of the Buy-Out Amount by the Member to the Company, the foregoing restrictive covenant will no longer be applicable.

11.2    INJUNCTIVE RELIEF. The Members acknowledge and agree that (i) the covenants and restrictions contained in this Agreement are necessary, fundamental, and required for the protection of legitimate business interests of the Company; (ii) such covenants and restrictions relate to matters that are of a special, unique, and extraordinary character; and, (iii) a breach of any such covenants or restrictions will result in irreparable harm and damages to the Company that cannot be adequately compensated by a monetary award. Accordingly, the Members expressly agree that in the event of an actual or threatened breach by a Member of the covenants contained this Agreement, the Company will be entitled to a temporary restraining order or an injunction (or both) to specifically enforce the provisions of this Agreement. Further, nothing herein will be construed as prohibiting compensation to the Company for such breach or threatened breach,

including (but not necessarily limited to) recovery of damages from the Member and for reasonable attorney's fees. The provisions of this Section 11.2 will survive termination of this Agreement.

11.3   CHANGE IN LAW.   In the event that, subsequent to the Effective Date of this Agreement, there is a change in Florida law governing covenants not to compete that renders all or a portion of the provisions of Sections 11.1 or 11.2 hereof unenforceable or if such provisions are deemed by a court of competent jurisdiction to be unenforceable, then the provisions of this Agreement will be modified by the parties within thirty (30) days or, if the parties are unable to agree to such modification within such thirty-day period, by a court of competent jurisdiction, to the extent necessary to bring the provisions of Sections 11.1 or 11.2 within the scope of such applicable law and such modification will be in a manner that, as closely as possible, enforces the intent of Sections 11.1 or 11.2 as set forth herein and the parties hereto will comply with such provisions as modified.   The provisions of this Section 11.3 will survive termination of this Agreement.

11.4   SECURITIES LAWS.   The term "Securities Laws" means that the Securities Act of 1933, as amended (the "Act") and applicable state securities laws.   Shareholder acknowledges that (a) the Units have not been registered under the Securities Laws and that the Units have been issued pursuant to exemptions from such laws; (b) the Units have not been filed with or reviewed by any federal or state securities administrators. Shareholder represents that Shareholder acquired the Units for Shareholder's own account and for investment purposes only, and without the intention of reselling or redistributing the Units. If any person holding or claiming an interest in the Units desires to have the Company recognize a transfer of the Units, the Units will not be transferred unless and until the Company determines that the proposed transfer is exempt from the registration provisions of the Securities Laws. If requested by the Company, Shareholder shall furnish the Company with a written opinion of legal counsel satisfactory to the Company, which opinion shall be satisfactory in form and substance to the Company's counsel, that the proposed transfer is exempt from the registration provisions of the Securities Laws.

## ARTICLE 12
## MISCELLANEOUS

12.1   ACCOUNTING AND FISCAL YEAR.   Subject to Code Section 448, the books of the Company will be kept on such method of accounting for tax and financial reporting purposes as may be determined by the Managing Member.   The fiscal year of the Company will end on December 31st of each year, or on such other date permitted under the Code as the Managing Member will determine.

12.2   AMENDMENTS.   Subject to the right of the Managing Member pursuant to Section 8.6 hereof to unilaterally amend this Agreement to comply with Applicable Law, this Agreement may be altered, amended, or repealed only with approval of a Majority in Interest.

12.3   JOINDER OF SPOUSES.   When Membership Interests or Units are owned by individual Persons, such Members' spouses will join in the execution and delivery of this Agreement for the express purpose of recognizing the Company's or Shareholders' right of first refusal described in this Agreement.   By their signature of to a Joinder to this Agreement the relevant Members' spouses acknowledge that they are fully aware of, understand, and fully consent and agree to the provisions of this Agreement and its effect upon any property interest they may now or hereafter own.   Nonetheless, per each Member spouse's joinder and partition germane to the Units, the Members' spouses release, assign and partition any property interest that they now or may ever have in a Membership Interest or Unit in favor of their spouse and which release, assignment and partition further evidences the Member's spouse's acknowledgement that the Company's or Shareholder's right of first refusal to repurchase stock shall remain inviolate.

12.4   CAPTIONS; PRONOUNS.   Any titles or captions contained in this Agreement are for convenience only and will not be deemed part of the text of this Agreement.   All pronouns and any variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as appropriate.

12.5   CONSTRUCTION.   This Agreement will be construed as if all Members prepared this Agreement.

12.6   COUNTERPARTS.   This Agreement may be executed in any number of multiple counterparts, each of which will be deemed to be an original copy and all of which will constitute one agreement, binding on all Members hereto.

12.7   NOTICE TO MEMBERS OF PROVISIONS OF THIS AGREEMENT.   By executing this Agreement, each Member acknowledges that the Member has actual notice of all of the provisions of this Agreement and all provisions of the Certificate.

12.8   DISPUTE RESOLUTION.   Except for material deadlocks as specifically addressed in this Agreement any controversy or dispute related to or arising out of this Agreement, the management and operations of the Company, or the management and operations of an Affiliate of the Company, the Members agree to meet and confer in good faith to attempt to resolve the controversy or dispute without an adversary proceeding.   If the controversy or dispute is not resolved to the mutual satisfaction of the Members within ten (10) Business Days of notice of the controversy or dispute, then such dispute will be resolved in accordance with the following dispute resolution procedures:

1. DISPUTES. This Policy is intended to be applied to disputes or claims between or among the Members and Members that arise out of or relate to their relationship as Members of the Company Any dispute to which this Policy applies is called a "Dispute" and any person, corporation, or entity that is subject to this Policy is called a "Party."

2. MEDIATION. Disputes will be subject to mediation conducted as follows: (a) Any Party wishing to commence mediation will send a written notice of intent to mediate to the other Party, specifying in detail the nature of the Dispute and proposing a resolution thereof. Within fifteen (15) calendar days after such notice is received by the other Party, if the parties cannot agree on a proposed mediator, one will be appointed by the executive director or functional equivalent of the American Arbitration Association (AAA) or its successor from a list provided by AAA. Each Party will designate no more than three (3) representatives who will meet with the mediator to mediate the dispute. Mediation will be commenced as soon as the mediator can be scheduled after the other Party receives such notice. The mediator will be a person having no conflict of interest relationship with a Party; (b) The mediation will be non-binding. Any non-binding mediation conducted under the terms of this Section will be confidential. The cost of the mediation will be borne equally by the Parties; (c) Should a Party disagree with the decision rendered by the mediators; the Parties will have the right to proceed with arbitration proceedings as set forth below.

3. ARBITRATION. Mediation will be a prerequisite to invoking arbitration. If unsuccessful in resolving an issue submitted to mediation as outlined above, such Dispute must be resolved by binding arbitration be conducted in Florida. The Party wishing to commence arbitration will send a written notice of intent to arbitrate to the other Parties. Arbitration will be commenced as soon as the arbitrators can be scheduled after such notice is received by the other Party, using a single arbitrator if the Parties can agree upon one within such thirty (30) day period. Otherwise, each Party will appoint one neutral arbitrator within the thirty (30) day period and the arbitrators so appointed will together appoint a third-party arbitrator for the arbitration between the parties.

4. It is expressly understood by each signatory to this Agreement that during the term of this Agreement, in case of any dispute under this Agreement, and after the term of this Agreement, Company's counsel, by virtue of his or her professional responsibilities, is barred from advising individual Members/shareholders and may only represent Company's interests. In particular, all shareholders understand that the attorney-client privilege does not extend to individual shareholders, officers, directors, or employees of Company, but only covers the Company as one separate, independent entity.

12.9 ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between the Members hereto pertaining to the subject matter hereof and fully supersedes any and all prior or contemporaneous agreements or understandings between the Members hereto pertaining to the subject matter hereof.

12.10 EFFECT OF WAIVER OR CONSENT. The Managing Member may give an express or implied waiver or consent to a specific breach or default by a Person of that Person's obligation to the Company. Any specific waiver or consent is not; however, a consent or waiver to any other breach or default in the Person's performance of the Person's same or other obligations to the Company. A Person's failure to complain of any Person's acts or to declare any Person in default with respect to the Company does not waive that Person's rights with respect to that default until the applicable statute-of-limitations period has run.

12.11 GENERAL COMPLIANCE. The Members enter into this Agreement with the intent of conducting the relationship in full compliance with Applicable Laws. Notwithstanding any unanticipated effect of any of the provisions of this Agreement, no Member or any Managing Member or other Person acting on behalf of the Company will intentionally conduct himself or itself under the terms of this Agreement in a manner that would constitute a violation of Applicable Laws. The Members will perform their obligations under this Agreement in accordance with the terms hereof. Any agreements between the Company and any Member or direct or indirect owner of a Member will be in writing, and the parties to any such agreement will perform their obligations under such agreement only in accordance with the terms thereof.

12.12 FURTHER ASSURANCES. Each of the Members hereto does hereby covenant and agree on behalf of itself, its successors, and its assigns, without further consideration, to prepare, execute, acknowledge, file, record, publish, and deliver such other instruments, documents and statements, and to take such other action as may be required by law or reasonably necessary to effectively carry out the purposes of this Agreement.

12.13 GOVERNING LAW; CERTAIN WAIVERS. This Agreement, including its existence, validity, construction, and operating effect, and the rights of each of the parties hereto, will be governed by and construed in accordance with the laws of the State of Florida without regard to otherwise governing principles of conflicts of law. The Members waive any and all rights they may have to punitive, special, exemplary, or consequential damages, in respect of any dispute based on this Agreement.

12.14 SEVERABILITY. In the event that any provision of this Agreement as applied to any party or to any circumstance, will be adjudged by a court to be void, unenforceable, or inoperative as a matter of law, then the same will in no way affect any other provision in this Agreement, the application of such provision in any other circumstance or with respect to any other party, or the validity or enforceability of the Agreement as a whole.

12.15 NO REGISTRATION STATEMENT. Each Member represents, warrants, acknowledges, and agrees that: (a) No Registration. No registration statement is currently on file with the Securities and Exchange Commission with respect to any Membership Units and the Company has no obligation or current intention to register any Membership Units under the Federal Securities Act of 1933 or Florida securities law; (b) Company Reliance upon Exception. The Membership Units have not been registered under the Federal Securities Act of 1933 as the Company has issued such Membership Units in reliance upon the exceptions and/or exemptions from registration requirements of the Federal Securities Act of 1933 providing for issuance of securities not involving a public offering, together with any corresponding exemptions from state securities regulations; (c) Held Solely for Investment. The Company has relied upon the Members' representations that the Membership Units are to be held by the Members solely for investment purposes and not with a view toward distribution; (d) View Toward Distribution. The exceptions and/or exemptions from registration under the Federal Securities Act of 1933 would be unavailable if the Membership Units were acquired by a Member with a view toward distribution; and (e) Sophisticated Investor. The Member acquired Membership Units in the Company based upon a diligent review and investigation by the Member of material information from the Company and the Member's determination that such acquisition is a suitable investment for the Member based upon such information as well as the Member's investment background and history. The Member is a sophisticated investor possessing an expertise in analyzing the benefits and risks associated with entities that are similar to the Company.

12.16 TAX MATTERS PARTNER. The Managing Member of the Company will be the "Tax Matters Partner" of the Company in accordance with Code Section 6231(a)(7) (referring to the "tax matters partner"). The Tax Matters Partner must take the action necessary to cause each other Member to become a "notice partner" within the meaning of Code Section 6223. The Tax Matters Partner must give prompt notice to all Members of significant matters or communications the Tax Matters Partner may receive. The Tax Matters Partner may not take any action contemplated by Code Sections 6222 through 6232 without the consent of the holders of at least sixty percent (60%) of the Membership Units.

IN WITNESS WHEREOF, the Members have caused this Agreement to be executed as of the date set forth below their respective signatures.

**MEMBER(S):**

| |
|---|
| **PRINTED NAME OF MANAGING MEMBER, PRESIDENT AND MEMBER: JEFFREY JUDDD** |
| SIGNATURE: _____ |
| BY: JEFFREY JUDD |
| DATE: _____ |

# EXHIBIT A

## NAMES OF COMPANY MEMBERS AND PERCENTAGE INTERESTS

|  | UNITS | SHARING RATIO | CAPITAL CONTRIBUTION |
|---|---|---|---|
| **MEMBERS** |  |  |  |
| **JEFFREY JUDD** | 100 | 100.00% | $1000.00 plus In-Kind/Contributed Assets |
|  |  |  |  |
| Total | **100** | **100.00%** |  |

# EXHIBIT B

## JOINDER OF INVESTOR TO THE OPERATING AGREEMENT

BY HIS OR HER SIGNATURE BELOW [NAME OF THE INVESTOR: _____] ACKNOWLEDGES THAT HE OR SHE HAS FULLY READ, UNDERSTANDS, AND HAS NO QUESTIONS ABOUT THE COMPANY'S OPERATING AGREEMENT AND AGREES TO AND JOINS THE EXECUTION AND DELIVERY OF THE AGREEMENT IN THE CAPACITY OF INVESTOR AND BENEFICIARY OF THE INVESTMENT RETURN IN PARTIAL BENEFICIARY INTERESTS AND NOT AS A MEMBER, OWNER, OR OTHER CAPACITY GERMANE TO THE COMPANY, FINANCIAL OR OTHERWISE, AND AGREES TO BE BOUND BY THE OPERATING AGREEMENT'S TERMS.

PRINTED NAME:

SIGNATURE: _____

DATE: _____

## JOINDER OF SPOUSES TO THE OPERATING AGREEMENT

BY HIS OR HER SIGNATURE BELOW, [NAME OF THE SPOUSE: _____] ACKNOWLEDGES THAT HE OR SHE HAS FULLY READ, UNDERSTANDS, AND HAS NO QUESTIONS ABOUT THE COMPANY'S OPERATING AGREEMENT AND AGREES TO AND JOINS THE EXECUTION AND DELIVERY OF THE AGREEMENT. NONETHELESS, MR. OR MRS. _____ VOLUNTARILY AND EXPRESSLY WAIVES ANY RIGHT TO DISCLOSURE OF HIS OR HER SPOUSE'S PROPERTY OR FINANCIAL OBLIGATIONS BEYOND ANY DISCLOSURE PROVIDED TO DATE REGARDING THE AGREEMENT, OR UNITS, OR OTHERWISE.

PRINTED NAME:

SPOUSE OF _____

PRINTED NAME:

MEMBER SPOUSE

# EXHIBIT C

## SAMPLE PURCHASE CONTRACTS 100K AND 80K (REDACTED)

## COMPANY'S CODE OF ETHICS AND BUSINESS CONDUCT

# PURCHASE AGREEMENT

This is a Purchase Agreement ("Agreement") dated the 3rd day of December, 2021. This Agreement is by and between ███████ ("Seller") who is represented by ███████ whose address is ███████ ("Attorney") and ███████, an ███████ corporation ("Buyer") who is represented by ███████, Esq. of the ███████ ("Buyer's Attorney") whose address is ███████, ███████.

A.     Seller has a claim arising from a slip and fall incident which occurred on February 8, 2020 ("Claim") at ███████ which is owned and operated by ███████. Seller has hired Attorney to represent Seller in this Claim. Seller has settled the Claim. The entire amount of the settlement is $███████ ("Settlement Amount"), less legal fees, superior medical liens existing on the date of this Agreement, costs and disbursements payable to Attorney under the existing fee agreement between Seller and Attorney ("Proceeds").

B.     Seller desires to sell and assign to Buyer an interest in the Proceeds. Buyer desires to purchase the interest in the Proceeds, on the terms and under the conditions set forth in this Agreement.

BUYER AND SELLER AGREE AS FOLLOWS:

1.     PURCHASE OF INTEREST

a.     Seller hereby sells, transfers, conveys and assigns to Buyer a $100,000.00 interest ("Interest") in the Proceeds for a purchase price of $80,000.00 ("Purchase Price"). Seller acknowledges receipt of the Purchase Price. Seller understands that the amount of Buyer's Interest, or, in other words, the amount to be paid to Buyer, will increase to reflect the date the Buyer is paid its Interest in the Proceeds as set forth in the following Disclosure Table ("Disclosure Table"):

[Intentionally Left Blank]

## DISCLOSURE TABLE

Purchase Price:         $80,000.00
Administration Fee:    $5,000.00

| **Date of Payment to Buyer** | **Amount due to Buyer** |
| --- | --- |
| On or before March 3, 2022 | $105,000.00 |
| After March 3, 2022 but on or before April 2, 2022 | $115,000.00 |

\*Should Seller not pay Buyer from the Proceeds by April 2, 2022 the Buyer's Interest will increase by **$10,000.00 every thirty (30) days thereafter.**

b.      Buyer's Interest will be paid by Attorney out of the Proceeds of the Claim and will be deducted directly from the Proceeds of the Claim and will be paid to Buyer prior to any payment to Seller with respect to the Claim. If the Proceeds of the Claim Amount are not enough to pay the full amount due to Buyer, then Buyer shall be entitled to receive 100% of the Proceeds of the Claim. Seller has directed Attorney to, among other things,(i) place an assignment, consensual lien and security interest in favor of Buyer against any and all Proceeds due Seller from the Claim (after payment of any and all legal fees and reimbursable costs) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of Buyer's Interest, (ii) notify Buyer of receipt of Settlement Amount, (iii) pay Buyer from the Proceeds the proper amount due to Seller representing Seller's Interest in the Proceeds at the time of distribution of the Proceeds prior to any payment to Seller with respect to the Claim, (iv) respond to requests for information from Buyer and (v) notify Buyer prior to any disbursements of funds to verify the amount due Buyer. Seller has provided Buyer with an executed Authorization for Attorney to Pay Buyer from Proceeds of Claim/Acknowledgement of Authorization by Seller and Attorney in the form attached as Exhibit "A" ("Authorization and Acknowledgement").

c.      The amount Buyer is entitled to may be more than is listed in the Disclosure Table above if Seller does not honor the obligations in this Agreement. Seller will also be liable to pay Buyer's Interest, even if there are no Proceeds, if Seller has mislead Buyer or Attorney concerning Seller's Claim and will also be liable for Buyer's attorney' s fees or collection costs, as permitted by law.

d.      If Seller wants to sell an additional Interest, and if Buyer agrees to purchase an additional Interest, Buyer and Seller will sign an amended Disclosure Table. Seller understands that Buyer is not required to purchase any additional Interest.

e.     In the event that the Claim is the subject of more than one lawsuit, claim or cause arising out of more than one incident/accident/transaction, or against one or more defendants, then the amount due Buyer pursuant to this Agreement shall be paid from the Proceeds of the first lawsuit, claim and/or case against any of the defendants, including insurance companies and malpractice claims arising out of the Claim, which results in a monetary recovery.  If insufficient funds are available from the first lawsuit, claim and/or case resulting in a monetary recovery to pay the full amount due Buyer pursuant to this Agreement, then the balance due Buyer shall be paid from the Proceeds of the next lawsuit, claim and/or cause, if any.

f.     The amount due Buyer shall be withheld from any money collected as a result of the Claim and shall immediately be paid to Buyer (after first deducting Attorney's fees and costs, and any prior liens which exist on the date of this Agreement).  Seller agrees and hereby directs that all Proceeds received in connection with the Claim, are held in Trust for Buyer until Buyer has been fully paid its Interest.  Seller understands that Seller will not receive any money or payment from the Proceeds of Seller's Claim until Buyer has been paid Buyer's Interest in full. This shall also apply to any structured settlements.  If Seller receives payments from several sources, Seller will pay Buyer all monies received from each source until Buyer is paid in full its Interest in the Proceeds of the Claim.  Seller acknowledge that receipt or use of any Proceeds of the Claim prior to the full payment to Buyer of Buyer's Interest in the Proceeds of the Claim may constitute an illegal conversion and may be a crime.

2.     GRANT OF SECURITY INTEREST

By signing this Agreement, Seller grants to Buyer a security interest and a lien in the Settlement Amount and all Proceeds of the Claim ("Collateral").  Buyer shall have all rights and remedies of a secured party under the Nevada Uniform Commercial Code. Seller authorizes Buyer to file one or more UCC financing statements regarding Buyer's security interest and lien in the Collateral and Seller agrees to take all other steps reasonably required by Buyer to perfect and maintain the perfection of Buyer's security interest.

3.     NO TRANSFER OF CLAIM

Seller is not assigning any portion of the Claim to Buyer, and Buyer is not buying any portion of the Claim under this Agreement.  Buyer has no right or obligation to take any legal action for Seller in connection with the Claim. Buyer has no right or obligation to advise, direct or instruct Seller or Attorney in how to go forward with Seller's Claim. Buyer will not be involved in the negotiation of any settlement of Seller's Claim.  Buyer has no obligations or duties concerning the Claim, or the collection of any settlement, award or verdict from the Claim.

4.     SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that:

a.     Seller is using the funds received from the Purchase Price for Seller's immediate economic necessities.  Seller has been advised that Seller should not sell any portion of the Proceeds of the Claim if Seller has any other alternative to meet my immediate economic necessities.  Seller understands that due to the various factors involved that Buyer may make a large profit.

b.     Seller acknowledges that Seller has been advised to seek the services of legal, tax, accounting and/or financial advisors in the negotiation and signing of this Agreement.  Seller has either received such counsel prior to signing this Agreement or expressly waived such counsel.  Seller understands from speaking to Attorney and/or other advisors that the amount of Buyer's Interest as set forth in the Disclosure Table is greater than the Purchase Price Seller is receiving, and that there is a cost to Seller selling Buyer the Interest.  Seller understands that Buyer is relying upon Seller's representations in deciding to purchase this Interest and Seller represents and warrants that all statements made by Seller are true and correct as of the date hereof.  Seller understands that if any information provided by Seller changes that Seller has an obligation to immediately notify Buyer.

c.     Seller is not currently in bankruptcy, there are no pending tax claims or criminal allegations against Seller, and Seller has complied with all laws in connection with the Claim.  Seller further represent that Seller is not in violation of any obligations concerning childcare, alimony or support, and Seller has not been convicted of a felony or other crime involving dishonesty.  Other than the Claim itself, there is no claim, legal action, lien or any proceeding or order pending or in effect or threatened, against Seller, or which would in any manner affect or impair Buyer's Interest or Buyer's rights under this Agreement.  Seller has been truthful in all aspects of the Claim and has provided all information to Attorney in a complete and honest fashion. Seller also confirms that all documents submitted in connection with the investigation and Buyer's evaluation of the Claim are true, whether submitted by Attorney or Seller.  Seller understands that Buyer is relying upon these statements in determining whether to enter into this Agreement.

d.     Seller agrees to not change the fee agreement between Seller and Attorney in any way that would reduce the amount of Buyer's Interest in the Proceeds of the Claim.  Seller further promises to notify Buyer in writing within 72 hours if Seller terminates the services of Attorney, or if Attorney determines not to proceed with the Claim.  If new attorneys are retained to represent Seller in the Claim, Seller will notify Buyer within 72 hours of the new attorneys being retained, and will direct the new attorneys to comply with the terms of this Agreement by Seller and the new attorney executing a

new Authorization and Acknowledgement within 14 days after accepting Seller's representation . Seller will also notify Buyer in writing within 72 hours if Seller moves from the address listed above.

e.    Seller will not knowingly create or permit any additional liens, charges, security interests, encumbrances, agreements of any kind or other rights of third parties against the Proceeds of the Claim without the prior written consent of Buyer. Seller specifically promises not to sell any additional portion of the Proceeds of the Claim after the date of this Agreement, unless Buyer has given prior written permission. Seller also confirms that neither the Claim nor the Proceeds are subject to any liens, charges, security interests, encumbrances, agreements of any kind or nature (other than this Agreement) or other rights of third parties except for liens previously provided to Seller's medical providers. Seller understands that if these statements are not true, it may be considered as a fraud, as Buyer is relying upon these statements in going forward with this Agreement.

5.    EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall be an event of default by Seller under this Agreement (each, an "Event of Default"):

a.    The failure by Seller or Attorney to pay Buyer's Interest in the Proceeds within thirty (30) days after the Settlement Amount is received by Seller or Attorney; or

b.    Seller's failure to perform or comply with any of the agreements, conditions, provisions or promises contained in this Agreement, including but not limited to if Buyer does not receive a timely response to a request for information from Seller or Attorney or if Buyer does not receive a new Authorization and Acknowledgement by Seller and new attorney within fourteen (14) days after accepting representation, and such failure to perform or comply continues unremedied for a period of ten (10) days after written notice from Buyer to Seller, unless such default, in Buyer's reasonable discretion, is not curable, in which event there shall be no grace period; or

c.    If Buyer discovers any material misrepresentation or inaccuracy in any representation or warranty made by Seller to Buyer in this Agreement.

Upon an Event of Default by Seller under this Agreement, Seller agrees that Buyer may contact any insurance company, claims adjuster or attorney then handling the Claim on behalf of any responsible party and advise such insurance company, claims adjuster or attorney about Buyer's Interest in Seller's Claim and to direct that Buyer be included as a payee on settlement checks provided further that nothing herein shall prevent Buyer from exercising any other right or remedy provided under law or equity. If Buyer does

anything stated in this paragraph, Buyer shall not be liable to Seller for any damages which Seller may suffer resulting from Buyer's actions described above.

6.  APPLICABLE LAW

This Agreement shall be governed, construed and enforced in accordance with, and all disputes arising out of or in connection with this Agreement shall be governed by, the internal laws of the State of Nevada, without regard to the conflict of law rules of Nevada or any other jurisdiction.

7.  ARBITRATION

BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT ALL DISPUTES, CLAIMS, DEFENSES OR CONTROVERSIES (WHETHER IN LAW OR IN EQUITY) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIPS THAT RESULT FROM THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY DISPUTES, CLAIMS OR CONTROVERSIES INVOLVING FEDERAL OR STATE STATUTORY CAUSES OF ACTION OR INJUNCTIVE RELIEF, ANY INVOLVING FEDERAL OR STATE ADMINISTRATIVE REMEDIES, ANY INVOLVING CONSUMER FRAUD AND ANY INVOLVING A CHALLENGE TO THE LEGALITY OF ANY PART OR ALL OF TH IS AGREEMENT ("DISPUTES") SHALL BE RESOLVED THROUGH FINAL AND BINDING ARBITRATION UNDER THE COMMERCIAL ARBITRATION RULES ("RULES") OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA"). THE ARBITRATION SHALL TAKE PLACE BEFORE A SINGLE ARBITRATOR TO BE CHOSEN BY AGREEMENT OF THE PARTIES, OR FAILING SUCH, IN ACCORDANCE WITH AAA RULES. THE ARBITRATION SHALL TAKE PLACE IN THE STATE OF NEVADA, COUNTY OF CLARK UNLESS THE PARTIES AGREE TO A DIFFERENT LOCATION. THE PARTIES AGREE THAT THIS ARBITRATION AGREEMENT IS MADE PURSUANT TO A TRANSACTION IN INTERSTATE COMMERCE AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SHALL BE GOVERN ED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. §1 AND THE SUBSTANTIVE LAWS OF THE STATE OF NEVADA SHALL BE APPLIED IN ALL EVENTS. JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. THE PARTIES ALSO AGREE THAT THE AAA OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION SHALL APPLY TO THE PROCEEDINGS.

8.  WAIVER OF JURY TRIAL

BUYER AND SELLER, AFTER CONSULTATION WITH THEIR RESPECTIVE ATTORNEYS, EACH HEREBY WAIVE ANY RIGHT WHICH THEY MAY HAVE TO A JURY TRIAL, INCLUDING ANY RIGHT VESTED BY FEDERAL, STATE OR LOCAL STATUTE, IN CONNECTION WITH ANY DISPUTES OR LEGAL PROCEEDING

INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER COMMENCED BY OR AGAINST EITHER PARTY IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR WITH ANY DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT.

9.     WAIVER OF CLASS ACTION CLAIMS

SELLER HEREBY AGREES TO WAIVE ANY AND ALL RIGHTS TO (i) ANY DISPUTE WITH BUYER BEING HANDLED AS A CLASS ACTION AND (ii) JOINING AS A PLAINTIFF, CLAIMANT, MEMBER OR PARTICIPANT IN ANY CLASS ACTION AGAINST BUYER. IT IS AGREED THAT ANY ARBITRATION WILL BE LIMITED TO THE DISPUTE BETWEEN BUYER AND SELLER, AND BUYER AND SELLER WAIVE ANY RIGHT TO CONSOLIDATE OR TO HAVE HANDLED AS A CLASS ACTION ANY PROCEEDING ON ANY DISPUTES WITH ANY PROCEEDING ON DISPUTES, CLAIMS, OR CONTROVERSIES INVOLVING ANY PERSON OR ENTITY NOT A PARTY TO THIS AGREEMENT.

10.     RECLASSIFICATION OF TRANSACTION

This Agreement represents an investment by Buyer, and not a loan to Seller. However, should a court of law determine that the transaction set out in this Agreement is a loan of money, Seller agrees that interest shall accrue at the maxim um rate permitted by law. Seller agrees that any fees or expenses paid by Buyer in connection with the Claim will not be included as interest. This includes any attorney's fees and costs Buyer has expended to enforce its rights under this Agreement. Seller agrees that these will be considered as a reimbursement to Buyer, rather than as interest.

11.     MISCELLANEOUS

a.     If any part of this Agreement is deemed invalid or unenforceable, it shall not affect the validity or enforceability of (i) any other part of this Agreement, and the Agreement shall be modified to the extent legally possible to legally carry out the intent of this Agreement and (ii) any agreement between Buyer and any other party. This Agreement and its exhibit make up the entire and only agreement or understanding between Buyer and Seller. It may not be changed unless signed in writing by Buyer and Seller. This Agreement takes precedence over all prior agreements, brochures, negotiations, commitments and representations, whether oral or written, about Seller's Claim and Buyer's purchase of its Interest.

b.      Should Buyer retain the services of an attorney to enforce the terms of this Agreement, Seller will be responsible for any costs or expenses (including reasonable legal fees and expenses) in enforcing Buyer's rights under this Agreement and the amount of Buyer's Interest shall be increased in an amount equal to Buyer's costs and expenses.

c.      This Agreement will be binding upon Buyer and Seller, and each of their heirs, executors, administrators, successors and assigns. Seller understands and agrees that Seller has no right to assign Seller's rights and obligations under this Agreement.  Seller further understands and agrees that Buyer may assign its rights and obligations under this Agreement (and Buyer's Interest) to any party without Seller's prior approval, provided that any such party agrees to be bound by the terms and conditions of this Agreement.  It is agreed that if Buyer assigns this Agreement as provided in the prior sentence, Buyer shall have no further obligations under this Agreement and Seller must look solely to the party Buyer assigned the Agreement to for performance under this Agreement.  When requested by Buyer or any assignee, Seller will sign and deliver any and all reasonably requested documents as Buyer or such assignee may require to confirm the various rights and obligations of the parties under this Agreement.  This Agreement may be signed in separate counterparts.  A facsimile signature shall be deemed to be an original signature.

12.     RIGHT TO CANCEL

SELLER HAS THE RIGHT TO CANCEL THIS AGREEMENT WITHOUT PENALTY OR FURTHER OBLIGATION AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH (5TH) BUSINESS DAY FROM THE DATE SELLER RECEIVES FUNDING HEREUNDER FROM BUYER.

In order for the cancellation to be effective, Seller must return the full amount of disbursed funds to Attorney within five (5) business day of the disbursement of funds who will then return the amount to Buyer's Attorney upon the clearance of the funds in Attorney's Trust Account.

DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT COMPLETELY OR IF IT CONTAINS ANY BLANK SPACE. BEFORE YOU SIGN THIS AGREEMENT YOU SHOULD OBTAIN THE ADVICE OF YOUR ATTORNEY.  YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS AGREEMENT.

SELLER:                                          BUYER:

## EXHIBIT A

AUTHORIZATION FOR ATTORNEY TO PAY ███████████████
FROM PROCEEDS OF CLAIM/ACKNOWLEDGEMENT OF AUTHORIZATION

Pursuant to that certain Purchase Agreement dated December 3, 2021 between ███████ ███████ ("Seller") and ████████████████ ("Buyer") (the "Agreement"), I ████████████ hereby irrevocably authorize and direct my attorney, ██████████████, Esq. ("Attorney"), (and any future Attorney representing me in connection with my Claim to, among other things, (i) place an assignment, consensual lien and security interest in favor of Buyer against any and all of the Proceeds due Seller from the Claim (after payment of any and all legal fees, reimbursable costs, statutory liens and liens) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of Buyer's Interest, (ii) pay Buyer's Attorney from the Proceeds the amount due to Buyer representing Buyer's Interest in the Proceeds of the Claim at the time of distribution of the Proceeds prior to any payment to Seller with respect to the Claim, (iii) in the event that the Claim is the subject of more than one lawsuit, claim or cause of action arising out of more than one incident/accident/transaction, or against one or more defendants, pay Buyer's Interest from the Proceeds of the first lawsuit, claim and/or case against any of the defendants, (iv) notify Buyer's Attorney of discontinuance or ending with respect to Attorney's representation, (v) respond to requests for information from Buyer's Attorney and (vi) call Buyer's Attorney prior to any disbursements of funds to verify the amount of Buyer's Interest.  Such amounts shall be paid directly to Buyer's Attorney to satisfy Seller's obligations to Buyer under the Purchase Agreement prior to any distribution of Proceeds to Seller. The amount of Buyer's Interest will increase to reflect the date Buyer is paid its Interest in the Proceeds as set forth in the Disclosure Table to the Agreement, as such may be amended from time to time.  This Authorization is irrevocable and binding and may only be amended by the mutual written agreement of Seller and Buyer.

Dated this 3rd day of December, 2021.


███████████████, Seller

## ACKNOWLEDGEMENT OF AUTHORIZATION

I, ███████████ , Esq. hereby acknowledge that ███████████████ represents ███████████ , as his attorney, in connection with the Claim described in the Agreement. I acknowledge that ███████████ has irrevocably instructed me to comply with the Agreement's terms pursuant to the Authorization set forth above (the "Authorization"). I will honor ███████████ Authorization. I agree to pay Buyer's Attorney Buyer's Interest from ███████████ Proceeds of the Claim in accordance with the Disclosure Table set forth in the Agreement, as such may be amended from time to time. I agree not to distribute any Proceeds of the Claim to ███████████ until Buyer's Interest has been paid in full. In the event of a dispute, I agree that only disbursements for attorney's fees, reimbursable costs, statutory liens and medical liens that are in existence prior to the date of the Agreement will be made. All other funds due ███████████ shall be held in my Trust Account until such dispute is resolved. In the event that I am terminated as ███████████ attorney with respect to the Claim, I shall give Buyer's Attorney immediate written notice thereof by certified mail, and state the name, address and telephone number of ███████████ new attorney.

All disbursements of funds, including ███████████ share of the Proceeds, will be through my Trust Account, and ███████████ will not receive a settlement check directly from any defendant or insurance company. I agree to verify the amount of Buyer's Interest prior to any disbursement of funds. I have no knowledge of ███████ ███████ having previously sold, transferred or assigned any interest in the Claim or in the Proceeds of the Claim, and understand that ███████████ may not further sell, transfer or assign any additional Interest to any party other than Buyer without Buyer's written permission. I warrant and covenant that I am authorized to execute this document on behalf of ███████████ .

DATED this 3rd day of December, 2021.

███████████████████

By: ███████████████ , ESQ.

# PURCHASE AGREEMENT

This is a Purchase Agreement ("Agreement") dated the 3rd day of December, 2021. This Agreement is by and between ███████████ ("Seller") who is represented by ████████████, Esq. of the ██████ whose address is ███████████ ("Attorney") and ██████████████, an corporation ("Buyer") who is represented by ███████████, Esq. of the ████████ ("Buyer's Attorney") whose address is ██████████████.

A.      Seller has a claim arising from a slip and fall incident which occurred on December 21, 2019 ("Claim") at ████████████████ which is owned by █████ ██████████ and operated by █████████████. Seller has hired Attorney to represent Seller in this Claim. Seller has settled the Claim. The entire amount of the settlement is $████████ ("Settlement Amount"), less legal fees, superior medical liens existing on the date of this Agreement, costs and disbursements payable to Attorney under the existing fee agreement between Seller and Attorney ("Proceeds").

B.      Seller desires to sell and assign to Buyer an interest in the Proceeds. Buyer desires to purchase the interest in the Proceeds, on the terms and under the conditions set forth in this Agreement.

BUYER AND SELLER AGREE AS FOLLOWS:

1.      PURCHASE OF INTEREST

a.      Seller hereby sells, transfers, conveys and assigns to Buyer a $125,000.00 interest ("Interest") in the Proceeds for a purchase price of $100,000.00 ("Purchase Price"). Seller acknowledges receipt of the Purchase Price. Seller understands that the amount of Buyer's Interest, or, in other words, the amount to be paid to Buyer, will increase to reflect the date the Buyer is paid its Interest in the Proceeds as set forth in the following Disclosure Table ("Disclosure Table"):

[Intentionally Left Blank]

## DISCLOSURE TABLE

Purchase Price:            $100,000.00
Administration Fee:     $5,000.00

| **Date of Payment to Buyer** | **Amount due to Buyer** |
|---|---|
| On or before March 3, 2022 | $130,000.00 |
| After March 3, 2022 but on or before April 2, 2022 | $142,500.00 |

*Should Seller not pay Buyer from the Proceeds by April 2, 2022 the Buyer's Interest will increase by **$12,500.00 every thirty (30) days thereafter.**

b.      Buyer's Interest will be paid by Attorney out of the Proceeds of the Claim and will be deducted directly from the Proceeds of the Claim and will be paid to Buyer prior to any payment to Seller with respect to the Claim. If the Proceeds of the Claim Amount are not enough to pay the full amount due to Buyer, then Buyer shall be entitled to receive 100% of the Proceeds of the Claim. Seller has directed Attorney to, among other things,(i) place an assignment, consensual lien and security interest in favor of Buyer against any and all Proceeds due Seller from the Claim (after payment of any and all legal fees and reimbursable costs) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of Buyer's Interest, (ii) notify Buyer of receipt of Settlement Amount, (iii) pay Buyer from the Proceeds the proper amount due to Buyer representing Buyer's Interest in the Proceeds at the time of distribution of the Proceeds prior to any payment to Seller with respect to the Claim, (iv) respond to requests for information from Buyer and (v) notify Buyer prior to any disbursements of funds to verify the amount due Buyer. Seller has provided Buyer with an executed Authorization for Attorney to Pay Buyer from Proceeds of Claim/Acknowledgement of Authorization by Seller and Attorney in the form attached as Exhibit "A" ("Authorization and Acknowledgement ").

c.      The amount Buyer is entitled to may be more than is listed in the Disclosure Table above if Seller does not honor the obligations in this Agreement. Seller will also be liable to pay Buyer's Interest, even if there are no Proceeds, if Seller has mislead Buyer or Attorney concerning Seller's Claim and will also be liable for Buyer's attorney' s fees or collection costs, as permitted by law.

d.      If Seller wants to sell an additional Interest, and if Buyer agrees to purchase an additional Interest, Buyer and Seller will sign an amended Disclosure Table. Seller understands that Buyer is not required to purchase any additional Interest.

e.     In the event that the Claim is the subject of more than one lawsuit, claim or cause arising out of more than one incident/accident/transaction, or against one or more defendants, then the amount due Buyer pursuant to this Agreement shall be paid from the Proceeds of the first lawsuit, claim and/or case against any of the defendants, including insurance companies and malpractice claims arising out of the Claim, which results in a monetary recovery.  If insufficient funds are available from the first lawsuit, claim and/or case resulting in a monetary recovery to pay the full amount due Buyer pursuant to this Agreement, then the balance due Buyer shall be paid from the Proceeds of the next lawsuit, claim and/or cause, if any.

f.     The amount due Buyer shall be withheld from any money collected as a result of the Claim and shall immediately be paid to Buyer (after first deducting Attorney's fees and costs, and any prior liens which exist on the date of this Agreement).  Seller agrees and hereby directs that all Proceeds received in connection with the Claim, are held in Trust for Buyer until Buyer has been fully paid its Interest.  Seller understands that Seller will not receive any money or payment from the Proceeds of Seller's Claim until Buyer has been paid Buyer's Interest in full. This shall also apply to any structured settlements.  If Seller receives payments from several sources, Seller will pay Buyer all monies received from each source until Buyer is paid in full its Interest in the Proceeds of the Claim.  Seller acknowledge that receipt or use of any Proceeds of the Claim prior to the full payment to Buyer of Buyer's Interest in the Proceeds of the Claim may constitute an illegal conversion and may be a crime.

2.     GRANT OF SECURITY INTEREST

By signing this Agreement, Seller grants to Buyer a security interest and a lien in the Settlement Amount and all Proceeds of the Claim ("Collateral").  Buyer shall have all rights and remedies of a secured party under the Nevada Uniform Commercial Code. Seller authorizes Buyer to file one or more UCC financing statements regarding Buyer's security interest and lien in the Collateral and Seller agrees to take all other steps reasonably required by Buyer to perfect and maintain the perfection of Buyer's security interest.

3.     NO TRANSFER OF CLAIM

Seller is not assigning any portion of the Claim to Buyer, and Buyer is not buying any portion of the Claim under this Agreement.  Buyer has no right or obligation to take any legal action for Seller in connection with the Claim. Buyer has no right or obligation to advise, direct or instruct Seller or Attorney in how to go forward with Seller's Claim. Buyer will not be involved in the negotiation of any settlement of Seller's Claim.  Buyer has no obligations or duties concerning the Claim, or the collection of any settlement, award or verdict from the Claim.

4.     SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that:

a.     Seller is using the funds received from the Purchase Price for Seller's immediate economic necessities.  Seller has been advised that Seller should not sell any portion of the Proceeds of the Claim if Seller has any other alternative to meet my immediate economic necessities.  Seller understands that due to the various factors involved that Buyer may make a large profit.

b.     Seller acknowledges that Seller has been advised to seek the services of legal, tax, accounting and/or financial advisors in the negotiation and signing of this Agreement.  Seller has either received such counsel prior to signing this Agreement or expressly waived such counsel.  Seller understands from speaking to Attorney and/or other advisors that the amount of Buyer's Interest as set forth in the Disclosure Table is greater than the Purchase Price Seller is receiving, and that there is a cost to Seller selling Buyer the Interest.  Seller understands that Buyer is relying upon Seller's representations in deciding to purchase this Interest and Seller represents and warrants that all statements made by Seller are true and correct as of the date hereof.  Seller understands that if any information provided by Seller changes that Seller has an obligation to immediately notify Buyer.

c.     Seller is not currently in bankruptcy, there are no pending tax claims or criminal allegations against Seller, and Seller has complied with all laws in connection with the Claim.  Seller further represent that Seller is not in violation of any obligations concerning childcare, alimony or support, and Seller has not been convicted of a felony or other crime involving dishonesty.  Other than the Claim itself, there is no claim, legal action, lien or any proceeding or order pending or in effect or threatened, against Seller, or which would in any manner affect or impair Buyer's Interest or Buyer's rights under this Agreement.  Seller has been truthful in all aspects of the Claim and has provided all information to Attorney in a complete and honest fashion. Seller also confirms that all documents submitted in connection with the investigation and Buyer's evaluation of the Claim are true, whether submitted by Attorney or Seller.  Seller understands that Buyer is relying upon these statements in determining whether to enter into this Agreement.

d.     Seller agrees to not change the fee agreement between Seller and Attorney in any way that would reduce the amount of Buyer's Interest in the Proceeds of the Claim. Seller further promises to notify Buyer in writing within 72 hours if Seller terminates the services of Attorney, or if Attorney determines not to proceed with the Claim.  If new attorneys are retained to represent Seller in the Claim, Seller will notify Buyer within 72 hours of the new attorneys being retained, and will direct the new attorneys to comply with the terms of this Agreement by Seller and the new attorney executing a

new Authorization and Acknowledgement within 14 days after accepting Seller's representation . Seller will also notify Buyer in writing within 72 hours if Seller moves from the address listed above.

e.     Seller will not knowingly create or permit any additional liens, charges, security interests, encumbrances, agreements of any kind or other rights of third parties against the Proceeds of the Claim without the prior written consent of Buyer. Seller specifically promises not to sell any additional portion of the Proceeds of the Claim after the date of this Agreement, unless Buyer has given prior written permission. Seller also confirms that neither the Claim nor the Proceeds are subject to any liens, charges, security interests, encumbrances, agreements of any kind or nature (other than this Agreement) or other rights of third parties except for liens previously provided to Seller's medical providers. Seller understands that if these statements are not true, it may be considered as a fraud, as Buyer is relying upon these statements in going forward with this Agreement.

5.     EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall be an event of default by Seller under this Agreement (each, an "Event of Default"):

a.     The failure by Seller or Attorney to pay Buyer's Interest in the Proceeds within thirty (30) days after the Settlement Amount is received by Seller or Attorney; or

b.     Seller's failure to perform or comply with any of the agreements, conditions, provisions or promises contained in this Agreement, including but not limited to if Buyer does not receive a timely response to a request for information from Seller or Attorney or if Buyer does not receive a new Authorization and Acknowledgement by Seller and new attorney within fourteen (14) days after accepting representation, and such failure to perform or comply continues unremedied for a period of ten (10) days after written notice from Buyer to Seller, unless such default, in Buyer's reasonable discretion, is not curable, in which event there shall be no grace period; or

c.     If Buyer discovers any material misrepresentation or inaccuracy in any representation or warranty made by Seller to Buyer in this Agreement.

Upon an Event of Default by Seller under this Agreement, Seller agrees that Buyer may contact any insurance company, claims adjuster or attorney then handling the Claim on behalf of any responsible party and advise such insurance company, claims adjuster or attorney about Buyer's Interest in Seller's Claim and to direct that Buyer be included as a payee on settlement checks provided further that nothing herein shall prevent Buyer from exercising any other right or remedy provided under law or equity. If Buyer does

anything stated in this paragraph, Buyer shall not be liable to Seller for any damages which Seller may suffer resulting from Buyer's actions described above.

6.    APPLICABLE LAW

This Agreement shall be governed, construed and enforced in accordance with, and all disputes arising out of or in connection with this Agreement shall be governed by, the internal laws of the State of Nevada, without regard to the conflict of law rules of Nevada or any other jurisdiction.

7.    ARBITRATION

BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT ALL DISPUTES, CLAIMS, DEFENSES OR CONTROVERSIES (WHETHER IN LAW OR IN EQUITY) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIPS THAT RESULT FROM THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY DISPUTES, CLAIMS OR CONTROVERSIES INVOLVING FEDERAL OR STATE STATUTORY CAUSES OF ACTION OR INJUNCTIVE RELIEF, ANY INVOLVING FEDERAL OR STATE ADMINISTRATIVE REMEDIES, ANY INVOLVING CONSUMER FRAUD AND ANY INVOLVING A CHALLENGE TO THE LEGALITY OF ANY PART OR ALL OF TH IS AGREEMENT ("DISPUTES") SHALL BE RESOLVED THROUGH FINAL AND BINDING ARBITRATION UNDER THE COMMERCIAL ARBITRATION RULES ("RULES") OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA"). THE ARBITRATION SHALL TAKE PLACE BEFORE A SINGLE ARBITRATOR TO BE CHOSEN BY AGREEMENT OF THE PARTIES, OR FAILING SUCH, IN ACCORDANCE WITH AAA RULES. THE ARBITRATION SHALL TAKE PLACE IN THE STATE OF NEVADA, COUNTY OF CLARK UNLESS THE PARTIES AGREE TO A DIFFERENT LOCATION. THE PARTIES AGREE THAT THIS ARBITRATION AGREEMENT IS MADE PURSUANT TO A TRANSACTION IN INTERSTATE COMMERCE AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SHALL BE GOVERN ED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. §1 AND THE SUBSTANTIVE LAWS OF THE STATE OF NEVADA SHALL BE APPLIED IN ALL EVENTS. JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. THE PARTIES ALSO AGREE THAT THE AAA OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION SHALL APPLY TO THE PROCEEDINGS.

8.    WAIVER OF JURY TRIAL

BUYER AND SELLER, AFTER CONSULTATION WITH THEIR RESPECTIVE ATTORNEYS, EACH HEREBY WAIVE ANY RIGHT WHICH THEY MAY HAVE TO A JURY TRIAL, INCLUDING ANY RIGHT VESTED BY FEDERAL, STATE OR LOCAL STATUTE, IN CONNECTION WITH ANY DISPUTES OR LEGAL PROCEEDING

INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER COMMENCED BY OR AGAINST EITHER PARTY IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR WITH ANY DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT.

9.     WAIVER OF CLASS ACTION CLAIMS

SELLER HEREBY AGREES TO WAIVE ANY AND ALL RIGHTS TO (i) ANY DISPUTE WITH BUYER BEING HANDLED AS A CLASS ACTION AND (ii) JOINING AS A PLAINTIFF, CLAIMANT, MEMBER OR PARTICIPANT IN ANY CLASS ACTION AGAINST BUYER.  IT IS AGREED THAT ANY ARBITRATION WILL BE LIMITED TO THE DISPUTE BETWEEN BUYER AND SELLER, AND BUYER AND SELLER WAIVE ANY RIGHT TO CONSOLIDATE OR TO HAVE HANDLED AS A CLASS ACTION ANY PROCEEDING ON ANY DISPUTES WITH ANY PROCEEDING ON DISPUTES, CLAIMS, OR CONTROVERSIES INVOLVING ANY PERSON OR ENTITY NOT A PARTY TO THIS AGREEMENT.

10.     RECLASSIFICATION OF TRANSACTION

This Agreement represents an investment by Buyer, and not a loan to Seller. However, should a court of law determine that the transaction set out in this Agreement is a loan of money, Seller agrees that interest shall accrue at the maxim um rate permitted by law.  Seller agrees that any fees or expenses paid by Buyer in connection with the Claim will not be included as interest. This includes any attorney's fees and costs Buyer has expended to enforce its rights under this Agreement.  Seller agrees that these will be considered as a reimbursement to Buyer, rather than as interest.

11.     MISCELLANEOUS

a.     If any part of this Agreement is deemed invalid or unenforceable, it shall not affect the validity or enforceability of (i) any other part of this Agreement, and the Agreement shall be modified to the extent legally possible to legally carry out the intent of this Agreement and (ii) any agreement between Buyer and any other party. This Agreement and its exhibit make up the entire and only agreement or understanding between Buyer and Seller.  It may not be changed unless signed in writing by Buyer and Seller.  This Agreement takes precedence over all prior agreements, brochures, negotiations, commitments and representations, whether oral or written, about Seller's Claim and Buyer's purchase of its Interest.

b.    Should Buyer retain the services of an attorney to enforce the terms of this Agreement, Seller will be responsible for any costs or expenses (including reasonable legal fees and expenses) in enforcing Buyer's rights under this Agreement and the amount of Buyer's Interest shall be increased in an amount equal to Buyer's costs and expenses.

c.    This Agreement will be binding upon Buyer and Seller, and each of their heirs, executors, administrators, successors and assigns. Seller understands and agrees that Seller has no right to assign Seller's rights and obligations under this Agreement.  Seller further understands and agrees that Buyer may assign its rights and obligations under this Agreement (and Buyer's Interest) to any party without Seller's prior approval, provided that any such party agrees to be bound by the terms and conditions of this Agreement.  It is agreed that if Buyer assigns this Agreement as provided in the prior sentence, Buyer shall have no further obligations under this Agreement and Seller must look solely to the party Buyer assigned the Agreement to for performance under this Agreement.  When requested by Buyer or any assignee, Seller will sign and deliver any and all reasonably requested documents as Buyer or such assignee may require to confirm the various rights and obligations of the parties under this Agreement.  This Agreement may be signed in separate counterparts.  A facsimile signature shall be deemed to be an original signature.

12.    RIGHT TO CANCEL

SELLER HAS THE RIGHT TO CANCEL THIS AGREEMENT WITHOUT PENALTY OR FURTHER OBLIGATION AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH (5TH) BUSINESS DAY FROM THE DATE SELLER RECEIVES FUNDING HEREUNDER FROM BUYER.

In order for the cancellation to be effective, Seller must return the full amount of disbursed funds to Attorney within five (5) business day of the disbursement of funds who will then return the amount to Buyer's Attorney upon the clearance of the funds in Attorney's Trust Account.

DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT COMPLETELY OR IF IT CONTAINS ANY BLANK SPACE. BEFORE YOU SIGN THIS AGREEMENT YOU SHOULD OBTAIN THE ADVICE OF YOUR ATTORNEY.  YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS AGREEMENT.

SELLER:                                          BUYER:

_____                      _____

Exhibit 1, Page 119

# EXHIBIT A

**AUTHORIZATION FOR ATTORNEY TO PAY** ████████████
FROM PROCEEDS OF CLAIM/ACKNOWLEDGEMENT OF AUTHORIZATION

Pursuant to that certain Purchase Agreement dated December 3, 2021 between ████████ ████ ("Seller") and ████████████████████ ("Buyer") (the "Agreement"), I, ████████████ hereby irrevocably authorize and direct my attorney, ████████████ ████, Esq. ("Attorney"), (and any future Attorney representing me in connection with my Claim to, among other things, (i) place an assignment, consensual lien and security interest in favor of Buyer against any and all of the Proceeds due Seller from the Claim (after payment of any and all legal fees, reimbursable costs, statutory liens and liens) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of Buyer's Interest, (ii) pay Buyer's Attorney from the Proceeds the amount due to Buyer representing Buyer's Interest in the Proceeds of the Claim at the time of distribution of the Proceeds prior to any payment to Seller with respect to the Claim, (iii) in the event that the Claim is the subject of more than one lawsuit, claim or cause of action arising out of more than one incident/accident/transaction, or against one or more defendants, pay Buyer's Interest from the Proceeds of the first lawsuit, claim and/or case against any of the defendants, (iv) notify Buyer's Attorney of discontinuance or ending with respect to Attorney's representation, (v) respond to requests for information from Buyer's Attorney and (vi) call Buyer's Attorney prior to any disbursements of funds to verify the amount of Buyer's Interest. Such amounts shall be paid directly to Buyer's Attorney to satisfy Seller's obligations to Buyer under the Purchase Agreement prior to any distribution of Proceeds to Seller. The amount of Buyer's Interest will increase to reflect the date Buyer is paid its Interest in the Proceeds as set forth in the Disclosure Table to the Agreement, as such may be amended from time to time. This Authorization is irrevocable and binding and may only be amended by the mutual written agreement of Seller and Buyer.

Dated this 3rd day of December, 2021.

_____

████████████, Seller

## ACKNOWLEDGEMENT OF AUTHORIZATION

I, ██████████████ , Esq., hereby acknowledge that ████████████ represents ██████████ , as her attorney, in connection with the Claim described in the Agreement.  I acknowledge that ████████████ has irrevocably instructed me to comply with the Agreement's terms pursuant to the Authorization set forth above (the "Authorization").  I will honor ████████████ Authorization.  I agree to pay Buyer's Attorney Buyer's Interest from ████████████ Proceeds of the Claim in accordance with the Disclosure Table set forth in the Agreement, as such may be amended from time to time.  I agree not to distribute any Proceeds of the Claim to ████████████ until Buyer's Interest has been paid in full.  In the event of a dispute, I agree that only disbursements for attorney's fees, reimbursable costs, statutory liens and medical liens that are in existence prior to the date of the Agreement will be made.  All other funds due ████████████ shall be held in my Trust Account until such dispute is resolved.  In the event that I am terminated as ████████████ attorney with respect to the Claim, I shall give Buyer's Attorney immediate written notice thereof by certified mail, and state the name, address and telephone number of ████████████ new attorney.

All disbursements of funds, including ████████████ share of the Proceeds, will be through my Trust Account, and ████████████ will not receive a settlement check directly from any defendant or insurance company.  I agree to verify the amount of Buyer's Interest prior to any disbursement of funds.  I have no knowledge of ██████ ████ having previously sold, transferred or assigned any interest in the Claim or in the Proceeds of the Claim, and understand that ████████████ may not further sell, transfer or assign any additional Interest to any party other than Buyer without Buyer's written permission.  I warrant and covenant that I am authorized to execute this document on behalf of the ████████████ .

DATED this 3rd day of December, 2021.

████████████████

_____

By: ████████████████ , ESQ.

# J AND J PURCHASING, LLC
# CODE OF ETHICS AND BUSINESS CONDUCT

October 15, 2021

# DEAR COLLEAGUES:

At J and J Purchasing, LLC ("J&J" or "Company"), our mission is to operate consistent with the highest ethical business conduct both as to our relationships amongst each other, and as it relates to our Investors and all Third Parties. This is our commitment to our Investors and ultimately the marketplace.

To meet our commitment to each other and the Company, we must also safeguard our reputation. As the Laws that govern our operations become increasingly complex, discerning right from wrong is not always evident. In many cases, failing to do the "right thing" can also be a violation of Laws.

While ethical missteps may have significant implication under Laws, any Misconduct only serves to knock down our reputation. Misconduct keeps us from meeting our commitment to our Investors and the marketplace. Because our success is inextricably tied to our reputation, it is up to all of us to bolster and protect it, act with the upmost of care, and always do the right thing.

At J&J, we conduct all aspects of our business according to our Code, its Core Values, Laws, and our Policies - our "Compliance Mandate." We hope that you are inspired to join us in always using sound judgment when deciding the proper course of action. If we always act in compliance with our Compliance Mandate, we succeed in the marketplace, we meet our commitments, and we safeguard our reputation.

This Code is intended to help you address compliance, ethics, integrity, and Laws issues by providing information, tools, and resources necessary to make good decisions. Our Management fully supports the Code and its Core Values — they constitute crucial components of our Corporate Compliance Program and our ongoing effort to ensure that our people fully commit to our Core Values, comply with all Laws, and in all things act with integrity and ethically.

Through our Code, and by leading by example, we want to make our Core Values understood and followed by everyone of our employees, agents, and contractors. Since no Code or Policy can anticipate every situation that may arise, everyone that works with us is encouraged to bring questions or concerns that may implicate Laws, the Code, or our Policies to our HR or Compliance Function, or myself.

The Code is incorporated into and complements our employee policies ("HR Policies") and Compliance Program and its Policies. Our Compliance Program is designed to assist our Company and our employees, agents and contractors in developing effective internal controls that promote adherence to Laws and ethics throughout our operations. For example, we always promote open communication and strive to inspire in everyone the importance speaking up. Whether it is about a question, concern, complaint, or Misconduct.

After carefully reading the Code, if you have any questions or concerns, please consult with your Manager or our HR or Compliance Function. Please remember that Capitalized Terms (sometimes in bold font) have a specific meaning and may be more expansively defined in the Code's Glossary or our HR Policies or another Company Official Record.

With your help, we are confident that J&J will exceed our commitment to the marketplace, we will continue to deserve the trust that our Investors have in us, and our reputation for integrity and our success will endure. Thank you for your continued dedication to J&J, for joining us in this effort, and for incorporating this Code and its Core Values into all aspects of your work.

JEFFREY JUDD

FOUNDER

PRESIDENT/MANAGER

# CODE OF ETHICS AND BUSINESS CONDUCT

## I. CORE VALUE — WE SEEK COMPLIANCE AND QUALITY IN EVERYTHING WE DO:

We are a dedicated team committed to our operations and Investors. In so doing, our focus is to find Third-Party Beneficiary Insurance Settlement Agreement opportunities and compliant results through the innovation we bring to the marketplace. To achieve our mission to improve our operations, we implement organization-wide solutions based on a variety of qualitative and quantitative measures. We are proud of our work and we take this great responsibility as a privilege. For these reasons and more, we endeavor to maintain only the highest level of compliancy throughout our business and all our activities. We always do the right thing. We commit to compliancy by competing ethically and all as consistent with Laws, our Code, and our Policies (our "Compliance Mandate").

To be "compliant" means that our behavior and business operations are consistent with Laws, our Code, and our Policies — all of which we expect our Personnel, agents, contractors to strictly honor. Indeed, this is a fundamental expectation and condition of employment by, or association with, our Company. Moreover, our Company supports the establishment of a Corporate Compliance Program. Our Compliance Program is implemented to meet regulatory requirements that our business and operations should meet.

To promote our Compliance Mandate, we expect to develop and update Policies that provide guidance for complying with the number of Laws governing our business and operations. Our Policies enable us to detect, correct and prevent non-compliant activities, operations, and Misconduct. Among others, Policies have been or will be implemented in the areas of Investment documentation, financial due diligence, Third-Party relationships, Official Records, among other regulatory areas, and Company Information (including, Trade Secrets, Confidential Information, Intellectual Property, Know-How, and Proprietary Information).

Moreover, to promote our Compliance Mandate, J&J will institute training, education, and awareness programs for our Personnel, agents and contractors. These programs may take the form of online learning modules, live training sessions, and periodic communications; for example, required compliance training (general, newly hired, and annual courses) for J&J Personnel, agents and contractors and specialized training for high-risk compliance topics for certain Personnel. "Independent Contractors" are required to complete specified compliance training.

Generally, our Compliance Program is supported by our Compliance Function which is committed to ensuring that the Compliance Program's key components are consistently made available to everyone and followed throughout our operations. Our Compliance Function serves as a contact for our Personnel and all Third Parties (including Investors, Vendors, Governments, and the public) on issues relating to the implementation, management and oversight of the Compliance Program and its key components. Generally, our Compliance Function supports our workforce and business partners to promote the integrity of the Company's operations. This ultimately supports Company-wide compliance with Laws and our Policies. Nevertheless, it is our Compliance Function that is ultimately responsible for the Compliance Program and our Compliance Mandate.

By following our Compliance Mandate, we also promote consistent satisfaction on the part of Investors and Third Parties. Our Compliance Mandate means that we do not just react, but we are proactive in our compliancy. Nonetheless, to foster our business relationships, we all must ensure that we operate consistent with our contractual requirements and also our Company's Policies and Laws. If you have a concern about any business or Third Party relationship or satisfaction issue, make sure to discuss the situation with your Manager right away.

☀ **NOTE:** Our Code is an important (but not the only) component of our Company's Compliance Program. Our Program's other key components include the HR Policies, Policies, Compliance Training and Education, Personnel and Operations Communications, and Compliance Monitoring, Auditing, Risk Analysis, Risk Assessments, Periodic Compliance Bulletins, Compliance Certifications, and Contingency Planning. Each of the preceding address, oversee, and support J&J's Compliance Mandate in its vigilance of, among others: (A) Documentation and Official Records, (B) Accounting and Financial practices; (C) Marketing practices; and (D) Relationships with Investors and Referral Sources.

## II. CORE VALUE — WE CONDUCT OUR BUSINESS ETHICALLY:

The Code reflects our belief that long-term, trusting business relationships are built by honesty, openness, and fairness. It is a resource you can rely on in many circumstances to determine whether something is appropriate or compliant. In short, our Core Values direct you to act with integrity in the workplace and everywhere you represent the Company.

### OUR CODE PROMOTES:




(1) HONEST, ETHICAL AND LAWFUL CONDUCT AND BUSINESS PRACTICES BY ALL OF US; (2) COMPLIANCE WITH LAWS; (3) PROMPT REPORTING, ACCOUNTABILITY, AND CORRECTIVE ACTION FOR LAWS, CODE, OR POLICY VIOLATIONS OR MISCONDUCT; (4) CLEAR, ACCURATE, COMPLETE, AND TIMELY THIRD-PARTY COMMUNICATIONS (E.G., INVESTORS, VENDORS, AND GOVERNMENTS); AND (5) STRICT SECURITY OF COMPANY AND THIRD-PARTY PRIVATE OR CONFIDENTIAL INFORMATION.

As a J&J employee, agent or contractor, you are required to read, understand, and abide by the Code. No one has the authority to make you violate the Code and any attempt to do so is unacceptable. You also have the responsibility to watch for potential Code violations and to report them — whether they occur inside our Company or through external dealings with, but not limited to, Investors, Third Parties, or any Government.

Moreover, if you are a Manager, you have a leadership role at our Company. This means that you are responsible for setting a good example for your Personnel and for any contractor that you oversee. In addition, it means that you must encourage open and honest communication and act when Misconduct, ethical issues, questions, concerns, or complaints are brought to your attention.

Nonetheless, as a Manager, you must work to ensure that anyone who reports to you understands the Code's requirements and support any Personnel or contractor who, in good faith, raises questions or concerns. You are responsible for acting to address conduct that violates the Code and to seek help from corporate Management if the proper course of action is not clear. The Code is intended for use as a guideline. It does not address every situation you may possibly face during your workday. In any case, our Personnel and every agent and contractor must exercise good judgment in decision-making and seek help with questions or concerns that are not addressed in the Code.

We are all tasked with strictly avoiding any activity that may diminish or appear to diminish confidence in the compliancy of the Company or its competence, impartiality, judgment, or operational integrity.



COMPLIANCE CERTIFICATIONS?: The Code applies to all Personnel, contractors and business operations. It is monitored by our Compliance Function and is affirmed by everyone through our Compliance Certification procedure under our Performance Management Program. Our HR Function and Compliance Function will instruct you on the various Compliance Certifications that apply to your job and Duties and Responsibilities and that you will be expected to acknowledge and fulfill.

**Q:** I BELIEVE THAT I CANNOT SIGN MY COMPLIANCE CERTIFICATION TO THE CODE OR ANOTHER POLICY OR OFFICIAL RECORD? (e.g., as a new hire or during annual certification)? **A:** Even if you do not sign a Compliance Certification, you are still obligated to follow our Compliance Mandate. If you are uncertain as to how this expectation works or have any issues with affirming that you will follow the Code or any other standard, you should discuss your concerns with Management.

**Q:** IF I COMPLY WITH LOCAL LAWS, IS THIS ENOUGH TO ENSURE MY COMPLIANCE WITH THE CODE OF ETHICS? **A:** Our Code of Ethics may impose standards more rigorous than those imposed under local Laws. Under such circumstances, and provided that the Code of Ethics does not conflict with local Laws, comply with Code of Ethics and discuss your concerns with Management.

Our Company's Compliance Function and Management will monitor Laws as they apply to our operations. Nonetheless, we trust our Personnel, agents, and contractors to follow the letter and spirit of all Laws and act ethically even when Laws may not be specific. When in doubt ask for guidance.

## III. CORE VALUE – WE COMMUNICATE WITH INTEGRITY AND CONSISTENT WITH LAWS:

Our Company's Personnel, agents, and contractors must always — through their words and their actions — accurately represent our Company and its operations. Accordingly, Company statements made in, without limitation, marketing and advertising materials (and in whatever medium) will not be deceptive or unfair, must be evidence-based, and contain appropriate Disclosures.

Moreover, only the officers of the Company may communicate with Investors germane to matters set out in our Investment documentation. No one at our Company, including our officers, is a licensed investment or financial advisors; accordingly, no Company Personnel may ever act, or in any way communicate with anyone, in a manner reserved solely to licensed professional investment or financial counselors. As to the preceding and also, no one at our Company may ever instruct or allow any Third Party to act in such a manner. Any direct or indirect act or communication which violates the preceding compliance standard is considered Misconduct and will lead to corrective action including up to termination of employment or association.

Nonetheless, and whether online or otherwise, our Personnel, agents, and contractors are expected to act consistent with all advertising and consumer protection Laws. This means that we compete in the marketplace free of deception and unfair practices. In short, we do not communicate in a manner that confuses Third Parties, including Investors. Everyone that works with us may only publish truthful communications and incorporate Clearly and Conspicuously such Disclosures, including qualifiers and limitations, that may be required or advisable.

**NOTE:** Our verbal and written communications: (A) are truthful, complete, fair and not misleading, and (B) substantiate "express" or "implied" claims. Moreover, if a "Disclosure" is ever necessary to make a Company communication accurate, it will be portrayed "Clearly and Conspicuously."

All public statements made by J&J, or by anyone on its behalf, including in connection with advertising, promotional materials, warranties or guarantees, must always be truthful and have a reasonable basis in fact and in no way deviate from the contents of J&J's, without limitation, Investment documentation and Official Records. No one may disseminate any written or verbal communication or material, whether relevant to our Company or our operations or otherwise, which is false, misleading or deceptive or not in compliance with applicable Laws or our Policies.

## IV. CORE VALUE – WE SPEAK UP AND SEEK HELP:

It is important to be competent about compliance. Being consciously competent allows you to recognize when you should seek advice from Management, our HR Function or our Compliance Function. As part of your Duties and Responsibilities, you are expected to earnestly study our Core Values and Policies so that you become competent about compliance.

When the best path forward is not obvious to you, take the Integrity Quick Test and answer its questions to help guide your decision-making process and your responses to uncertain circumstances. Remember that in all matters, you are expected to understand the Code and Laws, use good judgment, and avoid even the appearance of Misconduct.

 INTEGRITY QUICK TEST:

If you ever have doubt about a course of action or are unfamiliar with the effect of a particular circumstance, ask yourself the following questions: (1) Is it consistent with the Code? Is it ethical or legal? (2) Is it consistent with all other Company Policies? (3) Will the conduct reflect well on me and the Company? (4) Will the course of action give the appearance of being unethical or illegal? (5) If publicly disclosed, will the course of action discredit me or the Company? (6) If someone treated me the same way, would I be comfortable with such act? (7) Am I properly protecting Confidential Information? (8) Would I be comfortable if the conduct appeared in the media? (9) Am I properly protecting the Company's or any Third Party's Confidential Information from disclosure to improper external or internal parties? If you answered "NO" to any of these questions, then don't do it. You should utilize one of our Reporting Channels and report the circumstances.

Exhibit 1, Page 126

NONETHELESS, IF YOU FIND YOURSELF SAYING OR HEARING THE FOLLOWING WORDS:



"Well, maybe just this once"/"Nobody will ever know"/"It doesn't matter how it gets done, as long as it gets done"/"Everyone does it"/"What's in it for me?"/"We always did it this way"/"Don't contact the Compliance Email"/"Remember, we didn't have this conversation,"

YOU SHOULD TAKE A STEP BACK AND CAREFULLY CONSIDER THE SITUATION BECAUSE OFTENTIMES THE CIRCUMSTANCES THAT ELICIT THESE WORDS CONSTITUTE MISCONDUCT, VIOLATE THIS CODE, LAWS, OR OUR POLICIES.

**Q:** AFTER COMPLIANCE TRAINNING, I WAS CONCERNED THAT AN INVESTOR PROTOCOL MAY BE INCORRECT. I TOLD MY MANAGER ABOUT MY CONCERNS AND SHE TOLD ME THAT "THIS IS HOW WE DO THINGS HERE" AND WALKED AWAY; WHAT SHOULD I DO? **A:** Use one of our Reporting Channels that don't involve your direct Manager and voice your concern.

**Q:** MY MANAGER ASKED ME TO WORK OFF THE CLOCK BECAUSE HE WAS NOT MEETING OUR HR BUDGET FOR THIS QUARTER; HE TOLD ME HE WOULD MAKE IT UP TO ME NEXT QUARTER; WHAT SHOULD I DO? **A:** This is both a Policy violation and a Laws violation. Your Manager is expected to exemplify our Compliance Mandate, not violate it. In essence you are being asked to work for free. In the future, you could bring a complaint against the Company for wage Laws violations; these circumstances amount to Misconduct on the part of your Manager. Use one of our Reporting Channels to speak up.

## V. CORE VALUE — WE PROMOTE A SAFE WORK ENVIRONMENT:

We promote a safe work environment for our Personnel. Our safety Policies have been developed to safeguard everyone from potential workplace hazards. We must all become familiar with and understand how these Policies apply, for example, to your specific Duties and Responsibilities. Our Personnel should be familiar with, and follow, all our safe workplace guidelines and seek advice if they have any safety question or concern and in all cases promptly report any accident or unsafe condition to Management. For additional guidance, see our HR Policies.

We foster the kind of environment where (at all times) people should feel safe and are treated with courtesy and professionalism. Accordingly, we promote a workplace that is positive, creative, and rewarding. An environment that promotes individual expression, innovation, and achievement. As part of our commitment to safety in the workplace, our Personnel — and any person who works with us — is not permitted to use, possess, or be under the influence of alcohol or illegal drugs during work hours or on Company property.

## VI. CORE VALUE — WE TREAT EVERYONE RESPECTFULLY:

Everyone working at our Company should feel welcomed, supported, and inspired to succeed. We care about, and are concerned for, the health and well-being of our Personnel. Indeed, every one of us should rightfully expect to experience a professional environment free from intimidation and harassment. To promote such an environment, we define harassment broadly and prohibit its many forms. Without limitation, harassment includes offensive remarks, unwelcome advances, requests for sexual favors, inappropriate jokes, or ethnic, racist, or sexual slurs.

We treat everyone with respect and dignity — and we encourage input from everyone on ways to enhance the inclusive and diverse atmosphere of our workplace. Moreover, we promote a workplace that is free from disruptive conduct by anyone. Our respect for people is demonstrated in what we do and how we act towards everyone we encounter in our work. To meet our commitments to one another and to meet our commitments in the marketplace — and to attract, cultivate and retain talented individuals — it is vital to have a work environment built on mutual trust, respect, and the principles embodied in this Code. We must treat everyone well and equitably and we never take advantage of others through manipulation, misrepresentation, or concealment.

**Q:** I RECEIVED AN EMAIL WITH AN OFFENSIVE JOKE, IS THAT HARASSMENT? **A:** Offensive material sent through Company Data and Information Systems ("CDIS") have no place in our workplace (regardless of intended recipient). You should contact our HR or Compliance Function to discuss this matter. Even if your coworker did not intend to be offensive, our Core Value is that we are always respectful and considerate of others.

**NOTE:** Our HR Policies contain further guidance on Sexual Harassment, Harassment, Reporting Channels, and Dispute Resolution. Nonetheless, respectively in the preceding circumstances you also (a) may respond directly to the co-worker, notifying him/her that you found the matter offensive/inappropriate, to stop the behavior in the future, and advise that you will escalate the matter if it continues; and (b) are always free to immediately and clearly communicate to the individual your disinterest in, or offense taken, with regard to any such conduct.

## VII. CORE VALUE – WE PROMOTE EQUAL OPPORTUNITY:

Under our Compliance Mandate, we promote and provide an equal opportunity environment for all Personnel. We prohibit discrimination based on race, color, religion, creed, age, sex, national origin, gender identity or expression, sexual orientation, disability, marital status, veteran or military status, genetics or citizenship status, and any other legally protected status. Accordingly, we base employment decisions only on business needs, skills, experience and relative work performance.

**Q:** WHAT SHOULD I DO IF I BELIEVE I WAS PASSED UP FOR A PROMOTION BECAUSE OF MY AGE? **A:** Our Policies require that employment decisions be made without regard to a candidate's age. If you conclude in good faith that you were treated unfairly, contact the HR or Compliance Function for assistance. Our standard is straightforward, all HR Function related decisions and practices, including recruitment, hiring, placement, promotion, demotion, transfer, training and discipline will be made and administered solely on the basis of the attendant facts; for example, individual experience, merit, performance and other legitimate job-related qualifications. We are proud of our commitment to maintaining a diverse workforce and will not take adverse action or retaliate based on any protected status. Our HR Policies contain further guidance on Equal Employment Opportunity, Diversity, Reporting Channels, and Dispute Resolution.

## VIII. CORE VALUE – WE REPORT QUESTIONS, CONCERNS, AND MISCONDUCT:

It is up to each of us to report questions and concerns, for example, if we believe that any operations or business action or omission or result is unclear. Even more so, it is up to each of us to challenge and report any suspected violation of Laws or the Code, HR Policies, or our Policies; in short, any kind of Misconduct. We expect that everyone will comply with our Affirmative Duty to Report Misconduct Policy.

We must all respect the fact that asking questions and reporting concerns, complaints and Misconduct means that we actively pursue clarity about our choices and actions and promote our Compliance Mandate. This helps everyone to identify problems and gives us all the opportunity to address, investigate and correct not just Compliance Mandate matters. When in doubt about the right choice or potential violation, you are always encouraged to seek out advice or make a report. But, in cases of Misconduct, you are required to do so.

If you become aware of a situation that violates or may violate Laws or the Code, HR Policies, or our Policies, there are two options for making a report ("Reporting Channels"). Depending on your level of comfort, the following Reporting Channels are at your disposal:

 **Discuss** the issue with your Manager, Management, or HR or Compliance Function representative.

**Send** an email to our Compliance Email.

For additional guidance, see the HR Policies', among others, Dispute Resolution Policy, Affirmative Duty to Report Misconduct, and Non-Retaliation/Whistle Blower Policy.

We take Code, Laws, and Policy violation (and any kind of Misconduct) reports seriously and we respond to them through follow-up steps including investigation, remediation, and when warranted, corrective action. These steps are designed to address compliance issues, learn from mistakes, and avoid recurrence of problems. Raising a concern regarding any noncompliance reinforces the Company's commitment to act ethically in all aspects of our business and supports our culture of compliance. Your actions do make a difference!

**NOTE:** The Compliance Function oversees and investigates Code, Laws, and Policy violations and most types of Misconduct. The Company's Managers may not conduct any independent investigation regarding any

alleged violation or Misconduct. Nonetheless, everyone involved in an investigation may be asked (and in some cases are required) to cooperate. In all cases, everyone involved will maintain the investigation's confidentiality. Raising a concern regarding any noncompliance reinforces the Company's commitment to act ethically in all aspects of our business and fosters a culture of compliance. Your actions do make a difference!

**Q:** WHAT IF I REPORT A CONCERN BUT NEVER HEARD ANYTHING FURTHER? **A:** Contact the Compliance Function to confirm that the report was received and the issues addressed. Some matters may take longer to investigate and resolve, but generally, you can expect to receive some form of update and final resolution. While all reports will be reviewed and acted upon, some aspects of the investigation or relevant information (e.g., due to privacy, confidentiality, or severity) may not be appropriate to share with the person who reported the Misconduct.

**Q:** WHAT HAPPENS IF I AM UNSATISFIED WITH THE RESOLUTION REGARDING A COMPLAINT I REPORTED? **A:** There may be circumstances when the Compliance Function has investigated and addressed a situation which does not result in a resolution you would have preferred, or where J&J has determined the concern is not contrary to the Code, Policy or Laws. If you continue to have concerns after a resolution has been instituted, please report your concerns back to the Compliance Email or Compliance Function for additional review and response.

**Q:** WHAT IF SOMEONE DELIBERATELY MAKES A FALSE REPORT AGAINST ME? **A:** All investigations are handled confidentially, professionally and objectively. Making an intentional false accusation is a serious matter that may lead to disciplinary action, up to and including, termination of employment.

**Q:** MY MANAGER INSTRUCTED ME TO DO SOMETHING THAT I BELIEVE MAY BE ILLEGAL OR MISCONDUCT BUT I AM AFRAID SHE WILL MAKE MY JOB HARDER IF I REFUSE, SHOULD I STILL REPORT MY CONCERN? **A:** While your Manager is generally the person with whom you will discuss compliance questions and concerns, if their instruction worries you, then contacting the Compliance Function is one option; remember, our Compliance Function retains independent objectivity to investigate and remediate these types of matters. Another option is the Compliance Email. When reporting through the Compliance Email, you will have the assurance of knowing that our Compliance Function is looking into the situation and that, in all cases, any retaliation by your Manager (or anyone else) will not be tolerated.

**NOTE:** We note that the Compliance Email may not be the best Reporting Channel for certain matters, including: (1) wages or benefits questions; (2) general questions, like parking or Facility issues; (4) computer or phone problems; or (5) general personal issues, like calling in sick. For these types of matters, contact the Company's HR Function or the IT Function.

**NOTE:** In some cases (and to assist in the Compliance Function's review) the Reporting Person is encouraged to identify themselves. However, anonymous reports will also be accepted and investigated to the extent possible. Remember that every reasonable effort will be made to treat the identity of anyone reporting a potential violation as confidential (noting that to the extent possible, this is subject to and consistent with the circumstances which may include our business practices).

## IX.  CORE VALUE – WE DO NOT RETALIATE:

We have a zero-tolerance policy against any form of retaliation. No one at our Company may retaliate against anyone who has raised any kind of operational, legal, or ethical concern or that cooperates with any investigation or remediation. Everyone must understand that retaliation is itself Misconduct and is deemed to be a violation of Laws. Nonetheless, retaliation that may result in liability and penalties.

We respect Laws and our Code and therefore no one may seek revenge against, or even try to "get even," with anyone who makes a good faith report, regardless of who is implicated. We take any retaliation allegation very seriously, and if it occurs, it will result in discipline up to and including termination of employment. All acts constituting retaliation must be reported to Management, our HR Function, or our Compliance Function.

**Q:** I CONCLUDE THAT I HAVE EXPERIENCED RETALIATION? **A:** You should report the matter because J&J strictly forbids any retaliation against any person who reports a concern. Reports or complaints made in Good Faith

will not expose you to any sanction, regardless of whether the underlying facts prove to be correct.

**NOTE:** "Retaliation" can sometimes be subtle or difficult to spot. Some examples include: changes in responsibilities • rudeness or getting the "cold shoulder" • demotion • denial of vacation requests without justification • exclusion from professional development opportunities or special projects. While the preceding examples may not always indicate retaliation, if you are concerned that a negative change you experience at work is connected to having spoken up, we want you to speak up again and use a Reporting Channel.

**NOTE:** "Good Faith" does not mean being correct about potential Misconduct, it means a reasonable belief that the information you report is true. Our Company's HR Policies have further guidance on our Dispute Resolution Policy, Affirmative Duty to Report Misconduct, and Non-Retaliation/Whistle Blower Policy.

**Q:** SHOULD I REPORT A CIRCUMSTANCE THAT I BELIEVE IS HARASSMENT FROM MY MANAGER WHEN I FEEL I MAY LOSE MY JOB? **A:** As a valued member of our Company, you are entitled to work in an environment free from intimidation, harassment, or hostile or offensive behavior. You can use a Reporting Channel but nonetheless, you may contact the HR Function or the Compliance Function to discuss the matter.

## X. CORE VALUE – WE AVOID CONFLICTS OF INTEREST:

Your everyday decisions and acts have an impact on the Company. For this reason, you must make each decision without conflict, objectively, and in the Company's (not your own) best interest.

Generally, a Conflict of Interest exists when a Company employee's private interests interfere with the Company's interests. In short, your working decisions and acts should be based on the Company's needs, rather than (without limitation) your potential personal gain or the interests of your family, friends or any Third Party.

Each of us is expected to use good judgment and avoid situations that can lead to a conflict or even the appearance of a conflict. You must disclose any activity or relationship that may:



COMPETE WITH ANY OF COMPANY'S BUSINESS ACTIVITIES

ENTAIL PROVIDING SERVICES TO A COMPETITOR

INTERFERE WITH YOUR WORK DUTIES AND RESPONSIBILITIES

CONFER AN INAPPROPRIATE PERSONAL BENEFIT TO YOU, YOUR FAMILY, OR ANY THIRD PARTY

If competing actions, interests, or relationships make it difficult to perform your work objectively and effectively, you must disclose the potential Conflict of Interest to Management. Moreover, you must recuse yourself from circumstances where a conflict could impact your judgment.

Any questionable activity should be disclosed to Management as soon as you become aware of it. This is an ongoing responsibility for all J&J Personnel, agents, and contractors. Failure to disclose may result in disciplinary action, up to and including, termination of employment or association.

**NOTE:** While some circumstances — like (1) acting as a broker, finder, or go-between, any of which may also benefit a Third Party in transactions involving the Company, or (2) receiving improper personal benefits as a result of your position with the Company — constitute a Conflict of Interest and maybe Misconduct, it is impossible to list all the situations that might signal its potential.

An often effective way to determine whether an activity present with or creates a Conflict of Interest is to ask the following questions: (1) Does the activity interfere (or give the appearance of interfering) with the Duties and Responsibilities that you perform at, or owe to, J&J? (2) Are you, a member of your family, or a Third Party receiving an improper advantage because of your position with J&J? (3) Does the activity compete against J&J's interests and may separately violates Laws? If you answered "YES" to any of these questions, the activity may indicate a conflict of interest. You should contact the Company's Management.

Our team members owe J&J a duty to advance the Company's legitimate interests when opportunities arise. Accordingly, our Personnel may not directly or indirectly take for themselves any opportunity that arises through

their position at the Company. Also, our Personnel may not personally profit from any use or diversion of, without limitation, the Company's Assets, including its Company Information.

**Q:** IS IT OK TO HAVE A SECOND JOB (MOONLIGHT)? **A:** Outside employment could pose a Conflict of Interest. You should disclose all relevant facts to your Manager or the Compliance Function. After consultation and the situation has been evaluated, only then will it be determined whether or not the outside activity/job does presents with a conflict in the performance of your Duties and Responsibilities; i.e., it is considered a Conflict of Interest.

**Q:** WHAT IF I OPERATE A SMALL BUSINESS FROM HOME AND MY MANAGER AND THE COMPLIANCE FUNCTION HAVE INFORMED ME THAT THE BUSINESS DOES NOT REPRESENT A CONFLICT OF INTEREST, IS IT OKAY FOR MY CUSTOMERS TO LEAVE MESSAGES ON MY COMPANY VOICEMAIL? **A:** No. Even though there is no Conflict of Interest, you have an obligation to use Company CDIS (including email and voicemail) and other Assets only for Company-related business. Our Personnel are not permitted to use any J&J Asset to support, without limitation, a second job, self-employment venture, or consulting effort.

**NOTE:** When reporting a potential conflict situation, you must truthfully disclose all relevant facts and circumstances (including your identity). Whether approval is granted rests with Management's sole discretion and will depend on Management's assessment of the particular situation. Any approval granted will be limited to the particular facts and circumstances disclosed. The Company retains the right to prohibit, place restrictions on, or require termination of any activity or relationship determined to create an actual or potential conflict of interest. In any case, you have a continuing obligation to report promptly any material changes in the facts and circumstances of an approved conflict situation. The Company must be allowed to reassess any conflict matter on a timely basis.

## XI. CORE VALUE – WE PROTECT OUR COMPANY'S ASSETS AND REPUTATION:

Through our work, we are the caretakers of our Company. It is our responsibility to take all appropriate actions to use and protect J&J's Assets with care and ensure their efficient and proper use for all legitimate business purposes. Indeed, we must all use good judgment to ensure that our Company's Assets are not lost, stolen, misused, or wasted.

Our Company's reputation is one of its greatest Assets. We are each responsible for enhancing and protecting our Company's reputation. For this reason, we are each personally accountable for any views or content published or shared with people outside the Company. Please remember, because our success will always be tied to our reputation, it is up to all of us to bolster and protect it, act with the utmost of care, and always do the right thing.

Always remember that Third Parties routinely provide us with sensitive or confidential information ("Third Party Information") that we use in our operations. We are obligated to protect these Third Party assets as we would J&J's Assets, making sure to use them only for their designated business purposes and to protect them from theft, loss or waste.

**NOTE:** (A) "Assets" include Company "Property" (e.g., Intangible Assets like "Company Information" and Good Will and the Physical Assets that we every day, our office supplies, and our Company Data and Information Systems ("CDIS"), noting that Company Revenue/Funds is deemed to be a Company Asset); (B) "Company Information" includes Confidential Information, Proprietary Information, Company Data & Information ("CDI"), Intellectual Property, Trade Secrets, Official Records, and Know How.

The Company's Assets are to be used only for the Company's legitimate business activities. Personnel may not use Company Assets for personal reasons except as permitted by Company Policies or otherwise approved in advance by their Manager. The misuse or misappropriation of Company Assets, the provision of anything of value to any party not in accordance with Company policy (or other appropriate authorization), and the retention of any benefit that belongs to the Company from any party with whom the Company has business or other dealings are strictly prohibited. Nonetheless, the Company's Assets must not be taken out of our Facility unless necessary to perform Duties and Responsibilities, however, any such action must always be pre-approved by Management and in some cases by the Compliance Function. If an Asset is removed from the Company's Facility for business purposes consistent with our Policy, our Personnel must return the Asset to the Facility as soon as the Asset is no longer needed

for business purposes.

**Q:** CAN I DOWNLOAD INTERNET SOFTWARE USING MY COMPANY ISSUED CDIS? **A:** Accessing the Internet creates the possibility of Malware being introduced to our CDIS/CDI. This can lead to Security Incidents and Security Breaches and generally, the compromise of Confidential Information and Company Information. Separately, this may result in the disruption of CDIS network performance; e.g., system failures. Any Software utilized by Personnel on their Company CDIS Asset must be authorized by a Manager and downloaded/installed only by our IT Function. Company Information/CDI may not be maintained on any personal device unless special circumstances apply, and when advance approval is received from your Manager and the Compliance Function. If you have any question, use one of our Reporting Channels.

**Q:** CAN I USE MY WORK COMPUTER FOR PERSONAL USE? **A:** As a critical corporate Asset, we take steps to minimize risk to our CDIS and safeguard all Company Information. These measures will help maintain confidentiality, provide data integrity, system availability, and User accountability and include the protection of Third-Party Information. While certain job Duties and Responsibilities require Access to the Internet and the use of certain Software, the inappropriate use of the Internet, email, and CDIS/CDI places our Company and others, including Investors, at significant risk. Remember, Company provided CDIS/CDI device for your Use (e.g., desk phones, cell phones, tablets, laptops, desktop computers, iPads, etc.) are important Company Assets and may only be used for Company business.

**NOTE:** Anyone that works with us may not, under any circumstance, use Company CDIS Assets to Transact inappropriate material; e.g., media or web content, without limitation, of an inappropriate nature. Transacting any such material or other inappropriate or discriminatory material via CDIS, is deemed harassment, and will be addressed according to our Compliance Mandate. Personnel violations of Company Acceptable Use or Harassment Policies may lead to disciplinary action up to and including termination. Any CDIS Transaction of content that contains derogatory or inflammatory remarks about any individual's race, age, disability, religion, national origin, physical attributes, or sexual preference is prohibited and can result in disciplinary action that may lead to termination. The preceding prohibitions apply equally to any other electronic equipment, including personal devices owned by the employee, if they are used (or the inappropriate material is Transacted) on Company time.

## XII. CORE VALUE – WE COMPETENTLY TRANSACT CDI & THE INTERNET:

Access to the Internet and Company Data and Information Systems ("CDIS") may be made available to Personnel for the purpose of carrying out the Company's legitimate business and incidental use. In the context of social media where interactions are quick and dynamic and can become highly visible, careless communications can pose a significant risk to our Company's reputation.

As part of this Core Value, you must be mindful and appropriate in your communications and always protect all Company Information, Third Party Information, Confidential Information, and our reputation. Particularly, you must protect Confidential Information and abide by all J&J Core Values, Policies, and Laws online and offline (even when, for example, if a relevant webpage, profile, or forum in which you are posting is listed as "private" or "closed"). We are all responsible for employing careful strategies in all communications and protecting the Company.



ALWAYS REMEMBER: (1) Only authorized individuals may speak on J&J's behalf; (2) Never post anything on the Internet or otherwise that is inconsistent with our Core Values or Policies; (3) Use of social media on CDIS during working time is permitted if the use is for pre-approved Company business (you must disclose the nature of your anticipated business use and the content of your communication with Management and obtain approval prior to each such use); (4) Respect copyright and similar Laws and use Company Information only in compliance with Laws; (5) You may not create a blog or online group related to Company (not including blogs/discussions involving wages or other terms and conditions of employment, or protected concerted activity) without Management's advance approval; (6) Do not publish Company Information without approval or authority; (7) Do not malign our Company, its Personnel or contractors or any Third Party on social media; (8) Any public recommendation or endorsement about J&J's operations on any personal social media site or digital platform must also include a Disclosure that you work for J&J in the post itself (not simply in your bio or

profile). Using a Disclosure in your bio or profile is recommended, but not sufficient. In all cases, you must ensure that any statements about our Company are truthful and substantiated and do not violate any Core Value; (9) If you become aware that a fellow employee has posted something you believe may violate our Core Values, this Code, Laws, or any Policy, report it to, among others, our Compliance Function; (10) Social media is not a substitute to report a concern about the Company, a worker or any other concern which should be reported to, for example, our HR or Compliance Function under our Reporting Channels; (11) Social media is prime ground for hackers to collect information on you that can be used to target the Company. Be careful of what you share online; (12) If you leave the Company, please update your employment information on your profiles/social media.

**Q:** I JUST READ A BLOG POST THAT UNFAIRLY CRITIZES THE COMPANY AND I KNOW IT IS NOT TRUE. SHOULD I POST A REPLY? **A:** You may not respond to any information posted publicly unless you are authorized to speak on the Company's behalf. Report the matter to your Manager or the Compliance Function.

## XIII. CORE VALUE – WE SECURE OUR COMPANY INFORMATION:

Each of us must understand that our Company Information is a valuable commodity. It is our Core Value that, both inside and outside of the Company, each of us is required to safeguard the confidentiality of information about our business, operations, Intellectual Property, Confidential Information, Proprietary Information, Trade Secrets, Goodwill, and any information that relates to our Investors, Vendors, Personnel, agents, contractors, business relationships and any other Third Party (i.e., the preceding is deemed to constitute "Company Information").

It is your duty to take precautions to avoid improper, inappropriate, illegal, or inadvertent disclosures of Company Information in whatever electronic or physical form it may exist. Generally, you may only share Company Information with Personnel who have a legitimate business "need to know" and only share the minimum necessary. Of course, you may never give Company Information to our competitors, suppliers or outside contractors or other Third Parties without proper authorization. We all must realize the sensitive nature of Company Information and be committed to maintaining its confidentiality both through our words and our actions.

**Q:** I AM LEAVING TO WORK FOR ANOTHER COMPANY. DO MY CONFIDENTIALITY OBLIGATIONS CONTINUE AFTER I LEAVE? **A:** Yes, your obligation to protect Confidential Information continues. When your employment ends, you must not use, retain, or disclose Confidential Information you obtained or learned while forging with us even if you created it.

**NOTE:** Company Information includes "Confidential Information" or any other information which might be of use to competitors (or disclosure of which may be harmful to the Company or any Third Party) including the following sources and types of information, documents, data or materials: (A) Company's confidential and proprietary information and trade secrets that cannot be obtained readily by Third Parties from outside sources including business models, authorization forms, business relationship list(s) or information, Referral Sources and their business relations, (B) legal opinions, (C) Company marketing materials, research or strategies, (D) concepts, ideas, plans, strategies, analyses, and information related to past, present, or anticipated business, agreements, corporate governing documents, or addenda, supplements or resolutions thereto, (E) confidential or proprietary information regarding Vendors or contracts as between Company and Third Parties, (F) expenses or financial information including pricing, revenue and profit projections, revenue and profits actually generated, (G) technical or other confidential information regarding the Company's business, processes, methods of operation, or procurement procedures, (H) information regarding the Company's Personnel, HR Policies, Policies, procedures, or Compliance Program, (I) information regarding members, partners, owners, or individuals or entities that the Company does or may seek to contract with or that are involved in any way with the Company's business, (J) databases, commercial agreements and details of ongoing commercial negotiations, development tools or techniques, training procedures, training techniques, or training manuals, or (K) confidential information and other business information disclosed to the employee by the Company, either directly or indirectly, in writing, orally, or by drawings or observation.

## XIV. CORE VALUE – WE SECURE EVERYONE'S PRIVACY AND INFORMATION SECURITY:

When a Third Party provides information to us, we have a responsibility to safeguard it and use it appropriately.

We may only share the information with others who have a business need to know it and are authorized to receive it. Accordingly, it is our Core Value that, both inside and outside of the Company, each of us is required to strictly safeguard the confidentiality of all Third Party Information. It is your duty to take precautions to avoid improper, illegal, or inadvertent disclosures of Third Party Information in whatever electronic or physical form it may be found.

Generally, you may only Transact Third Party Information with Personnel who have a legitimate business "need to know" and only share the "minimum necessary." Of course, you may never give Third Party Information or any Confidential Information to any person or entity without proper authorization. We all must realize the sensitive nature of Confidential and Third Party Information and be committed to maintaining its confidentiality both in our words and our actions. We do not sell or obtain any type of Third Party personal, confidential or private information without proper authorization and we protect everyone's personal and sensitive information from unauthorized disclosure and use.

## XV. CORE VALUE — WE COMPLY WITH LAWS AND POLICIES:

Every J&J employee and contractor is expected to adhere to all Laws and our Code, Policies, HR Policies and Compliance Program. This is a fundamental expectation and condition of employment at or association with our Company. Our Policies, HR Policies and Compliance Program cover important aspects of our operations, including corporate compliance, human resources, and Company Data and Information Systems ("CDIS"). They are all in place to help ensure that we comply with Laws governing our business and its operations. They enable us to detect, correct, and prevent non-compliant activities including Misconduct. Please remember, meeting our commitments to the marketplace and our success are always tied to our compliance with Laws and our Policies. We act with the upmost of care and we always do the right thing.

## XVI. CORE VALUE — WE ACCURATELY TRANSACT OUR AND OUR INVESTORS' RECORDS:

Our Company measures our business operations accurately and without omissions. Accordingly, our Company's public statements, financial records, internal and external communications, and all other documentation (collectively, each such memorialization is considered to be a Company "Official Record") must accurately reflect the facts, substance, and context of our actions. Therefore, when we measure or describe our Company's successes, failures, and routine operations, all facts must be accurately represented in our Official Records with sufficient substance and context so that internally we (and externally any Third Party, including our Investors and any Government) may understand the true nature of our activities or transactions.

In short, our Company's Official Records must conform to all applicable industry, accounting and professional standards, Laws, as well as our Company's Policies and procedures. For example, when we report or transmit Official Records — such as (1) investment or payment information, or (2) regarding any item of value provided to Third Parties — the information must be complete and accurate.

Our Company is committed to ensuring that we provide accurate information in our Official Records to allow Governments and, as relevant, Investors and any other Third Party to make informed decisions. Our Company's high standard for documentation also extends to the exacting level of detail that we expect from any Third Party, including any Referral Source.

 **NOTE:** Collectively or individually, any Company Information memorialization (and whether in physical or electronic form) is deemed under our Compliance Mandate to be a Company "Official Record."

Generally, our Personnel must ensure that our financial records and accounts — as well as supporting documentation for which they are responsible — accurately and completely reflect J&J's actual operations, transactions and other activities. For this reason, J&J has a strict zero-tolerance policy against any form of falsification or deception in connection with anyone's Transaction of Company Official Records or as may be otherwise relevant to the Company's books, records, accounts or entries therein and whether by alteration, destruction, omission, or false or misleading recording.

Nonetheless, our transactions and other activities must be recorded as necessary and appropriate to permit

preparation of financial statements in conformity with generally accepted accounting principles and other applicable rules, regulations and criteria, and to ensure full accountability for all Company Assets, liabilities and transactions. All Company Assets, liabilities, receipts and disbursements must be accurately and completely recorded in the regular books, records and accounts of the Company. No undisclosed or unrecorded funds, Assets or accounts may be created or maintained, nor any undisclosed or unrecorded payments received or made, regardless of the purpose.

All payments made on Company's behalf must be in accordance with applicable legal and regulatory requirements and the Code and other Company Policies and accompanied by appropriate and accurate supporting documentation. In addition, no payment on J&J's behalf may be approved or made with the intention, understanding or knowledge that any part of the payment is to be used for any purpose that is inconsistent with the purpose(s) described in the supporting documentation. All Personnel with responsibility for preparing and maintaining J&J's financial records must strictly comply with the Company's internal accounting and financial Policies.

## XVII. CORE VALUE – WE PROTECT AND RETAIN OUR OFFICIAL RECORDS:

Each of us is responsible for the integrity and accuracy of our Company's Official Records. This is required not only to comply with Government regulatory and legal requirements but also to ensure Official Records are available, for example, to support our business practices at any time. Accordingly, our Official Records must be maintained and stored in a consistent and reliable manner so as to comply with the requirements of Laws as well as to provide for effective operations.

No one may alter or falsify information on any Official Record. Records must never be destroyed to deny any Third Party, including Governments, any information that, for example, may be relevant to a Government Inquiry or other function. Similarly, Official Records relevant to any potential or pending administrative, civil or criminal proceeding or matter may not be destroyed to deny any relevant Third-Party's rightful request for information. "Inquiry" is read to be inclusive of any judicial or other Government proceeding or process ("Process").

Official Records are maintained in accordance with Laws and our Document Retention Policy, which includes specific retention schedules. Official Records include "Company Data and Information" ("CDI") and paper documents (such as letters and Investment documentation) and any of which may be found on our CDIS or any other medium that contains information about the Company or its business activities.

It is paramount to retain and destroy Official Records only according to our Document Retention Policy. No one may remove or destroy records prior a specified date without first obtaining permission as outlined in the Company's Policy. Under no circumstance may any J&J employee Transact the information of a colleague or any other individual or entity's information to personally benefit themselves (e.g., perpetrate identity theft). If you believe or know that any sort of improper or unauthorized Transaction of any Official Records or any other Company Information has occurred, immediately report it.

☼ **NOTE:** "Company Data & Information" ("CDI") is a Company Asset and means all external and internal electronic data and information, including without limitation, files, documents, e-mails, communications, messages, memoranda, or any other transmissions of data or information including any other Company Information whether Transacted directly or indirectly by, from, or through CDIS or otherwise Transacted by any Company employee or, as relevant to Company, any Third Party. ALL CDI is deemed to constitute Official Records.

## XVIII. CORE VALUE – WE TRANSPARENTLY COOPERATE WITH THE GOVERNMENT:

In relation to any part of our operations, federal and state Government agencies may conduct, among others, inquiries or investigations (an "Inquiry"). Regardless of the reason for the Inquiry, we are respectful when working with Government representatives, we respond with openness and accurate information, and we cooperate with all legal requests.

Our Core Value in responding to any Inquiry is that we never conceal, destroy, or alter information (in whatever form it may exist), we do not directly or indirectly obstruct or delay, and we never lie or make misleading statements. If you have any doubt about the accuracy, responsiveness, or propriety of the information that you may be producing

regarding an Inquiry, check with our Compliance Function or, if the Company has engaged legal counsel on the matter, do not produce anything inconsistent with their instruction. Of course, you may not attempt to persuade or assist a Company employee, or any other person, to violate any aspect of our Inquiry Core Value.

Finally, you must honor all "Holds" that are placed on our normal document destruction procedures when an Inquiry or Process is pending. You must maintain the "Hold" until you are instructed in writing by the Compliance Function or its designee that it can be released. Any act violating our Inquiry Core Value will result in disciplinary action, up to and including termination.

If you are approached by any person identifying as a Government representative, contact our Compliance Function before responding or providing any information. Our Compliance Function will assist you in following proper procedures for cooperating with any Inquiry. You should not feel pressured to talk to a Government official or investigator without first contacting our Compliance Function. Generally, our Compliance Function will consult with any employee who is contacted in connection with any Inquiry. Request the official or investigator's contact information and inform her that you need to contact the Compliance Function and that someone from the Company will get back to them as soon as possible.

**NOTE:** No part of the preceding (or any Company Policy) may be construed to prohibit or restrict anyone from truthfully reporting instances of Misconduct or any illegal activity of any nature to any Government (or law enforcement function) separately or before reporting under the Company's Affirmative Duty to Report Misconduct Policy.

## XIX. CORE VALUE – WE PERFOM OUR DUE DILIGENCE IN FINANCIAL OPERATIONS:

Our Company and its affiliates are committed to complying with all anti money laundering Laws. For this reason, we have established our Anti-Money Laundering ("AML") policy. The objective of the AML Policy is to ensure that money laundering and terrorism financing risks identified by J&J are appropriately reported, addressed and mitigated. In short, as part of our Compliance Mandate, our AML Policy is meant to protect our reputation and avoid even the perception of involvement in the illegal receipt of funds from Investors or otherwise.

The AML Policy will be implemented as a system of internal controls designed to facilitate our Company's due diligence, oversight and audits relevant to applicable AML Laws and as part of our Investor documentation. As part of our internal controls, we implement:

(1) Written internal control documentation forms and systems of internal controls designed to facilitate ongoing compliance with applicable AML Laws; (2) An Investor due diligence documentation system that incorporates individual and entity identification and verification/know your customer principles; (3) An AML Risk Assessment Policy and enhanced due diligence on any Investor that may be assessed as higher risk; (4) Monitoring and reporting of suspicious activity to appropriate regulatory authorities or as further advised by our legal counsel; (5) AML training for appropriate Personnel; and (6) proper record keeping in accordance with required or advisable legal and business standards.

**NOTE:** The Company may revise its AML Policy from time to time to address the marketplace and any technology advancements (e.g., blockchain technology) and as necessary to ensure that our due diligence practices remain effective and current. In accordance with appropriate industry standards, J&J will remain vigilant in its AML Compliance Mandate.

**Q:** WHAT IS DUE DILIGENCE AS RELATED TO OUR INVESTORS? **A:** As it relates to our Investors, Due Diligence refers to our activities in ensuring that we certify our Investors. In short, that our Investors are who they say they are and that any funds invested are Bona Fide/consistent with AML Laws. This standard is primarily incorporated into our subscription agreements and investor questionnaires. In practice, this means that, among other factors, we properly identify our Investors through their provision of proper documentation, among other certifications. Moreover, we secure our prospective Investor's information and assign a compliance assessment to the Investor based on our AML compliance standard; i.e., when potential AML Red Flags are identified.

**Q:** WHAT DO WE DO WITH ANY AML RED FLAG CIRCUMSTANCE? **A:** In AML Red Flag circumstances, we act and perform further due diligence before a potential relationship with an Investor inures to the Company. For example, we seek additional identification and source of funds or source of wealth information from our potential Investors. In all cases that present with AML Red Flag circumstances, we will subject our Investor to ongoing monitoring procedures.

**NOTE:** As part of our ALM Red Flag Compliance Mandate, we remain vigilant of the potential of Investor "hidden beneficial owners." For example, relevant to AML Red Flag circumstances, an individual or entity may rely on a variety of structures to hide the beneficial owner of funds or assets. Specifically, we note that a potential investor not meeting our AML Compliance Mandate may attempt to launder money using one of a number of vehicles designed to obscure or disguise the beneficial ownership of assets or Investment Principal transferred to the Company. In these types of circumstances, we evaluate the vehicle's principals, obtain and review financial statements or audits, verify the sources of funds or wealth, evaluate contributors or grantors, and conduct reference checks.

THE FOLLOWING CONSTITUTE BENEFICIAL OWNER AML RED FLAGS AND SHOULD BE IDENTIFIED AS RELATED TO ANY POTENTIAL OR RECURRING INVESTOR:

(1) TRUSTS; noting that assets placed in a trust may be paid out without justification of wealth or funds sourcing; (2) SHELL COMPANY; an entity that does not present with active business operations or assets; set up to achieve specific objectives; e.g., reducing tax liabilities or legal risks, or raising capital. Oftentimes used to launder money, circumvent sanctions, or hide beneficial ownership from law enforcement; (3) FRONT COMPANY; generally, a functioning company presenting with legitimate business characteristics, but serving to disguise and obscure illicit financial activity, including laundering funds (e.g., double or multiple invoicing as a form to repatriate offshore funds); (4) NON PROFITS/CHARITIES; noting that these may be cash driven organizations; (5) BEARER BONDS; noting that possession establishes ownership; or (6) BLOCKCHAIN TECHNOLOGY.

**Q:** WHAT SHOULD I DO IF, AS PART OF OUR SUBSCRIPTION DOCUMENTATION, AN INVESTOR SETS OUT A CAYMAN ISLANDS ENTITY? **A:** In AML Red Flag circumstances, we act and perform due diligence before any further relationship with an Investor inures to the Company. Our Due Diligence activities will include requesting all incorporation documents, bank statements, or recently filed business accounts, among other verification steps. In general, you can always ask for documentation as to a source of funds or wealth (i.e., confirming the source such as a sale of a house, the sale of shares, receipt of a personal injury award, a bequest from an estate or a win from gambling activities).

**Q:** AN INVESTOR WANTS TO INVEST IN BEARER BONDS OR CASH, WHAT SHOULD I DO? **A:** This is an AML Red Flag circumstances; our Investors may not invest with bearer bonds. Report this to our Compliance Function.

**Q:** I HAVE REVIEWED A POTENTIAL INVESTOR'S DOCUMENTATION AND IT IS NOT AS DETAILED AS REQUIRED, WHAT SHOULD I DO? **A:** There may be circumstances that may not present with AML Red Flags because some people do not retain detailed records; that is, slack documentation does not always mean that an AML Red Flag is afoot. Look at the totality of the circumstances and if there is any other information that makes you suspicious. Memorialize these facts and seek advice from Management.

## XX. CORE VALUE – WE PROHIBIT IMPROPER OR ILLEGAL INDUCEMENTS:

Everyone we encounter should be able to rely on us without concern that their or our independent judgment has been improperly influenced by improper or illegal incentives. Accordingly, it is never permissible to offer or provide anything that directly or indirectly benefits any Third Party, including any Referral Source, any of which is intended to secure business or a business advantage for our Company. Our general Compliance Mandate is that anything we may offer any Third Party must be pre-approved by our Compliance Function in conjunction with legal counsel approval.

Similarly, it is not acceptable to offer or provide anything of value as a "reward" for any past or existing Third

Exhibit 1, Page 137

Party relationship with our Company. Everyone at our Company must proactively manage Third Party relationships (including Investors, Referral Sources, Vendors, suppliers, marketers, distributors, consultants, or promoters) to ensure that, for example, services performed on our Company's behalf are consistent with our Policies and Laws.

We enter into and manage Third Party relationships mindfully and with due diligence. If we are the recipient of any Third Party relationship service, we only pay Fair Market Value and we always accurately document payments to Third Parties. If a Third Party Referral Source presents with any unethical or illegal circumstance, we will not do business with such Third Party. In short, we will only do business with a Referral Source which relationship meets all ethics, operations, and licensing matters germane to, or that governs, the Referral Source.

Nonetheless, our Company reimburses our Personnel for all pre-approved, reasonable, and necessary business expenses. Bona Fide business expenses are acceptable. These include legitimate expenses during the normal course of business. These expenses must be within reason and on par with general practices and local customs. If you are aware of any inappropriate expenditures that are being allocated, gifted, swapped, charged, invoiced, or billed to Company or regarding any Company business activity, this may constitute Misconduct and you must report it to Management.

A. GIFTS. The offering, giving or receiving of Gifts (see further guidance later in this Code) may be occasionally encountered in our operations. However, there is a fine line that should not be crossed, and it is not always easy to identify. While giving a Third Party Referral Source/referral business relationship a weeklong vacation to a tropical island (which Gift is not pre-approved by the Company) may constitute Misconduct, the offering, giving or receiving of other "Gifts" can also be a violation of our Code — or in some cases, Laws — and often, without our Personnel even realizing that they have committed a violation.

Our Policy at J&J, we do not directly or indirectly seek, accept, offer, promise, or give anything of value from or to any person or entity as a condition or result of doing business with our Company. Of course, Gifts in money or cash equivalent in any amount are prohibited in all circumstances. The occasional exchange of Gifts either of nominal value with employees of other organizations may be appropriate unless the recipient's employer forbids the practice. Remember, any courtesy you extend must comply with our Compliance Mandate and the policies of the recipient's organization. Anyone that we do business with should be informed of, and understand, our Policy as well.

A. J&J EMPLOYEE GIFTS. Our Company may provide a Gift reward or recognition (e.g., a Gift card or bonus) to an employee for exemplary service. Gifts provided to Personnel are considered taxable income and must be reported as such. Contact our HR Function for guidance.

B. VENDORS, SUPPLIERS, BROKERS, AGENTS. J&J employees may accept occasional, unsolicited, and reasonable business meals from actual or prospective suppliers of goods and services, agents, brokers, or other Third Parties (e.g., "Vendors") if the following requirements are met: (1) The Vendor or prospective Vendor providing the meal or entertainment attends the event with the Company employee; (2) The value of the meal or entertainment is modest as judged by local standards; (3) The venue is conducive to informational communication and includes or is contiguous to legitimate business discussions. Of course, the facts and circumstances relevant to the preceding must be transparently disclosed to Management and otherwise properly accounted for in our Official Records.

Q: MAY I ACCEPT A GIFT FROM A VENDOR/SUPPLIER? A: This depends on the nature and value of the Gift. If it is expensive or not considered modest, you may not accept the Gift. You must return the Gift to the Vendor explaining that the Company's policy does not permit expensive Gifts. If the amount of the Gift is modest and considered reasonable, it may be accepted. If the nature of the Gift permits (e.g., box of cookies), the best approach is to share it with your co-workers. Transparency is the key element in either circumstance. That is, notify Management and if you have further questions, contact the Compliance Function.

Q: WHAT SHOULD I DO IF I RECEIVE A GIFT THAT IS KNOW IS INAPPROPRIATE? A: Return the Gift with a polite explanation that J&J policy prohibits you from accepting such generosity noting that this circumstance may present with a Conflict of Interest otherwise prohibited. In some circumstances, other alternatives may be considered, such as displaying the Gift in a public area or donating it to a charity. In any case, you should consult with Management or use a Reporting Channel to inform the Compliance Function.

**NOTE:** Travel or lodging in connection with a meal or entertainment sponsored by a Vendor or prospective Vendor is strictly forbidden. The expenses for business meals and entertainment for any employee's spouse, partner, significant other, or any other guest of the employee are similarly not allowed.

C. POTENTIAL REFERRAL SOURCES AS MAY BE RELEVANT TO OUR OPERATIONS. Our Company is committed to following the highest ethical standards and complying with Laws. Any Gift or token of appreciation involving Third Parties who are in a position to (directly or indirectly) enter into any agreement with the Company or otherwise refer any business to the Company — must be undertaken in accordance with all Laws and our Policies.

Consistent with our Policies, and as approved by our Management or Compliance Function, J&J Personnel may conduct development, promotional, and other business meetings or conferences involving Third Parties to discuss J&J and its operations. Generally, any such setting should be conducive to effective transmission of knowledge. In appropriate circumstances, modest meals in connection with Compliance Function approved programs may be provided if same are subordinate in time and focus to the program and similarly, regarding reasonable travel and lodging matters.



We conservatively respect the fact that our Company's business interactions with Third Parties may involve the presentation of business information and that such exchanges may be productive and efficient when conducted in conjunction with meals. Accordingly, modest meals may be provided as an occasional business courtesy, but always subject to reporting to the Compliance Function, this Code's guidance on Gifts, and pursuant to Management's pre-approval.

**Q:** MAY WE PROVIDE A CATERED LUNCH DURING A MEETING WITH A MAJOR J&J THIRD PARTY RELATIONSHIP, e.g., A VENDOR? **A:** It is acceptable to provide lunch if offered consistent with the letter and spirit of our Gift policy and if it otherwise complies with the value guidelines for what is considered acceptable.

**Q:** MAY I TAKE A THIRD PARTY OUT FOR A BUSINESS MEAL? **A:** Generally, it is permissible to take a Third Party for a business meal. Always check with Management or the Compliance Function for policy requirements and monetary limits. If you have any question, you are expected to report under the Reporting Channels.

**Q:** MAY I ACCEPT A VENDOR'S LUNCH OFFER OR SOCIAL OUTING INVITATION? **A:** Personnel should decline even the smallest of Gifts. If declining would be perceived as impolite and may cause harm to a business relationship, you may accept the Gift subject to Company approval and in all cases you must nonetheless report same under our Reporting Channels.

**Q:** MAY I ACCEPT EXPENSE REIMBURSEMENT IF I SPEAK TO A GROUP OR AT A PROFESSIONAL MEETING? **A:** You should obtain pre-approval from your Manager for related engagement expenses. J&J policy requires that all Third Party relationships are treated fairly and impartially. Therefore, you may not accept anything from a Third Party relationship that could suggest even the appearance of favoritism or Improper Remuneration. Normally, it is inappropriate to accept payment of expenses from any Third Party to speak, for example, at conferences. On the other hand, it may be permissible to accept reimbursement for expenses from associations and professional groups because they are not Vendors and would not be using the speaking invitation to gain favorable treatment.

## XXI. CORE VALUE — WE PROHIBIT CONFLICT, IMPROPER, AND ILLEGAL REMUNERATION:

Our daily work decisions must be based on an impartial and objective assessment of each situation, without being influenced by Gifts that may have the effect of, directly or indirectly, impairing our Personnel's or any Third Party's independent judgment or worse, violate Laws.

Accordingly, J&J Personnel may not accept (or offer) any Gift that compromises (or might be perceived to compromise) our, our representative's, or a recipient's ability to make an objective and fair business decision or, in any case, that might otherwise be perceived by anyone as unfairly influencing a business transaction. The preceding standard applies whether or not the act is contrary to Laws.

Every Third Party with whom we interact (including existing or potential Investors, Third Parties, Vendors, or any Government representative) must make objective and impartial decisions without inappropriate interference.

Accordingly, in or through any business interaction with any Third Party and anywhere, it is our Core Value that J&J representatives may not offer, give or receive any conflicted, improper, or illegal remuneration.

In all business interactions we must use the following criteria to guide our judgment:

 If a gift, fee, loan, service, entertainment, favor, payment, commission, remuneration or, without limitation, any other thing of value (collectively, a "Gift") is received, provided or offered, directly or indirectly, in order to obtain favorable treatment or other improper advantage in a business transaction or germane to any referral of Investors, directly or indirectly applicable to Company or any Third Party, then it is deemed under our Compliance Program to be conflict, improper or illegal remuneration (collectively, "Improper Remuneration"). J&J has a zero-tolerance policy against offering, providing, or accepting Improper Remuneration.

**NOTE:** Our Compliance Mandate deems a "commission" to constitute a Gift. If unapproved by the Company, any such commission is deemed to be Improper Remuneration and is strictly prohibited. Discuss this matter with our Compliance Function.

 GUIDANCE ON THE USE OF COMPANY ASSETS (INCLUDING COMPANY REVENUE/FUNDS) FOR BUSINESS GIFTS TO NON-REFERRAL SOURCES. Gifts may be extended to Non-Referral Source Third Parties on Company expense provided that such Gift strictly complies with the following criteria, that the Gift is: (1) reasonable and not excessive, in nature, frequency or value; (2) made in connection with the conduct of legitimate business or other Company activity; (3) in accordance with all Laws, customary business practice in the governing jurisdiction of both the Company and the Referral Source and in addition consistent with all ethics, operations, and licensing matters germane to or that governs the Referral Source, and Company's Policies; (4) properly pre-authorized and properly reported and recorded; and (5) would not embarrass the Company should the Gift be made public or in any case be construed as Improper Remuneration; (6) does not involve the giving of cash or cash equivalents such (e.g., gift certificates).

GUIDANCE ON THE USE OF COMPANY ASSETS (INCLUDING COMPANY REVENUE/FUNDS) FOR BUSINESS GIFTS TO POTENTIAL REFERRAL SOURCES. Gifts may be extended to potential Referral Sources on Company expense provided that the value of the Gift is otherwise consistent with all Laws, customary business practices, and Company's Policies. Any Gift cost germane to Referral Sources must be reported and strictly accounted for in Company's accounting, financial, and other Official Records. Any Gift to a potential Referral Source must be pre-approved by the Compliance Function.

**NOTE:** (1) cash or cash equivalents such (e.g., gift certificates) to Referral Sources are prohibited under all circumstances; (2) non-cash Gifts to Referral Sources are prohibited unless approved by the Compliance Function; (3) Gifts to Referral Sources may only be made in connection with the conduct of legitimate business or other activities for or on behalf of the Company; (4) Gifts to Referral Sources must be in accordance with Laws, customary business practices, J&J's Policies, and in addition, all Laws or regulatory standards governing the Referral Source/consistent with all ethics, operations, and licensing matters germane to, or that governs, the Referral Source.

GUIDANCE ON THE USE OF COMPANY ASSETS (INCLUDING COMPANY REVENUE/FUNDS) FOR BUSINESS GIFTS TO OR FROM GOVERNMENT REPRESENTATIVES. (1) J&J Personnel may not offer any Gift — no matter how small the value — to any Government representative in the course of conducting J&J business; and (B) except as otherwise approved by Company's Management, the Company will make no corporate political contributions (even where such contributions may be legal) but encourages Personnel to participate in community affairs and to exercise citizenship responsibilities.

**NOTE:** In addition to the preceding guidance, always consider the following questions and seek guidance from our Compliance Function if your action or response is not clear: (1) Is this interaction with a Government representative? (2) Is the benefit of minimal or token value, does it occur infrequently? (3) Does any exchange impose or create any perception of obligation on either party? (4) Does the exchange create obligation or embarrassment

Exhibit 1, Page 140

on the giver or recipient? (6) Is the exchange common to business relationships? (7) Will it stand up to any public scrutiny?

## XXII. CORE VALUE – WE COMPLY WITH THE FTC IN THE MARKETPLACE:

To the extent that we communicate in the marketplace and provide Third Parties Company Information and materials, we recognize that SEC and consumer protection laws apply, for example, to in person or online operations. We understand that the internet sphere is never static, accordingly, we conduct our communications in appreciation of emerging online or technology developments and always in compliance with Laws. In short, we understand that SEC and consumer protection Laws apply to all mediums, including online platforms like social media. And we always remember that prohibitions on "unfair or deceptive acts or practices" includes online communications, but moreover, extends to all marketing and sales activity.

Accordingly, whether online or otherwise, our marketing and sales Core Value is that our Company will act consistent with all Laws. This means that we compete in the marketplace free of deception and unfair practices. We do not communicate in a manner that confuses Third Parties, including Investors. For these reasons, our Company will only publish truthful communications and incorporate such disclosures, qualifiers, and limitations ("Disclosures") that may be required or advisable. All Disclosures will be "Clear and Conspicuous."

Generally, we do not "bury" Disclosures. We prominently display our Disclosures so that they become unavoidable, including paying attention to the size, font, color, and relative relationship to the communication generally – that is, we review the communication as a whole and determine whether the Disclosure is sufficiently effective in consideration of other communications components, like text type and size, links, sounds or graphics, among others, and any of which may serve as a detractor to any Third Party.

A. "CLEAR AND CONSPICUOUS." To be Clear and Conspicuous, we are mindful that our Disclosures be consistently placed in proximity to 'triggering' express or implied claims (we do not hide or minimize our Disclosures).

 WE CONSIDER THESE FACTORS: (1) Disclosures to an express or implied claim will be presented in proximity to the claim; (2) the Disclosure will be prominent and unavoidable; (3) whether any part of our communication is deficient considering the communication as a whole and whether the communication distracts from any Disclosure; (4) whether a Disclosure should be repeated in a communication and duplicated in other locations of our online or other presence; and (5) whether our Disclosures are adequately understood by the intended recipient; e.g., is the Disclosure of such low volume or presented as such a speed so as to lessen its intended impact on the listener.

 **NOTE:** A Disclosure cannot "cure" a false express or implied claim. It can be used to clarify, but not contradict a claim in a communication.

 FOR A DISCLOSURE TO BE CLEAR AND CONSPICIOUS IN A COMMUNCATION IT MEANS THAT: (1) we physically place the Disclosure close to the triggering claim; (2) we understand how varied platforms or devices utilized by consumers may work against our Disclosures; and (3) if a Disclosure is ever space-constrained, we will seek expert and legal advice germane to the propriety of linking such Disclosure to a separate communication, if any — noting that in such circumstances when we use a hyperlink to a Disclosure, the link shall be obvious and consistent with the Clear and Conspicuous standard.

 **NOTE:** A Third Party should never have to search or scroll to access Disclosures. When scrolling is unavoidable, we will consult with legal experts and we will use visual or textual cues to direct and encourage the reader to find Disclosures. As part of our effort, we will seek to be informed regarding such behavior and technology matters relevant to consumer access and utilization; for example, where does the consumer's attention get drawn to and what do consumers tend to ignore.

If a Disclosure is necessary for a communication to be fair, not deceptive, and consistent with Laws and it is impossible to make a Disclosure "Clear and Conspicuous," then we will not publish the communication and will not allow a Third Party to do so on our behalf. If a communication platform or

medium is not conducive to "Clear and Conspicuous" Disclosures, then we will not use that platform or medium.

We take our communications Disclosure duties as paramount to our operations. We know that Clear and Conspicuous Disclosures in our communications benefit Third Parties including our Investors. Meeting these standards bolsters confidence, benefits our Company, and keeps us compliant with Laws.

B. "TESTIMONIALS AND ENDORSEMENTS." The FTC Act regulates endorsements (e.g., generally industry experts) and testimonials (e.g., generally Third Parties) in any platform or medium through which we communicate. In all contexts, we are subject to liability for: (1) false or unsubstantiated claims made through T&E's, or (2) failing to disclose "Material Connections." If we have a "Material Connection" to the source of any T&E communication — whether such T&E was created (a) by Personnel, or (b) any Third Party, and by whomever or however communicated — such communication will disclose the Material Connection consistent with Laws and our Code and we will ensure that the relevant individual or entity endorser likewise complies. These standards apply to any person which may communicate any aspect of our operations to a Third Party, but nonetheless, may never otherwise violate Laws (including as germane to the provision of any investment or financial advice, which is strictly prohibited).

NOTE: When a significant minority of Third Parties do not understand a Material Connection between J&J and any person that communicates with such Third Party in any direct or indirect way, a Clear and Conspicuous Disclosure must be implemented. It is crucial to remind everyone that no one except our Company officers may in any way communicate with Investors and that we do not and will never act or otherwise serve as investment or financial counselors for anyone. If a Third Party so communicates in violation of our Core Values, it shall be deemed to be contrary to Laws and it must be reported.

NOTE: Remuneration can take many forms. It can be in the form of any Gift or other benefit, including, privileges, special access, prizes, or any other type of "freebie."

## XXIII. CORE VALUE — WE PROMOTE FAIR TRADE AND ENTERPRISE:

In the course of our business operations, we maintain a level playing field. This means that we promote principles of fair and open marketplace dealings and communications. We know that any unfair advantage in our business operations translates to negative disruptions to competition and lead to negative consequences, for example, to our reputation.

Accordingly, it our policy that business decisions — including determining prices, pricing policies, terms, the markets or lines of business to compete in and the Vendors, supplies or any Third Party with whom J&J does business — be made on an independent basis, considering all relevant factors, including the Company's costs and profit objectives, prevailing market conditions, competitive prices and other relevant factors and information, and always in compliance with all Laws.

We will not: (A) enter into agreements or other understandings with industry competitors to fix terms of services or prices; (B) boycott any Third Party; (C) disparage our competitors or misrepresent the value or correctness of their services or products; or (D) trade or allocate territories or Investors or engage in other activities that that anticompetitive or involve exclusive dealing.

Q: AM I ALLOWED TO GATHER INFORMATION ABOUT THE MARKETPLACE, FOR EXAMPLE, ABOUT OUR COMPETITORS AND THEIR PRODUCTS, SERVICES OR TRANSACTIONS? A: Yes; but we note that there are ethical limits that you must not cross when Transacting in any Third Party Information, especially about (or potentially belonging to) a competitor. Act consistent with the following guidance:



(1) it is ok to gather information from public sources; i.e., published articles, advertisements, brochures, other non-proprietary/non-confidential materials, surveys by consultants and conversations with Third Parties, but not if such survey, conversation or activity is likely to suggest at all or to anyone that we are attempting to (a) conspire with our competitors, using for example a Third Party as an intermediary, or (b) gather information in breach of a Third Party's nondisclosure agreement with a competitor or through other wrongful means; or (c) elicit any Confidential, Proprietary or other Third Party Information that, if we become a holder of,

violates any Third Party's pecuniary, beneficial or other proprietary right under Laws or as otherwise contrary to our Code or Policies. If you ever improperly come across information about a competitor or regarding any Third Party or Referral Source contrary to the preceding or Laws/Code of Ethics, you must use a Reporting Channel and identify any source of such information; (2) we will not acquire a Third Party's or a competitor's confidential, trade secret or other proprietary information through unlawful means (e.g., theft, spying, bribery) or breach of a Third Party's or competitor's rights under a nondisclosure agreement with any person or entity; (3) If you have any inkling that information you are being offered was not lawfully received by the party in possession, you must refuse to accept it. If you receive any competitive information anonymously or that is marked "confidential," do not review it. Use a Reporting Channel to visit with our Compliance Function immediately. The improper receipt or use of a Third Party's competitive information could subject the Company, and you individually, to criminal and civil liability. When in doubt, speak up.

## XXIV. CORE VALUE — WE ARE ACCOUNTABLE FOR VIOLATIONS OR MISCONDUCT:

Consistent with your acknowledgment to this Code, you are expected to read, understand, and abide with the Code, our Core Values, Laws, HR Policies, Company's Compliance Program, and all other Company Policies. Accordingly, any claims of ignorance, good intentions, or poor judgment will never constitute an excuse for non-compliance.



CORRECTIVE ACTION RELATED TO ANY NON-COMPLIANCE (OR MISCONDUCT) MAY INCLUDE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION AND LEGAL ACTION FOR:

(A) Authorization of, or participation in, any violation of our Compliance Mandate or any Misconduct; (B) Improper refusal to cooperate in any Laws, Code or Policy violation or Misconduct investigation; (C) Failure by a violator's Manager to detect or report a violation or Misconduct (e.g., in cases of inadequate supervision on the part of the Manager); (D) Reporting a matter that is knowingly false or intended to, without limitation, intimidate or retaliate against anyone; (E) Any instance of retaliation — including by intimidating, threatening, harassing or maligning any person who has in good faith reported a concern or complaint, or a Code, Laws or policy violation, or any Misconduct.



PLEASE REMEMBER THAT:



COMPLIANCE IS EVERYONE'S RESPONSIBILITY.



THE CODE OF ETHICS IS JUST ONE OF THE COMPLIANCE RESOURCES AVAILABLE TO YOU.



IF YOU HAVE ANY QUESTION (OR ARE UNSURE ABOUT ANY CORE VALUE OR ANY OTHER POLICY) CONTACT YOUR MANAGER OR OUR COMPLIANCE FUNCTION, HR FUNCTION, OR COMPLIANCE EMAIL OR THE COMPANY'S PRESIDENT.

Exhibit 1, Page 144

## RESOURCES

I.   CONTACT INFORMATION:

A.   MANAGER — The best place to start if you have questions on how our Code applies to you is with your immediate Manager.

B.   COMPLIANCE FUNCTION - The Compliance Function is a corporate resource available to address your questions or concerns about our Company's Core Values and standards of conduct: (1) Email any compliance related question or concern to our Compliance Email.

II.   OTHER RESOURCES:

Policies - Refer to our all our Policies including the HR Policies and any stand-alone Policies.

Employment related questions - Contact Company's Human Resources Function for concerns involving employment conditions, Management and/or other Personnel.

III.   GLOSSARY:

"Access" means to appropriately or with permission obtain, examine or retrieve data or information or the ability or the means necessary to Transact, without limitation, CDIS, CDI, Official Records, Confidential Information, or Company Information.

"Access Control" means control of (or restrictions to) Access of the means necessary to obtain, examine or retrieve data or information or Transact, without limitation, CDIS, CDI, Official Records, Confidential Information, or Company Information.

"Assessment(s)" means the evaluation or estimation of the nature, quality, or ability of Company Personnel and their provision of service to the Company as periodically and regularly documented. An Assessment is meant to review Personnel performance pursuant to consistent standards for such Assessments. Adherence to Policies, Laws and any other regulatory requirement constitute some of the measures of Assessments. "Security Assessment(s)" means and relate to the evaluation and estimation of the nature and quality of the Company's Policies and security or privacy standards and controls all of which are measured to establish that same are correctly implemented and as implemented, are effective. "Risk Assessment(s)" means and relates to the identification, evaluation and estimation of the nature and quality of risks that the Company may face in relation to its Laws compliance, Policies and other compliance related matters. Assessments and Security Assessments/Risk Assessments/Risk Analyses are overseen, documented and respectively managed under the Company's Performance Management Program and its Compliance Function.

"Assets" include Intangible Assets like "Company Information" (whether in physical, electronic, or other form, including CDI) and Good Will and the Physical Assets that we use in our operations and, without limitation, Company's Facilities and CDIS.

"Code" or "Code of Ethics" means the Company's Code of Ethics and Business Conduct.

"Compliance Certification" means such Company Personnel or any Third Party acknowledgment, certification, or other memorialization of compliance, without limitation, germane to the Code of Ethics, HR Policies, Policies, or Laws. Examples include, without limitation, Personnel training attendance acknowledgments, compliance warranties and certifications, conflict of interest forms, Code of Ethics acknowledgment.

"Company Data and Information Systems" ("CDIS") means, without limitation, all Company computing, communication and information technology Assets and Company's equipment, devices, computers, systems, servers, networks, Software, Hardware, websites, databases, smartphones, tablets, computer systems, computing resources, resources, databases, voice mail resources, messaging resources, hard drives, removable

media, thumb drives, external hard drives, intranet resources, internet, or any other data, information, or communication Asset or system (and including the means to Access CIDS, e.g., passwords and other Access authentication requirements). CDIS is a Company Asset.

"Company Data and Information" ("CDI") means all external or internal/physical or electronic data/information, including without limitation, files, documents, e-mails, communications, memoranda, messages or transmissions of data/information of any kind or any other aggregation of data or information including Confidential information, Official Record, Intellectual Property, Proprietary Information, Company Information, Know How and Trade Secrets, whether Transacted directly or indirectly by, from, or through CDIS or otherwise Transacted by Company Personnel or, as relevant to Company, germane to (or by) any Third Party. CDI is a Company Asset (and in most cases) constitutes a Company Official Record.

"Company Information" includes Confidential Information, Proprietary Information, Company Data & Information ("CDI"), Intellectual Property, Trade Secrets, Official Records, and Know How.

"Confidential Information" means (in addition) information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to our Personnel or others, and information developed or learned by our Personnel, contractors, or others, during the course of their association with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company and markets therefor, business relationships (including, but not limited to, Investors or business relations of the Company with which our Personnel, contractors or others have contact with or otherwise become aware of, developments, processes, formulas, technology, designs, drawings, Hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company Assets. Notwithstanding the foregoing, Company Confidential Information will not include any such information which (1) was publicly known or made generally available prior to the time of disclosure by Company; (2) becomes publicly known or made generally available after disclosure by Company through no wrongful action or omission by our Personnel, contractors or others; or (3) is in our Personnel, contractors or others' rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by then-contemporaneous written records.

"Facility" or "Facilities" means any real property (including all offices, operations facilities, buildings, fixtures or other improvements located thereon) now or in the future owned, leased, supervised, operated or used by the Company or any of its affiliates wherein (or germane to) the Company or its Personnel conducts any business or operations. Broadly in relation to any of our Company operations, "Facility" includes in relation to Company, without limitation, all Workstations (e.g., desks and cubicles) offices, reception areas, waiting rooms, hallways, and any other discrete physical location within the Facility.

"Government" means any international, domestic, federal, national, state, county or municipal or other local government, any subdivision, department, office, service, agency, commission, or authority thereof including the judiciary, or any quasi-governmental body exercising any regulatory authority or any other authority exercising authority over Laws, whether civil or criminal.

"HR Function" means any and all Company Personnel or external individuals or entities responsible for the

development, maintenance, support and other business operational aspects germane to Human Resources and employment matters within or for the Company and will (as contextually relevant) include the HR Function's, without limitation, HR Policies, Personnel/Human Resources Files, Performance Management Program, and CDIS/CDI.

"Intellectual Property" means (1) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (2) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (3) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (4) all mask works and all applications, registrations, and renewals in connection therewith, (5) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, techniques, technical data, specifications, business relationships lists and information, pricing and cost information, and business and marketing plans and proposals), (6) all CDI (including data and related documentation), (7) all other proprietary rights, and (8) all copies and tangible embodiments thereof (in whatever form or medium).

"Inquiry" as consistent with Company Code of Ethics, means any Government, without limitation, inquiry, investigation, demand, visit, subpoena, civil investigative demand, or audit any of which may consist of requests of information or any examination of any aspect of Company's operations, CDIS, CDI, Company Information or Official Records.

"IT Function" means any Personnel individuals (or as may be relevant external Vendor) responsible for the development, maintenance, support and other function related to "Information Technology" (including CDIS and CDI) within or relevant to the Company.

"Know How" means all Company technical information, know-how and data, discoveries, trade secrets, specifications, instructions, processes, formulae, materials, expertise and other technology applicable to Company's operations.

"Laws" means all applicable international, supranational, nation state, and United States federal, state, local, or municipal law including as to each of the preceding their common law, constitutions, statutes, codes, treaties, proclamations, judicial precedents, judicial authorities, regulatory policies, judgments, settlements, conventions, directives, requirements, writs, orders or consents, regulations, rules, injunctions, decrees or awards that are or have been issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Government, including their interpretation or administration by any Government agency, including courts, charged with their enforcement, interpretation or administration and all applicable administrative or judicial orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Government.

"Malware" is the contraction for "malicious software" and generally consists of computing code or programs designed to damage computing systems (like Company's CDIS) noting that the term Malware will refer to and consists of (among other things) viruses, worms, trojan horses, ransomware attacks, system intrusions, and spyware.

"Management" means the Company's executive managers including as relevant, any Company officer.

"Manager" means such supervisor/manager level Personnel tasked with the responsibility for the Personnel assigned to work under their oversight, training and management, and to whom such Personnel report.

"Misconduct" means any violation or potential violation of any Laws, or any Company Policy, whether stand

alone or as may be found in the Company HR Policies, Code of Ethics or otherwise, or any other type of improper or unprofessional behavior.

"Official Record" means, without limitation, all Company Information whether relating to Company's operations, Assets, or business matters and includes all data, information, books, files, and records of the Company, including Facility, corporate and operating records, correspondence, tax returns, and logs and other records and whether consisting of paper or electronic format and whether it is CDI or Transacted in CIDS.

"Personnel" means our workers and workforce and includes Management and all Company executives, Managers, officers, agents, employees, volunteers, trainees, and other persons whose conduct in the performance of work for Company is under the direct control of the Company. The term Personnel will be deemed to include any contractor that provides services to the Company. Instances in this Code of Ethics of either "worker" or "employee" will be deemed to mean "Personnel."

"Proprietary Information" means all Company Information or Official Record developed or acquired by the Company or any of its affiliates that has not been specifically authorized to be disclosed including, but not limited to, the following items and information relating to the following items: (1) all Intellectual Property and proprietary rights of the Company (including, without limitation, the Intellectual Property), (2) CDIS processing systems and techniques, inputs and outputs (regardless of the media on which stored or located) and Hardware and Software configurations, designs, architecture and interfaces, (3) business research, studies, procedures and costs, (4) financial data, (5) operations methods, (6) marketing data, methods, plans and efforts, (7) the identities of actual and prospective Third Party business relationships, (8) the terms of contracts and agreements with, the needs and requirements of, and the Company's or its affiliates' course of dealing with, actual or prospective operational relationships, (9) Personnel information, (10) Vendor Third Party information, and (11) information received from Third Parties subject to obligations of non-disclosure or non-use. Failure by the Company or its affiliates to mark any Proprietary Information as confidential or proprietary will not affect its status as Proprietary Information.

"Process" means any legal or judicial action, appeal, document instrument or other writing issued, filed or recorded to pursue a claim against person or property, exercise jurisdiction, enforce a judgment, fine a person, put a lien on property, authorize a search and seizure, arrest a person, incarcerate a person or direct a person to appear, perform or refrain from performing a specified act and without limitation includes a complaint, decree, demand, discovery request, indictment, injunction, judgment, lien, motion, notice, order, petition, pleading, sentence, subpoena, summons, warrant or writ.

"Program" means the Company Corporate Compliance Program and all Program constituent components, Policies and procedures, standards, and guidance.

"Referral Source" means any Third Party individual or entity that refers any business to the Company, either directly or through such Referral Source's employees or agents and includes when a Referral Source is an Investor or otherwise directly or indirectly affiliated with an Investor, or as may be germane to any Third Party Beneficiary Insurance Settlement Agreement, or any of which may relate to the Company's operations.

"Security Awareness" means and refers to the knowledge, training, attitude, conscientiousness, and effort the Company's Personnel put forth regarding the protection of Company Assets, CDIS, CDI, Confidential Information and Company Information. The Company requires Security Awareness training and reinforcement for all Personnel. Security Awareness (Assessments) are overseen, memorialized and managed under the Company's Performance Management Program.

"Software" means a set of instructions/computing language that directs a computer/Hardware to perform tasks and includes, without limitation, the following terms: computer software, applications, utilities, operating

systems, courseware, shareware, and other computer language products or services. Software is an included component of CDIS.

"Third Party" means any outside person or entity and includes as germane to Company: Investors, consultants, agents, independent contractors, Vendors, suppliers, business relationships, partners, and affiliates. This definition will include as contextually relevant, any Government agency, department, commission, association or other pertinent governing, body having direct or indirect authority over the Company or its operations. Any Third Party's data or information may be referred to as "Third Party Information." Third Party Information will (as contextually relevant) include its Confidential Information.

"Trade Secrets" means any and all information, including a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. By way of illustration but not limitation, "Trade Secrets" includes without limitation information regarding plans for research, development, current and new services or products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, production and as appropriate, Confidential Information, Third Party Information, Intellectual Property and Know How.

"Transacts" or to "Transact" or (and contextually, "Transacted/Transaction") means: access, accesses, accessed, administer, administers, administered, analyze, analyses, analyzed, collect, collects, collected, compile, compiles, compiled, compose, composes, composed, create, creates, created, creation, disclosure, disclose, discloses, disclosed, deliver, delivers, delivered, edit, edits, edited, modify, modifies, modified, process, processes, processed, read, revise, revises, reviews, reviewed, send, sends, sent, store, storing, stores, transmit, transmits, transmitted, use, uses, used, using, utilize, utilized, or utilized.

"User" means any Company Personnel, and as relevant, without limitation, independent contractors, temporary workers, consultants, agents, and Vendors who directly or indirectly Transact CDIS or CDI.

"Vendor" means any person or entity that provides or facilitates the direct or indirect provision (or that seeks to enter into a relationship with the Company regarding same) to Company of any service or product germane to which Vendor, without limitation, may be a dealer, distributor, seller, merchant or other type of supplier of services or products.

"Workstation(s)" means generally any identifiable portion of any Facility or otherwise where Company's Personnel perform any duty or responsibility germane to Company's business/operations (e.g., desk, cubicle, work area); Workstation will also refer to CDIS equipment/devices located at Workstations or elsewhere or that are used directly or indirectly by Personnel to fulfill their Duties and Responsibilities

# CODE OF ETHICS AND BUSINESS CONDUCT

## COMPLIANCE CERTIFICATION

## ACKNOWLEDGMENT

I ACKNOWLEDGE AND CERTIFY BY MY SIGNATURE BELOW THAT:

I HAVE BEEN PROVIDED A COPY OF J AND J PURCHASING, LLC'S ("J&J" OR "COMPANY") CODE OF ETHICS AND BUSINESS CONDUCT (THE "CODE").

IT IS MY RESPONSIBILITY TO FULLY READ, UNDERSTAND, AND COMPLY WITH: (A) THE CODE AND ITS POLICIES, GUIDANCE, AND STANDARDS (OUR "CORE VALUES"), AND (B) ALL OTHER J&J POLICIES, PROCEDURES, STANDARDS, GUIDELINES, AND DIRECTIVES (COLLECTIVELY, IN THIS CODE AND AS MAY BE FOUND ELSEWHERE, OUR "POLICIES").

I WILL AT ALL TIMES ACT IN ACCORDANCE WITH ALL FEDERAL, STATE, LOCAL AND APPLICABLE INTERNATIONAL AND FOREIGN NATION LAWS, STATUTES, RULES, AND REGULATIONS (COLLECTIVELY, IN THIS CODE AND ELSEWHERE, "LAWS").

I HAVE A CONTINUING OBLIGATION TO IMMEDIATELY REPORT ANY ACTUAL OR SUSPECTED CODE, LAWS, OR POLICY VIOLATION OR ANY MISCONDUCT TO MY MANAGER OR THE COMPANY'S MANAGEMENT, HR FUNCTION, COMPLIANCE FUNCTION, AND/OR THROUGH THE COMPLIANCE EMAIL.

MY VIOLATION OF THE CODE, LAWS, OR POLICIES MAY RESULT IN CORRECTIVE ACTION UP TO, AND INCLUDING, IMMEDIATE TERMINATION OF EMPLOYMENT OR ASSOCIATION TO COMPANY.

THE CODE AND POLICIES MAY BE REVISED AT ANY TIME AND, IN SUCH A CASE, THE COMPANY WILL NOTIFY ME AND PROVIDE ME WITH A REVISED CODE AND POLICIES.

ONLY A DULY AUTHORIZED COMPANY REPRESENTATIVE MAY ISSUE ANY REVISION OF THE CODE, OUR CORE VALUES, OR OUR POLICIES.

_____

PRINTED NAME

_____

SIGNATURE

_____, 202 _

DATE SIGNED

# EXHIBIT D
# INVESTOR QUESTIONNAIRE

# J AND J PURCHASING, LLC
# CONFIDENTIAL INVESTOR QUESTIONNAIRE

IN CONNECTION WITH THE PROPOSED ISSUANCE BY **J AND J PURCHASING, LLC** OF UP TO FIVE (5) PARTIAL BENEFICIAL INTERESTS THAT WILL BE HELD BY INVESTOR GERMANE TO COMPANY'S PURCHASE(S) OF INSURANCE SETTLEMENT AGREEMENTS UNDER A PURCHASE CONTRACT BETWEEN COMPANY AND CERTAIN THIRD-PARTY INSURANCE SETTLEMENT AGREEMENT BENEFICIARIES, IN **MINIMUM AMOUNTS AND IN INCREMENTS OF EITHER $80,000.00 OR $100,000.00** (THE "***INSURANCE SETTLEMENT AGREEMENT PURCHASE AMOUNT(S)***"), IN A TRANSACTION INTENDED TO QUALIFY UNDER SECTION 4(2) OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"), AND RULE 506 OF REGULATION D PROMULGATED HEREUNDER, AS AN OFFERING OF SECURITIES EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, THE SUBSCRIBER PROVIDES THE COMPANY WITH THE INFORMATION SET FORTH BELOW AND CERTIFIES THAT SAME IS ACCURATE IN ALL RESPECT.

SUBSCRIBER UNDERSTANDS THAT COMPANY WILL FULLY RELY ON THE INFORMATION FURNISHED BY SUBSCRIBER AND THAT COMPANY WILL EITHER: (A) NOT DO ANY INDEPENDENT INVESTIGATION TO VERIFY OR FALSIFY ANY PROVIDED INFORMATION; OR (B) PROCEED TO SEEK ADDITIONAL INFORMATION AND CERTIFICATIONS FROM SUBSCRIBER CONSISTENT WITH COMPANY'S COMPLIANCE PROGRAM, CODE OF ETHICS AND BUSINESS CONDUCT, AND ITS POLICIES AND PROCEDURES.

The Subscriber represents that the information presented herein and in the Subscription Agreement is complete, true, and accurate as of the date indicated and the Subscriber agrees to notify the Company immediately of any change in any such information that occurs prior to (or during or after) any investment under this offering.

The information disclosed below shall be held as **strictly confidential by the Company** under our compliance program/code of ethics and business conduct and will not be disclosed to any person except to the Company's President, the Investor, their respective counsel, or such other party as the President deems appropriate to establish, among others, the availability of an exemption from registration of the **Partial Beneficial Interests** under the Securities Act and applicable state securities and other laws.

ALL ITEMS MUST BE FULLY COMPLETED

1. FULL NAME OF THE SUBSCRIBER: _____. I VERIFY THAT THE PHOTOCOPY OF THE STATE OR FEDERALLY ISSUED IDENTIFICATION THAT I SUBMIT WITH THIS QUESTIONAIRE CONSTITUTES A TRUE AND CORRECT COPY OF SAME.

| | |
|---|---|
| I AM A RESIDENT OF: | |
| ADDRESS: | |
| BANK OR FINANCIAL INSTITUTION – SOURCING OF FUNDS FOR INVESTMENT – NAME: | |
| BANK OR FINANCIAL INSTITUTION – SOURCING OF FUNDS FOR INVESTMENT – ADDRESS: | |

2.  PLEASE INDICATE WHETHER YOU QUALIFY AS AN **ACCREDITED INVESTOR** BY INITIALING AT LEAST ONE OF THE FOLLOWING TESTS (IF NONE APPLIES, PLEASE CONSULT THE COMPANY):

| INITIALS | TESTS |
|---|---|
|  | YOU ARE A NATURAL PERSON AND HAVE HAD AN INDIVIDUAL ANNUAL ADJUSTED GROSS INCOME[1] IN EXCESS OF $200,000 FOR EACH OF THE TWO MOST RECENT YEARS OR JOINT INCOME WITH YOUR SPOUSE IN EXCESS OF $300,000 IN EACH OF THOSE YEARS AND REASONABLY EXPECT THE SAME INCOME LEVEL FOR THE CURRENT YEAR. |
|  | YOU ARE A NATURAL PERSON WHOSE INDIVIDUAL NET WORTH[2] OR JOINT NET WORTH WITH YOUR SPOUSE, AS OF THE DATE HEREOF EXCEEDS $1,000,000 (INCLUSIVE OF THE VALUE OF HOME FURNISHINGS AND AUTOMOBILES BUT EXCLUDING THE VALUE OF YOUR PRIMARY RESIDENCE). |
|  | YOU ARE AN EMPLOYEE BENEFIT PLAN WITHIN THE MEANING OF TITLE I OF THE UNITED STATES EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), WHERE THE INVESTMENT DECISION IS MADE BY A PLAN FIDUCIARY (AS DEFINED IN SECTION 3(21) OF ERISA) WHICH IS EITHER A BANK, SAVINGS AND LOAN ASSOCIATION, INSURANCE COMPANY, OR REGISTERED INVESTMENT ADVISER, OR WHERE THE EMPLOYEE BENEFIT PLAN HAS TOTAL ASSETS IN EXCESS OF $5,000,000, OR, IF A SELF-DIRECTED PLAN, WHERE INVESTMENT DECISIONS ARE MADE SOLELY BY PERSONS THAT ARE ACCREDITED INVESTORS. |
|  | YOU ARE AN ORGANIZATION DESCRIBED IN SECTION 501(C)(3) OF THE US INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), A CORPORATION, A MASSACHUSETTS OR SIMILAR BUSINESS TRUST, OR A COMPANY, NOT FORMED FOR THE SPECIFIC PURPOSE OF ACQUIRING THE SECURITIES OFFERED, WITH TOTAL ASSETS OF AT LEAST $5,000,000. |
|  | YOU ARE A TRUST WITH TOTAL ASSETS IN EXCESS OF $5,000,000, NOT FORMED FOR THE SPECIFIC PURPOSE OF ACQUIRING THE SECURITIES OFFERED, WHOSE PURCHASE IS DIRECTED BY A SOPHISTICATED PERSON AS DESCRIBED IN RULE 506(B)(2)(II) UNDER THE SECURITIES ACT. |
|  | YOU ARE A COMPANY, CORPORATION, OR OTHER ENTITY IN WHICH ALL EQUITY OWNERS THEREOF INDIVIDUALLY QUALIFY AS ACCREDITED INVESTORS. |
|  | YOU ARE NOT AN ACCREDITED INVESTOR. |

3.  TAX INFORMATION.

| | |
|---|---|
| U.S. SOCIAL SECURITY NUMBER/FEDERAL TAX I.D. NUMBER: | |
| STATE TAX IDENTIFICATION NUMBER (IF ANY): | |
| IDENTIFY WHICH FORM(S) YOU FILE WITH THE UNITED STATES INTERNAL REVENUE SERVICE FOR UNITED STATES | |

---

[1]  "Annual adjusted gross income" means "adjusted gross income" as reported for income tax purposes, less any income attributable to a spouse or to property owned by a spouse and increased by the following amounts (but not including any portion of such amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any tax-exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited Company; (iii) any deduction claimed for depreciation; and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

[2]  Net worth for this purpose means your total assets (excluding the value of your principal residence) subtracted by total liabilities (excluding the amount of indebtedness secured by your primary residence up to the value of your primary residence (except that if the amount of indebtedness secured by your primary residence at the time exceeds the amount of such indebtedness 60 days ago, other than as a result of the acquisition of your primary residence, the amount of such excess shall be included in total liabilities)). Indebtedness secured by your primary residence in excess of the value of your primary residence will be deducted from the determination of your net worth.

| FEDERAL INCOME TAX PURPOSES (E.G., 1040, 1065, 1120, 5500, 990): | |
|---|---|
| PLEASE INDICATE WHETHER YOU ARE TREATED FOR UNITED STATES FEDERAL INCOME TAX PURPOSES AS (CHECK ONE): | AN INDIVIDUAL |
| | A TRUST |
| | A COMPANY |
| | AN S CORPORATION |
| | A CORPORATION |
| | OTHER; PLEASE SPECIFY |

| ARE YOU A TAX-EXEMPT ENTITY? | ( ) YES | ( ) NO |
|---|---|---|

| IF YOU ARE A TAX-EXEMPT ENTITY PURSUANT TO THE IRS CODE, PLEASE SPECIFY THE SECTION OF THE CODE THAT EXEMPTS YOU BELOW AND ATTACH A COPY OF THE DETERMINATION LETTER OR PRIVATE LETTER RULING FROM THE US INTERNAL REVENUE SERVICE CONFIRMING SUCH EXEMPTION. | EXEMPTED UNDER SECTION: |
|---|---|

4. ENTITY DUE DILIGENCE INFORMATION:

| FULL LEGAL NAME OF ANY ENTITY DISCLOSED: | | | |
|---|---|---|---|
| ENTITY REGISTERED AGENT – ADDRESS: | | | |
| DATE OF INCORPORATION: | | | |
| STATE OF INCORPORATION: | | | |
| MAIN LINE OF BUSINESS: | | | |
| PRINCIPAL PLACE OF BUSINESS – ADDRESS: | | | |
| PHONE/FAX OF PRINCIPAL PLACE OF BUSINESS: | | | |
| PERCENTAGE OWNED BY INVESTOR/SUBSCRIBER: | | | |
| OFFICER OR OTHER MANAGEMENT POSITION HELD BY INVESTOR/SUBSCRIBER: | | | |
| TYPE OF OWNERSHIP: | PUBLICLY TRADED | |
| | PRIVATELY HELD | |
| | PARTNERSHIP | |
| | SOLE PROP. | |
| HAS THE ENTITY DEFAULTED WITH ANY FINANCIAL INSTITUTION? | ( ) YES | ( ) NO |

| IF YES, HAS THE DEFAULT STATUS BEEN RESOLVED? | ( ) YES | ( ) NO |
|---|---|---|
| MAIN BANKER OF ENTITY, NAME AND ADDRESS: | | |
| HAS THE ENTITY BEEN AUDITED? | ( ) YES | ( ) NO |
| IF YES, NAME OF AUDIT FIRM AND ADDRESS: | | |
| HAS THE INVESTOR DEFAULTED WITH ANY BANK/FINANCIAL INSTITUTION? | ( ) YES | ( ) NO |
| IF YES, HAS THE DEFAULT STATUS BEEN RESOLVED? | ( ) YES | ( ) NO |

5.  DUE DILIGENCE VERIFICATION AND INFORMATION?

| IS THE SUBSCRIBER OR ENTITY UNDER ANY SANCTION OR EMBARGO LIMITATION - WHETHER INTERNATIONALLY OR IN ANY APPLICABLE JURISDICTION? IF YES, PLEASE PROVIDE DETAILS IN A SEPARATE PAGE SUBMITTED WITH THIS AGREEMENT. | ( ) YES | | ( ) NO |
|---|---|---|---|
| SOURCE OF INVESTMENT FUNDS: (ATTACH ADDITIONAL PAGES IF NECESSARY) | PERSONAL | | |
| | FAMILY | | |
| | BUSINESS | | |
| | THIRD PARTY | | |
| IF FAMILY OR THIRD PARTY – PLEASE SET OUT THE NAME AND CONTACT INFORMATION FOR EACH POTENTIALLY BENEFICIARY OWNER OF ANY FUNDS TRANSFERRED TO COMPANY. | | | |
| DOES THE INVESTOR OR ANY IMMEDIATE FAMILY MEMBER HAVE ANY POLITICAL PARTY LINK. IF YES, PLEASE PROVIDE DETAILS IN A SEPARATE PAGE SUBMITTED WITH THIS AGREEMENT. | ( ) YES | | ( ) NO |
| IS INVESTOR SUBJECT TO ANY PENDING CRIMINAL INVESTIGATION, INDICTMENT, CHARGE/PROCEEDING? IF YES, PLEASE PROVIDE DETAILS IN A SEPARATE PAGE SUBMITTED WITH THIS INVESTOR QUESTIONNAIRE. | ( ) YES | | ( ) NO |
| DOES THE INVESTOR OR ANY ENTITY IDENTIFIED HAVE ANY DIRECT OR INDIRECT BUSINESS OR OTHER LINK TO ANY GAMBLING, DRUG, OR MONEY LAUNDERING ACTIVITY, OR ANY OTHER IMPERMISSIBLE CONFLICT WITH LAWS GERMANE TO THE FUNDS TRANSFERRED UNDER THIS OFFERING OR OTHERWISE. | ( ) YES | | ( ) NO |

6.  HAVE YOU RELIED UPON THE ADVICE OF OTHERS WHEN EVALUATING THE MERITS AND RISK OF THIS INVESTMENT?

( ) Yes　　　　　( ) No

**Note:** You should answer the above in the affirmative only if you have presented this investment to others who in turn have analyzed the investment in depth on your behalf and who, in making such an analysis, were familiar with and took into consideration your financial position and investment objectives, whether or not such third party is properly registered under applicable Laws to serve in such financial advice or investment advice capacity. Do not answer the above in the affirmative if you have merely described the investment to others in broad generalities and sought their advice more on a social (as opposed to a professional) basis.

**Note:** You acknowledge and certify if you answer the above in the negative that the Company and any affiliated individual has not provided you with any sort of financial or investment advice or service; noting that no one at the Company is allowed to do so under its Compliance Program and as consistent with the fact that no such individual is registered or allowed to so provide investment or financial advice under applicable Laws.

7.  IF YOUR ANSWER TO QUESTION 4 IS "YES," PLEASE IDENTIFY SUCH ENGAGED PURCHASER REPRESENTATIVE.

| NAME: |
| --- |

8.  HAVE ALL QUESTIONS THAT YOU OR YOUR PURCHASER REPRESENTATIVE(S) HAVE REGARDING ALL RISKS BEEN ANSWERED TO YOUR FULL SATISFACTION?

( ) Yes　　　　　( ) No

| IF NOT, PLEASE SET FORTH HERE ANY SUCH QUESTION: |
| --- |
|  |

9.  HAVE ALL QUESTIONS THAT YOU OR YOUR PURCHASER REPRESENTATIVE(S), IF ANY, MAY HAVE CONCERNING THE PROPOSED INVESTMENT BEEN ANSWERED TO YOUR FULL SATISFACTION?

( ) Yes　　　　　( ) No

| IF NOT, PLEASE SET FORTH BELOW ANY SUCH QUESTION |
| --- |
|  |

10. IF YOU SHOULD CHOOSE TO INVEST UNDER THIS OFFERING, IS IT YOUR OPINION THAT YOUR PRESENT FINANCIAL POSITION IS, AND IS EXPECTED TO CONTINUE TO BE, SUCH AS TO ENABLE YOU:

| TO BEAR THE ECONOMIC RISK OF LOSING ALL OF THE INVESTMENT? | ( ) YES ( ) NO |
| --- | --- |
| TO BEAR THE ECONOMIC BURDEN OF HAVING ALL SUCH FUNDS CONFINED TO AN ESSENTIALLY ILLIQUID INVESTMENT FOR A PERIOD OF | ( ) YES ( ) NO |

Case 2:22-cv-00612-JCM-EJY Document 50-1 Filed 03/21/22 Page 157 of 182 Page ID #:157

OVER THREE MONTHS AND SUBJECT TO THE UP TO 30 DAY TIME PERIOD SUBSEQUENT ANY EXERCISE OF THE RIGHT OF REDEMPTION OF THE INVESTMENT PRINCIPAL?

11. I CERTIFY THAT I AM ACQUIRING THE PARTIAL BENEFICIAL INTEREST AS A PRINCIPAL, FOR INVESTMENT, AND NOT WITH A VIEW TO RESALE OR DISTRIBUTION AND THAT ALL REPRESENTATIONS MADE BY ME IN THIS INVESTOR QUESTIONNAIRE AND THE SUBSCRIPTION AGREEMENT ARE TRUE, ACCURATE, AND CORRECT IN ALL RESPECTS AND MAY BE FULLY RELIED UPON BY THE COMPANY. I HAVE NOT ACTED AS A FINDER, AND IF I MAY BE DEEMED TO BE A FINDER AT ANY TIME BY ANYONE, I NONETHELESS CERTIFY HEREBY THAT I HAVE PROVIDED NO INVESTMENT OR FINANCIAL ADVISE TO ANYONE AT ANY TIME AND HAVE NOT VIOLATED ANY SECURITIES OR INVESTMENT LAWS OR REGULATIONS, WHETHER STATE OR FEDERAL.

12. I CERTIFY THAT I HAVE NEVER ACTED DIRECTLY OR INDIRECTLY AS A FINANCIAL OR INVESTMENT ADVISOR GERMANE TO ANY THIRD PARTY AT ANY TIME AND WILL NOT DO SO IN THE FUTURE UNLESS I AM LEGALLY ALLOWED TO DO SO UNDER ALL APPLICABLE LAWS AND REGULATIONS. I FURTHER CERTIFY THAT ANY INVESTMENT I MAKE IN BENEFICIAL INTERESTS OR FUNDS THAT I TRANSFER GERMANE TO THIS OFFERING ARE SOURCED SOLELY AS CONSISTENT WITH MY REPRESENTATIONS AND WARRANTIES UNDER THIS INVESTOR QUESTIONNAIRE, SUBSCRIPTION AGREEMENT AND OTHERWISE, AND WHETHER AS RELEVANT TO MY CERTIFIED STATUS AS AN ACCREDITED INVESTOR OR OTHERWISE, MY CERTIFICATIONS REMAIN TRUE AND ACCURATE THAT ANY SOURCE OF INVESTMENT FUNDS FOR BENEFICIAL INTERESTS ARE COMPLIANT WITH ALL OF MY REPRESENTATIONS AND WARRANTIES MADE HEREIN AND ALL OF WHICH ARE CONSISTENT WITH THE SUBSCRIPTION AGREEMENT AND THE COMPANY'S CODE OF ETHICS AND BUSINESS CONDUCT. I WARRANT TO COMPANY THAT ANY FUNDS OR AMOUNTS THAT I TRANSFER TO COMPANY FOR INVESTMENT IN BENEFICIAL INTERESTS SHALL BE CONSISTENT WITH ALL, WITHOUT LIMITATION, ACCREDITED INVESTOR STATUS AND ANTI-MONEY LAUNDERING WARRANTIES AND CERTIFICATIONS THAT I MAKE IN THIS OR ANY OTHER DOCUMENT. I WARRANT THAT ANY FUNDS, HOWEVER OR FROM WHEREVER SOURCED, THAT I TRANSFER TO THE COMPANY SHALL ONLY BE SOURCED AND ORIGINATE FROM, AND AS CONSISTENT WITH MY STATUS AS, AN ACCREDITED INVESTOR AND THAT DIRECTLY OR INDIRECTLY, HOWEVER SOURCED, THE ACCREDITED INVESTOR IS IN COMPLIANCE WITH ALL ANTI MONEY LAUNDERING STANDARDS, WARRANTIES AND CERTIFICATIONS SET OUT AS A CONDITION OF THIS OFFERING, AND FURTHER ALL OF WHICH I WILL TRANSPARENTLY DISCLOSE TO THE COMPANY IF ANY ACTION BY ME, OR FACT OR CIRCUMSTANCE, DEVIATES FROM THE PRECEDING STANDARDS.

13. I UNDERSTAND AND AGREE THAT THE PARTIAL BENEFICIAL INTERESTS OR ANY INVESTMENT OPPORTUNITY AVAILABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR UNDER ANY APPLICABLE STATE SECURITIES LAWS AND THAT THE COMPANY HAS NOT MADE ANY COMMITMENT TO REGISTER SAME UNDER ANY CONDITIONS OR TO FILE REPORTS WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER FEDERAL OR STATE GOVERNMENT AGENCY OR TO MAKE ANY OTHER ACTION WHICH WILL ENABLE ME TO TRANSFER ANY PARTIAL BENEFICIAL INTEREST UNDER THE OFFERING.

14. I UNDERSTAND THAT THE CAUSES OF ACTION OR LIABILITY CIRCUMSTANCES IMPLICATED OR RELEVANT TO ANY INSURANCE SETTLEMENT AGREEMENT INTEREST THAT IS PURCHASED BY COMPANY THROUGH A PURCHASE CONTRACT, DO NOT INVOLVE ANY PENDING LAWSUIT OR OTHER COURT PROCEEDING. SUCH CONTROVERSY IS NOT BEING PROSECUTED OR DEFENDED IN ANY COURT PROCEEDING WITH THE CONTROVERSY BEING SETTLED THROUGH THE INSURANCE SETTLEMENT AGREEMENT THAT IS BEING PURCHASED.

15. I AGREE TO HOLD THE PARTIAL BENEFICIAL INTEREST FOR AT LEAST THREE MONTHS AND FOR A PERIOD OF AT MOST 90 DAYS SUBSEQUENT MY EXERCISE OF ANY RIGHT OF REDEMPTION AS CONSISTENT WITH MY SUBSCRIPTION AGREEMENT AND THE TERMS OF THE COMPANY

OPERATING AGREEMENT.

16. I HEREBY CERTIFY THAT I HAVE FULLY REVIEWED THE COMPANY OPERATING AGREEMENT AND ANY AMENDMENTS OR SUPPLEMENTS THERETO (THE "COMPANY OPERATING AGREEMENT") AND I ACCEPT AND ADOPT ALL TERMS AND PROVISIONS OF THE COMPANY OPERATING AGREEMENT. SPECIFICALLY, I UNDERSTAND THAT (A) THE TRANSFER OR REDEMPTION OF THE INVESTMENT PRINCIPAL GERMANE TO THE PARTIAL BENEFICIAL INTERESTS IS RESTRICTED BY THE TERMS OF THIS OFFERING AND PURSUANT TO THE DISCRETION GRANTED TO THE COMPANY PURSUANT ITS OPERATING AGREEMENT.

17. I UNDERSTAND AND RECOGNIZE THAT INVESTMENT IN THE COMPANY INVOLVES SIGNIFICANT FINANCIAL AND LEGAL RISKS AND I HAVE TAKEN FULL COGNIZANCE OF AND UNDERSTAND ALL OF THE RISK FACTORS RELATED TO THE ACQUISITION OF THE PARTIAL BENEFICIAL INTERESTS AND RELATIONSHIP TO THE COMPANY.

18. I (AND MY FINANCIAL, TAX, INVESTMENT, AND LEGAL ADVISORS) HAVE BEEN GIVEN SUFFICIENT OPPORTUNITY TO INSPECT ALL DOCUMENTS, BOOKS AND RECORDS OF THE COMPANY (INCLUDING WITHOUT LIMITATION, ANY UNAUDITED FINANCIAL STATEMENTS OF THE COMPANY, IF ANY) TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE FACTS AND LAWS AND EXPECTATIONS DISCLOSED AND DESCRIBED IN THIS OFFERING AND THE COMPANY OPERATING AGREEMENT, THE PRIVATE PLACEMENT MEMORANDUM, AND THE SUBSCRIPTION AGREEMENT.

19. I CERTIFY THAT COMPANY AND ITS REPRESENTATIVES HAVE NOT DENIED ME ANY ACCESS TO ANY DOCUMENT OR OTHER INFORMATION THAT I HAVE REQUESTED BEFORE SIGNING THIS DOCUMENT OR ANY OTHER DOCUMENT ANY OF WHICH MAY BE RELEVANT TO MY INVESTMENT UNDER THIS OFFERING.

20. I CERTIFY THAT I HAVE ALSO BEEN GIVEN THE OPPORTUNITY TO ASK QUESTIONS OF THE COMPANY'S REPRESENTATIVES CONCERNING ANY AND ALL ASPECTS OF COMPANY OPERATIONS, AS WELL AS THE TERMS AND CONDITIONS GERMANE TO THE PARTIAL BENEFICIAL INTERESTS.

21. I CERTIFY THAT NO DISCREPANCY EXISTS BETWEEN ANY ORAL REPRESENTATION BY ANY COMPANY REPRESENTATIVE AND THE INFORMATION PROVIDED IN THE COMPANY OPERATING AGREEMENT, THE PRIVATE PLACEMENT MEMORANDUM, OR THE SUBSCRIPTION AGREEMENT.

22. I CERTIFY THE FACT THAT I HAVE BEEN ADVISED TO CONSULT WITH MY OWN TAX, INVESTMENT, AND FINANCIAL COUNSEL AND ATTORNEY IF I SO CHOOSE PRIOR TO ENTERING THE SUBSCRIPTION AGREEMENT AND EXECUTING THIS QUESTIONNAIRE, AND THAT I WAS AFFORDED SUFFICIENT TIME TO UNDERTAKE AND DID SO CONSULT WITH MY TAX, INVESTMENT, AND FINANCIAL COUNSELOR AND ATTORNEY.

23. I CERTIFY THAT I WILL ABIDE BY ALL RELEVANT FEDERAL AND STATE LAWS REQUIREMENTS AND ALL SUBSCRIBER'S REPRESENTATIONS, WARRANTIES AND COVENANTS IN THE SUBSCRIPTION AGREEMENT AND THIS INVESTOR QUESTIONNAIRE.

24. I CERTIFY THAT I AM NOT AWARE AND HAVE NO DIRECT OR INDIRECT KNOWLEDGE THAT ANY FUNDS TRANSFERRED TO COMPANY UNDER THIS OFFERING ARE SUBJECT TO, AMONG OTHERS, FORFEITURE OR ARE SOURCED IN ANY WAY INCONSTENT WITH MY WARRANTIES, REPRESENTATIONS AND CERTIFICATIONS THAT I MAKE HEREIN. NO LOCAL, STATE OR FEDERAL GOVERNMENT AGENCY, COURT OR ANY OTHER SUBDIVISION OR BRANCH HAS LAID CLAIM TO ANY PART OF ANY FUNDS TRANSFERRED TO COMPANY UNDER THIS OFFERING. NO LOCAL, STATE OR FEDERAL GOVERNMENT AGENCY, COURT OR ANY OTHER SUBDIVISION OR BRANCH MAY LAY A CLAIM TO ANY PART OF ANY FUNDS TRANSFERRED TO COMPANY UNDER THIS OFFERING AS BEING VIOLATIVE OF ANY ANTI MONEY LAUNDERING NATIONAL OR INTERNATIONAL LAWS OR REGULATIONS OR STANDARDS, OR DIRECTIVE OR OTHERWISE.

25. I CERTIFY MY UNDERSTANDING THAT UNDER THE COMPANY'S COMPLIANCE PROGRAM, I MAY OR WILL BE SUBJECT TO VARIOUS DUE DILIGENCE MATTERS AND INQUIRIES AS TO THE SOURCE OF THE FUNDS I TRANSFER TO THE COMPANY UNDER THIS OFFERING AND THAT SAME IS

CONSISTENT WITH ALL NATIONAL AND INTERNATIONAL LAWS REGARDING MONEY LAUNDERING AND ANY ATTENDANT RESTRICTION GERMANE TO SAME.

26. PLEASE ANSWER THE FOLLOWING QUESTIONS (AND IF YOU ARE AN ENTITY, PLEASE INDICATE THE NAME OF THE RELEVANT OWNER OR BENEFICIARY OF THE ENTITY AND RESPOND WITH RESPECT TO SUCH OWNER OR BENEFICIARY):

| | | | |
|---|---|---|---|
| IF YOU ARE AN ENTITY, DO YOU AGREE TO DESIGNATE THE UNDERSIGNED AS THE INVESTOR REPRESENTATIVE AS GERMANE TO TERMS AND CONDITIONS OF THE COMPANY OPERATING AGREEMENT AND AS SIGNATORY FOR THE SUBSCRIBER IN THE SUBSCRIPTION AGREEMENT? | ( ) YES | ( ) NO | ( ) N/A |
| IF YOU ARE AN ENTITY, DO ALL OWNERS, INVESTORS, SHAREHOLDERS OR ANY PERSON OR ENTITY HOLDING AN INTEREST IN THE SUBSCRIBER AGREE TO DESIGNATE THE UNDERSIGNED AS THE INVESTOR REPRESENTATIVE AS GERMANE TO THE TERMS AND CONDITIONS OF THE COMPANY OPERATING AGREEMENT AND AS THE SIGNATORY FOR THE SUBSCRIBER? | ( ) YES | ( ) NO | ( ) N/A |

27. IF YOU OWN AN INTEREST OR ARE ENGAGED IN A BUSINESS OR OTHER ACTIVITY THAT COMPETES WITH THE PARTIAL BENEFICIAL INTERESTS, OR THE COMPANY OR ITS BUSINESS OR OPERATIONS, PLEASE DESCRIBE SUCH INTEREST/BUSINESS OR ACTIVITY:

28. I CERTIFY THAT AN INVESTMENT IN THE COMPANY WILL NOT CONSTITUTE A VIOLATION OF ANY AGREEMENT TO WHICH I AM A PARTY (E.G., PARTNERSHIP, SUBSCRIPTION AGREEMENT, NON-COMPETITION AGREEMENT, ETC.).

( ) Yes          ( ) No

This Statement is made effective as of the ___ day of _____ ___, 202__

[Subscriber/Potential Investor]

_____

By: _____

Name: _____

Title: _____

THE PROSPECTIVE INVESTOR REPRESENTS, CERTIFIES AND WARRANTS TO THE COMPANY THAT THE INFORMATION CONTAINED IN THIS INVESTOR QUESTIONNAIRE IS ACCURATE, TRUE AND COMPLETE, AND UNDERSTANDS THAT THE COMPANY HAS NOT MADE AND WILL NOT MAKE AN OFFER OF ANY PARTIAL BENEFICIAL INTERESTS TO THE SUBSCRIBER UNTIL IT HAS RECEIVED AND REVIEWED THIS INVESTOR QUESTIONNAIRE, AND ONLY THEN IF THE COMPANY DETERMINES THAT

SUCH AN OFFER MAY BE MADE WITHOUT VIOLATING ANY FEDERAL OR STATE SECURITIES LAWS OR ANY ANTI MONEY LAUNDERING LAWS OR ANY OTHER LAWS.

[IF A PURCHASER REPRESENTATIVE WAS NOT USED IN CONNECTION WITH THIS SUBSCRIPTION, THEN INSERT "N/A". IF A PURCHASER REPRESENTATIVE WAS USED IN CONNECTION WITH THIS SUBSCRIPTION, THEN A "PURCHASER REPRESENTATIVE QUESTIONNAIRE" WILL BE PROVIDED TO THE SUBSCRIBER FOR COMPLETION BY THE PURCHASER REPRESENTATIVE.]

**J AND J PURCHASING, LLC**

**ACKNOWLEDGMENT OF USE OF PURCHASER REPRESENTATIVE**

**(IF APPLICABLE)**

I ACKNOWLEDGE THAT _____ HAS SERVED AS MY PURCHASER REPRESENTATIVE(S), IN CONNECTION WITH EVALUATING THE MERITS AND RISKS OF MY PROSPECTIVE INVESTMENT IN THIS OFFERING FOR THE **PARTIAL BENEFICIAL INTERESTS**. I REPRESENT TO YOU THAT IN MY OPINION HE HAS (OR THEY HAVE) SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS SUCH THAT HE IS (OR THEY ARE) CAPABLE OF EVALUATING THE MERITS AND RISKS OF THAT PROSPECTIVE INVESTMENT AND THAT HE HAS (OR THEY HAVE) REPRESENTED TO ME IN WRITING AS FOLLOWS:

1. HE IS (OR THEY ARE) NOT AN AFFILIATE (AS DEFINED IN RULE 405 UNDER THE SECURITIES ACT OF 1933, AS AMENDED), DIRECTOR, OFFICER, OR OTHER EMPLOYEE OF THE COMPANY OR ANY OF ITS AFFILIATES OR A BENEFICIAL OWNER OF 10 PERCENT OR MORE OF THE EQUITY INTEREST IN THE COMPANY;

2. EXCEPT FOR THE FOLLOWING RELATIONSHIPS WHICH HAVE PREVIOUSLY BEEN DISCLOSED BY HIM (THEM) IN WRITING TO ME, NEITHER HE (THEY) NOR HIS (THEIR) AFFILIATES HAVE ANY MATERIAL RELATIONSHIP WITH THE COMPANY OR ANY OF ITS AFFILIATES, NO SUCH MATERIAL RELATIONSHIP HAS EXISTED AT ANY TIME DURING THE PREVIOUS TWO YEARS AND NO SUCH MATERIAL RELATIONSHIP IS MUTUALLY UNDERSTOOD TO BE CONTEMPLATED. (ANY COMPENSATION RECEIVED AS A RESULT OF SUCH RELATIONSHIP(S) SHOULD ALSO BE PROVIDED BELOW):

I REQUEST THAT COPIES OF ALL MATERIAL DISTRIBUTED TO ME IN CONNECTION WITH THE TRANSACTION BE SENT TO MY PURCHASER REPRESENTATIVE(S).

DATED: _____ __, 202__.


SIGNATURE:

I hereby attest and certify on 6/6/22 that the foregoing document is a full, true and correct copy of the original on file in my legal custody,

PRINTED NAME:_____

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA

By _____ Deputy Clerk

Exhibit 1, Page 161

# EXHIBIT 2

TRACY S. COMBS (California Bar No. 298664)
Email: combst@sec.gov
CASEY R. FRONK (Illinois Bar No. 6296535)
Email: fronkc@sec.gov
SECURITIES AND EXCHANGE COMMISSION
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel: (801) 524-5796
Fax: (801) 524-3558

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>MATTHEW WADE BEASLEY; BEASLEY LAW GROUP PC; JEFFREY J. JUDD; CHRISTOPHER R. HUMPHRIES; J&J CONSULTING SERVICES, INC., an Alaska Corporation; J&J CONSULTING SERVICE, INC., a Nevada Corporation; J AND J PURCHASING LLC; SHANE M. JAGER; JASON M. JONGEWARD; DENNY SEYBERT; and ROLAND TANNER;<br><br>Defendants;<br><br>THE JUDD IRREVOCABLE TRUST; PAJ CONSULTING INC; BJ HOLDINGS LLC; STIRLING CONSULTING, L.L.C.; CJ INVESTMENTS, LLC; JL2 INVESTMENTS, LLC; ROCKING HORSE PROPERTIES, LLC; TRIPLE THREAT BASKETBALL, LLC; ACAC LLC; ANTHONY MICHAEL ALBERTO, JR.; and MONTY CREW LLC;<br><br>Relief Defendants. | Case No.: 2:22-cv-00612<br><br>Judge: James C. Mahan<br>Magistrate Judge: Elayna J. Youchah<br><br><br>**ORDER APPOINTING RECEIVER** |

1

**WHEREAS** this matter has come before this Court upon motion of the Plaintiff U.S. Securities and Exchange Commission ("SEC", "Commission" or "Plaintiff") to appoint a receiver in the above-captioned action and for related relief;

**WHEREAS** the Court has found based on the evidence presented and record in this case that the Commission has made a proper *prima facie* showing that Defendants directly and indirectly engaged in violations of the federal securities laws as alleged in the Complaint, and thus, the equity jurisdiction of this Court has been properly invoked and the Court possesses the power and authority to fashion appropriate remedies and relief;

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Defendants and those assets of certain Relief Defendants that: (a) are attributable to funds derived from investors or clients of the Defendants; (b) are held in constructive trust for the Defendants; (c) were fraudulently transferred by the Defendants; and/or (d) may otherwise be includable as assets of the estates of the Defendants;

**WHEREAS** this Court has subject matter jurisdiction over this action and personal jurisdiction over the Defendants and Relief Defendants, has jurisdiction to determine the applicability of the automatic stay to this action, and venue properly lies in this district; and

**WHEREAS**, the Court finds that the Commission has brought this action to enforce the federal securities laws, in furtherance of the Commission's police and regulatory powers, and the relief sought by the Commission and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct, penalizing past unlawful conduct and deterring future wrongdoing, and is not in furtherance of a pecuniary purpose, and therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to Section 362(b)(4) of the Bankruptcy Code, 11 U.S.C. §362(b)(4).

//

//

//

//

Exhibit 2, Page 164

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the following Defendants and/or Relief Defendants: J&J Consulting Services, Inc., an Alaska corporation; J&J Consulting Services, Inc., a Nevada corporation; J and J Purchasing LLC; The Judd Irrevocable Trust; and BJ Holdings LLC (collectively, the "J&J Receivership Defendants").

2.     Subject to further order of the Court, the Court shall not take exclusive jurisdiction and possession of the assets of Defendant Beasley Law Group PC, except for the Wells Fargo Interest On Lawyers' Trust Account ("IOLTA") No. XXXXXX5598 in the name of Beasley Law Group PC (the "Beasley IOLTA").

3.     This Court hereby takes exclusive jurisdiction and possession of the personal assets, of whatever kind and wherever situated, of the following Defendants:  Matthew Wade Beasley; Jeffrey J. Judd; Christopher R. Humphries; Shane M. Jager; Jason M. Jongeward; Denny Seybert; and Roland Tanner  (collectively, the "Individual Receivership Defendants", and together with the J&J Receivership Defendants and the Beasley IOLTA, the "Receivership Defendants").

4.     Until further Order of this Court, **GEOFF WINKLER** of **AMERICAN FIDUCIARY SERVICES LLC** (the "Receiver") is hereby appointed to serve without bond as receiver for the estates of the J&J Receivership Defendants, the assets of the Beasley IOLTA, and the assets of the Individual Receivership Defendants (collectively, the "Receivership Estate").  In addition to and independent of his appointment as Receiver, pursuant to the Court's equitable powers and inherent authority, the Court further appoints **GEOFF WINKLER** as the sole and exclusive officer, director and managing member of each of the J&J Receivership Defendants.

//

//

//

3

# I. **GENERAL POWERS AND DUTIES OF RECEIVER**

5.     The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the J&J Receivership Defendants under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Federal Rule of Civil Procedure 66.

6.     The trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys and other agents of the J&J Receivership Defendants shall have no authority with respect to the J&J Receivership Defendants' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver.  The Receiver shall assume control of the J&J Receivership Defendants' assets and any affiliated entities owned or controlled by the J&J Receivership Defendants and shall pursue and preserve all of their claims.

7.     Subject to the specific provisions in Sections III through XIV, below, the Receiver shall have the following general powers and duties:

      A.     To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly (collectively, "Receivership Property");

      B.     To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Defendants; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

Exhibit 2, Page 166

C. To manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Property, pending further Order of this Court;

D. To use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E. To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees and agents of the Receivership Defendants;

F. To engage and employ persons in his discretion, subject to approval of the Court, to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

G. To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H. To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure, without further Court order;

I. To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J. To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and,

K. To take such other action as may be approved by this Court.

5

Exhibit 2, Page 167

## II. **ACCESS TO INFORMATION**

8.      The Individual Receivership Defendants and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants and employees of the J&J Receivership Defendants, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts and all other instruments and papers.

9.      Within fourteen (14) days of the entry of this Order, the Individual Receivership Defendants shall file with the Court and serve upon the Receiver and the Commission a sworn statement, listing: (a) the identity, location and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants and any other agents or contractors of the Receivership Defendants; and, (c) the names, addresses and amounts of claims of all known creditors of the Receivership Defendants.

10.      Within thirty (30) days of the entry of this Order, the Individual Receivership Defendants shall file with the Court and serve upon the Receiver and the Commission a sworn statement and accounting, with complete documentation, covering the period from January 1, 2016 to the present:

A.      Of all Receivership Property, wherever located, held by or in the name of the Receivership Defendants, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry and other assets, stating the location of each; and/or (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect

beneficial interest, including the account statements from each bank, brokerage or other financial institution, and/or law or professional firm holding a retainer;

B.    Identifying every account at every bank, brokerage or other financial institution: (a) over which Receivership Defendants have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Defendants;

C.    Identifying all credit, bank, charge, debit or other deferred payment card issued to or used by each Receivership Defendant or for which such Receivership Defendant may be liable, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

D.    Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

E.    Of all funds received by the Receivership Defendants, and each of them, in any way related, directly or indirectly, to the conduct alleged in the Commission's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

F.    Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity; and

G.    Of all transfers of assets made by any of them.

11.    Within thirty (30) days of the entry of this Order, the Receivership Defendants shall provide to the Receiver and the Commission copies of the Receivership Defendants' federal income tax returns for January 1, 2016 to the present with all relevant and necessary underlying documentation.

Exhibit 2, Page 169

12.     The Individual Receivership Defendants and the J&J Receivership Defendants' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Defendants, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Defendants. In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons or entities, the Receiver shall make its discovery requests in accordance with the Federal Rules of Civil Procedure.

13.     The Receiver may issue subpoenas to compel testimony of persons or production of records, consistent with the Federal Rules of Civil Procedure and applicable Local Rules, except for the provisions of Federal Rule of Civil Procedure 26(d)(1), concerning any subject matter within the powers and duties granted by this Order, without further order of the Court.

14.     The Receivership Defendants are required to assist the Receiver in fulfilling his duties and obligations. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

### III.  ACCESS TO BOOKS, RECORDS AND ACCOUNTS

15.     The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records and all other documents or instruments relating to the J&J Receivership Defendants. The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records and all other documents or instruments for the Individual Receivership Defendants upon application to the Court. All persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

16.     The Receivership Defendants, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Defendants, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having

possession of the property, business, books, records, accounts or assets of the Receivership Defendants are hereby directed to deliver the same to the Receiver, his agents and/or employees.

17. All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, and of the Receivership Defendants that receive actual notice of this Order by personal service, facsimile transmission or otherwise shall:

A. Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver;

B. Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C. Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D. Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

## IV. ACCESS TO REAL AND PERSONAL PROPERTY

18. The Receiver is authorized to take immediate control of all personal property of the Receivership Defendants, including jewelry, artwork, and other valuables.

19. The Receiver is authorized to take immediate control of all real property of the Receivership Defendants, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of

the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or, (c) destroying, concealing or erasing anything on such premises.

20.     In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to any premises used by the J&J Receivership Defendants. The Receiver shall have exclusive control of the keys. The J&J Receivership Defendants, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

21.     The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the J&J Receivership Defendants, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

22.     Upon the request of the Receiver and direction of the Court, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody and control of, or identify the location of, any assets, records or other materials belonging to the Receivership Estate.

## V. <u>NOTICE TO THIRD PARTIES</u>

23.     The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers and general and limited partners of the Receivership Defendants, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

24.     All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

25.     In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that he

deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

26. The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations or activities of any of the J&J Receivership Defendants (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the J&J Receivership Defendants. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The J&J Receivership Defendants shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mail box, depository, business or service, or mail courier or delivery service, hired, rented or used by the J&J Receivership Defendants. The J&J Receivership Defendants shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository or courier service.

27. Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage or trash removal services to the Receivership Defendants shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

28. The Receiver is authorized to assert, prosecute and/or negotiate any claim under any insurance policy held by or issued on behalf of the Receivership Defendants, or their officers, directors, agents, employees or trustees, and to take any and all appropriate steps in connection with such policies.

//

//

//

11

Exhibit 2, Page 173

## VI. <u>INJUNCTION AGAINST INTERFERENCE WITH RECEIVER</u>

29.     The Receivership Defendants and all persons receiving notice of this Order by personal service, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A.     Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B.     Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

C.     Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property, enforcing judgments, assessments or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property; or,

D.     Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate.

30.     The Receivership Defendants shall cooperate with and assist the Receiver in the performance of his duties.

Exhibit 2, Page 174

31.     The Receiver shall promptly notify the Court and Commission counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## VII. STAY OF LITIGATION

32.     As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the Commission related to the above-captioned enforcement action, are stayed until further Order of this Court:  All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings (except as provided in Paragraphs 47—48), arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

33.     The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

34.     All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court.   Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

//

//

//

# VIII. MANAGING ASSETS

35.     For each of the Receivership Estate, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

36.     The Receiver's deposit account shall be entitled "Receiver's Account, Estate of SEC v. Beasley, et al. Receivership Defendants" together with the name of the action.

37.     The Receiver may, without further Order of this Court, incur expenses in the ordinary course of business, except for professional fees, in an amount not to exceed $25,000, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate.

38.     Upon appropriate order of the Court, subject to Paragraph 40, immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real or personal property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real or personal property.

39.     Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estate.  The Receiver shall take all legal steps necessary to obtain authority to obtain control over real or personal property including making any necessary filings in the counties where such properties are located.

40.     The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estate, including making legally required payments to creditors, employees, and agents of the Receivership Estate and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate, subject to Paragraph 38.

41.     If appropriate, the Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the

meaning of Section 468B of the Internal Revenue Code and of the regulations, when applicable, whether proposed, temporary or final, or pronouncements thereunder, including the filing of the elections and statements contemplated by those provisions. The Receiver shall be designated the administrator of the Settlement Fund, pursuant to Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2, including but not limited to (a) obtaining a taxpayer identification number, (b) timely filing applicable federal, state, and local tax returns and paying taxes reported thereon, and (c) satisfying any information, reporting or withholding requirements imposed on distributions from the Settlement Fund. The Receiver shall cause the Settlement Fund to pay taxes in a manner consistent with treatment of the Settlement Fund as a "Qualified Settlement Fund." The Receivership Defendants shall cooperate with the Receiver in fulfilling the Settlement Funds' obligations under Treas. Reg. § 1.468B-2.

## IX. INVESTIGATE AND PROSECUTE CLAIMS

42. Subject to the requirement, in Section VII above, that leave of this Court is required to resume or commence certain litigation, the Receiver is authorized, empowered and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may in his discretion, and in consultation with Commission counsel, be advisable or proper to recover and/or conserve Receivership Property.

43. Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered and directed to investigate the manner in which the financial and business affairs of the Receivership Defendants were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to

Exhibit 2, Page 177

enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the Commission before commencing investigations and/or actions.

44.     The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all J&J Receivership Defendants.

45.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## X. BANKRUPTCY MATTERS

46.     Effective immediately, the Receiver, as sole and exclusive officer, director and managing member, of Defendant J & J Consulting Services, Inc. (a Nevada corporation) and J and J Purchasing LLC (together, "the J&J Debtors") shall possess sole and exclusive authority and control over the J&J Debtors, as debtors-in-possession, in their respective Chapter 11 cases (the "Bankruptcy Cases") pending in the U.S. Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"). The employment of any and all other officers, directors, managers or other employees of either of the J&J Debtors (including Peter Kravitz, as Chief Restructuring Officer) is and are hereby terminated by the Court. All such persons shall comply with the applicable provisions of this Order.

47.     Within thirty (30) days of the entry of this Order, the Receiver shall report to this Court as to whether the Bankruptcy Cases should continue in Chapter 11, or be converted to Chapter 7, dismissed or suspended during the course of the receivership. The Receiver shall file the appropriate pleadings with the Court and the Bankruptcy Court effectuating this Order.

48.     The Receiver may seek authorization of this Court to file petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for other Receivership Defendants. If a J&J Receivership Defendant is placed in Chapter 11 bankruptcy proceedings, the Receiver, pursuant to the powers provided herein, shall become, and shall be empowered to operate each of the J&J Receivership Defendants as a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 4 above, the Receiver

16

is vested with management authority for all J&J Receivership Defendants and may therefore file and manage a Chapter 11 petition.

49.     All persons and entities, other than the Receiver, are barred from commencing any bankruptcy proceedings against any of the Receivership Defendants.

## XI.  LIABILITY OF RECEIVER

50.     Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

51.     The Receiver and his agents, acting within scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree.  In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

52.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

53.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor.  The Receiver shall then follow such instructions as the Court may provide.

## XII.  RECOMMENDATIONS AND REPORTS

54.     The Receiver is authorized, empowered and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

55.     Within ninety (90) days of the entry date of this Order, the Receiver shall file a preliminary plan for the liquidation of assets in the above-captioned action, with service copies to counsel of record.  This time may be altered based on appropriate motion to the Court.

Exhibit 2, Page 179

56.     Within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estate.

57.     The Quarterly Status Report shall contain the following:

A.      A summary of the operations of the Receiver;

B.      The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.      A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.      A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.      A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.      A list of all known creditors with their addresses and the amounts of their claims;

G.      The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.      The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

58.     On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting

Exhibit 2, Page 180

requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's mission.

## XIII. FEES, EXPENSES AND ACCOUNTINGS

59.     Subject to Paragraphs 61—67 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

60.     Subject to Paragraph 62 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

61.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estate as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver. Such compensation shall require the prior approval of the Court.

62.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estate (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

63.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership. At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

64.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. The total amounts

Exhibit 2, Page 181

held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

65.     Each Quarterly Fee Application shall:

A.      Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

B.      Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

66.     At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED**.

Date: June 3, 2022 _____

_Xxxx C. Mahan_
JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE

Presented by:
Tracy S. Combs
Casey R. Fronk
Attorneys for Plaintiff
Securities and Exchange Commission

I hereby attest and certify on 6/6/22 that the foregoing document is a full, true and correct copy of the original on file in my legal custody.

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA

By _____ Deputy Clerk

